# Exhibit A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

JANE DOE

BOARD OF SUP...
COUNTY OF LOS ANGELES
FILED
2024 SEP -9 P

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

Electronically FILED by
Superior Court of California,
County of Los Angeles
5/29/2024 4:27 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Kim, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse
111 N. Hill Street
Los Angeles, CA 90012

**CASE NUMBER:**
*(Número del Caso):*
24STCV13350

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Vincent Miller, Law Offices, 16255 Ventura Boulevard, Suite 625, Encino CA 91436 213-948-5702

**DATE:** 05/29/2024
*(Fecha)*

David W. Slayton, Executive Officer/Clerk of Court
Clerk, by D. Kim , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☑ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: County of Los Angeles, a municipal entity
   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☑ by personal delivery on *(date)*: 9/9/24

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

VINCENT MILLER (SBN 291973)
NICK SAGE (SBN 298972)
The Law Offices of Vincent Miller
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Telephone: (213) 948-5702
Attorney for Plaintiff JANE DOE

FILED
Superior Court of California
County of Los Angeles
08/30/2024
David W. Slayton, Executive Officer / Clerk of Court
By: _____ N. Osollo _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALFORNIA

## CENTRAL DISTRICT

JANE DOE,

    Plaintiff,

v.

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive,

    Defendant.

) CASE NO: 24STCV13350
)
)
)
) **PLAINTIFF'S FIRST AMENDED**
) **COMPLAINT FOR:**
)   1. **DEPRIVATION OF CIVIL RIGHTS**
)      **UNDER 42 U.S.C. § 1983;**
)   2. **NEGLIGENCE (VICARIOUS)**
)
) **Jury Trial Demanded**
)
)
)
)

Plaintiff JANE DOE ("Plaintiff" or "Jane Doe") by and through her undersigned attorneys, hereby prays to this honorable Court for relief and remedy based on the following:

### SUMMARY OF ALLEGATIONS

1. At all times mentioned herein, Defendant, County of Los Angeles (hereinafter, "Los Angeles County" "Defendant County"), a government agency, is in Los Angeles County, California.

First Amended Complaint   JANE DOE V. LOS ANGELES COUNTY, et al.           Page 1

The Los Angeles County Sheriff's Department ("LASD") is a branch of Los Angeles County.

2. Plaintiff is an individual residing in Los Angeles County, California. Her real name is withheld for her safety, on the advice of informant sergeants working for LASD. The sergeants are concerned that Jane Doe could be further harmed by a member or members of the deputy gang, the Rattlesnakes. Jane Doe has vacated her residence, as she is in hiding from LASD deputies. Jane Doe's life is in danger, and up to the filing of this First Amended Complaint she continues to be stalked by LASD deputies.

3. The Sheriff's Department has a pattern and practice of allowing and encouraging the use of excessive force by deputy gang members against County residents, as LASD does not hold deputies accountable for such wrongful conduct. Jane Doe is a victim of the Rattlesnakes gang. The failure of the County to reign in deputy gangs endangered and continues to endanger the life of Jane Doe.

4. Defendant Aaron Tanner ("Tanner") is the self-proclaimed "shot caller" of the Rattlesnakes "gang" at LASD's Lancaster station. The term "shot caller" is adopted by deputy gangs from the term "shot caller" used to describe the leaders of inmate gangs.

5. Tanner was terminated by LASD this year. LASD's Internal Criminal Investigation Bureau ("ICIB") investigated Tanner for his abuse and violence of Jane Doe. Recently, ICIB concluded its investigation and referred Tanner to the County's District Attorney ("DA"). The DA has not yet indicted Tanner for his conduct towards the Plaintiff. However, ICOB investigators expect prosecution.

6. Defendant Tanner repeatedly committed violence against the Plaintiff, choking, strangling her unconscious multiple times. Tanner threatened the Plaintiff with his gang, which has controlled the Lancaster sheriff's station. Rattlesnakes have helped stalk and intimidate the Plaintiff to silence her into not reporting their crimes. Tanner continues to stalk the Plaintiff up through the filing of this amended complaint. Jane Doe's life has been repeatedly put in danger by Rattlesnakes and it remains in danger.

7. Lancaster LASD deputies also recently failed to come to a call where Jane Doe was reported to be under violent attack. On or about August 17, 2024, Jane Doe and her daughter were approached by a man at supermarket. The man yelled and cussed at Jane Doe and her daughter and ran after them to assault them and pushed Jane Doe. Residents intervened and chased the suspect. Residents called the Lancaster station to report the incident. Deputies never arrived.

8. Jane Doe filed a claim with the County of Los Angeles, regarding the extremely troubling allegations contained in this lawsuit. The County improperly rejected the claim, wrongly stating that Jane Doe needed to reveal her identity to the County even though County policy says otherwise. The County demanded this information even though revealing Jane Does's name at that time would have further endangered her life.

9. In 2019, County leaders, including the Board of Supervisors, the Inspector General Max Huntsman, the Civilian Oversight Commission, and other leaders admitted that the County of Los Angeles had been plagued by deputy subgroups and gangs for 50 years, and that the County did not do reform or any type of genuine intervention to curb the harms to residents and employees caused by these deputy gangs.

10. There has been a hotbed of deputy subgroup and gang activity in the Antelope Valley, at LASD's Palmdale and Lancaster Stations. The Antelope Valley stations have long been known for virulent racism towards African Americans. The Cowboys are also notorious for an incident where several members of the gang held another deputy down so a Cowboy could shoot a hole in the victim deputy's leg to shoot off an "unauthorized" tattoo. LASD only gave a day ten suspension to the shooter deputy and covered up the circumstances around the shooting. The shooter was then promoted by the County to sergeant.

11. Tanner is a member and leader of the Rattlesnakes. Most members of the Rattlesnakes, like most members of deputy gangs, claim that their tattoos are simply about hard work and camaraderie, and that their group is not a gang. Defendant Tanner has made no such claims about the Rattlesnakes. Tanner has openly referred to the Rattlesnakes as his "gang."

12. If the County had truly done reform in 2019 and ended the pattern and practice of deputy gangs depriving citizens of their civil rights, harm would not have come to Jane Doe.

13. The Plaintiff exhausted all administrative remedies. As noted above, the Plaintiff filed a Tort Claim for Damages with the County on February 27, 2024. The Plaintiff filed the claim under the name of Jane Doe to protect her safety. She also omitted Tanner's name to further protect her safety. However, the County did no investigation of the claim and sent an improper rejection of the claim to Plaintiff's counsel. Plaintiff did file a supplement to the claim to ensure the County could not misstate whether she adequately exhausted administrative remedies.

14. Up until she met Tanner, Jane Doe was a well-adjusted resident of the County, enjoying her life. As a result of the conduct of Tanner and other Rattlesnakes, and the violence committed against her, and the ongoing threats, she has been emotionally destroyed and according to psychiatrists and psychologists suffers from an extreme form of PTSD.

15. Jane Doe began dating Tanner in 2020. Tanner informed the Plaintiff that he was the shot caller of what he called his "gang," the Rattlesnakes. Tanner explained to the Plaintiff that he and his gang controlled the Lancaster station, through intimidation including the use of tactics such as withholding back up on other deputies' patrol calls to endanger their lives. Tanner told Plaintiff of other illegal conduct by Rattlesnakes members, including false arrests and writing false police reports to frame residents.

16. Tanner bragged to Jane Doe about how he and other deputies caused the death of a resident. Tanner told Plaintiff that he and other Rattlesnakes intentionally allowed a resident to die a tortured death when they could have easily pulled him to safety. In 2018, a body of a resident was found trapped in a pillar at a Winco supermarket in Lancaster. The body was that of a suspect that Tanner and other deputies had chased in pursuit near the Winco. Tanner explained to Jane Doe that he and other deputies knew the suspect had fallen into the pillar and was trapped. However, the deputies left him in there to die, and made false reports that they lost track of the suspect in the pursuit. When they found the body (of Raymundo Rivera), a witness stated that, I saw some gooey liquid… it was oozing out of the pillar onto

the pavement. It smelled like death." A Lt. John Corina told the media that it's "one of those strange cases." It would not have been "strange" if the resident had been pulled to safety by the deputies.

17. Tanner repeatedly committed violence against Jane Doe, and told her if she told anyone, his gang would "take care of her." Jane Doe subsequently feared for her life and still fears for her life.

18. On several occasions, from 2021 to late in 2022, Tanner strangled Jane Doe unconscious, telling her that he needed to do that to maintain "dominance" over her. Tanner would put both of his hands around Jane Doe's neck and choke her until she lost consciousness.

19. The Defendant violated its own internal procedures by using unreasonable force. Section 3-10/030.00 – Unreasonable Force: Department members shall use only that force which is objectively reasonable. Unreasonable force is that force that is unnecessary or excessive given the totality of the circumstances presented to Department members at the time the force is applied. Department members shall use only that force which is objectively reasonable. Unreasonable force is prohibited. The use of unreasonable force will subject Department members to discipline and/or prosecution. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of *Graham v. Connor*, 490 U.S. 386 (1989).

20. Choking a resident unconscious to maintain dominance is an unreasonable use of force.

21. Due to her fear of retaliation by the Rattlesnakes, Plaintiff intended to never report Tanner. Jane Doe saw how powerful Tanner and the Rattlesnakes were, and how they controlled the Lancaster Station, when Tanner told her to follow behind his car with her car. Tanner drove at a high speed, then suddenly slammed on his brakes to intentionally cause Jane Doe to crash her car into his car. Jane Doe jumped out of her car, panicked. A bystander asked if she needed help, and the Plaintiff yelled to her, "Yes, he's psycho! Please help!" The witness proceeded to call 911. However, the shot caller, Tanner, called dispatch and told dispatch to call off the 911 into himself. The dispatcher dutifully complied with the Rattlesnakes request,


and called off the 911, knowing that Tanner has been reported for the violent act and was a danger, with no concern for the life of Jane Doe.

22. Jane Doe finally broke off her relationship with the shot caller in fall 2022. However, Tanner and his gang stalked her (showing up at her place of employment), terrorizing and intimidating her, until up through the filing of this amended complaint.

23. While Jane Doe had done her best to stay away from Tanner, she continued to not report Tanner and the Rattlesnakes out of fear for her safety.

24. However, in 2023, she was contacted by LASD's Internal Affairs Bureau ("IAB"), about its investigation into Tanner and a deputy who was stopped for a DUI by Tanner. Jane Doe was a witness to the incident while Tanner had her ride in his patrol car as an unauthorized ride-along. Soon after IAB interviewed Jane Doe, LASD executives asked the Lancaster Station to do an inquiry into Tanner.

25. Sergeants and deputies came to Jane Doe's home to interview her about Tanner. The lead sergeant in the inquiry brought with her a member of the Rattlesnakes, Sgt. Clayton Marion (since promoted to lieutenant). Jane Doe told the sergeant that Marion was an associate of Tanner, and she was not comfortable about speaking in front of him, as he was clearly there to intimidate her and report what she said to Tanner. The handling sergeant was hostile and insisted she speak in front of the Rattlesnake. Plaintiff refused and the handling sergeant would later lie about the incident.

26. In 2023, LASD's Internal Criminal Investigation Bureau ("ICIB") opened an investigation into Tanner. Soon after, in September 2023, deputies from LASD began doing surveillance on Jane Doe's home, and the gas tank of her car was tampered with, in an apparent effort to cause her to crash her car.

27. ICIB investigators went to Lancaster Station to question deputies about Tanner. Two deputies confirmed for the investigators that Tanner had been using the tactic of withholding back up on other deputies, to put their lives in danger. The deputies were asked if they had reported the withholding of back up to anyone, and the deputies confirmed they had done so, to the station captain. However, when they reported the withholding of back up, the captain

quickly moved to cover up the deputy gang activity at the station, telling the deputies to never tell him about this again and to "get the fuck out of my office!"

28. ICIB investigators wrapped up their investigation into Tanner and the Rattlesnakes and referred the matter to the DA. The investigators are confident the DA will indict Tanner for the violence committed against Jane Doe and the use of his gang to intimidate the witness.

29. While ICIB is not doing a comprehensive investigation into the Rattlesnakes, to the credit of the investigators, this appears to be the first serious investigation of any kind by the County into deputy gangs in LASD. There were also three IAB investigations being done into Tanner. One of the investigations is into Tanner for sawing off the leg of a dead horse with a pocket-knife, while making a trainee hold the leg. Tanner has been terminated. This does not provide any comfort for the Plaintiff who continues to be terrified. Up through the filing of this complaint, Tanner continues to stalk her, parking his car next to hers at the supermarket and coming into her gym. Under the circumstances, Plaintiff reasonably fears that deputies from LASD will murder her.

30. Jane Doe suffers from an extreme form of PTSD, severe trauma, severe distress, recurring intense nightmares, and depression. The plaintiff's whole life and mental state was upended by the Defendants' attacks on her. The Defendants have completely destabilized plaintiff's mental health.

31. Tanner and LASD violated Plaintiff's constitutional rights. The County is also liable for negligence, allowing the Rattlesnakes to terrorize and endanger the Plaintiff with no consequences.

32. Plaintiff is informed and believes and thereupon alleges that Defendant DOES 1-100, are liable for wrongful conduct, and each of them, whether individual, corporate, associate or otherwise, are still unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. Plaintiffs will further amend her complaint to show the Doe Defendants true names and capacities, together with appropriate charging language, when such information has been ascertained. Plaintiff will file DOE amendments, and/or ask leave

of court to amend this Complaint to assert the true names and capacities of these Defendants when they have been ascertained.

33. Plaintiff is informed and believe, and upon, such information and belief allege, that each Defendant designated as a DOE was and is in some manner, negligently, wrongfully, or otherwise responsible and liable to Plaintiff for the injuries and damages hereinafter alleged and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

34. Plaintiff is further informed and believes, and thereupon alleges, that at all times relevant hereto, Defendants, and each of them, acted in concert and in furtherance of the interests of each other Defendant.

35. At all relevant times, Defendants or their predecessors in office have acted or failed to act, as alleged herein, under the color of state law.

## FIRST CAUSE OF ACTION
## (FOR DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C.§1983 AGAINST THE DEFENDANT COUNTY OF LOS ANGELES, DEFENDANT AARON TANNER, AND DOE DEFENDANTS 1-100)

36. Plaintiff repeats and re-alleges as though fully set forth herein each and every allegation contained in paragraphs 1-35 of this complaint.

37. Under section 1983 of the United States Code, the County and individual Defendants are liable for subjecting the Plaintiff to conduct that occurred under color of state law, and this conduct deprived Jane Doe of her rights, privileges, or immunities guaranteed under the 4th, 5th, and 14th Amendments of the Constitution of the United States of America.

38. According to 42 U.S.C. § 1983, Civil action for deprivation of rights: every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

39. Defendant and its employee/agents, sheriff's deputies, were and are informed that Plaintiff was and is a vulnerable citizen, a female being subjected to repeated domestic violence, strangled unconscious multiple times by the shot caller of a deputy gang. The Rattlesnakes gang was used by the Defendants to scare Jane Doe into silence, and not report the violence against her.

40. The County has had a 50-year practice and pattern of allowing the formation of deputy gangs, gang activity, and excessive force against residents with no accountability by the residents.

41. The deputies' actions deprived Jane Doe of her constitutional rights under the 4th and 14th amendment by assaulting her, and falsely imprisoning, choking her unconscious on several occasions. The Defendants made the Plaintiff fear for her life as they terrorized her. Plaintiff reasonably fears the deputies will stalk her, come to her home, and kill her.

42. Some of the County's own sergeants in ICIB found that Tanner is guilty of violence and witness intimidation by his gang and expect him to be prosecuted.

43. At all times mentioned herein each of the individual Los Angeles County sheriffs' deputies, were working as employees, and acting as agents and servants of the Defendant and Doe Defendants. The sheriff deputies were acting under the color of law at all times.

44. The Defendant County is liable for violating its own policies and establishing a custom and practice of engaging in excessive force, and deputy gang activity. The County has stood idly by as LASD has maintained a custom of allowing the existence of deputy gangs and a deputy gang culture that permeates LASD and encourages the use of excessive force against residents.

45. The Ninth Circuit has held that in some cases the plaintiff is entitled to have the jury instructed that evidence of governmental inaction - specifically, failure to investigate and discipline employees in the face of widespread constitutional violations – can support an inference that an unconstitutional custom or practice has been unofficially adopted. (Hunter

First Amended Complaint  JANE DOE V. LOS ANGELES COUNTY, et al.  Page 9

v. County of Sacramento (9th Cir. 2011) 652 F.3d 1225, 1234, fn. 8.) "The [entity] may not be held liable for acts of [employees] unless 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or if the constitutional deprivation was 'visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.' " (Redman v. County of San Diego (9th Cir. 1991) 942 F.2d 1435, 1443-1444. ) • "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (Bd. of the County Comm'rs v. Brown (1997) 520 U.S. 397, 404 [117 S.Ct. 1382, 137 L.Ed.2d 626].) • "The custom or policy must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " (Castro v. County of Los Angeles (9th Cir. 2016) 833 F.3d 1060, 1075 (en banc).) "While a rule or regulation promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirement, a 'policy' within the meaning of § 1983 is not limited to official legislative action. Indeed, a decision properly made by a local governmental entity's authorized decisionmaker - i.e., an official who 'possesses final authority to establish [local government] policy with respect to the [challenged] action' - may constitute official policy. 'Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority, and of course whether an official had final policymaking authority is a question of state law.' " (Thompson v. City of Los Angeles (9th Cir. 1989) 885 F.2d 1439, 1443.) • "[A] plaintiff can show a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies." (Castro, supra, 833 F.3d at p. 1075 fn. 10.) "Appellants need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice." (Nehad v. Browder (9th Cir. 2019) 929 F.3d 1125, 1141.)

"As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." (Jett v. Dallas Independent School Dist. (1989) 491 U.S. 701, 737 [109 S.Ct. 2702, 105 L.Ed.2d 598].) • "[I]t is settled that whether an official is a policymaker for a county is dependent on an analysis of state law, not fact." (Pitts v. County of Kern (1998) 17 Cal.4th 340, 352 [70 Cal.Rptr.2d 823, 949 P.2d 920].) • "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." (Jett, supra, 491 U.S. at p. 737.) Gibson v. County of Washoe [(9th Cir. 2002) 290 F.3d 1175, 1186] discussed two types of policies: those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so, and those that result, through omission, in municipal responsibility 'for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.' We have referred to these two types of policies as policies of action and inaction." (Tsao v. Desert Palace, Inc. (9th Cir. 2012) 698 F.3d 1128, 1143.) • "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, 'that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right[,]' and that the policy caused the violation, 'in the sense that the [municipality] could have prevented the violation with an appropriate policy.' " (Tsao, supra, 698 F.3d at p.1143). • "To show deliberate indifference, [plaintiff] must demonstrate 'that [defendant] was on actual or constructive notice that its omission would likely result in a constitutional violation.' " (Tsao,

supra, 698 F.3d at p. 1145.) • "[P]laintiff may prove . . . deliberate indifference, through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.' Thus, it is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." (Rodriguez v. County of Los Angeles (9th Cir. 2018) 891 F.3d 776, 803). "Discussing liability of a municipality under the federal Civil Rights Act based on 'custom,' the California Court of Appeal for the Fifth Appellate District recently noted, 'If the plaintiff seeks to show he was injured by governmental "custom," he must show that the governmental entity's "custom" was "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." ' " (Bach v. County of Butte (1983) 147 Cal.App.3d 554, 569, fn.11 [195 Cal.Rptr. 268].) The federal courts have recognized that local elected officials and appointed department heads can make official policy or create official custom sufficient to impose liability under section 1983 on their governmental employers." (Bach, supra, 147 Cal.App.3d at p. 570.)

46. The Defendants engaged in unreasonable search and seizure. The unprovoked and unjustified attacks and on Plaintiff deprived Jane Doe of her right to be secure in her person against unreasonable searches and seizures as guaranteed under the 4th Amendment of the United States Constitution and incorporated and made applicable to states and municipalities by the Due Process Clause of the 14th Amendment to the constitution. Plaintiff posed absolutely no danger to the Defendants whose decision to use excessive force against Plaintiff to harm her for being female and intimidate was objectively unreasonable.

47. The Defendant County's LASD has a long history of a practice of encouraging, accommodating, and ratifying the use of excessive force by deputy gang members against the residents of the County of Los Angeles. The Defendant County has municipal liability for unconstitutional customs, practices, and policies, and for failing to properly train and supervise its employees. The County did not adequately train and supervise the Defendant deputies to prevent the use of excessive force against Plaintiff and other residents. The County employs and retains deputies that it knows violate the constitutional rights of County

residents including through deputy gang membership and the use of excessive force. The County fails to discipline these deputies for their wrongful acts and by not holding them accountable encourages them to continue to engage in excessive force and other wrongful conduct against residents. The customs and practices of unconstitutional policing is directly connected to the assault and battery committed by Defendant Tanner here.

48. Defendants Tanner and other Rattlesnakes, including DOEs 1 through 100, inclusive, acted specifically with the intent to deprive the Plaintiff of the following rights under the United States Constitution:
   a. Freedom from unreasonable searches and unreasonable seizures, in the form of the use of excessive force by Deputy Sheriffs,
   b. Freedom from a deprivation of liberty without due process of law; and
   c. Freedom from summary punishment.

49. Said Defendants subjected Plaintiff to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard of her rights under the U.S. Constitution.

50. The County is liable for the Defendant deputies' conduct as the County ratified said conduct, by failing to hold the deputies to account for use of excessive force and other wrongful conduct. The County and LASD knew of their employees' ongoing unconstitutional conduct. Deputy gang members have a history of engaging in excessive force and Tanner's attack on Plaintiff was predictable.

51. The deputy's actions deprived Jane Doe of her constitutional rights under the 14th amendment. Plaintiff had a right to be free from state actions that would deprive her of liberty. The Defendants were deliberately indifferent to the constitutional rights of Jane Doe and their unprovoked attacks on her, cruelly harming her simply because she is female, shocks the conscience. The Defendants made and make the Plaintiff fear for her life as they, unprovoked, attacked her. Plaintiff still fears the deputies will come to her home and kill her.

52. Jane Doe has suffered and suffers from extreme mental and emotional damage, PTSD, and severe distress as a result of wrongful treatment by the Defendants whom mentally, emotionally, and physically abused the Plaintiff.

## SECOND CAUSE OF ACTION
## NEGLIGENCE AGAINST DEFENDANT COUNTY, DOE DEFENDANTS 1-100

53. Plaintiff repeats and re-alleges as though fully set forth herein each and every allegation contained in paragraphs 1-52 of this Complaint.

54. Pursuant to section 815.2 of the California Government Code, given that the employee Deputy Defendants, Defendant Tanner and the Doe Defendants, were acting within the course and scope of their employment, the Defendant County is liable under respondeat superior.

55. The Defendants breached their duty of care to Plaintiff as they violently attacked her, strangled her unconscious on several occasions, and stalked and terrorized her, harming her severely. While all the Deputy Defendants are alleged to have engaged in intentionally wrongful conduct, they also made substantial errors in how they handled the incidents with the Plaintiff.

56. Plaintiff was injured as a proximate and direct cause of the Defendants' breach of care.

57. The Defendant County was also negligent in its training and supervision practices, as it has maintained a practice and culture where deputies are not held accountable for deputy gang activity, and use of excessive force, and do not receive sufficient training and supervision to protect the constitutional rights of residents, including Plaintiff. Here, Plaintiff was physically, emotionally, and mentally harmed due to the violation of those rights.

58. The Defendant County knew or should have reasonably known that deputy gang members such as Tanner would harm Plaintiff through the use of excessive force.

59. The Defendant County breached its duty of care, when it did no intervention and failed to do reform and end deputy gang membership. Several County leaders have been admitting for several years that deputy gangs create a dangerous condition for residents. However, the

County never fixed the problem, simply giving lip service to doing reform and protecting residents and employees.

60. As a direct, foreseeable and proximate cause of Defendant County's negligence and the resulting acts, Plaintiff suffered severe mental damage and PTSD, unending nightmares, constant fear for her life, mental anguish and physical pain and continues to suffer humiliation, embarrassment, anxiety, and severe emotional distress. Plaintiff was required to and did employ and will in the future employ physicians and health care providers to examine, treat and care for her, and did, and will in the future, incur medical expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against the Defendant as follows:

1. For special damages, including but not limited to, lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at the time of trial, all in an amount set forth above and/or according to proof at the time of trial;
2. For further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial;
3. For general damages, including from severe emotional distress, in an amount set forth above and/or according to proof at the time of trial, but in a minimum of $5 million;
4. For interest: Pre-Judgment and Post-Judgment at the maximum legal rate;
5. For costs of suit;
6. For attorney's fees, pursuant to 42 U.S.C section 1988 and state statutes;
7. That Plaintiff be awarded such further legal and equitable relief as the Court deems proper.

Dated this August 30, 2024

THE LAW OFFICES OF VINCENT MILLER

*Vincent Miller*

---

VINCENT MILLER,

Attorney for Plaintiff Jane Doe

REQUEST FOR JURY TRIAL

Dated this August 30, 2024

THE LAW OFFICES OF VINCENT MILLER

*Vincent Miller*

---

VINCENT MILLER,

Attorney for Plaintiff Jane Doe

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>05/29/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: D. Williams, Deputy |
| NOTICE OF CASE ASSIGNMENT<br>UNLIMITED CIVIL CASE | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>24STCV13350 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| ✔ | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✔ | Barbara A. Meiers | 12 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    David W. Slayton, Executive Officer / Clerk of Court

on 05/29/2024                                                                                   By D. Williams                              , Deputy Clerk
    (Date)

LACIV 190 (Rev 6/18)           **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

LACIV 190 (Rev 6/18)   **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06