Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
Blessing O. Ekpezu, State Bar No. 332308
E-Mail: bekpezu@hurrellcantrall.com
HURRELL CANTRALL LLP
800 West 6th Street, Suite 700
Los Angeles, CA 90017-2710
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendant, COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE DOE,

       Plaintiff,

     v.

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive,

       Defendants.

Case No. 2:24-cv-08649-SPG(SKx)

**DEFENDANT COUNTY OF LOS ANGELES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

Filed concurrently with:
1. Joint Appendix of Facts;
2. Joint Appendix of Evidence;
3. Joint Appendix of Objections;
4. Plaintiff's Request for Judicial Notice;
5. Defendant's Opposition to Plaintiff's Request for Judicial Notice;
6. Proposed Order; and
7. Proposed Judgment.

**Hearing Date: November 12, 2025**
**Time:       1:30 p.m.**
**Venue:     Courtroom 5C**

[Assigned to Hon. Sherilyn Peace Garnett, Courtroom "5C"]

---

[1] Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all signatories listed on this document, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 12, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard in the courtroom 5C, at the United States District Court, First Street Courthouse, Defendant County of Los Angeles ("County") will and hereby does move this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56.

This Motion is made on the grounds that there is no genuine dispute of material fact and the County is entitled to judgment as a matter of law on all claims asserted in Plaintiff JANE DOE ("Plaintiff") operative First Amended Complaint ("FAC"):

1. Regarding the first cause of action - Section 1983 Deprivation of Constitutional Rights, the claim fails because: (a) the undisputed facts show that Deputy Tanner did not act under color of law; (b) there is no underlying constitutional violation; (c) Plaintiff cannot establish municipal liability under *Monell* because there is no County policy, custom, or deliberate indifference that caused the alleged injuries; and (d) the claim is time-barred as to all conduct that occurred before May 29, 2022.

2. Regarding the second cause of action – Negligence, the claim fails because: (a) California Government Code § 815.2 provides no basis for liability where the employee acts outside the scope of employment; (b) Plaintiff's government claims were untimely under Government Code § 911.2; and (c) Plaintiff cannot establish duty, breach, or causation as required by California law.

3. Regarding the entirety of the action, Plaintiff's use of a pseudonym is improper and therefore the FAC should be dismissed or she should be ordered to state her true name.

This Motion is based upon this Notice, the accompanying Memorandum of

Points and Authorities, the Joint Appendix of Facts, the Joint Appendix of Evidence including the accompanying Declarations and Exhibits, the Joint Appendix of Objections, filed concurrently herewith, the pleadings and records on file, and any argument presented at the hearing.

Pursuant to Federal Rule of Civil Procedure 56 and this Court's Standing Order re MSJ, all parties met and conferred on September 8, 2025 to discuss the grounds for this Motion. Despite good-faith efforts, the parties were unable to resolve the issues presented.

DATED:  October  17, 2025          HURRELL CANTRALL LLP


By:        /s/ Blessing O. Ekpezu
          THOMAS C. HURRELL
          BLESSING O. EKPEZU
          Attorneys for Defendant, COUNTY OF
          LOS ANGELES

DATED:  October 17, 2025          LAW OFFICES OF VINCENT MILLER


By:        /s/ Vincent Miller
          VINCENT MILLER
          JAMES JIRN
          Attorneys for PLAINTIFF, JANE DOE

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

**TABLE OF CONTENTS**

**Page**

I.    MEMORANDUM OF POINTS AND AUTHORITIES ................................. 1

II.    INTRODUCTION ....................................................................... 1

    A.    The County's Introduction ..................................................... 1

    B.    Plaintiff's Introduction ........................................................ 1

III.    STATEMENTS OF UNDISPUTED FACTS ....................................... 3

    A.    The County's Statement of Facts .............................................. 3

    B.    Plaintiff's Statement of Facts ................................................. 8

IV.    PROCEDURAL POSTURE .......................................................... 11

V.    LEGAL STANDARD ................................................................. 12

VI.    ANALYSIS ............................................................................. 13

    A.    The County's Argument 1: ..................................................... 13

        a.    Tanner Did Not Act Under Color of State Law ...................... 13

        b.    Plaintiff's Response: Tanner Acted Under the Color of State Law ................................................................. 15

    B.    The County's Argument 2: ..................................................... 20

        a.    Plaintiff's *Monell* Theory Against The County Fails as a Matter of Law ................................................................. 20

            (1)    No Underlying Constitutional Violation ........................ 21

            (2)    No policy, Custom or Deliberate Indifference ................ 21

            (3)    No Action By a Final Policymaker ............................. 22

            (4)    No "Moving Force" Causation .................................. 22

        b.    Plaintiff's Response ........................................................ 22

            (1)    Underlying Constitutional Violation ........................... 22

    C.    The County's Argument 3 ...................................................... 27

        a.    The County Cannot Be Held Vicariously Liable for Tanner's Alleged Conduct ............................................... 27

        b.    Plaintiff's Response ........................................................ 31

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

i

D.    The County's Argument 4 ...................................................31

  a.    Plaintiff's Negligence Claim Fails as a Matter of Law .............31

    (1)    No Statutory Basis for the Claim ...................................31

    (2)    No Duty to Protect Against Private Violence .................31

    (3)    No Breach of a County Obligation.................................32

    (4)    No Causation ...............................................................32

  b.    Plaintiff's Response...........................................................33

E.    The County's Argument 5 ...................................................33

  a.    Plaintiff's Claims Are Time–Barred and Her Government Claim Was Untimely ...................................................33

    (1)    The § 1983 Claim Is Statute Barred................................33

    (2)    The State-Law Negligence Claim Is Untimely ................34

  b.    Plaintiff's Response...........................................................35

F.    The County's Argument 6 ...................................................36

  a.    Plaintiff's Use of a Pseudonym Is Improper and Provides an Additional Basis for Dismissal ...................................................36

  b.    Plaintiff's Response...........................................................36

VII.    CONCLUSION ....................................................................37

A.    The County's Conclusion ...................................................37

B.    Plaintiff's Conclusion .......................................................37

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 139 (1981)............28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ..................12, 13, 17, 22

*Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)..................26

*Barna v. City of Perth Amboy*, 42 F.3d 809, 815–18 (3d Cir. 1994) ........................14

*Bird v. Dep't of Human Servs.*, 935 F.3d 738, 747 (9th Cir. 2019) ....................33, 35

*Bonsignore v. City of New York*, 683 F.2d 635, 639–40 (2d Cir. 1982) ...................14

*Bull v. City & Cnty. Of San Francisco*, 595 F.3d 964 (9th Cir. 2010).....................23

*Canatella v. Van De Kamp*, 486 F.3d 1128, 1132 (9th Cir. 2007).........................33

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).............................................12

*City of Canton v. Harris*, 489 U.S. 378, 385–92 (1989) .....................................21, 26

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) .......................................24

*City of Stockton v. Superior Court (2007)* ...............................................................34

*Comm'rs v. Brown*, 520 U.S. 397, 403–05 (1997)....................................................21

*Connick v. Thompson*, 563 U.S. 51, 61 (2011)..........................................................23

*Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ......................................................passim

*de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 251, 255 (2007)............32

*Doe 1 v. City of Murrieta*, 102 Cal. App. 4th 899, 907–09 (2002)....................30, 31

*Doe v. Kamehameha Schools*, 596 F.3d 1036, 1042 (9th Cir. 2010)................passim

*Does I thru XXIII v. Advanced Textile Corp* ...........................................................36

*Farmers Ins. Grp. v. Cnty. of Santa Clara*, 11 Cal. 4th 992, 1004–06 (1995..........28

*Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021).................................24

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)........................23

*Gutowsky v. County of Placer* ..................................................................................35

iii

*Hechavarria v. City & County of San Francisco* ........................................................ 14

*Hess v. Garcia*, 72 F.4th 753, 757 (7th Cir. 2023) .................................................... 17

*Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998) .......... 13, 14

*Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011 ................... 23

*Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) ........................................................................................................ 24

*K.G. v. County of Riverside*, 106 Cal.App.4th 1374 (2003) ................................ 30, 31

*Ladd v. County of San Mateo*, 12 Cal.4th 913, 917 (1996) ....................................... 31

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 301–02 (1995) .......................................................................................................... 28, 30, 31

*Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal.3d 780, 785 (1985) .............................. 31

*M.P. v. City of Sacramento*, 177 Cal.App.4th 121 (2009) ............................... 28, 30, 31

*Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 213 (1991) ........................ 28, 29, 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ........ 12

*Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978) ............... passim

*Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1111 (2004) ......................... 32

*Naffe v. Frey*, 789 F.3d 1030, 1037–38 (9th Cir. 2015) ........................................... 13

*Ohio v. Harris*, 489 U.S. 378, 391 (1989) ............................................................... 26

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ........................................... 21

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ........................................... 33

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986) ................................. 21

*Pete v. Olsen*, No. CV-09-54-EFS, 2010 WL 996408, at *3 (E.D. Wash. Mar. 15, 2010) ........................................................................................................ 13

*Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994) ........................................... 14

*Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) ........................................................................................................ 26

*Screws v. United States*, 325 U.S. 91, 111 (1945) .................................................... 13

*See Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) ............... 23

*State v. Superior Court (Bodde)*, 32 Cal.4th 1234, 1239–40 (2004) .................. passim

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

iv

*Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014) ................................................................................................35

*Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989) ............23, 31

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ......................................................22

*Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996) ...........................13

*Wallace v. Kato*, 549 U.S. 384, 388 (2007).................................................................33

*West v. Atkins*, 487 U.S. 42, 49 (1988)..................................................................1, 13

*Zelig v. County of Los Angeles*, 27 Cal.4th 1112, 1128–29 (2002)...........................31

## OTHER AUTHORITIES

§ 1983 claim.........................................................................................................35

42 U.S.C. § 1983...........................................................................................12, 37

*Cal. Code Civ*. Proc. § 335 .................................................................................33

*Cal. Gov. Code* § 815.2(a). .................................................................................31

*Cal. Gov. Code* § 815.2(a.) .................................................................................27

*Gov. Code* § 910 .................................................................................................34

U.S.C. §§ 1331 and 1441 .....................................................................................12

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

v

I.  **MEMORANDUM OF POINTS AND AUTHORITIES**

II.  **INTRODUCTION**

    A.    **The County's Introduction**

This action stems from a private love affair, not official law enforcement activity. Plaintiff, Jane Doe ("Plaintiff") alleges that former Los Angeles County Sheriff's Deputy Aaron Tanner ("Tanner") abused her during their relationship and now seeks to pin Tanner's alleged private misconduct on the County of Los Angeles ("County") under 42 U.S.C. § 1983 and state-law negligence. The undisputed record tells a different story.

Every alleged incident occurred in purely personal settings—inside the parties' shared apartment at night, in private cars, bars or hotels—often while Tanner was off-duty or merely home on a lunch break. There is no evidence that Tanner used or even invoked police authority during any of these incidents, and Plaintiff waited months after the breakup to make her first report to the County.

These facts are fatal to her claims. Without state action, there can be no § 1983 liability. Without an underlying constitutional violation, there can be no *Monell* claim against the County. And there is no evidence of any County policy, custom, training failure, or policymaker decision caused Plaintiff's alleged injuries.

Her state-law negligence claim fares no better. California requires a statutory basis and a timely government claim, yet Plaintiff's claim is untimely and *Government Code* § 815.2 cannot supply liability because Tanner's alleged acts were outside the scope of his employment.

Because the record shows nothing more than alleged private violence in a private relationship, the County is entitled to summary judgment on every claim asserted in the operative First Amended Complaint.

    B.    **Plaintiff's Introduction**

The Defendant's position that all matters are here are of a private love affair and in personal settings totally misses the mark. The Plaintiff participated in

1

LASD's "Ride Along Program" over 30 times. During several of those department Ride Alongs, Deputy Tanner violently assaulted the Plaintiff. Patrol Deputies are forbidden by LASD policy from taking lunch breaks while they are on duty and subsequently there is no such thing as a lunch break during a patrol deputies shift. If the deputy and participant eat lunch during a Ride Along, they are still on the Ride Along. If the deputy assaults a Ride Along Participant such as Plaintiff, he and the County are not excused from liability, if he has started to have intimate relations with the Ride Along Participant.

Defendant County of Los Angeles allowed Tanner, a self-proclaimed shot caller (leader) of the deputy gang called the Rattlesnakes, to repeatedly assault Plaintiff while on duty and in uniform and thus under the color of state law when he took Plaintiff under his tutelage as a participant in LASD "Ride-Alongs." The County has made party admissions as to the existence of a longstanding practice of encouraging deputy gangs and turning a blind eye to the violence and intimidation, including against Plaintiff. In 2013, the U.S. Department of Justice ("DOJ") found that LASD engaged in the practice of allowing Tanner's deputy gang, in particular, of violating the constitutional rights of residents. In March 2023 (subsequent to all the violent acts against Plaintiff), the County's Civilian Oversight Commission and all of its five supervisors on the Board of Supervisors made the admissions for the County that LASD practices enabled deputy gangs, including the Rattlesnakes, to violate residents' constitutional rights.

Contrary to Defendant's mischaracterization, the assaults inflicted upon Plaintiff were not merely "private misconduct" in pursuit of Tanner's "personal interests, unrelated to his law enforcement duties"—stemming from "a private love affair." The violence against Plaintiff was committed during an official LASD program intended, among other things, to educate participants and allow them an opportunity to experience the day-to-day matters confronted by on-duty deputies. Tanner's misuse of power, possessed by virtue of state law and possible only

2

because the wrongdoer is clothed with the authority of state law, was only possible during the Ride-Alongs because Plaintiff was expected to stay by Tanner's side during his entire shift, regardless of whether he and Plaintiff were in the patrol car, on foot at a call, working side-by-side at the station, or on lunch break (often at Plaintiff's apartment). Under these circumstances, the County cannot hide behind the pretense that Tanner's conduct was not official law enforcement but purely personal.

And when, after intentionally causing Plaintiff to violently crash into his vehicle, prompting a bystander to call 911 on Plaintiff's behalf out of concern for Plaintiff's life, Tanner invoked his law enforcement status to instruct the 911 request to be canceled by another deputy, such conduct undeniably was taken under the color of state law in violation of Plaintiff's civil rights. The County's attempt to render these actions as merely off-duty, private disputes is without merit.

## III.   **STATEMENTS OF UNDISPUTED FACTS**

### A.   **The County's Statement of Facts**

Plaintiff and Tanner began a romantic relationship in 2020 and made the relationship "official" in early 2021. (Joint Appendix of Facts, ("JAF") No. 1).) Plaintiff acknowledges that she knew Tanner was married at the time, yet she and Tanner nevertheless maintained a consensual romantic relationship. (JAF No. 2.) Plaintiff and Tanner lived together at an apartment near 16th Street in the City of Lancaster, where Plaintiff resided with her daughter. (JAF No. 3.) Tanner frequently stayed overnight and kept personal belongings at the apartment. (JAF No. 4.) The relationship ended in September 2022, and Tanner moved out of the apartment. (JAF No. 5.) Tanner was employed with the Los Angeles County Sheriff's Department ("LASD") as a deputy sheriff during the period of their relationship. (JAF No. 6.) Tanner was subsequently terminated from his employment with LASD on December 1, 2023, in connection with an unrelated incident. (JAF No. 7.)

Plaintiff testified that Tanner treated her well at the beginning of the

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

3

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

relationship but that the relationship deteriorated over time. (JAF No. 8.) She alleges that the first physical incident occurred at their apartment toward the end of 2021, at night, during an argument in which Tanner threw her on the bed, struck her hip, placed her face down, put his knee on her back, and choked her. (JAF No. 9.) Plaintiff claims that after this first incident, Tanner choked her on multiple occasions at the apartment, in vehicles, and in bars. (JAF No. 10.) She further alleges that throughout the relationship, Tanner grabbed and twisted her arms roughly fifty times, typically when she tried to walk away from an argument or when he wanted her to look at him. (JAF No. 11.) She recounts that after each episode, Tanner would apologize and the relationship would temporarily return to normal. (JAF No. 12.)

Plaintiff describes a March 2022 incident in Las Vegas during the "Baker to Vegas" event. (JAF No. 13.) While riding in a private SUV with three of Tanner's colleagues, she alleges that Tanner became irritated when she attempted to get his attention, and so he grabbed and twisted her wrists, and called her a "bitch." (JAF No. 14.) During the same ride, she asked for a sweater and Tanner allegedly threw his backpack at her. (JAF No. 15.) Plaintiff did not ask the other passengers for help. (JAF No. 16.) When they arrived at the hotel, Plaintiff alleges Tanner remained upset. (JAF No. 17.) He asked her to change her outfit, and when she refused, Tanner allegedly chased her into the bathroom, broke a glass shower door, tackled her to the floor, put his knee on her back, and struck her. (JAF No. 18.) She did not report this incident to the friends who accompanied them or to anyone at LASD. (JAF No. 19.)

Plaintiff also describes an incident on New Year's Eve of 2022 at a Lancaster bar called Schooners. (JAF No. 20.) After she hugged a bouncer, Tanner allegedly became upset. (JAF No. 21.) Around 2:00 a.m., Tanner asked her to drive behind him. (JAF No. 22.) While driving his private blue Subaru, Plaintiff alleges Tanner suddenly braked at the intersection of 30th Street and Avenue L, causing Plaintiff's

4

vehicle to rear-end Tanner's. (JAF No. 23.) Plaintiff claims a bystander called 911 to report the incident and that Tanner used his cell phone to cancel the call. (JAF No. 24.) Plaintiff and Tanner left the scene within minutes, and Plaintiff does not know whether emergency personnel or law enforcement ever responded. (JAF No. 25.)

Plaintiff further claims that Tanner "stalked" her during and after the relationship, by appearing at her gym (Planet Fitness in Lancaster), at a grocery store while she was shopping and at her place of employment. (JAF No. 26.) In her FAC, Plaintiff alleges the stalking continued until the filing of this action. (JAF No. 27.) She admits that on each occasion, Tanner never approached, spoke to, or otherwise interacted with her. (JAF No. 28.) Her apartment manager allegedly told her that a man in plain clothes was surveilling her apartment complex, but Plaintiff admits she does not know whether this person was affiliated with Tanner or with the County. (JAF No. 29.) She admits she made no reports to the County or to law enforcement regarding these incidents when they occurred. (JAF No. 30.)

Plaintiff describes a separate 2022 incident at their apartment in which Tanner displayed a county-owned firearm and his personal knife because he believed she had changed the locks. (JAF No. 31.) She states that Tanner had just returned from work wearing plain clothes when this incident occurred. (JAF No. 32.) Tanner put the gun and knife away when he was convinced Plaintiff hadn't changed the locks and then they reconciled. (JAF No. 33.)

Plaintiff recounts that Tanner took her on multiple Ride-Alongs in his LASD patrol vehicle and occasionally used the patrol car to transport her and her daughter. (JAF No. 34.) She admits she never signed the waiver forms required by LASD for civilian Ride-Alongs. (JAF No. 35.) She does point to any assault occurring during the Ride-Alongs. (JAF No. 36.)

Plaintiff contends that the alleged physical assaults occurred both while Tanner was on duty and while off duty. (JAF No. 37.) When asked to describe the supposed on-duty incidents, she testified that every incident she characterizes as

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

occurring "on duty" happened inside their shared apartment when Tanner came home on his lunch break and an argument ensued. (JAF No. 38.) She admits that all alleged on-duty incidents occurred inside the apartment and that all other incidents occurred while Tanner was off duty.  (JAF No. 39.) She further admits that she did not report any of these incidents to LASD or the County before the summer of 2023 and that no LASD management personnel were aware of Tanner's alleged conduct during the relationship. (JAF No. 40.)

Plaintiff also recounts that Tanner told her he was the leader of a group of deputies called the "Rattlesnakes." (JAF No. 41.) Tanner allegedly told her he had a tattoo on his right leg signifying membership in the group. (JAF No. 42.) Plaintiff described the group as operating like a gang, and claimed Tanner told her the group controlled the Lancaster station. (JAF No. 43.) Plaintiff admits that her knowledge of the alleged Rattlesnakes group comes entirely from Tanner's statements and that she has no independent source of information. (JAF No. 44.) She admits she never reported anything about the alleged group to the County. (JAF No. 45.) She admits she is not aware of any County policy encouraging deputy gangs. (JAF No. 46.) She admits she knows of no LASD management personnel who approve of such a group. (JAF No. 47.)  She admits she possesses no documents showing that LASD management knew of the group's existence. (JAF No. 48.) She further admits she has no evidence that Tanner was improperly trained. (JAF No. 49.) She concedes that the County did not encourage or approve of Tanner's conduct. (JAF No. 50.)

In the summer of 2023, several months after Plaintiff and Tanner ended their relationship, Plaintiff received a call from an investigator from LASD regarding an unrelated matter that led to an internal affairs investigation involving Tanner. (JAF No. 51.) During that call she informed the investigator of her allegations against Tanner. (JAF No. 52.) This was her first notice to the County regarding these events. (JAF No. 53.) Approximately one hour later, two LASD investigators arrived at Plaintiff's home to interview her. (JAF No. 54.) Plaintiff recognized the male

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

6

investigator, identified as "Marion," as a friend of Tanner and asked that he be excused, which he was. (JAF No. 55.) The female investigator, identified as "Kaylee," then conducted the interview. (JAF No. 56.) LASD's Internal Criminal Investigations Bureau (ICIB) opened an investigation into Plaintiff's allegations against Tanner, which remains ongoing. (JAF No. 57.)

LASD maintains a written Family Violence Policy that expressly prohibits employees from engaging in acts of family or domestic violence. (JAF No. 58.) The Family Violence Policy requires that all incidents of family violence involving Department employees be promptly evaluated and, if necessary, formally investigated, and provides that violations are subject to disciplinary action up to and including termination. (JAF No. 59.) LASD operates a Ride-Along Program, which permits members of the public to accompany deputies only with advance approval by a station or unit commander and a signed written waiver. (JAF No. 60.) The Ride-Along Program policy provides that unauthorized Ride-Alongs are strictly prohibited. (JAF No. 61.) LASD maintains a written policy entitled "Prohibition—Law Enforcement Gangs and Hate Groups", which forbids employees from participating in, promoting, or soliciting others to participate in any law-enforcement gang or hate group. (JAF No. 62.) The Law-Enforcement Gangs policy requires that substantiated violations be reported to the Commission on Peace Officer Standards and Training (POST) and provides that violations are subject to disciplinary action up to and including termination. (JAF No. 63.) LASD has no policy or custom authorizing deputies to commit domestic violence, to take civilians on unauthorized Ride-Alongs, or to participate in any so-called deputy gang. (JAF No. 64.)

Before commencing suit, Plaintiff submitted a Government Tort Claim to Los Angeles County on February 27, 2024. (JAF No. 65.) In a written response dated March 18, 2024, the County advised that the claim was untimely as to incidents occurring before August 27, 2023, and deficient as to any incidents after that date,

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

7

because it failed to identify the claimant and the County employee or employees alleged to have caused the injury. (JAF No. 66.) The letter also specifically requested additional details so that the County could investigate the allegations. (JAF No. 67.)

On May 29, 2024, the same day she filed the complaint, Plaintiff submitted an amended claim that alleged the same facts but added the names of Plaintiff and Tanner. (JAF No. 68.) Before that amended claim was received, the County had already issued a second written response on April 25, 2024, formally rejecting the original claim and reiterating that it was untimely and deficient. (JAF No. 69.) No application for late-claim relief was ever filed. (JAF No. 70.)

### B.      Plaintiff's Statement of Facts

Numerous leaders of the County of Los Angeles have made party admissions regarding the practices in LASD that led to the harms to Plaintiff. In 2013, the DOJ found that LASD engaged in the practice of allowing Tanner's deputy gang, the Rattlesnakes, of violating the constitutional rights of residents. (JAF No. 99.) Tanner's violent acts against Plaintiff took place from 2021 until about September 2022. Throughout 2022, the County's Civilian Oversight Commission, in acknowledgment of the LASD deputy gang practices, held a series of hearings on deputy gangs, and subsequent deprivations of residents' constitutional rights. in LASD. (JAF No. 101.) In March 2023 (subsequent to the violent acts against the Plaintiff), the County's Civilian Oversight Commission and all of its five supervisors on its Board of Supervisors made the admissions for the County that LASD practices enabled deputy gangs, including the Rattlesnakes, to violate residents' constitutional rights. (JAF Nos. 100-103.) In March 2023, Civilian Oversight Commission report was endorsed and approved by the Board of Supervisors. (JAF No. 102.)

Plaintiff was introduced to Tanner in 2020 by friends at LASD. Plaintiff expressed to Tanner her interest in a career in law enforcement. In response, Tanner

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

8

invited Plaintiff to participate in LASD's Ride-Along Program. (JAF No. 71.) The LASD Ride-Along Program permits members of the public to accompany deputies during their shifts. Ride-alongs include not just riding in the patrol car; the program allows a resident to spend a day with a deputy while he or she performs duties: driving around on patrol, handling calls by foot, working in the station, taking breaks, etc. (JAF No. 74.) During Ride-Along, participants are not allowed to leave the deputy's side during the entire shift. (JAF Nos. 75.) By LASD policy, patrol deputies are not allowed to take "lunch breaks." Patrol deputies can eat lunch, but they continue to be on duty. If the Ride-Along participant eats lunch (regardless of location), the Ride-Along does not pause during the "break." (JAF No. 76.)

Watch commanders are required to ask participants to sign waivers to protect LASD from liability. (JAF No. 77.) However, an absence of a signed waiver does not change the nature of the Ride-Along; the Ride-Along is still a Ride-Along, with or without the Waiver. (JAF No. 78.)

Tanner and Plaintiff began dating after a few Ride-Alongs, beginning their romantic relationship in early 2021. (JAF No. 1.) At the time Plaintiff met Tanner, he told her that he was separated from his wife and living apart from her. Plaintiff rented an apartment with the intention that the two would live together but later she found out that he had lied and was still living with his wife. (JAF No. 2 [Plaintiff response].) While Tanner and Plaintiff were in a romantic relationship, he would sometimes stay overnight at her apartment. (JAF No. 4.)

Tanner took Plaintiff on approximately 30 Ride-Alongs, sometimes weekly. (JAF Nos. 81, 115.) Those Ride-Alongs took place with transparency, in the view of other deputies and supervisors at LASD, where other deputies and supervisors would observe Plaintiff on calls, as Deputy Tanner, in uniform, would assist other deputies with their calls or deputies would assist Tanner on his calls. (JAF Nos. 115, 116.) When handling patrol calls, Tanner and Plaintiff would often step out the patrol car and walk up to locations and suspects. Plaintiff often interacted with

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

9

sergeants and deputies. At times, they would ask Plaintiff if she was on a Ride-Along and she would confirm it. No one ever objected to Plaintiff's participation in any of the roughly 30 Ride-Alongs. (JAF Nos. 81, 95.)

Plaintiff was unaware of the Ride-Along Program's requirement that she sign a waiver and no one from LASD instructed her to sign one. (JAF No. 79.)

Plaintiff was first interviewed by an employee of LASD about Deputy Tanner because of an incident that occurred on one of the Ride-Alongs in which Plaintiff was a participant. (JAF No. 119.) Tanner had pulled over a drunk, speeding driver, who turned out to be another deputy. The drunk deputy assaulted Tanner and tried to confront Plaintiff. (*Id.*)

Over time Tanner became violent and abusive toward Plaintiff. On several occasions, Tanner twisted Plaintiff's wrist and inflicted tremendous pain in his patrol vehicle during Ride-Alongs, sometimes in the patrol vehicle, other times outside the vehicle and walking when Tanner would cause Plaintiff to fall to the ground in pain. (JAF Nos. 11, 14.) On at least three occasions, during a Ride-Along, Tanner threw Plaintiff to the ground, got on top of her with his full weight, and choked her until she lost consciousness. (JAF No. 38 [Plaintiff response], 97, 110.) These occurred during Ride-Along "breaks" at Plaintiff's apartment, while Tanner was still on duty and Plaintiff was required to remain with him throughout the day. (JAF Nos. 74-76.) Tanner told Plaintiff that he choked her "to show dominance."

In April 2022, Plaintiff accompanied Tanner and other LASD deputies to a law enforcement event called "Baker to Vegas," a gathering of several law enforcement agencies. (JAF Nos. 13, 85, 112.) The LASD event was attended by the sheriff and other Los Angeles County officials. (JAF No. 85.) In a vehicle with other deputies in route to the event, Tanner grabbed and twisted Plaintiff's arm, inflicting severe pain, threw his backpack at her, and called her a "bitch." (JAF No. 14.) Other deputies expressed concern for Plaintiff but did nothing to help her and did not report the incident. (JAF No. 112.) When they arrived at the hotel room, Tanner

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

chased Plaintiff into the bathroom, shattered the glass shower door, tackled Plaintiff to the ground, put his knees of her and struck her. (JAF No. 18.)

In another incident in December 2021, after leaving a bar Tanner told Plaintiff, driving in a separate vehicle, to follow him. Plaintiff tried to keep up with Tanner's vehicle as he was driving very fast. Then suddenly Tanner slammed on his brakes at the intersection of 30th Street and Avenue L in Lancaster, intentionally causing Plaintiff to violently crash into his vehicle. (JAF No. 86.) Tanner got out of this car laughing. Plaintiff was hysterical and frightened, asking why Tanner did such a thing, and he just smirked. A bystander saw that Plaintiff was in distress. Plaintiff told the bystander that Tanner was "psycho" and asked her to please call 911; the bystander called 911 for assistance. (JAF No. 88.) Tanner used his authority as a law enforcement officer and called the 911 dispatcher, identifying himself as a deputy, and directed the dispatcher to call off the request for assistance. (*Id.*) Deputies did not respond to the call to the location protect the Plaintiff, because the 911 was cancelled.  Tanner then grabbed Plaintiff and forced her into his car. (*Id.*)

Plaintiff ended her relationship with Tanner in September 2022. Nevertheless, Tanner continued to stalk Plaintiff, repeatedly showing up at her apartment and place of work, the gym, and at the grocery store throughout 2023 and into 2024. (JAF No. 118.)

Tanner was a leader or "shot caller" of the Rattlesnakes deputy gang and referred to himself as the shot caller of "his gang." (JAF No. 96.) He has a rattlesnake tattoo on his right leg signifying his membership in the gang. (JAF No. 107.) The Rattlesnakes and Tanner exercised control of the Lancaster station, where even his supervisor deferred to him. (JAF Nos. 83, 94, 96, 105) Brazenly, in front of numerous deputies, sergeants, watch commanders, and other supervisors, Deputy Tanner took Plaintiff on over 30 Ride-Alongs.

IV.   **PROCEDURAL POSTURE**

Plaintiff filed this action in the Los Angeles County Superior Court on or

11

about May 29, 2024, using the pseudonym "Jane Doe." The original complaint alleged claims under 42 U.S.C. § 1983 and state-law negligence against the County of Los Anges and Aaron Tanner. On August 30, 2024, Plaintiff filed a First Amended Complaint ("FAC") in state court, again proceeding under the pseudonym "Jane Doe." and asserting the same causes of action against Defendants.

The FAC was served on the County, and the County timely removed the action to the United States District Court for the Central District of California based on federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1441. After removal, the County filed a timely Answer to the FAC, and Defendant Tanner separately filed his Answer (Dkts. 10 & 17.)

## V.  LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome under the governing law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56 also authorizes partial summary judgment or summary adjudication of specific claims or issues where no genuine dispute exists. *Celotex*, 477 U.S. at 323–24. The moving party need not produce evidence negating the opponent's claim; it may simply point out the absence of evidence supporting an essential element on which the non-movant bears the burden of proof at trial. *Id.* at 325. Once that showing is made, the burden shifts to the non-moving party to set forth specific facts—by admissible evidence— demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(c). Mere allegations, speculation, or a scintilla of evidence are insufficient to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The court views the evidence in the light most favorable to the non-movant, but "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

# VI.   ANALYSIS

## A.   The County's Argument 1:

### a.   Tanner Did Not Act Under Color of State Law

Section 1983 imposes liability only when a defendant acts "under color of" state law. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 49 (1988). The Supreme Court has interpreted the phrase to mean "under pretense of law," requiring that the defendant misuse state-conferred authority to commit the challenged conduct. *Screws v. United States*, 325 U.S. 91, 111 (1945). Courts look to whether the officer was cloaked in official authority, considering factors such as whether the officer was on duty, in uniform, using police equipment, or purporting to exercise police power. *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998); *Anderson v. Warner*, 451 F.3d 1063, 1068–69 (9th Cir. 2006); *Naffe v. Frey*, 789 F.3d 1030, 1037–38 (9th Cir. 2015); *Pete v. Olsen*, No. CV-09-54-EFS, 2010 WL 996408, at *3 (E.D. Wash. Mar. 15, 2010). An officer who pursues purely personal objectives unrelated to law enforcement "does not act under color of law, unless he purports or pretends to do so." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996).

The undisputed record of this case demonstrates that Tanner was pursuing his personal interests, unrelated to his law enforcement duties, when the alleged force incidents occurred. According to Plaintiff's sworn testimony, the first alleged physical incident occurred in their shared apartment toward the end of 2021, at night, during an argument. (JAF No. 9.) The remaining alleged incidents—the repeated choking and arm-twisting, the New Year's Eve brake-check in Tanner's private Subaru, the Las Vegas car and hotel episodes, and the display of a firearm in plain clothes—likewise occurred in private homes, personal vehicles, or social venues, all in plain clothes and without any assertion of police authority. (JAF Nos. 10, 14, 17-18, 23, 31-33, 38-39.) In fact, every event Plaintiff characterizes as occurring while Tanner was "on duty" took place inside their shared apartment during Tanner's lunch break, when he returned home to eat or rest. (JAF Nos. 38-

13

39.)

These facts mirror the circumstances in *Van Ort v. Estate of Stanewich*, *supra*, where an off-duty deputy who burglarized and assaulted homeowners with a gun was found not to have acted under color of law because he was "pursuing his own goals and [was] not in any way subject to control by his public employer." 92 F.3d at 838. The Ninth Circuit reached the same result in *Huffman v. County of Los Angeles, supra*, holding that an off-duty deputy who shot a bar patron without invoking police authority was a private actor. 147 F.3d at 1058. Likewise, here, Tanner was a private actor during his encounters with Plaintiff which occurred in purely domestic or social settings, when he was not performing law-enforcement duties.

Plaintiff's allegations of unauthorized Ride-Alongs and occasional use of a patrol car do not alter this conclusion. She does not point to any assault occurring during any Ride-Along. Her allegation that Tanner displayed his service weapon at their apartment while off duty and in plain clothes is legally insufficient. Courts uniformly hold that unauthorized use of police equipment does not convert private conduct into state action. See *Huffman*, 147 F.3d at 1058 (no state action even though deputy used ammunition issued by the department); *Hechavarria v. City & County of San Francisco*, 2010 WL 3743651, at *3 (N.D. Cal. Sept. 17, 2010), aff'd, 463 Fed. Appx. 632 (9th Cir. 2011) (use of state-issued pepper spray during personal dispute not color of law); *Barna v. City of Perth Amboy*, 42 F.3d 809, 815–18 (3d Cir. 1994) (off-duty officer who assaulted family member with service revolver not acting under color of law); *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994) (off-duty officer shooting guest in home not state action); *Bonsignore v. City of New York*, 683 F.2d 635, 639–40 (2d Cir. 1982) (officer's use of required service gun to shoot spouse not color of law).

Furthermore, any conduct occurring after Tanner's termination could not qualify as state action. LASD terminated Tanner on December 1, 2023 for an

14

unrelated matter. (JAF No.  .) By Plaintiff's own account, some of the purported "stalking" at her gym and grocery store occurred after this termination date. (JAF No. 26-27.) Once Tanner ceased to be a deputy, he no longer possessed any state-conferred authority to invoke, and any conduct thereafter was necessarily private as a matter of law. Because Tanner's alleged actions were motivated by personal reasons, occurred in private settings, and involved no exercise or pretense of police authority, no reasonable jury could find that he acted under color of state law. Without state action, Plaintiff's § 1983 claim fails as a matter of law.

    **b.    Plaintiff's Response: Tanner Acted Under the Color of State Law**

Tanner acted under the color of state law when, in uniform and on duty, he assaulted Plaintiff during several LASD Ride-Alongs and when, off duty, he misused his law enforcement status to instruct a 911 dispatcher to cancel an emergency request for assistance made by a bystander who had witnessed "Tanner suddenly brake[] at the intersection of 30th Street and Avenue L, causing Plaintiff's vehicle to rear-end Tanner's." (JAF No. 23.) Contrary to Defendant's characterization, these acts were not merely in pursuit of Tanner's "personal interests, unrelated to his law enforcement duties." Rather, the Ride-Along was an official LASD program intended, among other things, to educate participants and allow them an opportunity to experience the day-to-day matters confronted by on-duty deputies. As for identifying himself as a deputy and commanding a 911 dispatcher to cancel a call for assistance against himself for committing violence against the Plaintiff, such conduct undeniably constitutes misuse of power, possessed by virtue of state law and possible only because Tanner was clothed with the authority of state law.

It is undisputed that Tanner assaulted Plaintiff on multiple occasions while riding in his vehicle, including during LASD "Ride-Alongs." (JAF Nos. 10, 39 [Plaintiff's Response], 127.) On at least three occasions in 2021 and 2022, during a

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

Ride-Along in the patrol car Tanner assaulted Plaintiff by twisting her wrist and arm until she could not handle the pain. (JAF Nos. 127, 128.) In addition, on several occasions while walking outside the patrol vehicle during the Ride-Along shift, Tanner twisted Plaintiff's wrist to make her fall to the ground. He also engaged in the same form of abuse during their Ride-Along "breaks"—"breaks" do not constitute a pause in the Ride-Along at Plaintiff's apartment (JAF Nos. 74-76). Tanner committed these acts both while on duty and in uniform during LASD Ride-Alongs as well as during off-duty social occasions when he would pick up Plaintiff at her home. (JAF No. 128.)

Tanner took Plaintiff on over 30 Ride-Alongs. (JAF Nos. 10, 40, 58, 60.) The idea for the Ride-Alongs developed after Plaintiff told Tanner of her interest in working in law enforcement one day and Tanner invited Plaintiff to participate in LASD's Ride-Along program. (JAF No. 71.) These were not mere personal or relationship outings. During the Ride-Alongs, Tanner was on duty and in uniform. (JAF No. 72.) In fact, Tanner made no secret to LASD of the fact that he was taking Plaintiff on such Ride-Alongs. Tanner took Plaintiff on Ride-Alongs sometimes weekly, involving situations where other deputies and supervisors would observe Plaintiff on the calls. With Plaintiff at his side, Tanner, in uniform, assisted other deputies with their calls or received assistance from deputies on his calls. (JAF Nos. 73, 81, 82.) When handling patrol calls, Tanner and Plaintiff would often step out of the patrol car and walk up to locations and suspects, and Plaintiff would sometimes interact with sergeants and deputies. At times, they would ask her if she was on a Ride-Along and she would tell them "yes." Usually, they did not ask questions but just interacted with Plaintiff as if she belonged there. No one ever objected to Plaintiff's presence on any of the Ride-Alongs, including watch commanders and lieutenants at the Lancaster station who repeatedly saw Plaintiff accompanying Tanner to the station on the Ride-Along days. (JAF Nos. 82, 84.)

The County argues that Tanner's abusive treatment of Plaintiff in her

apartment was not "under the color of state law" because "Tanner was pursuing his personal interests, unrelated to his law enforcement duties." This argument without merit. Ride-Alongs entailed not only the time spent riding in the patrol vehicle but also the periods when Plaintiff accompanied Tanner during his shift outside the vehicle when responding to calls and also on breaks. (JAF No. 75.) Indeed, during the Ride-Alongs Plaintiff was expected to stay by Tanner's side during his entire shift, regardless of whether he and Plaintiff were in the patrol car, on foot at a call, working side-by-side at the station, or on lunch break (often at Plaintiff's apartment). (JAF No. 74.) Thus, the fact that Tanner and Plaintiff sometimes took their lunch break at Plaintiff's apartment did not render Tanner's abusive treatment of Plaintiff during those breaks in her apartment beyond the color of state law. *See Hess v. Garcia*, 72 F.4th 753, 757 (7th Cir. 2023) (reinstating § 1983 claim where sexual assault committed on break at gas station and in "secluded area" despite defendant not purporting to engage in performance of official duties or exercise of police power). As in *Hess*, involving allegations of a police officer groping a Ride-Along participant, inquiring about her sex life, and soliciting sex—none of which could be considered pursuant to or engaging in the pretense of the exercise of police power—the court held that the plaintiffs sufficiently alleged that such conduct was under the color of state law. *Id*. at 757.

"There is no rigid formula for determining whether a state or local law official is acting under color of state law… [W]hether a[n] ... officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties …. Misuse of power, possessed by virtue of state law and possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under the color' of state law… It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) (internal quotation marks and citations

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

17

omitted); *Hess*, *supra*, 72 F.4th 753 (reversing dismissal of § 1983 claim based on sexual assault by police officer on Ride-Along). The conduct in question "must be sufficiently related either to the officer's governmental status or to the performance of his official duties." *Warner*, 451 F.3d at 1069. However, "[t]his requirement cannot mean that an officer must have been acting within the scope of his authority in order for him to have been acting under color of state law. If that were true, no § 1983 suit could ever succeed, for the premise of a successful suit is that the officer acted illegally—that is, outside the scope of his authority. Instead, the requirement must mean only that the challenged conduct must have a sufficiently close relationship to the officer's 'governmental status' or to 'the performance of his duties.'" *Ibid*.

The question of whether a person who has allegedly caused a constitutional injury was acting under color of state law is a factual determination. *See Pasadena Republican Club*, 985 F.3d at 1167 (explaining that to determine whether a private person or corporation acts under color of state law, the courts must engage in sifting facts and weighing circumstances to answer what is necessarily a fact- bound inquiry).

The County argues that the "brake check" incident (JAF Nos. 23-25) in which Tanner intentionally caused Plaintiff to violently crash into his vehicle and then canceled a bystander's 911 call was a "personal" matter "unrelated to his law enforcement duties" and therefore not under the color of state law. The County is wrong. The County relies solely on the fact that this incident occurred while Tanner was off duty and driving his personal vehicle but ignores the implication of a law enforcement officer using his authority to intervene, instructing the 911 dispatcher to cancel the request for assistance while Plaintiff's life was in danger from Tanner. In *Anderson v. Warner*, *supra*, 451 F.3d 1063, defendant Warner—a jail commander in Mendocino County—assaulted Anderson after Anderson rear-ended him. Warner was off duty, driving in his car with his wife and a friend. Nevertheless, Warner

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

18

prevented bystanders from intervening in his attack by claiming that he was "a cop." *Id*. at 1065–66. The court held that Warner acted under color of state law because he invoked (and therefore abused) his law enforcement status while assaulting Anderson, and there was a close nexus between his work at the jail and his claim that the assault was "police business." *Id*. at 1066. Like Warner, Tanner was also off duty. Also, like Warner, Tanner invoked (and therefore abused) his law enforcement status when he instructed the 911 dispatcher to call off the bystander's request for assistance despite the possibility that Plaintiff may have been injured by the violent impact of the collision. By doing so, Tanner acted under the color of state law.

The County repeatedly points out that Plaintiff did not sign a waiver and argues that the Ride-Alongs were therefore unauthorized. The County cites no authority for the proposition that failure to sign a waiver somehow rendered the unlawful conduct of Tanner during the Ride-Alongs outside the color of state law. In order to minimize LASD liability, participants in the "Ride-Along" program are asked to sign a Waiver of liability. (JAF Nos. 77, 78.) If the participant does not sign the Waiver—Plaintiff was neither aware of the waiver requirement nor asked to sign one (JAF No. 79)—the department could be liable for injuries suffered by the participant. The Watch Commander (not the deputy) is responsible for making sure the Waiver is signed. (JAF No. 77.) If a participant does not sign the waiver but still participates in the "Ride-Along," it is still an official "Ride-Along" and the civilian is still a participant in that "Ride-Along." A lack of a signed Waiver does not turn a "Ride Along" into something else. A signed Waiver is not needed to make a "Ride Along" official. (JAF No. 78.) The County, without any basis in law or policy, now seeks to weaponize its own failure to procure from the Ride-Along participant an executed waiver as the basis to characterize Tanner and Plaintiff's Ride-Alongs as "unauthorized" and thereby deem Tanner's intentional violation of her civil rights a "personal" or "social" matter outside the color of state law. The County's argument lacks merit. By allowing the Ride-Alongs to take place despite a lack of a signed

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

waiver, whose procurement was the responsibility not of Plaintiff but the department's, LASD effectively consented to the Ride-Alongs and may not now claim that they were unauthorized.

Plaintiff was unequivocal in her deposition testimony that she went on multiple Ride-Alongs with Deputy Tanner and that Tanner assaulted her multiple times during those Ride-Alongs, including while she was riding in his patrol vehicle. The County picks and chooses references to Plaintiff's testimony on this issue to try to show that assaults did not occur during Ride-Alongs. For example, at one point Plaintiff was asked about very specific and narrow incidents (where Tanner had his gun and knife out at Plaintiff's apartment), and she indicated that those couple of incidents did not occur during a Ride-Along.

While the County is correct that Tanner did not choke Plaintiff unconscious in the patrol vehicle, Tanner did assault Plaintiff more than once in the patrol vehicle, while on duty and in uniform and while Plaintiff was participating in official LASD Ride-Along. Tanner also choked Plaintiff unconscious during Ride-Along while on "break" at Plaintiff's apartment. All of the over 30 Ride-Alongs that Plaintiff participated in were LASD events. At all times during Tanner's entire shifts on those Ride-Alongs, while Tanner and his participant, Plaintiff, were together. Tanner continued to be on duty, and the Ride-Along remained in effect while the two rode in the patrol car, walked patrol by foot, worked in the station, or took "breaks" at Plaintiff's apartment.

**B.    The County's Argument 2:**

**a.    Plaintiff's *Monell* Theory Against The County Fails as a Matter of Law**

Municipal liability under 42 U.S.C. § 1983 is "limited to action for which the municipality is actually responsible." *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). A county may be held liable only if the plaintiff proves: (1) a constitutional violation committed by a state actor; (2) the existence of a municipal

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

20

policy, custom, or decision amounting to deliberate indifference to constitutional rights; and (3) a causal link showing that the policy was the **moving force** behind the violation. *Monell*, 436 U.S. at 694; *City of Canton v. Harris*, 489 U.S. 378, 385–92 (1989); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–05 (1997); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). A policy may consist of an official regulation, a longstanding practice, a deliberate failure to train or supervise, or, in rare cases, a single decision by a final policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986). But a municipality cannot be held liable on a respondeat superior theory. *Monell*, 436 U.S. at 691.

### (1)    No Underlying Constitutional Violation

The analysis begins and ends with the first element. Tanner's alleged assaults arose from a private romantic relationship and, as Plaintiff admits, occurred in private settings without any use or pretense of LASD authority. Because Tanner was not acting under color of law, there is no underlying constitutional violation, which alone bars *Monell* liability.

### (2)    No policy, Custom or Deliberate Indifference

Plaintiff also cannot identify any written policy authorizing or encouraging deputies to commit domestic violence or to misuse their position in private relationships. She acknowledges that LASD had a policy in place requiring civilian Ride-Alongs to execute a waiver firm, which she flouted. (JAF No. 35.) She admits she is not aware of any County policy encouraging deputy gangs, does not know of any LASD manager who approves of a so-called "Rattlesnakes" group, and has no documents suggesting that management even knew such a group existed. (JAF Nos. 46-50.) Her only information about the "Rattlesnakes" comes entirely from Tanner's own statements, which she never reported to the County while the relationship was ongoing. (JAF No. 44.) Nor is there any basis for a "failure to train" or "failure to supervise" theory. Plaintiff admits she has no evidence of deficient training and that no supervisor was aware of Tanner's alleged conduct. (JAF No. 49-50.) These

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

admissions defeat any theory that a formal LASD policy or an unofficial custom "so persistent and widespread" caused her injuries. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Moreover, the evidence establishes that LASD has written policies that expressly prohibit deputies from committing domestic violence, taking civilians on unauthorized Ride-Alongs and participating in any so-called deputy gang. (JAF Nos. 58-64.)

(3)    No Action By a Final Policymaker

There is also no evidence that the Sheriff or any other final policymaker directed or authorized Tanner's conduct. Plaintiff admits no LASD management personnel knew about her allegations during the relationship. She further admits her first notice to the County was in the summer of 2023 after which LASD promptly responded by sending investigators to interview her at her home. (JAF Nos. 51-56.) Far from approving Tanner's alleged conduct, LASD initiated a formal investigation and subsequently terminated Tanner in December 2023. (JAF Nos. 7; 57.)

(4)    No "Moving Force" Causation

Finally, *Monell* requires a "direct causal link" between a municipal policy and the alleged injury. *Monell*, 436 U.S. at 694; *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). Plaintiff offers no evidence connecting her injuries to any County policy, practice, or decision. As in *Huffman v. County of Los Angeles*, *supra*, Tanner's private misconduct breaks the causal chain and defeats municipal liability. Therefore, Plaintiff's *Monell* claim fails as a matter of law and summary judgment should be entered for the County.

b.    **Plaintiff's Response**

(1)    Underlying Constitutional Violation

As discussed above, in Section IV.A.b., Tanner acted under the color of state law when he assaulted and otherwise abused Plaintiff.

Practice and Custom of Allowing Deputy Gangs to Flourish and Violate Constitutional Rights of Residents

22

The County's own leadership has made party admissions that LASD and the County have a 50-year deputy gang problem, with the County's practices resulting in the violation of resident's constitutional rights. In support of the Plaintiff's Opposition, the Plaintiff asks the Court to take judicial notice of documents published by County leaders that serve as admissions for the Defendant. Plaintiff will also ask the court to take judicial notice of US Government DOJ findings of LASD practices that allowed Tanner's deputy gang to deprive residents of their constitutional rights.

There are three ways a plaintiff can prove a § 1983 claim against a county. *See Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018). First, a plaintiff can show that the violation resulted from the county's official policies or customs. *See Monell*, 436 U.S. at 694. Second, a plaintiff can show that the county was "deliberately indifferent" to her constitutional right, by demonstrating a failure to train the officers or "through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'" *See Rodriguez*, 891 F.3d at 802–03 (*quoting Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011)). Third, a plaintiff can show that "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A policy "promulgated, adopted, or ratified by a local governmental entity's legislative body unquestionably satisfies Monell's policy requirement." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. Of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (*en banc*). Moreover, a policy of inaction may be a municipal policy within

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 9017-2710
TELEPHONE (213) 426-2000

the meaning of Monell. *See Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). Even if there is not an explicit policy, a plaintiff may establish municipal liability upon a showing that there is a permanent and well-settled practice by the municipality that gave rise to the alleged constitutional violation. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021).

Consistent with Tanner's statement to Plaintiff that he was leader of a group of deputies called the "Rattlesnakes" (JAF No. 41), the County has admitted to the existence of longstanding practice of encouraging deputy gangs and turning a blind eye to the violence and intimidation of the type suffered by Plaintiff. (See JAF No. 100.) Dating to as far back as 2013, the United States Department of Justice found that the County of Los Angeles had practices and customs that led deputies with rattlesnake tattoos to cause harms to residents such as Plaintiff. Members of deputy gangs such as the Rattlesnakes were allowed by LASD to deprive residents of their constitutional rights by engaging in excessive force and other illegal acts. (JAF No. 99.) In fact, the County, in a report issued by its Civilian Oversight Commission ("COC") and its chairman, Sean Kennedy, admitted that the County has had a 50-year gang problem which the County had never addressed or fixed the practices, cited by the DOJ in 2013, that allowed the Rattlesnakes and other gangs to flourish. (JAF No. 100.) The COC held hearings on the County's practice of allowing deputy gangs, including the Rattlesnakes, to flourish, break the law, and deprive citizens of their constitutional rights. During the entire period in which Tanner terrorized Plaintiff, the County continued its practices of allowing Tanner and other deputy gang members to deprive citizens such as Plaintiff of their constitutional rights. In March 2023, the COC submitted its report on deputy gangs, which found that the County practices were continuing, and the County's Board of Supervisors approved it. (JAF Nos. 101, 103.)

In March 2023, the top leadership of the County admitted to the ongoing

24

long-standing practices and approved reform to be implemented; reform was not implemented by LASD despite board approval. In 2020 and in 2023, LASD, in acknowledgment of the long-standing practices, enacted new policies purporting to address deputy gangs, but the practices continued in the department, with the policies remaining unenforced. (JAF No. 104.)

Deputies told the Internal Criminal Investigation Bureau ("ICIB") in interviews that Tanner was the shot caller of the Rattlesnakes and ran the Lancaster station, and this helps confirm that the County never ended the practices the DOJ found in 2013.. (JAF No. 105.) Despite being informed by deputies and Plaintiff's statement to investigators about Tanner and the role of the Rattlesnakes deputy gang, LASD turned a blind eye to the gang problem and did not terminate Tanner for his acts against Plaintiff or for his membership in the illegal deputy gang. (JAF No. 106.)

The County was deliberately indifferent to Plaintiff's constitutional rights by allowing a culture of corruption and abuse and lawlessness to infect LASD and failing to implement adequate reforms to address the deep-rooted problem of deputy gangs. (JAF No. 99, 120.) The U.S. Department of Justice's investigation of unconstitutional conduct by deputies at two stations, including Lancaster where Tanner worked, "found deficiencies in how the Antelope Valley stations implement the use of force review systems that LASD has put in place, deficiencies that compromise LASD's ability to effectively respond to problematic uses of force by Antelope Valley deputies. While LASD supervisors in the Antelope Valley appeared willing to offer guidance or mild critiques of officer uses of force, we found a pattern of reluctance to hold deputies accountable even when they commit serious violations of LASD policy, including significant uses of unreasonable force." (JAF No. 121.) The DOJ also found "Some Antelope Valley deputies wear tattoos or share paraphernalia with an intimidating skull and snake symbol as a mark of their affiliation with the Antelope Valley stations." (JAF No. 122.) The DOJ's

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

25

findings are consistent with findings documented in the Sheriff's Civilian Oversight Commission's report ("COC Rpt"), which found that deputy gangs "engage in misconduct directed against the community such as excessive force and violations of constitutional rights. The factual investigation has revealed widespread, deliberate misconduct that at minimum violates fundamental principles of professional policing and in many cases appears to violate the law." (JAF No. 123.)

To prove a deprivation of a constitutional right under § 1983, the "requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II v. Clark Cnty. Sch. Bd. of Trs*., 479 F.3d 1175, 1183 (9th Cir. 2007). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981).

Where, as here, the claim is based on policy, custom or practice of allowing corruption and deputy gangs to flourish and act with impunity, the question is whether Plaintiff's injuries could have been avoided had the County implemented reforms and carried out practices to eradicate the culture of lawlessness and corruption. Whether the actions of the County in allowing deputies to engage in, among other things, excessive force without the fear of discipline or whether the County undertook adequate measures to prevent such conduct is a fact question. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

It is undisputed that the County for 50 years had either actual or constructive knowledge of the widespread problem of deputy gangs engaging in misconduct directed against the community, using excessive force and violating constitutional rights. (JAF Nos. 99, 100, 123.) The County's own factual investigation, by the County's Civilian Oversight Commission, revealed widespread, deliberate misconduct that at minimum violates fundamental principles of professional policing and in many cases appeared to violate the law. (JAF No. 100-103.) Even

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

26

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

the County's own retained police practices expert here acknowledged the abundance of evidence of County practices that led to the harms to Plaintiff. Undersheriff Neal Tyler, the County's own retained police practices expert here described the failure of LASD and the County to adequately address and eliminate the gang problem and culture of corruption within the department. According to Tyler, "the problem is still with us today, and I do view it as a problem, that there are secretive exclusive subgroups improperly symbolized, and the fact that that is still there, we have to look at our own accountability for that problem still existing." (JAF No. 124.) This assessment is consistent with his testimony before the COC in which he states that "various actions taken about the deputy subgroups . . . were effective on a small scale but not on the widespread scale necessary." (JAF No. 125.) According to Tyler, the County's ineffective solutions "enabled the subgroups to flourish . . . and thrive for up to 50 years." (*Id.*) According to Plaintiff's police practices expert, Roger Clark, "the Sheriff's Department and County of Los Angeles' customs, policies, practices, and/or procedures . . . encouraged, allowed, and/or ratified by policy making officers/deputies . . . the use of excessive and/or unjustified force." (JAF No. 126.)

At minimum, therefore, there is a triable issue of material fact regarding the County's failure to address or indifference toward deputy gang problem and the culture of lawlessness, and even tacit approval of deputy gangs, including the Rattlesnakes, and whether it was reasonably foreseeable that such deliberate indifference would result in the harm inflicted upon Plaintiff by Tanner.

## C. The County's Argument 3

### a. The County Cannot Be Held Vicariously Liable for Tanner's Alleged Conduct

Plaintiff's negligence claim relies on Government Code section 815.2, which makes a public entity vicariously liable only for acts of an employee committed "within the scope of employment." *Cal. Gov. Code* § 815.2(a.) Whether conduct

27

falls within that scope is a question of law when, as here, the facts are undisputed. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 213 (1991).

California applies a broad version of the respondeat superior doctrine. *Farmers Ins. Grp. v. Cnty. of Santa Clara*, 11 Cal. 4th 992, 1004–06 (1995.) "The fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer." *Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 139 (1981). Acts reasonably necessary to an employee's "comfort, convenience, health, and welfare while at work," though personal in nature, may still be considered within the scope of employment. *Id*. But this broad view has limits. California courts consistently hold that an employer is <u>not</u> vicariously liable when an employee substantially departs from job duties for purely personal reasons. See *Farmers Ins. Grp. v. Cnty. of Santa Clara*, *supra*; *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 301–02 (1995); *M.P. v. City of Sacramento*, 177 Cal.App.4th 121, 134 (2009.)

In *Farmers Ins. Grp. v. Cnty. of Santa Clara*, *supra,* the Supreme Court of California held thus:

> "[A]n employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee substantially deviates from the employment duties for personal purposes. Thus, if the employee inflicts an injury out of personal malice ... or acts out of personal malice unconnected with the employment ... if the misconduct is not an "outgrowth" of the employment, the employee is not acting within the scope of employment."

*Farmers*, 11 Cal. 4th at 1005 (internal citations and quotations omitted.)

In other words, vicarious liability is  inappropriate when the misconduct does not arise from the conduct of the employer's enterprise but instead arises out of a personal dispute or personal compulsion. *Id*.

Here, Plaintiff's own testimony places Tanner's alleged conduct well outside the scope of his employment as a deputy sheriff. She describes a series of physical

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

assaults and acts of intimidation that occurred almost entirely inside the parties' shared apartment or in private settings such as private cars, bars, and hotel rooms. She admits that all supposed "on-duty" incidents occurred during his visits home during lunch breaks, and that he never used LASD authority in connection with the alleged assaults. The alleged conduct—choking, arm-twisting, brake-checking, display of firearm, and stalking—are paradigmatic examples of purely personal pursuits motivated by romantic emotions, and not acts "engendered by" LASD employment. None of these incidents was reasonably necessary to Tanner's "comfort, convenience, health, and welfare" while at work. Several of the alleged "stalking" incidents occurred even after Tanner's termination on December 1, 2023, when he had no employment relationship at all.

Plaintiff may rely on *Mary M.*, where the Supreme Court allowed vicarious liability for an on-duty officer's sexual assault of an intoxicated motorist he had detained during a traffic stop. The Court emphasized that the officer abused his official authority to accomplish the assault, and that the victim submitted because of the coercive power of the badge. *Id.* at 213–18. The decision rested on the unique combination of the officer's use of actual police authority over a member of the public and the public policy of allocating to law enforcement the risks inherent in granting officers such coercive power. *Id.*

Courts have repeatedly cautioned that *Mary M.* is confined to that narrow context. The rule does not extend to every act of sexual or physical misconduct by peace officers, especially where, as here, the misconduct is unrelated to law-enforcement duties and involves no use or pretense of police power. In *Farmers, supra*, a sheriff's deputy sexually assaulted a fellow deputy while on duty. The Supreme Court held that the County was not required to indemnify the assailant because the assault was a personal, independent, and far-removed deviation from the employee's duties, even though it occurred in the workplace. *Id.* The Court explained that employment may create the opportunity to commit a tort, but that

29

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 9017-2710
TELEPHONE (213) 426-2000

alone does not make the risk a cost of the enterprise. *Id*. at 1005–06.

Further, in *K.G. v. County of Riverside*, 106 Cal.App.4th 1374 (2003), the court refused to extend *Mary M.* to a deputy's sexual abuse of his own step child, reasoning that the misconduct was not directed at a member of the public and did not arise while enforcing the law. *Id*. at 1385. Similarly, in *Doe 1 v. City of Murrieta*, 102 Cal. App. 4th 899, 907–09 (2002), a police officer had sexual relations with two teenage participants in the police explorer program. The court affirmed dismissal of the vicarious liability claim, emphasizing that the officer's misconduct "did not arise out of the exercise of [his] job-created authority" and that no arrest or detention was involved. (Id. at 907.) Additionally, in *M.P. v. City of Sacramento*, 177 Cal.App.4th 121 (2009), two on-duty firefighters were alleged to have sexually assaulted a woman in a fire truck. The court held the city was not liable because the assault was motivated by personal gratification and did not arise out of the performance of any firefighting duties. *Id.* at 134. Lastly, in *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, *supra*, the Supreme Court held a hospital was not liable for a technician's sexual assault of a patient, describing the conduct as a personal compulsion not engendered by the hospital's enterprise. *Id*. These authorities are more analogous to this case than *Mary M.*. Each rejected liability even where the employee used the trappings of employment or committed the misconduct while on duty.

Here, Plaintiff never alleged that Tanner detained her, used police commands, or otherwise invoked official authority. The relationship was consensual and all alleged assaults occurred in private or social settings. The fact that Tanner transported Plaintiff in his patrol vehicle or displayed a department-issued gun at their residence does not change this analysis. As *Farmers* explains, "the mere fact that an employee has an opportunity to abuse facilities or authority necessary to the performance of his or her duties does not render the employer vicariously liable." 11 Cal.4th at 1006.

30

Because Tanner's alleged misconduct arose from a private romantic relationship, was unconnected to the exercise of police power, and in some instances occurred after his employment ended, it is even further removed from the County's enterprise than the misconduct in *Farmers*, *K.G.*, *Doe 1*, *M.P.*, or *Lisa M.*. Under these controlling authorities, *Govt. Code* § 815.2 provides no basis for liability, and the County is entitled to judgment as a matter of law..

### b.      Plaintiff's Response

Plaintiff intends to dismiss her negligence claim.

### D.      The County's Argument 4

#### a.      Plaintiff's Negligence Claim Fails as a Matter of Law

##### (1)      No Statutory Basis for the Claim

California public entities are immune from common-law tort liability; they can be sued only if a specific statute authorizes the claim. *Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal.3d 780, 785 (1985). Plaintiff identifies no such statute. Her complaint relies on *Government Code* section 815.2, which provides only vicarious liability for acts of employees committed within the scope of employment. *Cal. Gov. Code* § 815.2(a). As shown above, Tanner's alleged misconduct occurred in private settings and was motivated by personal reasons, placing it outside the scope of his employment. Because section 815.2 cannot serve as the required statutory predicate, the negligence claim fails at the threshold. *Van Ort v. Estate of Stanewich*, *supra*.

##### (2)      No Duty to Protect Against Private Violence

Even if a statute could be identified, Plaintiff cannot establish the basic negligence elements of duty, breach, and causation. *Ladd v. County of San Mateo*, 12 Cal.4th 913, 917 (1996). California law imposes no general duty on public entities to protect individuals from the criminal or tortious acts of third parties absent a "special relationship" or a specific statutory obligation. *Zelig v. County of Los Angeles*, 27 Cal.4th 1112, 1128–29 (2002); *Thompson v. County of Alameda*, 27

31

Cal.3d 741, 750 (1980).

Plaintiff alleges injuries from Tanner's private acts of domestic violence, but she was never in County custody, was not an arrestee, and identifies no statute imposing a duty to protect her from a deputy's off-duty conduct. Any alleged incidents after Tanner's December 2023 termination occurred when he was no longer an employee, eliminating any conceivable duty on the County's part.

(3)     No Breach of a County Obligation

Plaintiff also cannot establish breach. She admits she never reported any abuse to the County until the summer of 2023—many months after the relationship ended. When she finally notified LASD, investigators were promptly dispatched to her residence to interview her and a formal investigation was set in motion. This response cannot be characterized as negligent. There is also no evidence that any identified County employee knew or should have known of a risk to Plaintiff during the relationship.

Plaintiff's theory of negligent hiring, training, or supervision against the County is not viable. California courts have consistently held that no direct cause of action exists against a public entity for negligent hiring or supervision absent a specific statute. See *de Villers v. County of San Diego*, 156 Cal. App. 4th 238, 251, 255 (2007); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1111 (2004). Section 815.2 provides only vicarious liability and cannot be stretched to create direct liability for hiring or supervision practices.

(4)     No Causation

Finally, Plaintiff cannot establish causation. Her own testimony confirms that all of Tanner's alleged assaults occurred in private settings, often while he was off duty or on lunch breaks, and involved no use of LASD authority. Any harm she suffered was caused by Tanner's independent acts, not by any policy, act or omission of the County. Tanner's employment alone is legally insufficient to establish proximate cause.

32

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

### b.   Plaintiff's Response

Plaintiff intends to dismiss her negligence claim.

### E.   The County's Argument 5

#### a.   Plaintiff's Claims Are Time–Barred and Her Government Claim Was Untimely

##### (1)   The § 1983 Claim Is Statute Barred

Section 1983 borrows California's two-year statute of limitations for personal-injury actions. *Cal. Code Civ*. Proc. § 335.1; *Canatella v. Van De Kamp*, 486 F.3d 1128, 1132 (9th Cir. 2007). A claim accrues when the plaintiff knows or has reason to know of the injury and its cause. *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

Plaintiff filed this action on May 29, 2024. She alleges a series of assaults beginning in late 2021 and continuing until the parties' breakup in September 2022. Because Plaintiff admittedly recognized the alleged injuries when they occurred, her § 1983 claim is time-barred as to all conduct before May 29, 2022. Incidents from late 2021 to May 29, 2022 including the New Year's Eve incident on January 1, 2022 and the March 2022 Las Vegas trip therefore fall outside the two-year window.

Plaintiff's operative complaint does not allege a continuing-violation theory. Even if it did, the doctrine does not save these claims. The Supreme Court has held that "discrete ... acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" because "[e]ach discrete ... act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Ninth Circuit applies *Morgan* to civil-rights claims, holding that plaintiffs cannot reach back to earlier discrete acts merely because they are related to later conduct. *Bird v. Dep't of Human Servs.*, 935 F.3d 738, 747 (9th Cir. 2019) (applying *Morgan* to bar civil-rights claims based on discrete acts outside the limitations period). Each alleged assault here was a separate, completed wrong; none can be revived by the continuing-violation theory.

(2)    The State-Law Negligence Claim Is Untimely

Plaintiff's state-law negligence claim is likewise barred by the California Government Claims Act ("GCA") which requires a written claim to be presented to the public entity within six months of accrual as a mandatory prerequisite to suit. *Gov. Code* §§ 911.2, 945.4; *State v. Superior Court (Bodde)*, 32 Cal.4th 1234, 1239–40 (2004). A claim must include, among other things, the name and post-office address of the claimant and the public employee causing the injury, and must provide sufficient facts to permit the entity to conduct a meaningful investigation. *Gov. Code* § 910; *City of Stockton v. Superior Court (2007)* 42 Cal.4th 730, 737–738.

Here, the alleged tortious conduct ended no later than September 2022, when Plaintiff and Deputy Tanner ended their relationship. Plaintiff did not present her first government claim to the County until February 27, 2024, well beyond the six-month deadline. (JAF No. 65.) The County responded on March 18, 2024, advising that the claim was untimely for incidents before August 27, 2023 and deficient for later incidents because it failed to identify the claimant and the employee involved, and expressly requested additional information so that the County could investigate. (JAF No. 66.) Plaintiff did not provide the required information until May 29, 2024, when she submitted an amended claim identifying both herself and Deputy Tanner. (JAF No. 68.)

Under the GCA, only a claim that satisfies the statutory content requirements triggers the County's duty to act. See *City of Stockton v. Superior Court, supra.* Because the February 27 submission was facially deficient, the effective claim date is May 29, 2024. Therefore, any alleged misconduct that occurred prior to December 29, 2023 is expired under *Government Code* sections 911.2 and 945.6. As argued above, continuing violation is not alleged in the FAC and does not apply in this instant action. Additionally, there is no evidence that Plaintiff sought or obtained relief to present a late claim under *Government Code* sections 911.4 or

34

946.6. (JAF No. 70.) Therefore, the negligence claim fails as a matter of law.

### b. Plaintiff's Response

Plaintiff intends to dismiss her negligence claim.

As to Plaintiff's § 1983 claim, the statute of limitations did not expire. First, the County concedes that even if this were not a continuing violation, the violence during the May to September 2022 period is within a two-year statute of limitations. Plaintiff has made clear that the violence against here, including her being choked unconscious, continued on a regular basis during the May to September 2022 period.

Defendant's reliance on *Bird v. Department of Human Services*, 935 F.3d 738 (9th Cir. 2019) is misplaced. In *Bird*, the court refused to apply the continuing violation doctrine where a single act—the State's wrongful publication of her name on its child protection registry—triggered the three-year statute of limitations. Plaintiff did not bring suit until five years after she first learned of the publication of her name. This case could not be more different.

Deputy Tanner used his authority as a peace office to keep Plaintiff trapped in an abusive relationship for over a year and a half, with non-stop, unending abuse. The abuse continued for the entire one-and-a-half-year period. At no time during that period did the acts cease. As such, the matter did not reach permanency until the Plaintiff finally escaped from the continuing, repetitive attacks and the abusive relationship until the fall of 2022. The "essence" of a continuing violation is "when a defendant's conduct is part of a continuing practice. . ." and in a such case an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014). Plaintiff was subjected by Tanner to over 30 violent acts in a period of months—in other words, "a series of related acts, one or more of which falls within the limitations period." *See Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997). Notably, in suggesting that permanency is not required to establish a continuing violation, the court in *Nat'l R.R. Passenger Corp. v. Morgan*,

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

536 U.S. 101 (2002) refused to hold that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. Here, where Plaintiff experienced a pattern of virtually identical, repeated, ongoing violations over a short period of time, those acts were not so discrete that any one act would trigger accrual under the statute of limitations. Only when Plaintiff ended the relationship and the violence ceased did she reasonably understand the basis for her claim.

F. **The County's Argument 6**

a. **Plaintiff's Use of a Pseudonym Is Improper and Provides an Additional Basis for Dismissal**

Plaintiff filed this action under the name "Jane Doe" without first seeking or obtaining leave of court. This is improper as a matter of both federal and state procedure. Federal Rule of Civil Procedure 10(a) requires that a complaint "name all the parties." The Ninth Circuit allows pseudonyms only in exceptional circumstances and only with prior court approval. Fed. R. Civ. P. 10(a); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000); *Doe v. Kamehameha Schools*, 596 F.3d 1036, 1042 (9th Cir. 2010). Privacy concerns or embarrassment are not enough. *Id*. Because the rules require public identification of parties and fairness to the defense, the Court should dismiss the complaint or order Plaintiff to amend to state her true name before this case proceeds.

b. **Plaintiff's Response**

After the initial tort claim was filed under the name "Jane Doe" to protect her life, the County demanded that Plaintiff's counsel tell the County the complainant's name. The Plaintiff's counsel revealed to the County the name and identity of the Plaintiff here as the lawsuit was filed. If the Court so orders, Plaintiff will amend the pleadings to include her true name. Defendant did not raise this issue previously during this litigation and cannot point to any prejudice or other harm resulting from

not revealing Plaintiff's identity *to the public*. The identity of Plaintiff was not hidden from Defendant. Defendant knew who Plaintiff was prior to the filing of the lawsuit. Defendant knew her identity throughout this litigation, as it had her discovery responses signed under her real name. Defendant deposed Plaintiff under her real name.

## VII.   CONCLUSION

### A.   The County's Conclusion

Based on the foregoing, Defendant County of Los Angeles respectfully requests that the Court grant summary judgment in its favor on all claims. In the alternative, should the Court determine that any claim cannot be fully resolved, the County requests summary adjudication of the issues raised herein.

### B.   Plaintiff's Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the County's motion for summary judgment as to the civil rights claim under 42 U.S.C. § 1983. Plaintiff intends to voluntary dismiss her negligence claim.

DATED: October 17, 2025          HURRELL CANTRALL LLP

By:  _____ */s/ Blessing O. Ekpezu* _____
THOMAS C. HURRELL
BLESSING O. EKPEZU
Attorneys for Defendant, COUNTY OF
LOS ANGELES

DATED: October 17, 2025          LAW OFFICES OF VINCENT MILLER

By:  _____ /s/ *Vincent Miller* _____
VINCENT MILLER
JAMES JIRN
Attorneys for PLAINTIFF, JANE DOE

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

37