# TABLE OF CONTENTS

**Page**

EXHIBIT "1"……………………………………………………………………………..1

EXHIBIT "2"…………………………………………………………………………..105

EXHIBIT "2A"………………………………………………………………………...109

EXHIBIT "2B"………………………………………………………………………...111

EXHIBIT "2C"………………………………………………………………………...113

EXHIBIT "3"…………………………………………………………………………..116

EXHIBIT "3D"………………………………………………………………………...119

EXHIBIT "3E"………………………………………………………………………...121

EXHIBIT "4"…………………………………………………………………………..124

EXHIBIT "4F"…………………………………………………………………………128

EXHIBIT "4G"………………………………………………………………………...132

EXHIBIT "5"…………………………………………………………………………..139

EXHIBIT "6"…………………………………………………………………………..142

EXHIBIT "6A"………………………………………………………………………...145

EXHIBIT "6B"………………………………………………………………………...166

EXHIBIT "6C"………………………………………………………………………...167

EXHIBIT "7"…………………………………………………………………………..191

EXHIBIT "8"…………………………………………………………………………..203

EXHIBIT "9"…………………………………………………………………………..207

EXHIBIT "10"…………………………………………………………………………214

EXHIBIT "10A"……………………………………………………………………….224

EXHIBIT "10B"……………………………………………………………………….271

EXHIBIT "10C"……………………………………………………………………….273

EXHIBIT "11"…………………………………………………………………………515

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 9017-2710
TELEPHONE (213) 426-2000

# EXHIBIT "1"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE DOE,                           )
                                    )
            Plaintiff,              )
                                    )
        vs.                         )   No.
                                    )   2:24-cv-08649-SPG
COUNTY OF LOS ANGELES, a            )   (SKx)
municipal entity; AARON             )
TANNER, an individual, DOES         )         VOLUME I
1-100 inclusive,                    )
                                    )
            Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF MYKALIA COOK

LOS ANGELES, CALIFORNIA

JULY 10, 2025

REPORTED BY:  CHRISTINA M. LOPEZ, CSR NO. 13048

JOB NO.: 10168165

Q.   So since you have full coverage, you never have to pay out of pocket or make co-payments; is that accurate?

A.   For me or for my daughter?

Q.   For you.

A.   I guess it depends because Medi-Cal isn't covered by everything.

Q.   Okay.

A.   It's like certain things.  So some things, I'm sure, like, I had to pay out of pocket.

Q.   Okay.  What are the things that you had to pay out of pocket for?  Give me examples.

A.   Some of my medication is not covered by insurance.

Q.   Okay.  What else?

A.   Right now, that's all I can think of.

Q.   Uh-huh.  So did you have the same insurance -- I guess this question is redundant because you said you've had Medi-Cal for, like, nine years.

A.   Yeah.

Q.   So that takes us back to 2016.

A.   2015.  2015.

Q.   2015; okay.

So this would be the 10th year.

A.   Uh-huh.

Q.   So I was going to ask you if you had the same insurance during the time of the incidents that led to this lawsuit?

A.   Yes.

Q.   The answer would be yes, right?

A.   Uh-huh.

Q.   Were there any time -- was there any time you were denied coverage?

A.   No.

Q.   In the past ten years; okay.

Have you ever filed any claim or lawsuit against a government entity?  And by government entity, I mean, like, the city?  The county?

A.   No.

Q.   Okay; no?

A.   No.

Q.   So now let's talk about your relationship with Aaron Tanner.  So just to keep things simple, I'll call him Tanner which is his last name.

Is that -- is that fine with you?

A.   That's fine.

Q.   Okay.  When did you first meet Tanner?

A.   '22 -- or no, no.  I'm sorry.  2020 some point.

Q.   Do you know --

A.   I mean, it's kind of hard, like the timeline. So when we met --

Q.   **It doesn't have to be perfect.  And estimate are fine --**

A.   Okay.

Q.   **-- as long as they're your best estimates, right?**

A.   Yeah.

Q.   **Okay.**

A.   I'm going to try to get -- okay, so.  We would keep running into each other, like, through these parties with mutual friends.  And we'd, like, talk and we kind of, like, both liked each other and it was, like, obvious.  So I want to say around, like, 2021. Well, we started sleeping together before then.

Q.   **Oh; okay.**

A.   So early -- I want to say it was, like, January or February is when we made it official and we were boyfriend and girlfriend in '21.

Q.   **'21.**

**So early 2021 you made it official?**

A.   Uh-huh.

Q.   **But prior to that time, you started sleeping together?**

A.   Yes.

Q.      Meaning you were having consensual sex, like friends with benefit type of arrangement; is that correct?

A.      Yes.

Q.      Okay.  So between the winter of 2020 and January of 2021, that's when all of this happened, right?

A.      Yes.

Q.      And then from January of 2021 you became official as boyfriend and girlfriend?

A.      (Nods head).

Q.      Meaning you decided to make your relationship exclusive?

A.      Yes.

Q.      Is that right?

A.      Yes.

Q.      Okay.  Did he disclose to you that he was married at the time that you met him?

A.      Yes.

Q.      Okay.  What did he tell you about his marital situation?

A.      They were coparenting and basically that was it, and they were just -- he was basically taking care of all her bills and just coparenting.

Q.      Okay.  Did he -- was he wearing his wedding

band?

A.    No.

Q.    Okay.  But he came out front and told you, hi, I'm married, but this is the situation that's going on.  Right?

A.    I don't think that was, like, the first thing he said to me was like, hi, I'm married.  Maybe it, like, came up in conversation, and then he -- like, he explained the situation.  Like, it's -- I think we're not together.  Yeah.

Q.    Okay.  So you decided to get with him even knowing that he was married, right?

A.    Yes.

Q.    Okay.  Did he also tell you that he has -- he has a child?

A.    Yes.

Q.    Okay.  What did he tell you about that?

A.    Well, I mean, the only things he said about Saila (phonetic) were just like normal things, like, was a proud father and things like that.

Q.    Did you ever ask him why he never filed for a divorce before getting with you?

A.    I did ask him.

Q.    You did ask him or you did not?

A.    I did.

Q.   Okay.  And what was his response?

A.   It would be expensive.

Q.   And you believed him?

A.   I did.

Q.   So you believed everything he told you about the circumstances of his marriage, right?

A.   Everything.

Q.   All right.  When did your relationship become romantic -- actually, strike that.

You already told me that you -- you became official in January of 2021?

A.   Uh-huh.

Q.   Okay.  So in 2020, you had not -- you had no relationship with Tanner as of 2020?

A.   2020, we were sleeping together.

Q.   Okay.  After you met in the winter of 2020, right?

A.   Yeah.

Q.   All right.  Did you live together -- did you two live together at any point?

A.   Yeah.

Q.   Can you tell me about that?  How that came to be?

A.   He got me an apartment, and he would basically just go, like, back and forth, like, live between

houses.

Q.    Okay.  So were you -- where were you living before he got you this apartment?

A.    I was living on the west side of Lancaster.

Q.    Okay.  Was your lease up?

A.    What -- what was that?

Q.    Did -- why did you decide to move from where you were living to the apartment that Tanner got you?

A.    He was having problems with my family, and I was living with my mom at the time.  And she was scared of him, and so we just moved out.  That's what she wanted.  So I just -- I felt like that would be best.

Q.    Okay.  So he -- he actually paid for the apartment, right?

A.    No.  I did.

Q.    Oh.

A.    He just like --

Q.    Okay.  But did he provide the finances?  Like the rent, did he give you the rent?

A.    No.

Q.    Okay.

A.    When I was short sometimes, but it was my responsibility.

Q.    Oh, okay.  So did he leave some of his personal belongings in the apartment that you two

shared?

A.    Yes.

Q.    Okay.  And then you said earlier that he shuttled between the apartment that you two shared and his marital home; is that correct?

A.    I'm assuming that's where he was going.  But yes, he was going back and forth to somewhere.

Q.    Okay.  So did he spend some nights with you?

A.    Many.

Q.    Oh, many nights.

Like, how many nights in a typical week?

A.    It depends.  If we were fighting, probably none.  If we weren't, four.

Q.    Four nights out of seven nights?

A.    (Nods head).

Q.    All right.  Do you remember the address of this apartment that you two shared?

A.    I don't.

Q.    Was it on 16th Street?

A.    Yes.  Right next to Costco.

Q.    Was it apartment number 22?

A.    I don't remember.

Q.    Okay.  Who else lived with you at the time that you two shared an apartment?

A.    My daughter.

Powell.

THE REPORTER:  Okay.

MR. MILLER:  I'll -- I'll second the emotion because you said how is the relationship.  It would be good if you were asking time period.

MS. EKPEZU:  Yeah, I was going to instruct her -- like, I was going to ask her -- okay.

BY MS. EKPEZU:

Q.    So I -- I asked you previously what the nature of your relationship with Tanner was.  I'm going to, like, make it -- kind of trim line it because I -- I know you guys knew each other for a while.

So how was your relationship at the beginning?  And that would be from -- from the winter of 2020 when you first met up until January of 2021 when you became official.  How would you describe your relationship during that timeframe?

A.    In the beginning, it was perfect.  It was -- everything seemed fine.  Actually, perfect, though.  In the beginning.

Q.    Okay.  And then after you became official in early 2021 up until the end of 2021, how was it like?

A.    Repeat that again, the timeframe.  I'm sorry.

Q.    January 2021 to December 2021?

A.    It was great.

Q.    Okay.

A.    I mean, there were, like, red flags and things, but at the time, I didn't, like, know.  I was really young.  So I didn't -- I wasn't seasoned, I guess, in, like, dating so.  But there were, like, questionable things, but other than that, it was, like -- I was happy.  He treated me good.  We had fun.

Q.    So he treated you good throughout the year 2021, right?

A.    Not all the time.  For the most part.  Like, yeah he was still in the process of grooming me.  Like, it was pretty great.  I'm not going to like.

Q.    Okay.

A.    Then it was gradual.  Little things just, like, crept in there.

Q.    Okay.  But I know you said there were red flags, but nothing alarming.  None of the things that you've alleged in this lawsuit occurred in the year 2021; is that right?

A.    I mean, he was, like, grabbing on my arms and stuff.  Like, twisting my arms and things like that, but I wasn't being, like, shoved down and, like, thrown around and stuff at that point.  It was still in the beginning, so no.

Q.    Okay.  So how about in 2022, from January of

testimony that you've provided so far?

A.    No.

Q.    Okay.  So we were talking about the timeline of your relationship with Tanner.  My next question to you is the circumstances that led to the end of the relationship.

So let's start by asking you when the relationship came to an end.

A.    Are you asking what timeframe.

Q.    When --

A.    When.

Q.    -- did you two break up?

A.    We broke up September 12th, 2022.

Q.    Okay.  Did you two live together throughout the relationship up until the time -- the time that you broke up?

A.    He would go back and forth.

Q.    Okay.  So he was still going back and -- back and forth up until September of 2022?

A.    Yes.

Q.    Why did the relationship end?

A.    Because he was abusing me.

Q.    Okay.  So in your words, he was abusing you and -- and the relationship had to end?

A.    Yes.

Do you understand that?

A.    I do.

Q.    Okay.  So when I asked you about your interview regarding the allegations in this case, that's just what I mean.  Like, when you first alerted the County that you had claims against Tanner or that you in -- I mean, like, the first time you made the County aware that you had concerns, and then maybe you -- you subjected yourself to being interviewed by County investigate -- investigators.  That's what I'm asking about.

Like, when did you first speak with the County investigate -- investigator regarding your claims in this lawsuit?  That's a very long-winded way of asking that one question, and I apologize for that.

A.    I don't remember the month.  Some time in '23.

Q.    Okay.  Do you remember the circumstances that led to you reporting any, you know, claims against Tanner?

A.    That led to the circumstances.  Well, I got a phone call from the investigator about something that me and Tanner were involved in, like -- like, way before that he was being investigated by.

Q.    Okay.

A.    And so he was, like, basically we setup an

appointment for me to, like, talk with him.  So we did that.  And then I kind of just asked him, like, a question, like, hey, so I have, like, this going on.  I wanted to see, like, what his thoughts were on it.  And then that's how everything just, like, happened.

I honestly just wanted advice, I guess, because I knew I couldn't call, like, the police or anything else.  I couldn't talk to anyone else so I was like, oh, Internal Affairs, like, this is my chance.  I'm on the phone with them.  So that's how it started.

Q.    Okay.  So let me get this right.  You -- someone reached out to you from the County to talk to you about an investigation into Tanner on a completely unrelated event, right?

And then after you talked to this person, you decided to seek advice about something that you were dealing with?

A.    Yeah, I was scared.

Q.    Okay.  Okay.  Do you remember what you reported to the County personnel?

A.    Yeah, it was just about, like, the ongoing abuse that had been going on.

Q.    Okay.  Do you remember the specifics of what you reported?

A.    The specifics were just the things that Tanner

was doing to me.  It wasn't anything, like, super specific.  It was just everything that had happened. And he was, like, oh, that's not okay.  I was like, yeah, I know.  And then that's how it happened.

Q.    Okay.  So what I'm asking is what did you tell this person?

A.    I can't give you all, like, the details, but I do know that I told him about the abuse that I was enduring.  But I can't give you, like, word for word of what I said.

Q.    I don't -- I don't expect you to remember word for word, but this is something that happened to you and this is what set in motion what we -- we have here today.  So I'm trying to understand what you -- you may have told this person that led to subsequent events.

A.    The abuse that Tanner had put me through.

Q.    Okay.  So I'm trying to understand what abuse. Can you tell -- can you tell me what you told him the abuse was?  Can you describe the abuse?

A.    The abuse.  I told him that he was putting his hands on me, that he was using the station and his gang to control me and stalk me, and that he had surveillance on my home.  And that he was stalking me and my daughter everywhere we went.  That is what I had told him.

Q.    Okay.  Okay.  And then what happened after you

told him this?

A.    After that phone call, an hour later, two deputies showed up.  Like, a sergeant and a deputy, and they interviewed me.  And that was it for that.

Q.    Okay.  So one hour after you reported this incident to the County personnel, two deputies showed up at your home, right?

A.    Yes.

Q.    Okay.  And then what happened after these deputies showed up at your home?

A.    What happened that -- on that day?

Q.    Yes.

A.    Nothing.

Q.    Did they ask you questions?

A.    Yeah, they like interviewed me.

Q.    Both of them?

A.    Not both.

Q.    Okay.  So two people showed up at your home but only one of them interviewed you?

A.    Uh-huh.

Q.    Okay.

A.    Yes.

Q.    Okay.  Why did the second person -- was the second person present why -- while the interviewer was interviewing you?

A.   No.

Q.   Okay.  Okay.  And did you specifically request that the second person not be present?

A.   (Nods head) yeah.

Q.   Why was that?

A.   Because he was friends with Tanner.

Q.   Okay.

A.   Close friends.

Q.   Okay.  So after you -- can you tell me how this actually happened, beginning from when the deputies showed up at your house?

A.   Wait, wait.  I'm sorry.  What do you mean what happened?

Q.   Yeah.  Okay.  So what I mean is I need you to clarify the sequence of events.  I know up until the deputies -- male and female deputies, you said?

A.   Uh-huh.

Q.   Showing up at your house one hour after you reported -- made some reports to the County, right?

A.   Uh-huh.

Q.   And then they both appear in front of your door; is that correct?

A.   Uh-huh.

Q.   Tell me what happened from then.

A.   Okay.  So I heard a knock on my door.  I see

through the peephole that it's two cops -- well,

actually one.  I open it.  It's her, Kaylee and then --

Q.     Is that -- Kaylee, is that a name of the deputy?

A.     The female one, yeah.

Q.     Oh, the female deputy.

Do you know her last name?

A.     No.

Q.     Is it Volk?

A.     That sounds very familiar.

Q.     Okay.

A.     I think you're right.

Q.     Let's just say Kaylee.  Okay.  So go -- go ahead.  I didn't mean to interrupt.

A.     That's okay.  So, yeah, it was her.  And then I want to say that Marion, yeah, he was on, like, the first step.  That's why I couldn't see him in the peephole.  And I was kind of, like, shocked because I didn't know they were going to be there.  So, like, you know, I'm having all these emotions going.  I'm crying.  I'm kind of, like, like, this is weird.  Like, I just made this report and this is, like, Tanner's really good friend.

And he was, like, oh, like, okay.  I'll go downstairs.  And so he went down to the car.  I stayed

and talked with her.  And that was for like a while.

And then she had left for something and then came back,

gave me like a piece of paper of something.  And then

that was it.

Q.    Okay.

A.    Okay.

Q.    So the male deputy was not present while --

while you spoke with the female deputy, right?

A.    No.

Q.    Okay.  So did the female deputy intimidate you

in any way?

A.    I think she tried.

Q.    She tried to intimidate?

A.    I think she did.

Q.    All right.  In what ways?

A.    Making it seem like I didn't know the things I

knew or that, like, maybe you should second guess

yourself type of thing, like.

Do you want me to give you an example?

Q.    Yeah.  Just -- no, like, I mean at the initial

encounter, not anything that happened --

A.    Oh, no.  No, no, no.

Q.    Okay.

A.    She showed up.  She did her thing and -- yeah.

Q.    Was she hostile?

A.    No.  But I didn't appreciate a few of her choice of words.  Those were hostile to me in a very passive, passive way, so.

Q.    At the first encounter?

A.    Yes.

Q.    Okay.  Can you give me examples?

A.    One example is when I said Marion's name, the other deputy, and she was, like, are you just saying his name because you heard me say it or you actually -- and I'm, like, what?  Like, no, I know this guy, like -- so that's one example.

Q.    Okay.  So who is Marion?  Marion or -- what -- what name did you just mention?

A.    Marion.  He's a deputy.

Q.    Oh, okay.  Is that the male deputy that -- that excused himself?

A.    Yes.

Q.    Okay.  Do you know his last name?

A.    I want to say he's a lieutenant.

Q.    Oh, lieutenant.  Okay.

A.    I'm sorry.

Q.    So for -- I know there are different rankings, but I'll just call them deputies --

A.    Okay.

Q.    -- for the purpose of this deposition --

A.    Okay.

Q.    -- because it's going to be hard for me to, you know, try to, like --

A.    Okay.  Oh.  I don't want to confuse you more.

Q.    Yeah, understood.

So Marion is the male deputy that show -- showed up; right?

A.    Yes.

Q.    And he did excuse himself and went to the car?

A.    Yeah.

Q.    Okay.  And you only spoke with the female deputy, Kaylee?

A.    Yes.

Q.    And Kaylee, you -- you felt she was being hostile because of maybe some questions that she asked you that you were not fine with?

A.    I just knew she wasn't on my side.

Q.    From the first time?

A.    Yes.

Q.    Oh, okay.  And what made you feel so?

A.    Her comments.

Q.    Okay.

A.    Just like the example that I gave you.

Q.    Okay.

A.    Yeah.

Q.    So the fact that she asked to be sure that you actually do know that guy, is that something you did not appreciate?

A.    Yeah.  She was -- I know what she was doing.

Q.    Okay.

A.    So, yeah, I didn't appreciate it.  No, I didn't.

Q.    Okay.  Did you tell her?

A.    No.  I didn't.

Q.    So after the first interview -- or this would be the second interview.  Because you did mention that the first interview was over the phone with the initial -- with the first initial County personnel that reached out to you, right?

A.    Yeah -- well, that interview was --

Q.    For something else?

A.    -- something else.

Q.    But then you proceeded to --

A.    With two other ones, yeah.

Q.    Okay.  No.  What I mean is you proceeded to tell him stuff --

A.    Right.

Q.    -- that led to -- for investigations -- for the investigations unrelated to the initial incident that he called you about?

a weekly basis?

A.    Yes.

Q.    Okay.  From 2021 to the end of 2022.

Do you recall saying that?

A.    Uh-huh.

Q.    Okay.

A.    Yes.

Q.    So I need you to talk about -- we're going to talk about each of these incidents, and I need you to, first of all, identify the first incident and when it occurred.

A.    The first ever incident?

Q.    Yes.  First ever incident of abuse, of physical assault.

A.    The first one was when we were at our apartment that we had together.  He was arguing with about -- with me about something.  And he got heated and threw me onto the bed and punched the side, lower side of my hip.  And that was the very first, like, ever time he had, like, hit me like that.

Q.    Okay.  Do you remember the date of this incident?

A.    I do not.

Q.    Was it in the year 2021 or 2022?

A.    '21.

Q.   Do you know if it was towards the end of 2021?

A.   Yes, it was towards the end.

Q.   Okay.  And you said it happened at your shared apartment, right?

A.   Yes.

Q.   Do you remember what time of the day it was?

A.   It was nighttime.

Q.   Where was your daughter at the time?

A.   I want to say she was with my mom.

Q.   Okay.  So it was just the two of you --

A.   Yeah.

Q.   -- in the apartment?

A.   I don't remember her being there.

Q.   Did you sustain any injuries from this incident?

A.   A bruise.

Q.   Did you take any photographs?

A.   No.

Q.   Why not?

A.   I had no reason to.

Q.   Did you seek medical treatment?

A.   No.

THE REPORTER:  Try to speak a little louder, please.

THE WITNESS:  Okay.

did he threaten you?

A.    Yes.

Q.    Okay.  And that's what informed your fear to -- like that -- okay.  I'll strike that.

That's why you stayed?

A.    I stayed because I knew that he had power.  I mean, he was a leader of a gang, a cop.  So, yeah.

Q.    We are going to get to that.  I was just asking about the acts of --

A.    I'm telling you why I stayed, though.

Q.    Okay. Okay.  All right.  So as of the end of 2021 when you -- when this first incident occurred, you knew that he was a member of a gang?

A.    I knew before then.

Q.    Oh, you knew before then?

A.    Yeah.

Q.    Okay.  But you still -- when did you know? When did you find out?

A.    Early, early on.  Like, when I first met him.

Q.    So that would be in the winter of 2020?

A.    Yeah.  And I had heard about him.  He -- like, he was, like, very known at Schooners.  Like, I knew about Tanner and, like, the power he had.

Q.    Okay.

A.    Not to the extent but. . .

Q.    Okay.  So you said before that he twisted your -- your wrist, right?

A.    Uh-huh.  Yes.

Q.    Approximately how many times?  Because it seems to me that it happened more than once.

A.    Yeah.  Can I just give you an estimate?

Q.    Yes.

A.    Over 50 times in our relationship.

Q.    Okay.  So you began dating in January of 2021, and then the -- the first act of physical violence, and by that I mean him allegedly hitting you occurred towards the end of 2021?

A.    Uh-huh.

Q.    So between January of 2021 and, let's say, October, does that sound accurate?  Like, when I say end of 2021, is October -- does October sound fair?

A.    That's what I think of when I think end. Like, September, October of that timeframe, yes.

Q.    Okay.  So between January of 2021 and September of 2021, he twisted your hand -- arms approximately 50 times?

A.    Our -- within our whole relationship.

Q.    Oh, okay, okay.  That's it.  That's --

A.    Yes.

Q.    -- now I understand.

A.   I can't give you a timeframe.

Q.   Was it --

A.   And estimate, I'll say that it was in the next two weeks.

Q.   Okay.  Was it same 2021?

A.   Yes.

Q.   Okay.  So approximately two weeks after the first time?

A.   (Nods head).

Q.   Okay.  Can you describe what occurred?

A.   I can't think of it at this time.

Q.   Okay.  So when did the weekly abuse start?

A.   Before it was getting really, really bad around my birthday.  I remember that.  My birthday is in March.  Just --

Q.   Okay.

A.   And that was in 2022.

Q.   Okay.

A.   It was really, really bad at that time. Because I remember we went to Vegas too for Baker to Vegas and my birthday celebration.  That's when it was really, really, really bad.

Q.   Okay.  So we talked about wrist twisting, and you said it occurred approximately 50 times through the life of your relationship.

A.    Could be more.

Q.    Okay.  Could be more?

A.    (Nods head).

Q.    And where did this occur at?  And what I mean is was it at your home?  Was it in his car?  Where did he twist your arms?

A.    Home, car, bar.  Wherever we were.  Drive-through.  Wherever we were at the time.

Q.    Can you describe what you mean by arm twisting?

A.    He would take his hand, grab the top of my wrist, twist that back or he'd, like, grab the top of my wrist, then grab, like, my elbow, like, twist.  And just twist my arm in all kinds of ways.  Call them, like, pressure points.

Q.    Was it -- did it happen during arguments?

A.    Yes.

Q.    So you argued that often?

A.    Almost every day.

Q.    Okay.  So, and he would proceed to grab your hand and twist it when an argument occurred?

A.    Like, if I tried to walkway or --

Q.    Oh, okay.

A.    -- or if he wanted me to, like, look at him, yeah.

Q. Did you express discomfort?

A. Me?

Q. Yes. You.

A. Yes.

Q. And what did he do when you did so?

A. Screamed, cried, begged him, told him that he was hurting me, please let me go.

Q. And how did he respond?

A. Stoic, no emotion.

Q. And what would happen after this occurred? Like in terms of how would the relationship, you know?

A. Just go back to normal. Actually really weird. Just stop. I'd be crying. We'd, like, eventually, like, be, like, way. Like, I'd be like on the bed or something. We would, like, just have, like, alone time. That was weird. It would just go back or he would come up to me and tell me he was sorry, and that he could do better, and, like, this isn't him. And it would just fall right back into it.

Q. Okay. So I asked you about where this occurred, this incident occurred, and you mentioned your home.

That's the apartment that you shared?

A. Uh-huh.

Q. And then you mentioned car, maybe when you

were in the drive-through?

A.    Yes.

Q.    Or maybe you were driving somewhere, and then you mentioned bars.

A.    Uh-huh.

Q.    Can you think of any other location?

A.    Not at this moment.

Q.    Okay.

A.    No.

Q.    Can you recall any other physical acts of violence that was made at you by Tanner?

A.    Yes.

Q.    Okay.  Can you -- can you tell me about that?

A.    There's one specific when we were in Vegas, for Baker to Vegas.  He was -- during the race day, he was upset about something.  I don't remember.  I think -- I want to say it was because, like, the race took up the whole day, and we were tired and wanted to be, like, back at the hotel, like, or something.  And he was upset.

He -- we were, like, in the back of an SUV on our way back into Vegas.  There's other people in the SUV.  We were in the back.  I was trying to get his attention for something, and he was just irritated.  And when he was irritated, like, you just have to leave him

alone.  And I remember I went to, like, play with his nose or something or, like, do that to, like, make him laugh and he grabbed my wrist, twisted it, called me like -- I don't know if I'm like allowed to, like, cursor or not.

Q.    Yeah.  You're allowed to.

A.    Okay.  Called me, like, a bitch.  I started crying because it hurt.  He continued to try to take a nap or pretend he was.  And then I told him I was, like, cold.  That upset him.  He threw his backpack in my face.  So, like, things like that were happening in the car.

And then when we got back to the hotel room, he was extra pissed.  I want to say because I involved one of his friends in the SUV because he had, like, asked, like, if we were okay because he, like, heard us in the back, and I was like no.

He had attacked me in the room and chased me into the bathroom.  And he actually had broke the glass shower door because he had, like, opened the -- the bathroom door so fast.

So that was one of them that I can recall.

Q.    Okay.  So let's talk about the Vegas trip. What did you call it?

A.    What was that?

sudden, he just grabbed your hand?

A.    Well, we were separated so we were in the actual van that was like -- we were with the racers at the time.  So, like, giving them water.  Basically we ride on the side, along side the racers so we were in that van.  He was in front with his -- the guy that was in front of me in the SUV, and then I was in the back.

And so after the race, we got into the SUV, and he was irritated and I knew that because it was, like, hot, and there's no AC in the van.

Q.    Okay.

A.    So he was already irritated.  He wanted to go back to Vegas, and I was like trying to make it better and --

Q.    Okay.

A.    -- and I didn't make it better.  So that's what happened.

Q.    Okay.  So he -- he grabbed your hand.

A.    Uh-huh.

Q.    Twisted it.

And then did anything else happen?

A.    He, like, shoved me away.  I was crying, and then he, like, went back, closed his eyes, and then until like 30 minutes later, it was really cold.  You know, like, I need your sweater, but it was in his

backpack that was on him.  And he took his backpack and threw it in my face as hard as he could.  And then that's when that guy was, like, hey, is everything okay. I was, like, no, Tanner is being psycho.  And then he didn't say anything after that.

Q.    Did you sustain any injuries from this incident?

A.    Just bruises.

Q.    Did you take pictures of the bruises?

A.    No.

Q.    So what happened?  How long was the trip to the hotel?

A.    Driving there?

Q.    The drive to the hotel, yes.

A.    I don't really remember.  I want to say, like, an hour, maybe an hour and a half.

Q.    Okay.  So how was the atmosphere in the vehicle after he threw the backpack at you?

A.    It was awkward.  Like --

Q.    Silent?

A.    It was silence.  Like, it was, like, they knew something was going on.  I mean, his friend asked if I -- like, if I was okay.  It was like silence, awkwardness.  And then once because we had made a bathroom stop, Tanner was the only one who got out, and

the driver had, like, leaned back and asked me if I was okay. So I knew that he'd saw and, like, heard, like, we were in the car together.

Q.    Okay.  Did you ask him for help?

A.    No.

Q.    Okay.  Did you -- why didn't you ask him to help you?

A.    I mean, when he had leaned back and, like, asked if everything was okay. I was, like, no, like, Tanner is being crazy. Like, I'm scared of him. I knew I wasn't going to get help if I asked for it. They weren't going -- they were just going to listen to him, and I was going to be screwed on that.

Q.    So did any of these persons in the vehicle see, actually see when he tossed the backpack at you?

A.    I don't know if they actually saw --

MS. POWELL:  Objection; calls for speculation.

Go ahead and answer.

MS. EKPEZU:  I think she already answered.

Did you catch that, Madam Reporter?

THE REPORTER:  "I don't know if they saw."

THE WITNESS:  I mean, I don't think they did, but they, for sure, did because they asked if I was okay.

BY MS. EKPEZU:

Q.    All right.  How about the arm twisting?  Did they see?

A.    Probably not.

Q.    Okay.  And then you got to the hotel?

A.    Yes.

Q.    Do you remember the name of the hotel?

A.    Trump.

Q.    The Trump Hotel?

A.    Uh-huh.

Q.    Do you remember what room it was?

THE REPORTER:  I'm sorry, Counsel?

BY MS. EKPEZU:

Q.    Room.  Room number.

A.    I don't remember the room number, but it was, like, a double.

Q.    All right.  So can you describe what happened at the hotel one more time?

A.    He was still upset.  I was, like, getting dressed.  I wanted to leave because that was our plan to, like, go out after.  He was upset.  He didn't want to leave.  And then he got more upset, and the reason, like, he attacked me was because I had an outfit on that he didn't approve of, and he said I looked like a whore. And so he wanted me to change, but I was, like, no, I am not going to change.

And he said you look like a whore.  We're not leaving until you take it off.  And I didn't want to, and I turned around to walk to the bathroom, I think, and he jumped up, because he was in, like, a little, like, arm chair, kind of like this, jumped up, tackled me to the floor.  I was, like, screaming, get off me.  I can't breath.  He -- I want to say he had his knee in my back.  I was like -- at this point, I was screaming loud.  Like, I want the hotel to hear me.  Like, it was loud loud, and then he got off because I was screaming so loud.

And then I ran to the bathroom and he ran after me, and I had slammed the door shut, and he had hit it before it shut and it went and hit the shower door that was open and it broke a part of that off.  And that was that.

Q.   Okay.  Was it the shower door that broke?

A.   Yeah.

Q.   Okay.  Did anyone from the hotel show up?

A.   No.

Q.   Did you take photographs --

A.   No.

Q.   -- of the broken door or any part of your body that may have been injured from this incident?

A.   No.

McDonald's because I was hungry.

Q.    Okay.

A.    And we ordered food.  And some guy complimented me, and then it restarted over again, and the abuse started again.  And then we went back to the hotel.  And I kind of blacked out after that.

But, yeah, we went out for, like, a little bit though.  It wasn't long because he got mad after the guy called me beautiful.

Q.    Okay.  Did you report the hotel incident to any of his friends or the people that you rode with to the hotel?

A.    No.

Q.    This -- did you discuss this Baker to Vegas incident with the County investigators that interviewed you previously?

A.    I did.

Q.    Okay.  Are you changing any part of your -- are -- are you changing any part of your story?

A.    No.

Q.    Okay.  Or are you adding anything?

A.    I don't believe I am.

Q.    Okay.  So any other acts of -- of physical violence that you wish to talk about?

A.    I mean, there was a lot.  I'm trying to, like,

Q.    We were talking about the first incident of physical violence that you said occurred towards the end of 2021.  Then you previously testified that he -- he struck you on -- on your side and that would mean --

A.    It was, like, lower.

Q.    Your lower abdomen --

A.    Like, lower butt side.  Right here.

Q.    Okay.  Towards your -- your --

(Speaking simultaneously.)

THE REPORTER:  I'm sorry.  One at a time.

BY MS. EKPEZU:

Q.    Okay.  Can you describe where he --

A.    Lower butt side.

Q.    Okay.

A.    Yes.

Q.    Okay.  Was it during this incident that he choked you?

A.    Uh-huh.

Q.    Okay.  So when -- when I asked you to describe the choking incident, I'm asking you based upon this singular incident.  We're going to talk about as many incidents as you would want to --

A.    Okay.

Q.    -- but I'm just limiting it to this first incident.

A.    Okay.  I understand.

Q.    Okay.

A.    Okay.

Q.    So could you please describe the choking.  How the choking occurred?

A.    So like I said, I don't remember what we were, like, exactly fighting about, but I do know that he was angry, and I was, like, trying to walk away or something.  And he had threw me onto the bed.  He was choking me first.  I was screaming saying I couldn't breath, and then he went -- he, like, jumped up.  I remember that.

He, like, jumped up, punched me and then, like, made, like, this, like, weird crying noise and then, like, backed away, sat on the back of the dresser. It was -- it was, like, our bed and then we had a dresser on the wall.  And he, like, sat on there and he was just, like, crying.  And then I had sat on the edge of the bed, and I was in shock, and I was honestly wondering why he was crying too.  Like, I was so confused.  Like, the whole thing was weird.  And I was just holding him but, like, in shock, and he was bawling.  And I was, like, I forgive you.  Like, I -- that's what it was.  Yeah.

Q.    Okay.  So he put you down and placed his hands

around your neck?

A.    No.  He had me -- so my body is on -- like, I'm on my stomach on the bed.  He had it like this.

Q.    Okay.  Like a choke hold --

A.    Yes.

Q.    -- is that what they call it?

A.    That's a choke hold, yes.

Q.    Okay.  Okay.  And you previously said that he had his knee on your back?

A.    Uh-huh.

Q.    So he did that simultaneously, had his knee on your back and had you in a choke hold --

A.    Well, we were -- we were like --

Q.    Struggling?

A.    Yeah.  It was for a little bit.

Q.    Okay.  So --

A.    Yeah, I was trying to, like, get out of his grasp.

Q.    Okay.  And which one occurred first?  The knee on your back or the choke hold?

A.    The knee because he was getting me down there.

Q.    The knee first?

A.    Yeah.

Q.    Okay.

A.    I never hit him, but there were times when I,

you know, with the whole situation. I'm screaming. I'm not shutting up while he's choking me out, like. And he punched me, and then he shocked himself, I think. That's what it looked like.

Q. Oh, okay.

A. He was crying. I don't know. He could have been, like, acting it, but that's what I saw.

Q. Okay. And then did the choking event occur after this -- this one time that we -- we're talking about now? Like, did it reoccur? Did he choke you after this -- the first time it happened?

A. Yes.

Q. Approximately how many times?

A. Throughout our relationship?

Q. Yes. Right from the first time it happened which is the end of 2021.

A. I'm going say over 50 times. Way over.

Q. Way over 50 times?

A. It's my estimate.

Q. Okay. And did it happen the same time -- the same times as the arm twisting?

A. It always, yeah. When it was physical, it was -- like, if there was arm twisting earlier in the day, there was going to be, like, something physical later in the day. Like, it always went hand-in-hand

with each other.

Q.    Okay.

A.    Yeah.

Q.    And this happened at home?

A.    Mostly.

Q.    Mostly at home?

A.    We were in the car too.

Q.    Okay.

A.    If it was at bars, it was more, like, secretive.  Like, he would just, like, grab on me, like, in public.

Q.    Okay.

A.    He was more aggressive with his -- in front of his friends.  Like, when we were at Baker to Vegas, he was more aggressive around them, but at home is when he'd really like. . .

Q.    Was it -- did it happen mostly in the middle of the night or around nighttime?

A.    I would say so.  Mostly, yeah.

Q.    Okay.  And I'm going to ask you this next question, but I don't mean to come off as being offensive, but it's just a question that I feel is important to ask.

And the question is did you and Tanner practice BDSM at any point during your relationship?

Q.    Okay.

A.    If I do, like, something comes to my head, am I able to, like, let you know?  Okay.

Q.    Okay.

THE REPORTER:  Just try to keep your voice up.

THE WITNESS:  Sorry.

BY MS. EKPEZU:

Q.    Okay.  So in your complaint and your responses to interrogatories, you did talk about an incident that occurred on New Year's Day in the year 2022.

A.    Yes.

Q.    Do you remember it?

A.    I do.

Q.    Okay.  Do you want to describe how that incident occurred?

A.    Yes.  So it was New Year's.

Q.    New Year's --

A.    It was New Year's eve.

Q.    Okay.

A.    It was, like, getting ready to go into New Year's; okay.  So we're at a bar.  So we go to a bar. We were only there for a little bit, and I don't remember what happened, but like usual, we were fighting.  And --

Q.    Where was this bar located?

A.    Lancaster.

Q.    Okay.  Do you know the name of the bar?

A.    Schooners.

Q.    Schooners, okay.

A.    Yeah.  So we were at Schooners.  We were waiting for the ball to drop.  And he had gotten upset. And I want to say it's because I, like, hugged one of the bouncers there or something.  I think that's what the fight started from.  He didn't like that.  So he, like, left out the backdoor.  The ball dropped.  All that happened.  So he's, like, mad at me, and then he, like, tells me to follow him, and I go to follow him, and he's, like, gradually upping the speed of the car.

        And right when we get into an intersection, he slams on his brakes so that I crash into him, and then I, like, saw my car like smoking, and I, like, jump out, and I'm, like, screaming and crying, and, like, I'm in shock.  And he gets out and he's smiling.  And there was someone who had seen it all.  And this was at like -- I'm going to say, like, maybe 2:00.  There was, like, no one on the road or anything.

Q.    2:00 a.m. in the morning?

A.    Yeah.  It was early.  Yeah, the ball had already dropped and all that.

        So there was, like, one person out.  She saw

and she pulled up and she was, like, do you need me to, like, call 9-1-1 for you.  Like, she could see.  Like, she knew something was not right about the situation. And I was, like, yes, please, get me away from him. He's crazy.  And so she was, like, okay.  And so she hurries up and calls 9-1-1, and explains the situation, and then he pulls out his phone, and he calls dispatch and cancels the call.

And that was that for that.

Q.   Okay.  So let's back up a bit.

Both of you went to the bar in your different cars?

A.   Uh-huh.

Q.   What car was he driving?

A.   The truck -- no, no, not the truck.  His Subaru, I want to say.  Subaru.  Blue.

Q.   Blue?

A.   A blue little car.

Q.   Is it an SUV or a sedan?

A.   Sedan.

Q.   Okay.  And you -- what car were you driving?

A.   I was driving my Toyota at the time.

Q.   What color is your Toyota?

A.   It was black.

Q.   And what make -- sorry, not the make.

A.    Home was the other way.

Q.    Okay.

A.    Yeah.

Q.    And then when you got to the intersection, he slammed on -- on his brakes?

A.    Uh-huh.

Q.    And then you hit him?

A.    I did.

Q.    So that means you rear-ended him, right?

A.    I did.

Q.    How close were you driving behind him before -- immediately before the accident occurred?

A.    I mean, it was like -- I don't know.  Like, your normal, like, distance driving behind someone.  Like, a normal, like, car distance.  What is that?  Like, 100, 200 feet?  I don't know.

Q.    Well, I -- I -- I'm not an expert --

A.    I'm not either.

Q.    -- on what a normal distance would be.

But were you paying attention while you were driving?

A.    I was very -- I was paying attention.  Because I did not want to loose him.

Q.    Okay.

A.    I didn't want him to get mad at me further.

Q.    Oh, he walked up to you?

A.    I was by my car.

Q.    Okay.

A.    Yeah.  He confronted me smiling, and I was asking him why did you do this.  I'm a single mom.  How am I going to get another car.  That's what I was saying.

Q.    Okay.  So at -- at this point, you talked about a bystander or someone just driving past?

A.    Uh-huh.

Q.    At this time when the confrontation occurred, where was this bystander positioned?

A.    I want to say she was at the red light from -- so we're in the intersection.  So think of, like, this as the intersection.  So we're driving this way.  She's at a red light right here.  So she was, like, right there, I want to say.

Q.    Okay.

A.    Because she was right there, like, when it happened.

Q.    Okay.  So can you tell me what intersection this happened at?

A.    30th and L, west Lancaster.

Q.    I'm not familiar with Lancaster.

A.    Okay.

Q.    So I'm just saying.

A.    Yeah.

Q.    I don't think I've ever been --

A.    Don't go.  Just don't.

Q.    Okay.  So it happened at the intersection of 30th and L, and then the bystander was driving her -- is it -- is it a female or?

A.    A girl.

Q.    A girl, okay.

She was driving her vehicle and had stopped at the red light?

A.    Yeah.  It was a red light.  I know that for sure.  I don't know if she was, like, already going, but she just, like, appeared there.  And there was no one else around.

Q.    Okay.  So did she drive up closer to you guys?

A.    To me, yeah.  And she --

Q.    Okay.  Did she get out of her vehicle?

A.    She did.  When we went in -- when I had pulled my car up into that McDonald's parking lot because it was, like, smoking or whatever.  But she was in it while she was calling 9-1-1, and then after all that, when he, like, canceled it and told me to pull my car up, then she got out and was, like, trying to get me -- she was, like, concerned for me.  She was trying to, like, make

sure I was okay.

Q.   Okay.  So this bystander -- I'm trying to understand the sequence of events.  So this accident happens and this bystander was stopped at the red light.

Did you pull over to the nearby McDonald's before she came to meet you guys there?

A.   No.

Q.   Okay?

A.   No.  So the accident happened.  I get out. I'm watching him walking over to me smiling.  Then I see her, okay.  She's in her car.

Q.   Okay?

A.   So she rolls up on me while I'm out of my car. She's still in her car and she asked me if I want -- if she wants me to call 9-1-1 or whatever.  Yeah.

So she calls.  He picks it up, cancels the call.  And then after that, then he puts his phone away, and then he tells me to park into the McDonald's parking lot.

Q.   Okay.  So this -- the bystander called 9-1-1 while you were at the intersection?

A.   Yes.

Q.   Okay.  Did you see when she actually picked up her phone and called 9-1-1?

A.   It was, like, immediate.

Q.   Okay.   So did you listen to the entire 9-1 -- the conversation that she had --

A.   It was short.  I was there.  I was standing there.

Q.   Okay.  Do you recall what she said?

A.   No.  I -- I think she asked if I was scared or something, and I was, like, yes.  Like, send help.  Like, they were asking her questions to ask me.

Q.   Okay.  So you do recall her asking you if you were scared?

A.   Something like that.  But I don't -- I can't tell you the conversation.

Q.   Okay.  Did she also ask Tanner if he needed help?

A.   She didn't even -- no, she didn't talk to him.

Q.   Okay.  She only talked to you?

A.   Uh-huh.  It was obviously I was, like, the victim.  It was, like, crazy what happened, yeah.

Q.   Okay.  So do you think she understood that you were the victim considering that you had just rear-ended --

A.   I absolutely do.

Q.   Okay.  And did she express that?

A.   Yeah.  I mean, she saw him laughing too.  Like, it was -- it was clear he, like, did it

intentionally.

Q.    Okay.  So the conversation that she had with the 9-1-1 operator, you think she called to report that something had happened to you?

A.    My witness?

Q.    No.  Okay.  Sorry.  Let me rephrase -- rephrase the question.

What I'm asking is the details of the bystander's call to 9-1-1.  I'm trying to understand what she reported.

Does that make sense?  Did she report -- did she call to report an accident or --

A.    She -- she asked me if I wanted -- if I was in fear if I wanted her to call 9-1-1, and I said, yes, please get me away from this guy.  He's crazy.

Q.    Okay.  Did you say that, like, out loud?

A.    Yes, yes.

Q.    Okay.

A.    That is why she called.

Q.    So what she asked you was not whether you were injured.  She asked if you were afraid.

A.    Yeah, she didn't ask if I was injured.

Q.    Okay.  And then you told -- you yelled or you responded you and said get me out of --

A.    Yeah, I like -- yeah --

THE REPORTER:  I'm sorry, just one at a time.

MS. EKPEZU:  I'm sorry.

THE REPORTER:  Counsel, can you ask the question again, please.

MS. EKPEZU:  I'm not really sure.  Can you try to read back?

THE REPORTER:  So then you yelled or you responded.

MS. EKPEZU:  Okay.  I didn't mean yell anyway.

BY MS. EKPEZU:

Q.    You responded to her when she asked you --

A.    Yeah.

Q.    -- if you were afraid.

What was your -- what were the exact words that you used or that you said?

A.    Yes, please, get me help.  He's crazy.  Get me away from him.  Call 9-1-1.  I was, like, frantic, though.  So I was probably saying all of them.

Q.    Right.

A.    Help me -- like, yeah.

Q.    Okay.  And do you know if she communicated that to the 9-1-1 operator?

A.    I'm going to say yes.

Q.    Okay.  And -- and just to clarify, you heard the entirety of the 9-1-1 call, not from the other side.

A.    Oh, no.

Q.    I mean from the by -- bystander's point of view.  Like, you heard everything that she said?

A.    I was standing up right outside her window.

Q.    Okay.

A.    With the window down.  I was right there with her.

Q.    When she made the call, right?

A.    Yes.

Q.    Okay.  And then what happened?  You pulled over to the nearby McDonald's?

A.    Uh-huh.

Q.    The parking lot?

A.    Yup.

Q.    And then what happened after that?

A.    We were just kind of like standing there, and she was, like, trying to talk to me.  And I want to say I was just silent just standing there because, like, after he canceled the call, I was, like, well, there's nothing I could do now.  And I knew that was, like, the end.  Like, I knew that that wasn't him just talking.  He just showed me right there how much power he had.  That's a pretty big deal to me.

Q.    Oh, yeah.  I was going to ask that -- I think we skipped some part.  The part where you said he called

dispatch to cancel the call.

Can you describe how that happened?

A.    So he took out his phone.

Q.    Was it after you got to the McDonald's parking lot?

A.    No, it was -- we were still at the crash scene.

Q.    Okay.

A.    Yeah.

Q.    Okay.

A.    Pulled it out.  And this was like right after she was done talking to them.  Like, he was just waiting.  It might have even been before she even hung up.  So he pulls it out, and he -- I just see him, like, do like whatever.  He gets on the phone and does, like, some, like, cop talk.  Whatever.  Like, hey, it's Tanner, yeah, it's me, blah, blah, like, cancel it.

And I was just, like, are you serious, like -- and it was canceled.  And then he said pull into the parking lot.  So I did.  I sat there and she was like trying to talk to me, like.

And Tanner put me in, like, a bear hug, and I remember him saying, we're going home now.  And I was, like, that's it, I'm going to die.

It sounds funny, but it's actually not.

Q.    No --

A.    I thought I was going to die that night.

Q.    Well, when you saw me like -- it -- it seemed like I was laughing, but that's just -- that was not me laughing.  I'm not laughing at your experience.  That's not what -- and I apologize if it came off that way.  It's not funny.  None of this is funny.

A.    Thank you.

Q.    So, and then you went home.

Whose car did you -- did you ride with him or you drove your --

A.    I drove mine back.

Q.    And then what happened to your vehicle?  Did you ever get it repaired?

A.    No, I didn't have the money to.

Q.    Did he offer to pay for the repairs?

A.    Tanner.

Q.    Uh-huh.

A.    He said he would, but then he decided to fix his car and then pay off his truck.  So then he decided not to fix mine after all.

Q.    You said that after Tanner spoke with the dispatcher, the -- the dispatcher complied with his directions.

Can you expound on that?  Like, how do you

know if the dispatcher did actually comply?  And do you remember -- sorry, I'm asking -- strike -- strike that.

Do you remember the exact words Tanner said to the -- to whomever he was speaking with on the phone after the 9-1-1 call was -- was made?

A.    The whole conversation, no.  But word for word, he did say, yeah, this is Tanner.  It's me.  Cancel.  Cancel the call.  Like, it's me.  The accident is me.

Q.    Okay.

A.    I couldn't hear dispatch, though.

Q.    How -- okay.  I -- I -- I expect that you would not hear since he was using his cell phone, right?

A.    Yeah.

Q.    He called using his cell phone.

And then how long after did Tanner call did you remain at the scene of this incident?

A.    Six minutes, five.

Q.    Okay.  So after Tanner made that call, you -- both of you drove off -- out of the accident scene within five to six minutes?

A.    Well, yeah, he wanted to go home because he was mad that I even had even thought to, like, ask for help from that girl.  Like, he was already pissed that I put him in that situation, I think, you know.  He knew

that he'd get in trouble, and him canceling it was my fault, and he wanted to get home.

Did I have a reason for that, no.  I don't know what his reasoning was to leave.  I think it's because just in case, like, cops came, you know.

Q.    Okay.  Do you know if -- since you left -- okay.  Let me back up.

So both of you drove off around -- around five or six minutes max after --

A.    Yeah.

Q.    -- he had called, right?

So do you know if cops or the EMT showed up eventually?

A.    I do not know.

Q.    Okay.  Is there a way you would have known?

A.    No.  Unless I asked.

Q.    So you're not even sure as you sit here, that he actually canceled that call?

A.    Oh, no.  He told me.  I asked him --

Q.    Okay.

A.    -- after all that was blown over.  I was, like, that was, like -- yeah, it was cancelled.

Q.    Okay.  So he told you it was canceled?

A.    Yes.  Yes.

Q.    Okay.  So I'm going to try to play an audio.

questions, and then you can now provide a response.

Do you understand?

A. I do.

Q. Okay. So the vehicles that -- are not the vehicles that you recall were involved in that incident, right? The vehicles that were described in the 9-1-1 call that we just listened to are not the same vehicles that were involved in the --

A. Yeah, that's not mine. That's not my 9-1-1 call.

Q. Okay. Okay.

A. Yeah.

Q. Okay. Understood. Let's move forward.

You talked about stalking.

A. Uh-huh.

Q. You alleged that Tanner stalked you after you broke up with him.

And you provided the breakup date as September 12th of 2022, correct?

A. Uh-huh.

Q. And then you testified earlier that he moved out. Like, he -- he went away for at least two months after the --

A. Yeah, yeah. I -- yeah. I had moved out of the apartment. But yeah, he went away.

Q.    Okay.  Okay.  I think I understand now.

A.    Okay.  Okay.  Maybe that's why.

Q.    So you moved out in November?

A.    Yes.

Q.    So that would mean you moved out in November of 2022?

A.    Uh-huh.

Q.    Okay.  That makes sense now.

A.    Yeah.  And then --

Q.    That's what I was trying to understand.

A.    Okay.

Q.    Because you said you stayed there for a -- like, you moved out after a year so I --

A.    Oh, okay.

Q.    -- I understood that to mean that you moved out after a year post-breakup.

A.    Okay.

Q.    Do you understand what I mean?

A.    Sorry.

Q.    Yeah.  So I -- now I get it.

A.    Okay.

Q.    Okay.  So you talked about stalking. And when did the stalking begin?

A.    Before we were intimate.  So years ago.  It started before we even dated.

Q.   Okay.  He just stalked you before --

A.   Uh-huh.

Q.   -- you began dating him?

A.   Uh-huh.

Q.   How do you know he was stalking you?

A.   He told me.  He'd take pictures of my car and send it to me, tell me he's watching me.

Q.   Oh.

A.   I'd see him.

Q.   How did that make you feel?

A.   Send me his location.

Q.   How did that make you feel?

A.   Upset, scared, confused.

Q.   Okay.  And that was before you even began being intimate with him?

A.   Uh-huh.

Q.   Okay.  So you were feeling upset, scared and -- what was the other word that you used?

A.   What was that?

Q.   What other word did you use?

A.   Scared, upset, frustrated.

Q.   Okay.  Frustrated.

A.   Confused.

Q.   Okay.  That he was doing -- stalking you, but then you still went into a relationship with him?

A.    I didn't know he was stalking me in the beginning.  He just had told me that.

Q.    Okay.

A.    After our relationship.

Q.    Okay.  He told you after you two were going together?

A.    Yeah.

Q.    Okay.

A.    If I knew he was stalking me, I'd probably call the cops on him.

Q.    Okay.  And then at what point did he tell you that he had been stalking you before you two got together?

A.    This was, like, when we got into our apartment.  He, like, waited until we were with each other for a bit.  Yeah.

Q.    Okay.  And then let's talk about the stalking that occurred post-breakup.

When did you first notice that he was stalking you after you two broke up?

A.    When I'd still see him driving by our apartment and shining the light in, the police light, the patrol light, the big one, into the window.  When I'd see him parked out of my work when I was working at Costco.  And he would take pictures of my vehicle and

send it to me.

I'd see him at the gym I go to, and he -- everyone knows he does not go to public gyms because of all the people he's arrested.  That's what he says.  He only goes to law enforcement gyms.  But he started going to my gym that I go to, going to the store, the only store that I go to.  It's just they aren't coincidences.

Q.    Okay.  Let's talk about the gym.

What's the name of the gym?

A.    Planet Fitness.

Q.    Okay.  And it's the one in Lancaster?

A.    Yes.

Q.    Okay.  How many outlets do they have in Lancaster?

THE REPORTER:  I'm sorry.  How many?

BY MS. EKPEZU:

Q.    Outlets, like store.  What do you call it?  Gyms.  Gyms.

A.    I think warehouse.

Q.    What?

A.    I'm not sure, though, how many warehouse gyms they have.

Q.    Okay.  So you just saw Tanner show up at the gym while you were working out?

A.    Uh-huh.

Q.    Did you take pictures of him?

A.    No.

Q.    What was your -- what was your immediate reaction after that when you saw him?

A.    Left.

Q.    You left?

A.    Immediately.

Q.    Okay.  Did you alert the gym staff?

A.    No.  I don't really go anywhere alone anyways so I always have, like, a buddy.  So I alerted my sisters.  They were there with me when that happened.

Q.    Okay.  How did you inform your sisters?  Did you text them?

A.    No.  We were next to each other and I told them, I said we need to go.

Q.    Okay.  Then you talked about him surveilling your home.

A.    Yeah.

Q.    Or flashing lights.

Is it like beam lights, harsh lights?

A.    I don't know if you have ever seen, like, a patrol car, a cop car, but they have big, like, circular lights on the front.

Q.    Okay.

A.    And they have handles on the inside for you

to, like, maneuver them so they can go all kind of which ways.  So that's what he would, like, use to put into the window.  And they're bright.  Like, they'll light up like a whole, like, field.  Yeah.

Q.    So he did that approximately how many times post-breakup?

A.    The light thing, that was, I would say, only a couple of times, but there were instances where my apartment manager told me that he saw a guy with binoculars in my window and he went to, like, ask him, like, what was up, and he said that he had permission from the sheriff's department to be there to watch one of his tenants.

Q.    What was the name of your apartment manager?

A.    Jesus.

Q.    Do you know his last name?

A.    I don't.

Q.    Okay.  So your apartment manager Jesus confronted some -- some guy?

A.    Uh-huh.

Q.    Was the guy on plain clothes?

A.    Yeah.

THE REPORTER:  I'm sorry.  Was the guy on?

BY MS. EKPEZU:

Q.    Plain clothes.

BY MS. EKPEZU:

Q.    How many times did he show at your gym?

A.    Three times.

Q.    Three times.

Okay.  You talked about him showing up at the only store that you shop in.

A.    Uh-huh.

Q.    What's the name of the store?

A.    Vons.

Q.    Vons.

Okay.  And how many times did he -- did that happen?

A.    Oh, that hap -- happens often.  Over 20 times.

Q.    Okay.

A.    Estimate.  And like --

Q.    So can you describe how it does happen?  Like you show up to shop and you find him shopping at the same time?

A.    Well, I don't find him.  I usually just, like, see him, like, creeping in a corner or something or, like, ducking down an aisle or like. . .

Q.    Has he ever, like, walked up to you to talk to you?

A.    No.  Because I get out of there.  I'm not going to wait around.  I'm scared.  I'm not going to do

A.    I discussed it with my attorney.

Q.    Okay.  So the individual that was on plain clothes that stood outside your apartment with binoculars, you testified earlier that this individual had said to your apartment manager Jesus that he was with the County, that he was the law enforcement?

A.    Well, he never said he was law enforcement. He said that he had permission from the sheriff's department to be there to watch.

Q.    Did you get this individual's name?

A.    No.

Q.    Do you know if he's a County employee?

A.    I don't.

Q.    Okay.  Do you know if the -- do you know who in the County permitted this individual to do what he did?

A.    I do not.

Q.    Okay.  Do you believe Tanner permitted him to do what he did?

A.    I do not.

Q.    Okay.  Any other stalking incidents that we haven't talked about?

A.    After the breakup, no.  I don't think so.

Q.    Okay.  Looks like some other stalking incident occurred during the relationship.

I would tell him that.  I'm an adult.  I can do what I want.  But I don't like feeling watched, you know.

Q.    So when you told him you didn't like it, did he stop?

A.    No.

Q.    Okay.  Did you report to the police?

A.    No.

Q.    Did you see the need to?

A.    I wanted to but I knew it wasn't going to do anything.

Q.    But you did not?

A.    I didn't.

Q.    Okay.  Did you report to the County, to the Los Angeles County Sheriff Department?

A.    Before the report?

Q.    Yeah, before the report that you made over the phone in 2023.

A.    I did not.

Q.    Okay.  So the first time that you reported anything concerning Tanner was during the phone call in May 2023, right?

A.    Yes.

Q.    Okay.  And that was, like, many months after your breakup?

A.    Uh-huh.

Q.    Okay.  Okay.  So in your interrogatory responses, you did say that Tanner abused you while on duty and sometimes off duty.

A.    Uh-huh.

Q.    So can you please distinguish for the record which of these incidents happened while he was on duty versus when he was off duty?

A.    Okay.  So -- and the violence was the same on or off duty.  So if it was on duty, he would come home from lunch or come to have lunch there with me or use the restroom.  Because cops don't like using public -- like public restrooms.  That's a thing.  And so, like, he'd come back home and, like, use the restroom or have lunch with me.  And then, like, that's when it'd happen. Like, he'd, like, snatch me up or throw me on the ground or grab my wrist or, like, pin me down to the ground. The same things over.

Q.    Okay.  So the -- the lunch break was at the apartment that you shared?

A.    Yeah.  That -- that was often.  We would do that, like, if he was at work --

Q.    Okay.

A.    -- he'd like buy lunch and then come bring it back and we'd have lunch.

Q.    Lunch together?

when did it begin?

A.   Can you ask the question again?  I'm sorry.

Q.   I'm sorry.  I know the question sounds confusing even to myself.  So I'll strike -- I'll strike -- I'll strike that.  Yeah.

I -- you testified earlier that the physical assault started some time in September, October of 2021?

A.   Yes.

Q.   Do you remember that?

A.   (Nods head).

Q.   Okay.  So, and it continued until you broke up -- broke it up in September of 2022?

A.   Yes.

Q.   So that would be a year long of abuse --

A.   Uh-huh.

Q.   -- per your testimony.

A.   Yeah.

Q.   So what I'm asking is if the -- the incidents that occurred during his break time occurred during this time -- timeline from September 2021 to September of 2022?

A.   Oh, yes.

Q.   Okay.

A.   Yes.  Absolutely.

Q.   Okay.  All right.  Did he ever display --

display his -- his arms, like gun at any point --

A.    Yes.

Q.    -- like, (inaudible).  Sorry, my accent.
Like --

A.    Sorry.  You mean like his biceps?

Q.    No, no, no.

Like his handgun or weapons.

Was there any -- was there any time that he used his weapons to, like, you know, assault you or intimidate you?

A.    Yes.

Q.    When did this happen?

A.    I don't have a date, but I know it was 2022.

Q.    Okay.

A.    And it's -- again, it's crazy.  We were fighting.  This time it was because -- I want to say this was Thanksgiving night, actually.  I don't -- no.  Maybe not.  That's a different time.

Okay.  So he, like, shows up to the apartment.  It's dark and he's convinced that I, like, changed the key for our door.  So he, like, has me come up and open the door for him, and he's, like, convinced.  So he stands there at the door and he's, like, looking at both of our keys for, like, 15 minutes.  Like, studying our keys.  Like, all of it.

And I was trying to convince him of, like, why -- like, why would I change the keys.  Like, that's kind of crazy.  Like, I knew you were going to come home, like, all these kind of things.  Like, we just moved here.  And so he's still convinced I changed the keys on him or the locks.  I'm sorry.  And so he starts taking his gun apart -- no.  He sits in my chair, my vanity chair.  He starts, like, taking his gun apart, and, like, this, like -- I don't know what's the right word -- cynical maybe.  Like, he had, like, this, like, offsetting look in his eyes and his face.  It was like stone cold, and he's sitting there, like, taking his gun apart, like, and, like, glancing over at me, glancing back.  Like, intimidating me.  And I was telling him, like, I'm scared.

That was another time I thought I was going to die.  So he takes the whole gun apart and puts it down.  And he was, like, do you feel better now.  I'm, like, well, yeah.  A little bit.  And so then he takes his knife out of his pocket and starts playing with his knife and like tracing his fingers on the sharp part and, like, looking at me.

So, yeah, that's that night.

Q.    Did he always carry a knife with him?

A.    Yes.

Q.    All right.  So this incident that you just talked about, the key comparison incident.  That's what I'll call it.

A.    Yeah.

Q.    Yeah.  Because there are so many incidents so let's call that one key comparison incident.

You said it happened in your shared apartment?

A.    Yes.

Q.    And where -- he -- he would -- he had just come from outside, right?

A.    Yes.

Q.    And you were already at home with your daughter?

A.    Yes.

Q.    Okay.  Was he returning from work?

A.    Well, actually, I don't know if my daughter was there.

Q.    Okay.  Sorry about that.  Okay.

A.    Yeah, I want to say I got off work and he got off work, and he was coming home.

Q.    So he got off.

Do you know if he was -- if he had just got off work?

A.    I want to say so.

Q.    Was he wearing his uniform?

A.    No.  He was wearing plain clothes.

Q.    He was wearing plain clothes?

A.    Yes.

Q.    But he had his gun?

A.    He did.

Q.    Did he --

A.    He always had his gun.

Q.    Okay.  Go ahead.

Do you know if it's the County gun or -- oh, strike that.  Let me back up a bit.

Do you know if he had any other gun apart from his, you know, assigned County gun?

A.    Yeah.  He did.

Q.    He did?

A.    Uh-huh.

Q.    How did you come to find out?

A.    He told me and showed me pictures.  He had, like, a huge safe.  He had, like, over, like, 80 guns, I want to say.

Q.    Oh, he has a safe where he stores 80 guns?

A.    Yeah.  Like, over that.

Q.    Over 80 guns?

A.    Yeah.

Q.    Is it, like, in a storage?

A.    Maybe.  I don't know.

one that he carried at work --

Q.    Okay.

A.    -- on his hip when he was also off duty.

Q.    Okay.

A.    So that one stayed on his hip.

Q.    Okay.

A.    Yeah.

Q.    So do you know which one he brandished?  The one he displayed?

A.    It was the patrol gun.

Q.    The patrol gun?

A.    Yes.

Q.    And how do you know that?

A.    Because it was -- it's the gun that he always wore on his hip.

Q.    Does it have any insignia like a stamp, like a common stamp?  Do you -- do you -- how do you distinguish --

A.    It's black.

Q.    Sorry?

A.    It's a black Glock.

Q.    Okay.  How do you distinguish his County gun versus his --

A.    Well, I just knew because I was with him.  Like, I dated him.  I just knew.  It's, like -- I don't

know.  I feel like that's, like, easy though to see. Like, you see it every day.  You see it on their -- your significant other, the person you're with.  It's just something you just, like, see every day, you know.

Q.    Okay.  So he displays the gun and the knife and then puts them away?

A.    Yes.

Q.    Just like that?

A.    On the dresser.

Q.    Okay.

A.    He just put them on the dresser.

Q.    And then takes them away, puts them away after he's convinced that you have not changed the locks?

THE REPORTER:  I'm sorry, Counsel.  I didn't hear you.

BY MS. EKPEZU:

Q.    I said he puts them away after you convince him that he -- you did not change the locks.

A.    He just sat them to the side on the -- the dresser.

Q.    Okay.  Yeah, that's what I meant.

A.    Yeah.

Q.    Okay.  And then what happened next?

A.    I want to say he ended up feeling bad, and we made up.

penalty of perjury.

A.    Okay.

Q.    Okay.  For -- for the incidents that you claim were on duty, did you ever report any of this incidents to the County --

A.    No.

Q.    -- to -- to the sheriff department?

A.    No.

Q.    And did any of this incidents occur outside of your home?

A.    Like, the physical --

Q.    No.  I mean, the one you said were on duty.

A.    No.

Q.    Okay.

A.    No, they did not.

Q.    Yeah.

Then I believe somewhere in your interrogatory responses, you talked about going on ride alongs with Tanner?

A.    Yes.

Q.    Okay.  Approximately how many times did this occur?

A.    It was a lot.  Estimate over 30 times.  It was a lot.

Q.    So can you tell me the circumstances of this

ride along?

A.    I'd be off work.  I'd just be doing nothing.
His day shift, and so he'd offer -- he'd be, like, hey,
I'm thinking about you.  Can I come pick you up or do
you want to come hop in the car and go for a ride along.
And I'd be like, yeah.  And then he'd pick me up from my
house, and I'd stay with him until end of shift.  And
then he'd change out of the station, finish up his
paperwork, and then we'd head home and he'd drop me off.

Q.    Did you sign any paperwork --

A.    No.

Q.    -- before getting in the actual vehicle?

A.    No.

Q.    Were any of these ride alongs scheduled
through the LASD?  LA -- by LASD I mean Los Angeles
County Sheriff Department.

A.    No -- no.  Because I didn't sign anything.  No
one was aware.

Q.    So since you didn't sign anything, there were
no logs, no formal logs that were prepared for --

A.    Correct.

Q.    -- the time --

THE REPORTER:  I'm sorry, there were no
formal?

MS. EKPEZU:  Logs.  Like logbook, l-o-g.

THE REPORTER:  I'm sorry, could you just ask the question again so I can get the answer.

BY MS. EKPEZU:

Q.    Okay.  So I was asking if there were any logs, formal logs --

A.    No.

Q.    -- that you completed; okay.

Did you observe him perform any deputy duties during the ride alongs?

A.    Yes.

Q.    Okay.  And what kind of duties?

A.    All of them; pulling people over, searching people, holding people at gunpoint, showing up to deaths, people overdosing on drugs, car accidents. Those things.

Q.    Okay.  How did you -- did you find it interesting?

A.    I did.

Q.    Okay.  So you enjoyed it?

A.    Well, I come from a family of law enforcement. So, yeah.

Q.    Okay.

A.    You know.

Q.    You also talked about him driving you places in his patrol vehicle when he was off duty.

Did that ever happen?

A.    I don't feel it was off duty, but did he like -- yeah, because --

Q.    Okay.

A.    -- there were rights being given, yeah.

Q.    All right.  Can you describe the occasions when did this happen?

A.    It was very frequent.  Like, let's say if he had to drop my daughter off to my mom or something, he'd use his patrol car, but he'd be on duty.  So he'd take her there.  Or if I was having car issues or something, like, he'd use -- he'd pick me up in his patrol and drop me off to work.  Things like that.

Q.    Did you consider these -- these rides official County business?

MR. MILLER:  Objection; vague.

MS. EKPEZU:  Do you need me to clarify?

MR. MILLER:  You can answer.

BY MS. EKPEZU:

Q.    You can answer if you understand.

A.    I don't think I understand.

Q.    Okay.  So the times that he dropped you off, dropped your daughter off and your mom off or took you places with the patrol vehicle, did you consider that he was doing the County's business during those times?

A.    Just to clarify, not to be rude, but he never, like, took my mom anywhere.

Q.    Oh, okay.

A.    Yeah.

Q.    I'm sorry.

A.    No, it's okay.  I just wanted to make sure that was --

Q.    Okay.  Yeah.  Sure.

A.    Yeah, I'm so sorry.

Q.    Okay.  Was it doing the County's business when you were -- you were -- you're driving?

A.    You know, I never even really thought about it, you know.  Yeah, I didn't know.

Q.    Okay.  You didn't -- you don't know if he was doing the County business?

A.    I didn't at the time.  Now I know that that was wrong, and that you're supposed to, like, sign things.  But at the time, I thought it was, like, normal.

Q.    Okay.  So during those times that he took you places, did you think he was, like, working or trying to do his law enforcement activities?  That's essentially where -- where I'm headed.  Like, was he doing law enforcement activities when he was taking you places in the patrol vehicle?

slewing (phonetic) around Lancaster.  He was very vocal about it.

Q.   Okay.  So did he ever threaten you with his gang?

A.   Yes.

Q.   What exact words did he say to you that made you feel threatened?

A.   That if I would come out and report him, that he would have them handle me, take care of me, remind me about the bodies that are in the desert.  And that he's a shot caller.  What he says goes.  And he wasn't lying. He was telling the truth.

Q.   Okay.  How many times did he threaten you using this gang?

A.   Towards the end of our relationship, I was threatening him with breaking up with him a lot more because I just wanted, like, the stuff to stop.  It was probably like quite a few times during the end.

Q.   So he threatened you quite a few times --

A.   Yeah.  He didn't want --

Q.   -- towards the end of your relationship?

A.   Yeah.

Q.   And can you estimate how many times?

A.   I'll say over 15.

Q.   Over 15?

A.    (Nods head).

Q.    Okay.  So that would be in 2022.

A.    Yes.

Q.    That's when the threat became more frequent.

A.    Yes.

Q.    Right?

A.    Yes.

Q.    Okay.  And you -- you mentioned -- you said he -- he told you he was a shot caller.

What does that mean?

A.    Basically he's the daddy of the station.  Like I know --

Q.    Daddy?

A.    I know it's a weird word, but that's what they, like, call each other.  He was the higher up.  Like everyone respected him.  He was --

Q.    Like a boss?

A.    The -- the big dog.  The top dog, yeah.

Q.    Okay.  But did he use the exact words, shot caller?

A.    He said I'm the one who calls off -- sorry.  I'm spacing the word.  Not dispatch, but, like, help.  He's the one who calls off help to other deputies' calls.  So, yeah, that is a shot caller.

Q.    Oh, that's what you mean by shot caller?

A.    Uh-huh.

Q.    That he calls -- like, he decides what calls get responded to?

A.    Yeah.

Q.    Oh.  So does this mean he's the helmsman of the Rattlesnakes gang?

A.    He's up there.

Q.    But you don't know for sure he's the number one guy?

A.    I know he's a shot caller.

Q.    And that's because -- based on what he told you?

A.    Uh-huh.

Q.    Okay.  Did anyone else tell you that Tanner was the shot caller?

A.    No.

Q.    Did anyone else tell you that Tanner belonged to a gang?

A.    Yes.

Q.    Who else?

A.    A couple of the guys that worked at the station.

Q.    Okay.  They -- these guys told you, oh, Tanner is a gang member?  Is that your testimony?

A.    One of them did.  I wouldn't say he said --

A.    I do get that.

Q.    Okay.  So anyone else talk to you about Tanner being a member of a gang?

A.    No.

Q.    Or being a shot caller?

A.    No.

Q.    Okay.  So tell me what you knew about the so-called Rattlesnakes gang.

A.    Well, all I knew was from what Tanner told me that there's about, like, 80 of them.  It's like a group at the station.  They basically run it.  Obviously, there's, like, a top dog.  But they would hold backup from people.  They basically just run around torturing all the other deputies.  Like, if you don't want to do something that they wanted you to do, like, something dirty.  Like, they'll get you back, they'll withhold backup from you or --

THE REPORTER:  I'm sorry.  They'll?

THE WITNESS:  Withhold backup from you.  They'd plant drugs on people.  I mean, obviously, they kill people, like with the WinCo guy.  You know, they left him there to die in the pillar.  So things like that.

BY MS. EKPEZU:

Q.    Okay.  So all you knew about the Rattlesnakes

gang is what Tanner told you?

A.    Yes.

Q.    You have no other independent source of information regarding this gang, right?

THE REPORTER:  I'm sorry.  You have?

BY MS. EKPEZU:

Q.    Independent source of information.

MS. EKPEZU:  Did you get that?

THE REPORTER:  I didn't get what you said after that.

MS. EKPEZU:  Okay.

BY MS. EKPEZU:

Q.    I -- I said you have no other independent source of information regarding this gang other than what Tanner told you?

A.    No.

Q.    Okay.  So did he use the word rattlesnakes?

A.    Tanner?

Q.    Yes.

A.    Yeah.  He showed me his tattoo too.

Q.    Okay.  So other than what Tanner told you, what other proof do you have that this gang exists?

A.    I guess I have none but the tattoo right now.

Q.    Okay.

A.    I mean, I don't have it with me.

the tattoo when he told me about the gang.  So I don't feel comfortable answering that because I might not be --

Q.    So did he ever -- did he ever tell you that these were gang tattoos?

A.    Yes.

Q.    That this was a gang tattoo?

A.    Yes.  And you had to be initiated to get one.

Q.    Okay.  So did he tell you that other gang members had the same tattoo?

A.    Yes.

Q.    Did he tell you when he got the tattoo?

A.    I want to say he did, but I don't remember.

Q.    Does he have other tattoos --

A.    Yes.

Q.    -- on his body?

Approximately how many?

A.    He has, like, another one on his leg.

Q.    Okay.

A.    On the other one.

Q.    On the other leg?

A.    Yeah.  Yeah, that's it.

Q.    Okay.  Do you know what that tattoo, like, depicts?

A.    No.  It's like -- like, you can't really,

like, recognize it.

THE REPORTER:  You can't really?

THE WITNESS:  Like, recognize it.

BY MS. EKPEZU:

Q.    Any other tattoos?

A.    No.

Q.    Do you know the tattoo artist that -- what do you call it? -- drew this tattoo on him?

A.    He told me who it was.  I don't know how true that is.  He told me that it was -- I forgot his name but he runs the AV scanner site in Lancaster.  He has, like, a tattoo shop out in Lancaster and apparently he does the tattoos, so.

Q.    Did he give you the name of the individual?

A.    The crazy thing is, is that I used to know the guy briefly.  So I kind of knew his name, but I can't tell you right now.  I don't -- I can't think of it.

Q.    Okay.  So other than this tattoo on his leg, what -- is it -- this specific tattoo that you -- that is depicted in this picture that you produced in discovery, what -- what side of his leg is the tattoo on?  Is it his left leg or his right leg?

A.    I think it's the right.

Q.    Right leg?

A.    Yeah.  I'm almost one thousand percent sure

it's the right leg.

Q.    So other than this tattoo on his right leg, is there any other -- is there any other thing that led you to believe that Tanner is a gang member?

A.    That was it.  Just what he showed me.

Q.    Yeah.  Just what he told and just that's it?

A.    And what I went through, yeah.

Q.    Okay.  Did you think what he went through was as a result of him being a gang member?

A.    The -- to the point of getting away with all that -- those things, absolutely.  Absolutely.

Q.    Okay.  What -- what led you to believe that?

A.    Well, that was my first time seeing someone cancel a 9-1-1 call when someone was asking for help.  That's crazy.  Like, that's a big one for me.  I could have died that night.

Q.    Okay.  Any other reason?

A.    None that I can think of right now.

Q.    Okay.  So in your discovery responses, you -- you named other deputies that are possible members of the Rattlesnake gang; is that correct?

A.    Yes.

Q.    So can you tell me the names of these deputies that you believe belonged to the gang?

A.    Yes.  I don't know for sure.  I just want to

A.    No.

Q.    Did Tanner ever show you any gang symbols? Like, you know, how some gangs have, like, a gang sign. You know, stuff like that?  Did he ever gesture -- gesture to you, show you a sign that he said was, like, peculiar to Rattlesnakes gang members?

A.    No.

Q.    So the only evidence, quote and unquote, that you have that -- about these Rattlesnake gang is a tattoo on Tanner's right leg?

A.    Yes.

Q.    Okay.  And that's because Tanner told you that that tattoo was an identifying tattoo for Rattlesnakes gang members?

A.    Yes.

Q.    Okay.  Did you observe gunner -- I'm sorry, gunner.

Did you observe Tanner engage in gang activities?

A.    Yeah.  It had to have been the time when he had like -- I want to say it's like crystal meth or something, but it's, like, a -- it kind of looks like quarts rock.  It's, like, clear-ish white milky-ish, not like exactly white.  And, like, he was, like, showing me, I remember, on, like, a -- a ride along, and he,

A.    Yes.

Q.    Okay.  And then you found him holding an -- an object --

A.    Yes.

Q.    -- that he described as crystal meth?

A.    Yes.

Q.    But you don't know what did he with that object?

A.    I do not.

Q.    Okay.  So any other -- did you observe him engage in any other gang activity?

A.    No.

Q.    Did you see him attend meetings, gang meetings?

A.    Gang meetings, no.

Q.    Okay.  Did you ever call 9-1-1 to report the things that you claim Tanner did to you?

A.    No.

Q.    Okay.  Did you make complaints to law enforcement, any law enforcement, not just LASD about Tanner's conduct towards you?

A.    No.

Q.    So that would mean you never reported any of this behaviors to LASD?

A.    No.

A.    They did.

Q.    Okay.  And you testified earlier that you never reported any of these incidents to the County up until July -- mid 2023?

A.    Yes.

Q.    Okay.  So the County's, like, decision not to discipline County, just like you're alleging right now -- sorry -- to discipline Tanner, as you're alleging right now is the reason why you think the County should be responsible?

A.    Yes.

Q.    Okay.  So in your discovery responses, you claim that the County has a pattern and practice -- that there's a pattern and practice in -- in LASD.

Do you understand what that means?  Because I'm trying to understand what you mean by that.

MR. MILLER:  I'm going to tell you, you can't say anything about any communications between your -- your attorney.  Anything that I told you, explained to you about it, you can't really answer to that.

THE WITNESS:  Okay.

BY MS. EKPEZU:

Q.    So what's the basis for your claim that the County has a pattern and practice?  Or LASD has a pattern and practice that -- this is what you included

Q.   Did you make any complaints or report to the County about deputy gangs or any gang at all --

A.   Before Tanner?

Q.   Yeah, before 2023 when you made that --

A.   No.

Q.   -- report over the phone?

A.   No.

Q.   No; okay.

Have you seen any County policy encouraging deputy gangs?

A.   Have I seen any?

Q.   County policy?

A.   County policy?

Q.   Uh-huh.

Encouraging deputy gangs?

A.   No.

Q.   Do you know if any exist?

A.   No.

Q.   Have you seen any e-mails, memo, directives encouraging deputy gangs?

A.   No.

Q.   Did anyone in -- in the County or LASD management say to you that they approved deputy gangs?

A.   No.

THE REPORTER:  I'm sorry.  That they approved?

MS. EKPEZU:  Deputy gangs.

BY MS. EKPEZU:

Q.    Do you know who sets the policies at LASD?

A.    Do I know who what?

Q.    Writes the policies or sets the policies --

A.    No.

Q.    -- at LASD?

Do you have any documents that proves that the County knew about the existence of these deputy gangs -- gang, rattlesnake or any deputy gang?

A.    Do I have any?

Q.    Document --

A.    No.

Q.    -- that shows that the County knew?

A.    No.

Q.    So do you have any document or any evidence that shows that the County were indifferent to Tanner's conduct towards you?

A.    Indifferent.  At this moment, no, I can't think of anything.

Q.    Is there anything you want to add or clarify about the County's responsibility for Tanner's conduct towards you other than what we've talked about?

A.    At this moment, not right now.  My mind is like -- it's a lot.

A.   I mean, Tanner told me that during, like, the process of becoming a cop, when he was doing, like, his lie detector and, like, the crazy test.  I don't know, like, psych test, that he, like, didn't pass any of them.  Like, they all came back, like, indifferent or, like, another word for that.  So, like, yeah, it's their fault for letting -- you're supposed to pass these tests.  They're supposed to know if you are absolutely mentally okay to become a sheriff's deputy.  You have a gun and a badge.  They let him just fail everything and still become a cop.

Q.   Okay.  So are you saying that Tanner was not even qualified --

A.   No.

Q.   -- to be a cop in the present sense, but, yet, the County employed him as a cop?

A.   They did.

Q.   Okay.  So this is based off of what Tanner told you?

A.   Yeah.

Q.   Do you have any other evidence that the County failed to train Tanner?

A.   No.

Q.   Okay.  Do you know what training he should have obtained that would have maybe made him fit to be a

A.    Oh, I thought you said did they put a stop to it.

Q.    Oh, no.  Yeah.  No, that's not what --

A.    Okay.

Q.    That's why I said if you don't understand, ask me.

A.    I thought I did understand the word.

Q.    I said stamp, and I even gestured because I was trying to, like, be clear.

So are you saying that the County approved of any of this, Tanner's conduct towards you?

A.    No.

Q.    Nothing.

Do you know if any County policy requiring deputies to conduct domestic violence?

A.    No.

Q.    Do you think Tanner -- the County encouraged Tanner to commit domestic violence towards you?

A.    No.

Q.    Do -- do you know if anyone in the County's management, and by County's management I mean LASD, the Los Angeles County Sheriff's Department, do you think anyone in the LASD's management knew about your relationship with Tanner while it was ongoing?

A.    Like, while we were dating?

Q.    Yes.

A.    Yeah.

Q.    I mean like -- I don't mean his fellow deputies.  I mean, like, people higher up.  Like, his supervisors, his --

A.    Yeah.

Q.    The captain in his station?

A.    I don't know about the captain.  But, yeah, they knew who I was.  I was brought around.

Q.    Okay.  Who were the persons that knew about your relationship?

A.    I can't give you names.  There's so many of those people there.

Q.    Okay.  So did Tanner ever introduce any of them as his supervisors?

A.    That, I do not remember.  He would have just said the names.  He wouldn't have said, like, this is my supervisor.  He wouldn't have said that.

Q.    Okay.  So you have no evidence that any LASD management personnel knew about your relationship?

A.    They knew about our relationship.  Did they know that it was -- there was domestic violence, no, I don't think so.

Q.    Okay.  Let's talk about your injuries, damages.  And that should alert you that we are near the

A.    No.

Q.    Okay.  You talked about photos that you have stored on your phone.

A.    Uh-huh.

Q.    Did you produce those photos -- are you willing to produce those photos in discovery because like I told you, this is --

A.    Right.

Q.    -- the only photo that we have.  The one with the tattoo.

A.    Okay.

Q.    So are you able to produce those photos to us?

A.    I believe I'm --

THE REPORTER:  Sorry.  Are you able to?

BY MS. EKPEZU:

Q.    To produce the photos to us?

A.    I -- I believe I am able to, yeah.

Q.    Okay.  All right.  Thanks.

So how about emotional injuries?  Are you claiming any in this lawsuit?

A.    Yes.

Q.    What are your symptoms?

A.    I have complex PTSD, anxiety, depression. Before Tanner, I was able to, like, function and work, hold a job like a normal person.  Now with my PTSD, I --

I really can't do anything.  Like, being here today is taking a really big toll on me and I want to, like, leave right now.  I want to, like, run out.

I don't know how long it's going to take me to heal my PTSD, if ever.  I'm working on it with my therapist, but we have a long journey to go, so.

Q.   Okay.  When did these symptoms begin?

A.   During my relationship with Tanner.

Q.   At the beginning of your relationship?

A.   No.  During.

Q.   During?

A.   My abuse started.

Q.   How often do you experience these symptoms?

A.   Every day.

Q.   Have you received a -- a diagnosis?

A.   Yes.

Q.   And have you sought treatment?

A.   Yes.

Q.   What's the name of the -- your provider?

A.   Healing Solutions Family Therapy.

Q.   Okay.  Healing Solutions Family Therapy?

A.   Yes.

Q.   Do you -- are you working with a specific therapist?

A.   Yes.

A.    Yes.

Q.    All right.  So are you claiming any other damages apart from the emotional injuries that we talked about?

A.    No.

Q.    Are you claiming financial losses?

A.    Yes.

Q.    What kind of -- what's the basis for your claim of financial losses?

A.    I can't hold a job.

Q.    Okay.

A.    So I can't have, like, a life of my own.

Q.    Okay.  So you previously produced your tax returns in discovery for year 2022 and 2024.

A.    Uh-huh.

Q.    Okay.  So your claim for lost income and wages, when does it begin?  I'm sorry if that question is confusing.  But at what point are you claiming this loss of income damages from?  From what timeframe?

A.    I guess from the beginning of our relationship.

Q.    So from 2020?

A.    No, no, no.  That was friends with benefits. So I'm saying like when we first started --

Q.    Okay.  So from 2021?

A.     So I want to say it started from when I started working at Costco.  So early 2022.

Q.     Okay.

A.     Because he was effecting my job.  I -- we were -- he was making us -- like, we were fighting all night and then I couldn't -- I would be late for work for two hours.  You can't show up for work for late for two hours.  That was all effecting my well being.  Me effecting my rent.

Q.     Okay.  So your loss of income claim dates back to 2022?

A.     Yes.

Q.     So January of 2022?

A.     Yes.

Q.     Up until present?

A.     Yes.

Q.     Okay.  What are the financial losses are you claiming in this lawsuit?

A.     Everything.  Housing, my car.  Everything pretty much.

Q.     Okay.  So you're claiming the cost of your -- replacement of -- of your car or the cost of repair?

A.     Uh-huh.  All -- all of it.

Q.     Okay.  Do you have any documents to substantiate these claims?

before we broke up.

Q.    So the last time that you saw Mr. Tanner and you had a conversation with him was before you broke up?

A.    Yes.  So almost three years ago.

Q.    The other occasions in which you said you've seen him has been in and around the Lancaster area, correct?

A.    Yes.

Q.    And of those occasions where you've seen him in and around Lancaster, I think you named Vons and Costco and Planet Fitness, correct?

A.    Vons and Planet Fitness.  Costco is when I worked there.

Q.    You worked there up until December of 2022, correct?

A.    Right.

Q.    Had you seen Mr. Tanner in Costco from September, when you broke up, to December of 2022?

A.    Yes.

Q.    Did he say anything to you?

A.    No.

Q.    In the times where you saw him at Planet Fitness, did he say anything to you?

A.    No.

Q.    And the times that you saw him at Vons, did he

say anything to you?

A.    No.

Q.    Did you ever seek to get a restraining order against Mr. Tanner?

A.    No.

Q.    Why not?

A.    Because I was scared and a piece of paper wouldn't stop someone like Aaron Tanner.

Q.    So you were afraid to go and seek court intervention because you thought a piece of paper would not help you?

A.    Yeah.  I thought, like, with me -- because it was like so soon with me coming out and making a police report, I felt like he was really angry with me for me doing that.  And I was scared to further him more.  I didn't want to do that.

Q.    As you sit -- understood.

As you sit here today, you said that you still suffer PTSD, correct?

A.    I do.

Q.    Are you still afraid of Aaron Tanner?

A.    I am.

Q.    Did you think that filing the civil lawsuit against him would provoke a response from him?

A.    I know it was very possible.

REPORTER'S CERTIFICATE

I, CHRISTINA M. LOPEZ, CSR No. 13048, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the actions.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 10th day of July, 2025.

CHRISTINA M. LOPEZ, CSR. No. 13048

# EXHIBIT "2"

Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
Blessing O. Ekpezu, State Bar No. 332308
E-Mail: bekpezu@hurrellcantrall.com
HURRELL CANTRALL LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017-2710
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendant, COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE DOE,

        Plaintiff,

        v.

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive,

        Defendants.

Case No. 2:24-cv-08649-SPG(SKx)

**DECLARATION OF DEPUTY CHRISTOPHER DEACON**

[Assigned to Hon. Sherilyn Peace Garnett, Courtroom "5C"]

I, DEPUTY CHRISTOPHER DEACON, declare as follows:

1.    I am a Deputy Sheriff with the Los Angeles County Sheriff's Department ("LASD") assigned to the Risk Management Bureau. In this capacity I am responsible for monitoring and evaluating risk-related issues, including departmental policies, training, and investigations involving deputy misconduct. I have personal knowledge of the facts set forth herein, and if called upon as a witness to testify thereto, I could competently and truthfully do so.

2.    Counsel for the County of Los Angeles has provided me with a brief overview of this lawsuit for purposes of preparing this declaration. My understanding is that Plaintiff, JANE DOE, alleges she was involved in a romantic

relationship with former LASD Deputy Aaron Tanner between approximately 2020 and September 2022, and that Tanner physically abused her during that relationship. I have been informed that Plaintiff claims some incidents occurred when Tanner was on lunch breaks, that he occasionally gave her rides in his LASD patrol vehicle without the required authorization. Plaintiff further alleges that Tanner told her he was part of a group of deputies referred to as the "Rattlesnakes." Plaintiff first reported these allegations to LASD during the summer of 2023.

3.      According to official LASD personnel records maintained in the regular course of business, Deputy Aaron Tanner's employment with LASD was terminated on December 1, 2023. The termination was based on an incident that is unrelated to the allegations made by Plaintiff in this case.

4.      After Plaintiff reported her allegations in the summer of 2023, LASD's Internal Criminal Investigations Bureau (ICIB) promptly opened an investigation into the allegations against Deputy Tanner. That investigation is ongoing.

5.      LASD maintains a written Family Violence Policy that expressly prohibits any employee from engaging in acts of family or domestic violence. The policy requires that all incidents of family violence involving Department employees be promptly evaluated and, if necessary, formally investigated, and provides that violations are subject to disciplinary action up to and including termination. Attached hereto as **Exhibit A** is a true and correct copy of LASD Manual of Policy and Procedures Section 3-01/030.16 (Family Violence).

6.      LASD operates a Ride-Along Program that allows members of the public to accompany deputies only after advance approval by a station or unit commander. Participants must sign a written waiver and meet specific eligibility requirements. Unauthorized ride-alongs—such as those alleged by Plaintiff—are strictly prohibited. Attached hereto as **Exhibit B** is a true and correct copy of LASD Manual of Policy and Procedures Section 5-09/250.00 (Ride-Along Program).

7.      LASD has a written policy entitled "Prohibition—Law Enforcement

2

Gangs and Hate Groups" which expressly forbids deputies from participating in, promoting, or soliciting others to participate in any law-enforcement gang or hate group. The policy requires that substantiated violations be reported to the Commission on Peace Officer Standards and Training and subjects violators to discipline up to and including termination. Attached hereto as **Exhibit C** is a true and correct copy of LASD Manual of Policy and Procedures Section 3-01/050.82 (Law Enforcement Gangs and Hate Groups.)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 22, 2025, at Los Angeles, California.

DEPUTY CHRISTOPHER DEACON

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

# EXHIBIT "2A"

_____

## 3-01/030.16 - Family Violence

Members of the Los Angeles County Sheriff's Department are prohibited from engaging in acts of family violence as defined by applicable law. All family violence incidents involving Department employees will be thoroughly evaluated by management and, if necessary, investigated.

For the purposes of this policy, incidents of family violence may include, but are not limited to, domestic violence as defined in the Manual of Policy and Procedures, section 5-09/030.00, Domestic Violence.

Members found in violation of this policy will be subject to appropriate discipline.

_____

# EXHIBIT "2B"

## 5-09/250.00 - Ride-Along Program

It is the policy of this Department to encourage interested citizens to familiarize themselves with the facilities, equipment, and operations of this Department by riding as observers and by touring station/unit facilities.

Assignments for ride-alongs (or station/unit tours) shall be made through prior arrangements with the station/unit involved.  Station/unit commanders are urged to approve requests for ride-alongs which originate within their station/unit, provided the participant meets the criteria set forth under this section.  When headquarter units receive group requests for ride-alongs, they shall supply the station/unit commander with the names and phone numbers of the persons wishing to participate in ride-alongs and coordinate the date and time with the station/unit involved.  Individual requests should be referred to the appropriate station/unit.

High school juniors and seniors, 16-years-old or older, shall be permitted to participate as ride-alongs. Students below the junior year should be limited to well-planned comprehensive tours of station/unit facilities.

The number of ride-alongs allowed during any given shift shall be determined by the station/unit commander.

Vehicle safety belts shall be worn by all ride-along participants while riding in county vehicles.

# EXHIBIT "2C"

## 3-01/050.82 - Prohibition - Law Enforcement Gangs and Hate Groups

### Purpose

Building and preserving trust between the community and law enforcement is crucial to effectively maintaining Department operations, reducing crime, and ensuring the safety of the County's residents.  The Department acknowledges the dedication and commitment exhibited by Department members who protect and serve the community.  However, participation in law enforcement gangs or hate groups, and any activities associated with these groups, which can include an associated symbol and/or tattoo, violate California State law, undermine the objectives of law enforcement, create a negative perception of the Department, erode public trust, increase the risk of civil liability to the Department and its members, harm morale, and violate fundamental principles of professional policing.  Participation in law enforcement gangs and hate groups creates community distrust, discourages community members from working with law enforcement, and discourages residents from seeking help from the Department. These groups undermine the Department's goals and core values.

### Definitions

**"Law Enforcement Gang,"** as defined in Penal Code section 13670(a)(2), is a group of peace officers within a law enforcement agency who may identify themselves by a name and may be associated with an identifying symbol, including, but not limited to, matching tattoos, and who engage in a pattern of on-duty behavior that intentionally violates the law or fundamental principles of professional policing, including, but not limited to, excluding, harassing, or discriminating against any individual based on a protected category under Federal or State anti-discrimination laws, engaging in or promoting conduct that violates the rights of other employees or members of the public, violating Department policy, the persistent practice of unlawful detention or use of excessive force in circumstances where it is known to be unjustified, falsifying police reports, fabricating or destroying evidence, targeting persons for enforcement based solely on protected characteristics of those persons, theft, unauthorized use of alcohol or drugs on duty, unlawful or unauthorized protection of other members from disciplinary actions, and retaliation against other Department members who threaten or interfere with the activities of the group.

Participation or membership in a law enforcement gang shall mean knowingly engaging with other members of a law enforcement gang in the activities prohibited by Penal Code section 13670(a)(2).

**"Hate group**," as defined in Penal Code section 13680(c), is an organization that supports, advocates for, threatens, or practices genocide or the commission of hate crimes, as defined in Penal Code section 422.55.

**"Membership in a hate group,"** as defined in Penal Code section 13680(d), means being, or holding oneself out as, a member of a hate group with the intent to further the unlawful aims of the group.

**"Participation in any hate group activity,"** as defined in Penal Code section 13680(e), means active and direct involvement in, or coordination or facilitation of, any hate crime by hate group members.

### Policy

Department members shall not participate in, solicit others to participate in, or be members of a law

---

Manual of Policy and Procedures : 3-01/050.82 - Prohibition - Law Enforcement Gangs and Hate Groups

---

enforcement gang, as defined above.  Such conduct shall be subject to discipline, up to and including termination, pursuant to Penal Code section 13670(b).

Department members shall not participate in, solicit others to participate in, or be members of a hate group, as defined above.  Any Department member engaged in membership in a hate group, participation in any hate group activity, or advocacy of any public expressions of hate shall be removed from the Department as a peace officer, pursuant to the provisions of Penal Code section 13682(a) and 13682(b).

If any of the above misconduct involves criminal allegations, the matter may be referred to the District Attorney's Office or other prosecutorial office for possible prosecution.

In addition to conducting its own investigations of alleged law enforcement gangs, the Department shall cooperate with the Office of the Inspector General, the California Attorney General, and/or any other authorized agency investigating the existence or the potential existence of such gangs within the Department, pursuant to Penal Code section 13670(b).  Employees are required to participate in these investigations, answer questions, and do so honestly.

Pursuant to the provisions of Penal Code section 13510.9(a)(2), the Department shall report any complaint, charge, or allegation of a peace officer's participation in a law enforcement gang to the Commission on Peace Officer Standards and Training, which can result in the suspension or revocation of certification by the Commission pursuant to Penal Code section 13510.8.  Except as specifically prohibited by law, the Department shall also disclose the termination of a peace officer for participation in a law enforcement gang to another law enforcement agency conducting a preemployment background investigation of that former peace officer pursuant to Penal Code section 13670(c) and shall make all required notifications to State agencies responsible for recording such information.

All personnel will be held accountable for this policy.  Failure to adhere to this policy may subject violators to discipline under the Manual of Policy and Procedures (MPP), including sections 3-01/030.05, General Behavior, 3-01/030.73, Hazing, and 3-01/050.10, Performance to Standards.

---