# EXHIBIT "3"

Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
Blessing O. Ekpezu, State Bar No. 332308
E-Mail: bekpezu@hurrellcantrall.com
HURRELL CANTRALL LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017-2710
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendant, COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANE DOE, | Case No. 2:24-cv-08649-SPG(SKx) |
| Plaintiff, | **DECLARATION OF YANCELY WELCH IN SUPPORT OF DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION** |
| v. | |
| COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive, | |
| Defendants. | [Assigned to Hon. Sherilyn Peace Garnett, Courtroom "5C"] |

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

## DECLARATION OF YANCELY WELCH

I, Yancely Welch declare as follows:

1. I am a Deputy Clerk of the Board of Supervisors for the County of Los Angeles, located at Kenneth Hahn Hall of Administration, Room 383, 500 West Temple Street, Los Angeles, California 90012. The following facts are within my personal knowledge and if called as a witness, I could and would competently testify thereto.

2. In accordance with my job duties, I am a duly authorized custodian of records of claims submitted to the Board of Supervisors and am familiar with the handling of such claims. Claims are logged in upon receipt and a record of the claim is kept in an electronic database, which dates from 1987 to the present. Said electronic-based records are regularly kept in the usual course of business. I am also authorized to search for other correspondence submitted to the Board of Supervisors related to claims and can certify such records if any such records are found.

3. On September 26, 2025, I made a diligent search of the claims electronic database for any and all government claims presented to the County of Los Angeles, under the name of Mykalia Cook. My search yielded one claim and one amendment filed by or on behalf of Mykalia Cook (aka Jane Doe), File No. 24-939.

4. Attached hereto as **Exhibit D** is a true and correct copy of the claim with File No. 24-939.

5. Attached hereto as **Exhibit E** is a true and correct copy of the amendment to the claim with File No. 24-939.

6. My search did not yield any other claims, amendments or applications for leave to present a late claim under the name of Mykalia Cook. Additionally, I searched our correspondence electronic database for any and all correspondence filed by or on behalf of Mykalia Cook. I found no correspondence under the name of Mykalia Cook.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on  26 day of September 2025, at Los Angeles, California.

_____
Yancely Welch

HOA.105570303.1

# EXHIBIT "3D"

**24-939**



# CLAIMS FOR DAMAGES
# TO PERSON OR PROPERTY

**COUNTY OF LOS ANGELES**

TIME STAMP
OFFICE USE ONLY

BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES
FILED

2024 FEB 27 P 12: 47

**INSTRUCTIONS:**

1. Read claim thoroughly.
2. Fill out claim as indicated; attach additional information if necessary.
3. Please use one claim form for each claimant.
4. Return this original signed claim and any attachments supporting your claim. This form must be signed.

DELIVER OR U.S. MAIL TO:
EXECUTIVE OFFICER, BOARD OF SUPERVISORS, ATTENTION: CLAIMS
500 WEST TEMPLE STREET, ROOM 383,
KENNETH HAHN HALL OF ADMINISTRATION, LOS ANGELES, CA 90012
(213) 974-1440

| 1. ☐ Mr. ☒ Ms. ☐ Mrs. LAST NAME | FIRST NAME | M.I. |
|---|---|---|
| Doe | Jane | |

**2. ADDRESS OF CLAIMANT**
Law Offices of Vincent Miller, 16255 Ventura Blvd. Suite 625

| CITY | STATE | ZIP CODE |
|---|---|---|
| Encino | CA | 91436 |

| HOME PHONE | ALTERNATE PHONE |
|---|---|
| (213) 948-5702 | |

| 3. CLAIMAINT'S BIRTHDATE: | 4. CLAIMANT'S SOCIAL SECURITY NUMBER |
|---|---|
| | |

**5. ADDRESS TO WHICH CORRESPONDENCE SHOULD BE SENT**
The Law Offices of Vincent Miller 16255 Ventura Blvd., Ste 625

| STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | Encino | CA | 91436 |

**6. DATE AND TIME OF INCIDENT**

**7. WHERE DID DAMAGE OR INJURY OCCUR?**
Los Angeles County Sheriff's Department

| STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | Los Angeles | CA | 90012 |

**8. DESCRIBE IN DETAIL HOW DAMAGE OR INJURY OCCURRED AND LIST DAMAGES** (attach copies of receipts or repair estimates):

Claimant is a victim of violence and witness intimidation by LASD employees and their deputy gang. The victim, deputies, and the gang are not named here to protect Claimant's life. Claimant is the victim of repeated violence, threats on her life, and intimidation. She suffers from PTSD, severe trauma, severe distress, recurring intense nightmares, and depression. Claimant has suffered significant mental damage. For about a year and half until summer of 2022, Claimant was in a relationship with the self-proclaimed lead "shot caller" of what he called a "gang" of deputies at one of LASD's stations. Stalking continues as of this filing.

**9. WERE POLICE OR PARAMEDICS CALLED?**   YES ☐   NO ☒

(IF YES) AGENCY'S NAME _____ REPORT # _____

CHECK IF LIMITED CIVIL CASE ☐

| TOTAL DAMAGES TO DATE | TOTAL ESTIMATED PROSPECTIVE DAMAGES |
|---|---|
| $ 1,000,000.00 | $ 5,000,000.00 |

**10. WHY DO YOU CLAIM COUNTY IS RESPONSIBLE?**

The shot caller admitted the gang committed illegal acts against residents. Up until the summer, 2022, the shot caller repeatedly strangled the Claimant unconscious. from the summer of 2022 until present, the shot caller and several employees of LASD terrorized and threatened, and intimidated the Claimant. The shot caller showed up uninvited at her work and broke into her apartment, and threatens her that his gang will kill her if she reports him. Deputy gang members help to intimidate the Claimant. When the shot caller intentionally caused Claimant to crash her car, 911 was called on him, but the gang controls the LASD station and when the shot caller called dispatch, deputies called off the 911 to allow him to escape. In September 2023, deputies came to her apartment, did surveillance, and sabotaged her gas tank to try to cause her to get into an accident. When sergeants came to the victim claimant's home to interview her, the investigators allowed a deputy gang member to come to the house to ensure Claimant was scared into silence.

**11. NAMES OF ANY COUNTY EMPLOYEES (AND THEIR DEPARTMENTS) INVOLVED IN INJURY OR DAMAGE (IF APPLICABLE):**

| NAME | DEPARTMENT |
|---|---|
| Deputy gang members | |
| NAME | DEPARTMENT |
| | |

**12. WITNESS(ES) TO DAMAGES OR INJURY: LIST ALL PERSONS AND ADDRESSES OF PERSONS KNOWN TO HAVE INFORMATION:**

| NAME | PHONE |
|---|---|
| Under investigation by LASD's ICIB | |
| ADDRESS | |
| | |
| NAME | PHONE |
| | |
| ADDRESS | |

**13. IF PHYSICIAN(S) WERE VISTED DUE TO INJURY, PROVIDE NAME, ADDRESS, PHONE NUMBER, AND DATE OF FIRST VISIT FOR EACH:**

| DATE OF FIRST VISIT | PHYSICIAN'S NAME | PHONE |
|---|---|---|
| | | |
| STREET | | CITY | STATE | ZIP CODE |
| DATE OF FIRST VISIT | PHYSICIAN'S NAME | PHONE |
| | | |
| STREET | | CITY | STATE | ZIP CODE |

## THIS CLAIM MUST BE *SIGNED*

*NOTE: PRESENTATION OF A FALSE CLAIM IS A FELONY (PENAL CODE SECTION 72)*

**CLAIMS FOR DEATH, INJURY TO PERSON OR TO PERSONAL PROPERTY MUST BE FILED NOT LATER THAN 6 MONTHS AFTER THE OCCURRENCE. (GOVERNMENT CODE SECTION 911.2)**

**ALL OTHER CLAIMS FOR DAMAGES MUST BE FILED NOT LATER THAN ONE YEAR AFTER THE OCCURRENCE. (GOVERNMENT CODE SECTION 911.2)**

| 14. PRINT OR TYPE NAME | DATE | 15. SIGNATURE OF CLAIMANT OR PERSON FILING ON HIS/HER BEHALF GIVING RELATIONSHIP TO CLAIMANT | DATE |
|---|---|---|---|
| Vincent Miller, Attorney for Claimant | 02/27/2024 | *Vincent Miller* | 02/27/2024 |

Revised 11-2016

02/27/2024

# EXHIBIT "3E"

**24-939_A**

# CLAIMS FOR DAMAGES TO PERSON OR PROPERTY

**COUNTY OF LOS ANGELES**



**INSTRUCTIONS:**

1. Read claim thoroughly.
2. Fill out claim as indicated; attach additional information if necessary.
3. Please use one claim form for each claimant.
4. Return this original signed claim and any attachments supporting your claim. This form <u>must</u> be signed.

DELIVER OR U.S. MAIL TO:
EXECUTIVE OFFICER, BOARD OF SUPERVISORS, ATTENTION: CLAIMS
500 WEST TEMPLE STREET, ROOM 383,
KENNETH HAHN HALL OF ADMINISTRATION, LOS ANGELES, CA 90012
(213) 974-1440

TIME STAMP
OFFICE USE ONLY

BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES
FILED

2024 MAY 29 P 3: 56

---

**1.** ☐ Mr. ☒ Ms. ☐ Mrs.  **LAST NAME** Doe  **FIRST NAME** Jane  **M.I.**

**2. ADDRESS OF CLAIMANT**
Law Offices of Vincent Miller, 16255 Ventura Blvd. Suite 625

**CITY** Encino  **STATE** CA  **ZIP CODE** 91436

**HOME PHONE** (213) 948-5702  **ALTERNATE PHONE**

**3. CLAIMAINT'S BIRTHDATE:**   **4. CLAIMANT'S SOCIAL SECURITY NUMBER**

**5. ADDRESS TO WHICH CORRESPONDENCE SHOULD BE SENT**
The Law Offices of Vincent Miller 16255 Ventura Blvd., Ste 625

**STREET**   **CITY** Encino  **STATE** CA  **ZIP CODE** 91436

**6. DATE AND TIME OF INCIDENT**

**7. WHERE DID DAMAGE OR INJURY OCCUR?**
Los Angeles County Sheriff's Department

**STREET**   **CITY** Los Angeles  **STATE** CA  **ZIP CODE** 90012

**8. DESCRIBE IN DETAIL HOW DAMAGE OR INJURY OCCURRED AND LIST DAMAGES** (attach copies of receipts or repair estimates):

Claimant is a victim of violence and witness intimidation by LASD employees and their deputy gang. The victim, deputies, and the gang are not named here to protect Claimant's life. Claimant is the victim of repeated violence, threats on her life, and intimidation. She suffers from PTSD, severe trauma, severe distress, recurring intense nightmares, and depression. Claimant has suffered significant mental damage. For about a year and half until summer of 2022, Claimant was in a relationship with the self-proclaimed lead "shot caller" of what he called a "gang" of deputies at one of LASD's stations. Stalking continues as of this filing.

**9. WERE POLICE OR PARAMEDICS CALLED?**   YES ☐   NO ☒

**(IF YES) AGENCY'S NAME** _____   **REPORT #** _____

CHECK IF LIMITED CIVIL CASE ☐

**TOTAL DAMAGES TO DATE** $ 1,000,000.00

**TOTAL ESTIMATED PROSPECTIVE DAMAGES** $ 5,000,000.00

**10. WHY DO YOU CLAIM COUNTY IS RESPONSIBLE?**

The shot caller admitted the gang committed illegal acts against residents. Up until the summer, 2022, the shot caller repeatedly strangled the Claimant unconscious. from the summer of 2022 until present, the shot caller and several employees of LASD terrorized and threatened, and intimidated the Claimant. The shot caller showed up uninvited at her work and broke into her apartment, and threatens her that his gang will kill her if she reports him. Deputy gang members help to intimidate the Claimant. When the shot caller intentionally caused Claimant to crash her car, 911 was called on him, but the gang controls the LASD station and when the shot caller called dispatch, deputies called off the 911 to allow him to escape. In September 2023, deputies came to her apartment, did surveillance, and sabotaged her gas tank to try to cause her to get into an accident. When sergeants came to the victim claimant's home to interview her, the investigators allowed a deputy gang member to come to the house to ensure Claimant was scared into silence.

**11. NAMES OF ANY COUNTY EMPLOYEES (AND THEIR DEPARTMENTS) INVOLVED IN INJURY OR DAMAGE (IF APPLICABLE):**

**NAME** Deputy gang members  **DEPARTMENT**

**NAME**   **DEPARTMENT**

**12. WITNESS(ES) TO DAMAGES OR INJURY: LIST ALL PERSONS AND ADDRESSES OF PERSONS KNOWN TO HAVE INFORMATION:**

**NAME** Under investigation by LASD's ICIB  **PHONE**

**ADDRESS**

**NAME**   **PHONE**

**ADDRESS**

**13. IF PHYSICIAN(S) WERE VISTED DUE TO INJURY, PROVIDE NAME, ADDRESS, PHONE NUMBER, AND DATE OF FIRST VISIT FOR EACH:**

| DATE OF FIRST VISIT | PHYSICIAN'S NAME | PHONE |
|---|---|---|

**STREET**   **CITY**   **STATE**   **ZIP CODE**

| DATE OF FIRST VISIT | PHYSICIAN'S NAME | PHONE |
|---|---|---|

**STREET**   **CITY**   **STATE**   **ZIP CODE**

---

## THIS CLAIM MUST BE *SIGNED*

### NOTE: PRESENTATION OF A FALSE CLAIM IS A FELONY (PENAL CODE SECTION 72)

**CLAIMS FOR DEATH, INJURY TO PERSON OR TO PERSONAL PROPERTY MUST BE FILED NOT LATER THAN 6 MONTHS AFTER THE OCCURRENCE. (GOVERNMENT CODE SECTION 911.2)**

**ALL OTHER CLAIMS FOR DAMAGES MUST BE FILED NOT LATER THAN ONE YEAR AFTER THE OCCURRENCE. (GOVERNMENT CODE SECTION 911.2)**

**14. PRINT OR TYPE NAME**
Vincent Miller, Attorney for Claimant
**DATE** 02/27/2024

**15. SIGNATURE OF CLAIMANT OR PERSON FILING ON HIS/HER BEHALF GIVING RELATIONSHIP TO CLAIMANT**
*Vincent Miller*
**DATE** 02/27/2024

Revised 11-2016

05/29/2024

ATTACHMENT TO AMENDED CLAIM


PRIMARY PERPETRATOR: AARON TANNER

VICTIM/CLAIMANT: JANE DOE (Mykalia Cook)

05/29/2024

# EXHIBIT "4"

Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
Blessing O. Ekpezu, State Bar No. 332308
E-Mail: bekpezu@hurrellcantrall.com
HURRELL CANTRALL LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017-2710
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendant, COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JANE DOE,

        Plaintiff,

        v.

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive,

        Defendants.

Case No. 2:24-cv-08649-SPG(SKx)

**DECLARATION OF LINDSAY YOSHIYAMA IN SUPPORT OF DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION**

[Assigned to Hon. Sherilyn Peace Garnett, Courtroom "5C"]

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

DECLARATION OF LINDSAY YOSHIYAMA

I, Lindsay Yoshiyama, declare as follows:

1.    I am a Senior Deputy County Counsel in the office of the Los Angeles County Counsel and am a duly authorized custodian of records of the County Counsel's Office of records related to the processing of government claims and late claim applications that are presented to the Executive Office of the Board of Supervisors pursuant to Government Code sections 900, et seq., including but not limited to written notices of action on claims and late claim applications.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.    In accordance with my job duties, I am familiar with the handling of claims submitted to the Board of Supervisors for the County of Los Angeles (the "County").  Claims, amendments to claims, and applications for leave to present a late claim are logged into a computer database by a clerk of the Executive Office of the Board of Supervisors upon receipt, in the regular course of business, at or near the time of receipt of the claim, amendment, or application for leave to present a late claim.  A record of the claim, any amendments, and applications for leave to present a late claim are kept in the computer database, which dates from 1987 to the present.  Claims are identified by a Board file number and assigned a 12 digit County Counsel file number.

3.    In accordance with my job duties, I also supervise the Claims Unit of the County Counsel's Office and, in that capacity, am familiar with the investigation, processing, and handling of government claims presented to the County of Los Angeles, Board of Supervisors.  All official correspondence sent out by the County Counsel's Office on behalf of the County in response to a claim, amended claim, or application for leave to present a late claim is imaged and uploaded to the same computer database as the claims, amendments, and applications for leave to present a late claim in the regular course of business, at or near the time of the mailing of the document.

HOA.105569674.1                          -1-

4.      On September 25, 2025, I made a diligent search of the County's computer database for records related to the processing of the claim presented by or on behalf of Jane Doe with Board file number 24-939, County Counsel file number 24-4422395*001 (the "Claim").

5.      As a result of my search, I found two letters. The first letter is dated March 18, 2024. True and correct copies of the letter dated March 18, 2024, and the accompanying proof of service, are attached hereto as Exhibit F.

6.      The second letter is dated April 25, 2024. True and correct copies of the letter dated April 25, 2024, and the accompanying proof of service, are attached hereto as Exhibit G.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 25, 2025, at Los Angeles, California.

_____
Lindsay Yoshiyama

# EXHIBIT "4F"



**OFFICE OF THE**
# COUNTY COUNSEL

**County of Los Angeles**

Dawyn R. Harrison
County Counsel



March 18, 2024

Vincent Miller, Esq.
THE LAW OFFICES OF
VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, California 91436

**Re:** **Claim Presented:** **February 27, 2024**
**File Number:** **24-4422395*001**
**Your Client:** **Jane Doe**

Dear Counselor:

The claim you presented to the County of Los Angeles, Board of Supervisors on **February 27, 2024**, as it pertains to activities occurring **before August 27, 2023**, is being returned because it was not presented within six months after the event or occurrence as required by law. See Sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action was taken on that portion of the claim.

Your only recourse at this time as to that portion of your claim is to apply without delay to the County of Los Angeles, Board of Supervisors for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See Section 911.6 of the Government Code.

This time limitation applies only to causes of action for which Government Code Sections 900 - 915.4 require you to present a claim. Other causes of action, including those arising under federal law, may have different time limitations.

Also, the claim that you presented to the County of Los Angeles, Board of Supervisors on **February 22, 2024**, as it pertains to activities occurring **since August 27, 2023**, fails to comply substantially with the requirements under the Government Code. See Section 910.8 of the Government Code. It fails to state with particularity the following:

**648 Kenneth Hahn Hall of Administration**
500 West Temple Street
Los Angeles, California 90012-2713

TEL 213.974.1913
TDD 213.633.0901

Vincent Miller, Esq.
March 18, 2024
Page 2

1.     The claim does not provide the name of the County employee(s) alleged to have caused the injury.

2.     The claim fails to identify the claimant.

Without this information we are unable to investigate your claim. We will wait 15 days before taking further action on this claim.

If you wish to present an amended claim correcting these deficiencies, you should do so immediately.

**Please submit your amended claim directly to:**

**Executive Offices of the Board of Supervisors**
**Room 383 Hall of Administration**
**500 West Temple Street**
**Los Angeles, California 90012**

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Very truly yours,

Dawyn R. Harrison
County Counsel

By

Lindsay Yoshiyama
Senior Deputy County Counsel
Litigation Monitoring Team

LY:ce

HOA.104683453.1

## PROOF OF SERVICE

### File No. 24-4422395*001

STATE OF CALIFORNIA, County of Los Angeles:

I am employed in the County of Los Angeles, State of California, over the age of eighteen years and not a party to the within action. My business address is 648 Kenneth Hahn Hall of Administration, 500 West Temple Street, Los Angeles, California 90012-2713.

That on **March /8 , 2024**, I served the attached

### NOTICE OF HYBRID LETTER

upon Interested Party(ies) by placing ☒ the original ☐ a true copy thereof enclosed in a sealed envelope addressed ☒ as follows ☐ as stated on the attached service list:

Vincent Miller, Esq.
THE LAW OFFICES OF VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, California 91436

☒ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses on the attached service list (specify one):

(1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) ☒ placed the envelope for collection and mailing, following ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **March/ 8 , 2024**, at Los Angeles, California.

| | |
|---|---|
| CAROLYN EDWARDS | Carolyn Edwards |
| **(NAME OF DECLARANT)** | **(SIGNATURE OF DECLARANT)** |

HOA.104683456.1

# EXHIBIT "4G"



**OFFICE OF THE COUNTY COUNSEL**

**County of Los Angeles**

**Dawyn R. Harrison**
County Counsel



April 25, 2024

Vincent Miller, Esq.
THE LAW OFFICES OF
VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, California 91436

| Re: | Claim Presented: | February 27, 2024 |
|---|---|---|
| | File Number: | 24-4422395*001 |
| | Your Client: | Jane Doe |

Dear Counselor:

Pursuant to Government Code Section 910.8, the Office of the County Counsel sent you a notice alerting you that the claim that you presented to the County of Los Angeles, Board of Supervisors on **February 27, 2024**, as it pertains to activities occurring **since August 27, 2023**, failed to comply substantially with the requirements under the Government Code. The notice asked that you provide the Office with additional information within 15 days. Because you failed to do so, we were unable to investigate your allegations.

We reserve the right to defend against any court action initiated by you on the basis that you failed to substantially comply with the requirements for presenting a timely claim.

Notice is hereby given that the claim that you presented to the County of Los Angeles, Board of Supervisors on **February 27, 2024**, as it pertains to activities occurring **since August 27, 2023**, was rejected on **April 24, 2024**. No further action will be taken on that portion of the claim.

WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See Government Code Section 945.6.

---

HOA.104749727.1      **648 Kenneth Hahn Hall of Administration**      TEL 213.974.1913
500 West Temple Street      TDD 213.633.0901
Los Angeles, California 90012-2713

Vincent Miller, Esq.
April 25, 2024
Page 2

This time limitation applies only to causes of action for which Government Code Sections 900 - 915.4 require you to present a claim. Other causes of action, including those arising under federal law, may have different time limitations.

This letter is also to remind you that the claim that you presented to the County of Los Angeles, Board of Supervisors on **February 27, 2024**, as it pertained to activities occurring **from February 27, 2023 to August 26, 2023**, was not timely presented and was previously returned. Please reference the dates and deadlines per our previous correspondence to you dated **March 18, 2024**, and enclosed for your reference.

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Very truly yours,

DAWYN R. HARRISON
County Counsel

By

LINDSAY YOSHIYAMA
Senior Deputy County Counsel
Litigation Monitoring Team

LY:ce

Enclosure

HOA.104749727.1

## PROOF OF SERVICE

### File No. 24-4422395*001

STATE OF CALIFORNIA, County of Los Angeles:

I am employed in the County of Los Angeles, State of California, over the age of eighteen years and not a party to the within action. My business address is 648 Kenneth Hahn Hall of Administration, 500 West Temple Street, Los Angeles, California 90012-2713.

That on **May** / , **2024**, I served the attached

### NOTICE OF DENIAL LETTER

upon Interested Party(ies) by placing ☒ the original ☐ a true copy thereof enclosed in a sealed envelope addressed ☒ as follows ☐ as stated on the attached service list:

> Vincent Miller, Esq.
> THE LAW OFFICES OF VINCENT MILLER
> 16255 Ventura Boulevard, Suite 625
> Encino, California 91436

☒ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses on the attached service list (specify one):

(1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) ☒ placed the envelope for collection and mailing, following ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **May** / , **2024**, at Los Angeles, California.

_Carolyn Edwards_
(NAME OF DECLARANT)

_Carolyn Edwards_
(SIGNATURE OF DECLARANT)

HOA.104749718.1



**OFFICE OF THE**
**COUNTY**
**COUNSEL**



**County of Los Angeles**

March 18, 2024

Dawyn R. Harrison
County Counsel



Vincent Miller, Esq.
THE LAW OFFICES OF
VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, California 91436

Re:  **Claim Presented:**   **February 27, 2024**
      **File Number:**       **24-4422395*001**
      **Your Client:**       **Jane Doe**

Dear Counselor:

The claim you presented to the County of Los Angeles, Board of Supervisors on **February 27, 2024**, as it pertains to activities occurring **before August 27, 2023**, is being returned because it was not presented within six months after the event or occurrence as required by law. See Sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action was taken on that portion of the claim.

Your only recourse at this time as to that portion of your claim is to apply without delay to the County of Los Angeles, Board of Supervisors for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See Section 911.6 of the Government Code.

This time limitation applies only to causes of action for which Government Code Sections 900 - 915.4 require you to present a claim. Other causes of action, including those arising under federal law, may have different time limitations.

Also, the claim that you presented to the County of Los Angeles, Board of Supervisors on **February 22, 2024**, as it pertains to activities occurring **since August 27, 2023**, fails to comply substantially with the requirements under the Government Code. See Section 910.8 of the Government Code. It fails to state with particularity the following:

648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713

TEL 213.974.1913
TDD 213.633.0901

Vincent Miller, Esq.
March 18, 2024
Page 2



1.    The claim does not provide the name of the County employee(s) alleged to have caused the injury.

2.    The claim fails to identify the claimant.

Without this information we are unable to investigate your claim. We will wait 15 days before taking further action on this claim.

If you wish to present an amended claim correcting these deficiencies, you should do so immediately.

**Please submit your amended claim directly to:**

**Executive Offices of the Board of Supervisors**
**Room 383 Hall of Administration**
**500 West Temple Street**
**Los Angeles, California 90012**

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Very truly yours,

Dawyn R. Harrison
County Counsel

By
Lindsay Yoshiyama
Senior Deputy County Counsel
Litigation Monitoring Team

LY:ce

HOA.104683453.1

**COPY**

**PROOF OF SERVICE**

**File No. 24-4422395*001**

STATE OF CALIFORNIA, County of Los Angeles:

I am employed in the County of Los Angeles, State of California, over the age of eighteen years and not a party to the within action. My business address is 648 Kenneth Hahn Hall of Administration, 500 West Temple Street, Los Angeles, California 90012-2713.

That on **March 18, 2024**, I served the attached

**NOTICE OF HYBRID LETTER**

upon Interested Party(ies) by placing ☒ the original ☐ a true copy thereof enclosed in a sealed envelope addressed ☒ as follows ☐ as stated on the attached service list:

> Vincent Miller, Esq.
> THE LAW OFFICES OF VINCENT MILLER
> 16255 Ventura Boulevard, Suite 625
> Encino, California 91436

☒   **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses on the attached service list (specify one):

(1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) ☒ placed the envelope for collection and mailing, following ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **March 18, 2024**, at Los Angeles, California.

Carolyn Edwards
**(NAME OF DECLARANT)**

Carolyn Edwards
**(SIGNATURE OF DECLARANT)**

# EXHIBIT "5"

VINCENT MILLER (SBN 291973)
NICK SAGE (SBN 298972)
The Law Offices of Vincent Miller
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Telephone: (213) 948-5702
Attorney for Plaintiff JANE DOE

**FILED**
Superior Court of California
County of Los Angeles
08/30/2024
David W. Slayton, Executive Officer / Clerk of Court
By: _____ N. Osollo _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALFORNIA

## CENTRAL DISTRICT

JANE DOE,

      Plaintiff,

v.

COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual, DOES 1-100 inclusive,

      Defendant.

_____

) CASE NO: 24STCV13350
)
)
)
) **PLAINTIFF'S FIRST AMENDED**
) **COMPLAINT FOR:**
    1. **DEPRIVATION OF CIVIL RIGHTS**
       **UNDER 42 U.S.C. § 1983;**
)   2. **NEGLIGENCE (VICARIOUS)**
)
) **Jury Trial Demanded**
)
)
)
)

Plaintiff JANE DOE ("Plaintiff" or "Jane Doe") by and through her undersigned attorneys, hereby prays to this honorable Court for relief and remedy based on the following:

## SUMMARY OF ALLEGATIONS

1.  At all times mentioned herein, Defendant, County of Los Angeles (hereinafter, "Los Angeles County" "Defendant County"), a government agency, is in Los Angeles County, California.

First Amended Complaint    JANE DOE V. LOS ANGELES COUNTY, et al.          Page 1

Electronically Received 08/30/2024 12:10 PM

The Los Angeles County Sheriff's Department ("LASD") is a branch of Los Angeles County.

2. Plaintiff is an individual residing in Los Angeles County, California. Her real name is withheld for her safety, on the advice of informant sergeants working for LASD. The sergeants are concerned that Jane Doe could be further harmed by a member or members of the deputy gang, the Rattlesnakes. Jane Doe has vacated her residence, as she is in hiding from LASD deputies. Jane Doe's life is in danger, and up to the filing of this First Amended Complaint she continues to be stalked by LASD deputies.

3. The Sheriff's Department has a pattern and practice of allowing and encouraging the use of excessive force by deputy gang members against County residents, as LASD does not hold deputies accountable for such wrongful conduct. Jane Doe is a victim of the Rattlesnakes gang. The failure of the County to reign in deputy gangs endangered and continues to endanger the life of Jane Doe.

4. Defendant Aaron Tanner ("Tanner") is the self-proclaimed "shot caller" of the Rattlesnakes "gang" at LASD's Lancaster station. The term "shot caller" is adopted by deputy gangs from the term "shot caller" used to describe the leaders of inmate gangs.

5. Tanner was terminated by LASD this year. LASD's Internal Criminal Investigation Bureau ("ICIB") investigated Tanner for his abuse and violence of Jane Doe. Recently, ICIB concluded its investigation and referred Tanner to the County's District Attorney ("DA"). The DA has not yet indicted Tanner for his conduct towards the Plaintiff. However, ICOB investigators expect prosecution.

6. Defendant Tanner repeatedly committed violence against the Plaintiff, choking, strangling her unconscious multiple times. Tanner threatened the Plaintiff with his gang, which has controlled the Lancaster sheriff's station. Rattlesnakes have helped stalk and intimidate the Plaintiff to silence her into not reporting their crimes. Tanner continues to stalk the Plaintiff up through the filing of this amended complaint. Jane Doe's life has been repeatedly put in danger by Rattlesnakes and it remains in danger.

First Amended Complaint    JANE DOE V. LOS ANGELES COUNTY, et al.                    Page 2

# EXHIBIT "6"

Vincent Miller (SBN 291973)
vincent@vincentmillerlaw.com
James Jirn (SBN 241189)
james@vincentmillerlaw.com
THE LAW OFFICES OF VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Tel.: (213) 948-5702 | Fax: (818) 450-0698

Attorneys for Plaintiff
JANE DOE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>               Plaintiff,<br><br>      v.<br><br>COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual; and DOES 1-100, inclusive,<br><br>            Defendants. | Case No.: 2:24-cv-08649-SPG(SKx)<br><br>**DECLARATION OF VINCENT MILLER IN OPPOSITION TO DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:<br>Time: 1:30 p.m.<br>Courtroom: 5C<br>Action Filed:<br>Judge:  Hon. Sherilyn Peace Garnett |

**DECLARATION OF VINCENT MILLER**

I, Vincent Miller, declare:

1.     I am attorney of record for Plaintiff Jane Doe in this action. I am over the age of 18 years. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could and would testify competently to the truth of the facts as stated herein.

2.     Attached as <u>Exhibit A</u> is a true and correct copy of Roger Clark's Expert Report (August 4, 2025).

DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

3.      Attached as <u>Exhibit B</u> is a true and correct copy of the transcript of the deposition of Plaintiff Jane Doe.

4.      Attached as <u>Exhibit C</u> is a true and correct copy excerpts of the Civilian Oversight Commission testimony of Neal Tyler.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. This Declaration was executed on October 13, 2025, Los Angeles, California.

By: /s/ *Vincent Miller*
Vincent Miller

Declaration in Opposition to MSJ

# EXHIBIT "6A"

EXHIBIT

Ext 9 - Neal Tyler - AB 7549684

exhibitsticker.com

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  rclark9314@aol.com

August 4, 2025

Vincent Miller, Esq.
The Law Offices of Vincent Miller
16255 Ventura Boulevard, Suite 625
Encino, CA 91436

**Regarding:   *Jane Doe v. County of Los Angeles, et al.* Case No.
2:24-cv-08649-SPG(SKx)**

Dear Mr. Miller:

Thank you for retaining me to analyze and render opinions regarding the multiple uses of force used by Los Angeles County Sheriff's Department (LASD) Deputy Aaron Tanner on Plaintiff Jane Doe, and the role of the deputy subgroup, the "Rattlesnakes".  Pursuant to the requirements of Rule 26, I have reviewed the reports, LASD policies, training documents, photographs, deposition transcript, media reports, and other material (as listed below) provided to me thus far regarding this case. I am informed that additional material is expected.  Please be advised that if/when any further data is provided, it is likely that a supplemental report will be necessary in order to refine my preliminary opinions and/or express additional opinions.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by the Defendant Deputies, and/or others, versus those proffered by Mr. Tanner, and/or other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses. I consider for the purpose on my expressed opinions that the resolution of any such conflicts are within the purview of a jury to decide.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears and decides cases brought in court.  My opinions rest on the training given to every Police Officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every certified Law Enforcement Officer. Additionally, my opinions are based on my own knowledge, skill, experience, training, and education as well as my review of the materials listed below.

**<u>Materials Provided and Reviewed Thus Far:</u>**

1.   First Amended Complaint

2.   Jane Doe Deposition Transcript, and exhibits used in her deposition.

3.   Written Discovery Produced by Plaintiff

4.   Written Discovery Produced by the Defendants included as related to the ICIB investigation into Aaron Tanner for his conduct against Jane Joe

5.   Defendant County documents on Deputy gangs, including reports by the Civilian Oversight commission and Inspector General Max Huntsman

6.   Reports on Winco death on patrol call by Deputy Tanner

7.   Deputy Aaron Tanner's "Rattlesnake" Gang Tattoo:

8.   *Estate of Francisco Nunez, er al, v. Los Angeles County, et al.*   Case No.: 2:25-cv-02588

9.   *Family of man left to die by deputy gang members files claim against LA County*:
     https://lapublicpress.org/2024/06/lancaster-deputy-gang-rattlesnakes-lawsuit-raymundo-rivera/

10.  *Cowboys and Rattlesnakes - A Tradidtion of Violence*:
     https://omny.fm/shows/a-tradition-of-violence/cowboys-and-rattlesnakes

**<u>Brief Overview of Events and Commentary:</u>**

Ms. Doe's allegations are as follows:

The County of Los Angeles has admitted that there is sufficient evidence for Deputy Aaraon Tanner to be prosecuted for the his use of force and intimidation (through his use

of his deputy gang) against Plaintiff Jane Doe.  LASD concluded its investigation into the allegations against Defendant Tanner and have referred the matter for prosecution to the District Attorney.

The County of Los Angeles' Sheriff's Department ("LASD") has a 50-year practice and custom of deputy gangs operating out of certain patrol stations, and violating residents' constitutional rights.  County leaders, including the Inspector General and the Board of Supervisors have made admissions that the County of Los Angeles' sheriff's department have allowed deputy gangs to operate within LASD for over 50 years, and that the failure to hold deputies accountable have caused many harms to residents as well as to employees of LASD.

Defendant Aaron Tanner told Plaintiff Jane Doe that he is a "shot caller" (leader), of what he calls a "gang," the rattlesnakes. The rattlesnakes was and is a deputy subgroup affiliated with LASD's Lancaster Station. Tanner bragged to the Plaintiff about his gang writing false police reports, withholding back up on patrol calls, and knowingly allowing a suspect to die, trapped in a pillar at a WinCo in Lancaster.

Tanner choked out the Plaintiff several times, including while Tanner was on duty, and called off a 911 call into himself, after he caused the Plaintiff to crash into his car. Tanner and his Rattlesnakes gang members intimidated, assaulted, stalked and terrorized the Plaintiff, while Tanner and the other deputies were on duty, in their uniforms, and representing LASD.  On multiple occasions, Tanner choked the Plaintiff unconscious. Tanner threatened Plaintiff that he and the Rattlesnakes would murder the Plaintiff if she reported Tanner's conduct.

## The Persistent Existence of Violent Secret Gangs Within the LASD

This case follows a prior State Court case of Taylor v. County of Los Angeles, et al. (As cited above)  The documentation of the secret Compton Sheriff clique/gang during discovery in the Taylor case put into motion what was then hoped to finally be an unprecedented investigation and elimination of the Los Angeles Sheriff gangs.

In reaction to the continuing call for investigation and reform spawned by the Taylor case (and others), then Los Angeles County Sheriff Jim McDonnell announced to the Sheriff Civilian Oversight Commission a new study of secret deputy societies, stating, "No one has undertaken a serious, comprehensive study of the issue; and I intend, on my watch, to get to the bottom of this."  Unfortunately, nothing happened during Sheriff McDonnell's tenure.  His successor, Los Angeles County Sheriff Alex Villanueva, who replaced

Page 3 of  20

Sheriff McDonnell in the election that took place in the midst of the public outcry over secret Sheriff department clique/gangs, has failed to tackle the issue.

Recently, the Los Angeles County Sheriff Civilian Oversight Commission has publicly announced:

> "Like past sheriffs Sherman Block and Lee Baca, Sheriff Villanueva has downplayed the problems caused by deputy cliques and staunchly refused to investigate them.  **** Whatever the reason, it is not likely that Sheriff Villanueva will investigate the cliques of his own accord."

Additionally, the Los Angeles County Board of Supervisors has repeatedly determined that the Sheriff Department:

> "has a long and troubled history involving unauthorized, exclusive and secretive Department groups consisting of sworn deputies, whose membership is based on a variety of factors, including station or unit assignment, ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment and even shootings of civilians."

The Board found that Sheriff Villanueva "has acknowledged the problems" but has characterized them as "benign".  The Board disagreed (rightfully so) and found that "it is unacceptable that unauthorized, exclusive self-affiliated groups involving a code of silence and violence be part of the Sheriff's Department".

It is my hope that along with compensating Lockett for his injuries, this case will generate the necessary action under the broad power the Federal Court has to address the secret societies within the Sheriff's Department - something that the Sheriff's Department chain of command has failed to do.

A brief history of these clique/gangs puts the metastasized cancer these gangs present into perspective.

When I joined the LASD in 1965 I became aware of a secret society at the East Los Angeles Sheriff's Station called, "The Little Devils." (East LA)  I understood that they were a group of white deputies who were responsible for wreaking havoc with the aggressive policing of largely African American and Hispanic communities.

In subsequent decades, clique/gangs such as the "Regulators" (Century Station), "Pirates" (Firestone Station), "Cavemen" (East LA Station), "Banditoes" (East LA Station)

"Rattlesnakes" (Antilope Valley/Lancaster Stations), "Vikings" (Linwood Station), "Jump Out Boys," (Men's Central Jail) "Grim Rapers," (Lennox Station) "Tanzanian Devils," (Temple Station) etc. were formed within the Department in stations.

While I was in command of Crescenta Valley Station in 1983, I became aware of the existence of a secret sheriff's gang at Lynwood Station that called themselves "Vikings." Subsequently, in a federal lawsuit against the Sheriff's Department, U.S. District Court Judge Terry Hatter labeled the Vikings gang a "Neo-Nazi, white supremacist gang." [(See Thomas v. County of Los Angeles, 978 F.2d 504, 511 (9th Cir. 1992), as amended (Feb. 12, 1993)]. In 1993 I gave testimony regarding the Vikings during the trial in the Thomas case.

Common to each of these secret clique/gangs is an identifying tattoo. These tattoos are placed on the bodies of deputies who have "earned their ink" by committing violent acts against citizens. For example, the "Jump Out Boys" tattoo is a sinister-looking skeleton skull with piercing red eyes, who is pointing a gun. When a deputy who has earned his ink with such a tattoo, as a further badge of honor, smoke is inked onto the tattoo coming out of the gun barrel, signifying that he has shot a citizen. This kind of glorification of shooting has resulted in many instances of illegal needless death and significant injury to civilians under color of authority.

In this instant case Tanner has the mark of the "Rattlesnakes" gang tattooed on his leg.


**My Experience Regarding The Development of Rogue Deputy Peer Groups within the LASD:**

As a prelude to my remarks regarding my personal experience with LASD Deputy Gangs, I offer a commentary - "The Ring of Gyges" found in Plato's *Republic*:

> Gyges was a shepherd in the service of the ruler of Lydia. After an earthquake, a cave was revealed in a mountainside where he was feeding his flock. Entering the cave, he discovered that it was in fact a tomb with a bronze horse containing a corpse, larger than that of a man, who wore a golden ring, which he pocketed. He discovered that the ring gave him the power to become invisible by adjusting it. He then arranged to be chosen as one of the messengers who reported to the king as to the status of the flocks. Arriving at the palace, he used his new power of invisibility to seduce the queen, and with her help he murdered the king, and became king of Lydia.

In Plato's Republic, the tale of the ring of Gyges is described by Glaucon who is the brother of Plato.  Glaucon asks whether any man can be so virtuous that he could resist the temptation of killing, robbing, raping or generally doing injustice to whomever he pleased if he could do so without having to fear detection.  Glaucon wants Socrates to argue that it's beneficial for us to be just apart from all considerations of our reputation.  Glaucon wrote:

> "Suppose now that there were two such magic rings, and the just put on one of them and the unjust the other; no man can be imagined to be of such an iron nature that he would stand fast in justice.  No man would keep his hands off what was not his own when he could safely take what he liked out of the market, or go into houses and lie with any one at his pleasure, or kill or release from prison whom he would, and in all respects be like a god among men.

> "Then the actions of the just would be as the actions of the unjust; they would both come at last to the same point.  And this we may truly affirm to be a great proof that a man is just, not willingly or because he thinks that justice is any good to him individually, but of necessity, for wherever any one thinks that he can safely be unjust, there he is unjust.

> "For all men believe in their hearts that injustice is far more profitable to the individual than justice, and he who argues as I have been supposing, will say that they are right.  If you could imagine any one obtaining this power of becoming invisible, and never doing any wrong or touching what was another's, he would be thought by the lookers-on to be a most wretched idiot, although they would praise him to one another's faces, and keep up appearances with one another from a fear that they too might suffer injustice."  (Plato, Republic, 360 BC)

When I was hired into the LASD on December 1, 1965, I was assigned at our Men's Central Jail early morning shift pending my attendance on January 1, 1966 at Academy Class #110.  During my first night of assignment, I was introduced to a group of deputies who attempted to recruit me into their group which I observed used unprovoked excessive force on inmates.  In my opinion the shift Sergeant, Ray Lloyd, was aware of their acts

Page 6 of  20

and did nothing to prevent them.  I personally refused their recruitment attempts and expected that my refusals would be reported to Sergeant Lloyd and result in my discharge before I would be able to attend the academy.  This did not occur, and I entered into the Academy training on January 1, 1966, and graduated on May 6, 1966.  On January 28, 1966 while was at the Academy, Sheriff Peter Pitchess announced the arrest and expected criminal prosecution of the 7 deputies involved in their collective excessive and illegal assaults on inmates at the jail.  Since that time, and throughout my career, I have become aware of the propensity within Law Enforcement agencies in general - and the LASD in particular - for such groups to develop.  I have had occasion to write in-house memoranda regarding their destructive influence on the organization as a whole and called such groups: "Peer-Clans".

I first became aware of the existence of the "Vikings" deputy clan at Lynwood station during conversations with former Deputy Robert Armstrong, who was serving county jail time from August 1983 to February of 1984 at the Crescenta Station.  I was the commander of the station at the time.  I had been instructed by Undersheriff Robert Edmonds to monitor Armstrong's mental condition on a daily basis and insure that there were no reprisals against him from deputies or prisoners.  Armstrong told me about his experiences as a deputy at the Lynwood station, and specifically recounted the organization and establishment of the "Vikings" group by his Watch Commander, Lieutenant Dennis Slocum.  According to Armstrong, Lieutenant Slocum announced that the Lynwood Vikings were going to take some extraordinary measures to make Lynwood safe.  As alleged by Armstrong, part of Slocum's strategy was that he would form a deputy group which would operate outside the rule of law and which would be known as the "Vikings."  As part of a "Peer Clan" ceremony, Slocum and the group (including Armstrong) tattooed the head of a Viking warrior on the calves of their legs.  Armstrong showed me his tattoo to certify the story.   He told me that the "Vikings" had great contempt for anyone they perceived to be part of the "criminal element."   Further, Armstrong stated that their rationale was that justice would never be served in the courts and that they were therefore justified to use any tactic necessary to remove suspected criminals from the street.  Racial bias had a lot to do with the Vikings' total lack of respect for the citizens that lived in Lynwood because Blacks and Hispanics were considered inferior and, therefore per se criminal.

Viking tattoos reflected this systemic racial prejudice and hatred.  Armstrong stated that it was common for Vikings deputies to use false evidence and file false police reports, and that beatings were common and included a propensity to use deadly force.  Armstrong himself had resorted to these unlawful tactics, which led to his shooting a pregnant woman, killing her fetus, which was the reason for his custody status.

Page 7 of  20

In my opinion, the Lynwood Station was out of control, especially during the 1980s and 1990s. The Vikings had become an admired peer group, and they were a real force and power behind that station and in my view they literally took it over. Their Aryan symbol became intimately associated with the Station itself and appeared on a flag and clothing, which tended to enhance the group's credibility among peers. Armstrong stated that Command and supervisory staff did nothing to control the Vikings and that if anybody tried, they would get hurt or run out of the station. I informed my superior (Commander Bill Hanke) of my conversations with Armstrong about this group of renegade deputies who were capable of such activities. I remember feeling sick to my stomach when I learned that these supervisors were already aware of this situation and were condoning it as: "nothing more than a social group."

A few years later, following publicity about the Vikings and their gang-like behaviors, which included actually defacing a City of Lynwood water tower with their Viking logo, "LV25", I raised this issue again with department heads, but they dismissed it again as merely "socializing and camaraderie among officers." I persisted in voicing my opinion that these "Peer Clans" posed problems because their twisted and perverse behaviors got in the way of the police officer's oath of allegiance to the Constitution. In my opinion, my concerns that the Vikings were extremely dangerous fell on deaf ears. I wrote a memorandum to a department Division Chief in August 1991 that summed up my opinion as follows:

> "In my opinion, we are hosting a cancer that could eventually kill us. These groups are so dangerous to our ethical health that the department should officially view and react to membership in them as acts of disloyalty. The narrow clique values of peer groups must not be tolerated. Our tacit acceptance of them must end."

The substance of my memorandum was ignored, except to the extent that it resulted in my being shunned by a significant number my fellow executive officers. This was one factor in my consideration to opt for an earlier retirement in 1993.

Following my retirement, I was contacted by attorney John Burton, who was one of the attorneys representing plaintiffs in the class action lawsuit filed against the LASD and numerous Lynwood Deputies (Darren Thomas, et al vs. County of Los Angeles). It was my understanding that Mr. Burton had come across my memorandum about the Vikings in the documents produced in discovery in the Thomas case. Mr. Burton took my deposition on January 20, 1994, and I later testified at the Monell (municipal liability) phase of the trial about the LASD's deliberate failure to track force and respond to citizens' complaints of use of excessive force.

I agree with the allegations in this case concerning the "code of silence" that continues to exist within the LASD. The code decrees that "cops protect other cops" no matter what, and that officers of higher rank back up line officers, no matter what. Noted experts agree with this assessment. In the closed society of police departments, especially those that adopt a siege "us vs. them" mentality, the pressure to remain loyal is enormous. The officers believe that betraying the group betrays themselves and destroys their identities.

Although this phenomenon exists in all human groups, it is exaggerated in some poorly commanded and supervised law enforcement departments because deputies and officers become so closely identify with their departments, their units, and their colleagues that they cannot even conceive of doing anything else. Policing, particularly because it is a 24-hour-a-day identity, generates powerfully distinctive ways of looking at the world, and cognitive and behavioral responses, which constitute a working personality. Each station is an extremely close-knit community - there are no secrets. In my opinion, It would be impossible for any Compton Station deputy or supervising personnel to be unaware of what was actually going on within their units.

Additionally in my experience, Law Enforcement Agencies with weak administrators, such as the LASD under Sheriff Block and Sheriff Baca, allow the line deputies to become free agents. These deputies develop their own sub rosa codes of behavior, their own loyalties, and their own systems for defining and dealing with good police work and bad police work. When misconduct occurs and a supervising officer "looks the other way," the message to the patrol deputy is clear. The centrality of this message was borne out in my own experience as a supervising commanding officer. For example, as a newly assigned Lieutenant at the Crescenta Valley Station, I confronted a deputy who was on the verge of striking a verbally abusive suspect in a booking cage. I asserted my position as superior officer to prevent the deputy from battering the suspect with his flashlight and then relieved the deputy from his duty. It was soon clear to every deputy at that station that such gratuitous use of force would not be tolerated. I am convinced that the problems festering within the Compton Station could have been cleared up through the use of vigorous and vigilant command and supervision that would create and enforcement a culture of honesty, integrity and loyalty to our oath of allegiance to the Constitution, and a number of citizens would still be alive, if similar leadership had been demonstrated.

**Opinions Thus Far:**

1. Tanner choking out the Plaintiff, Jane Doe, were uses of excessive force

2.     The Rattlesnakes are a subgroup in LASD operating out of the Lancaster Station

3.     The Rattlesnakes meet the definition of a deputy gang

4.     Deputy Tanner's references to the rattlesnakes in conversation with Jane Doe would intimidate a witness

5.     Law Enforcement Deputies are trained by POST and department policy that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers. Officers are also trained that "Unreasonable force occurs when the type, degree and duration of force employed was not necessary or appropriate." (LD 20: Chapter 2 and Chapter 6.)

If the jury were to conclude that Jane Doe's allegations as true, and as supported by the record thus far, I see nothing that indicates any behaviors whatsoever by Mr. Tanner that would justify the use of physical force including: strangulation and punches to jane Doe's body.

6.     This case presents another in a long line of case demonstrating the Sheriff's Department and County of Los Angeles' customs, policies, practices, and/or procedures which were directed, encouraged, allowed, and/or ratified by policy making officers/deputies. Many of these are listed in the complaint in this case and the evidence in this case shows the policies exist:

a.     To use or tolerate the use of excessive and/or unjustified force;

b.     By failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, and/or unlawful seizures;

c.     By ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity, including the proliferation of "cliques" or "gangs" within the Sheriff Department, thus condoning and allowing said cliques/gangs to exist and operate with impunity within the ranks of the Sheriff Department and a policy, practice and/or custom of failing to investigate said cliques/gangs.

7.      The collective approvals by the LASD puts the general public at unnecessary future risk of death and/or injury from the Defendant Deputies, and others on the department, who have been, or are now, similarly trained and/or supervised.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

Page 11 of  20

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later.  During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals.  I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption.  The majority of our cases were homicide cases, including the murder of police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of

investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,600 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Alabama,

Page 13 of 20

Arizona, California, Colorado, Florida, Illinois, Iowa, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.  I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California.  On February 18, 2020, and on March 10, 2021, and on October 27, 2023.  I lectured (at invitation and request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.  On February 26, 2025, I lectured (at invitationa dn request) at the California Western School of Law regarding Detective Investigations.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047.  I have been recognized, and my expert report was

quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District

Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop,"  No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the U.S. Supreme Court, No. 16-369, regarding the use of officer(s) pre-shooting conduct resulting in lethal force and searches.  This case was cited by the U.S. Supreme Court in *The Estate of Barns, Deceased v. Felix et al,* No. 23-1239 regarding  officer(s) pre-shooting conduct resulting in lethal force. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.  My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for

publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135-SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx).. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.* D.C. No. 4:19-cv-00301 KAW regarding use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.* D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger." My opinions supported argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 - JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard. My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force. My opinions supported argument in the Ninth Circuit opinion, *SB v. County of San Diego*, 864 F. 3d 1010 - Court of Appeals, 9th Circuit, 2017. My opinions supported argument in the Ninth Circuit opinion, Case No. 23-15356, D.C. No.2: 21-cv-00099 - JJT (for publication), *Krish Singh, v. City of Phoenix, Brittany Smith-Peterson, et al.,*

Page 17 of  20

regarding Qualified Immunity/Excessive Force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 22-16495, D.C. 5:20-cv-07429-NC (for publication), *Rosalina Calonge, v. City of San Jose, Edward Carboni, et al.,* regarding Deadly Force/Qualified Immunity.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding .  I was cited by name by the State of California Court of Appeal, Fourth aAppellate District, Division One (For Publication), A.B. a minor, etc., v. County of San Diego, et al., DO84376 regarding positional asphyxia and forceful restraint.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children", pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate.  On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights.  I was the retained Use of Force consultant

Page 18 of  20

regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-0522-L NLS) and which was taken under formal consideration by the Inter-American Commission on Human Rights (an international human rights tribunal) on November 2022.

During my service on the LASD, I became aware of the existence of Deputy Gangs and in particular the "Vikings" Deputy Gang at Lynwood Station (LV-25)." Since 1980 I wrote significant in-house memorandums regarding the existence of Deputy Gangs and the harm they caused within the LASD. My first trial testimony as a consultant (1994) regarding Deputy gangs after my retirement was: *Thomas v. County of Los Angeles, 2:90-cv-05217* wherein I testified in Federal Court as an expert on Deputy Gangs. My consistent 30 year participation (with others) on this issue has now evolved in LASD Policy 3-01/050.82 - *Prohibition - Law Enforcement Gangs and Hate Groups* as defined and supported in Penal Code sections 13670(a)(2), 13670(b), 422.55, 13680(d) and 13680(e), 13670(b), 13682(a), 13682(b). 13670(b), 13510.9(a)(2), 13510.8, 13670(c), etc.

My most direct trial testimony regarding the Americans With Disabilities (ADA) rights and requirements (as trained by POST) was *Marina Borawick, v. City of Los Angeles, et al. Case No. 2:17-cv-02036 BRO-JC*, on March 30, 2023. There have been others, including in written Rule 26 Reports.

Additionally, a number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants, and a number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on

Page 19 of 20

November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS*, and on March 1, 2024 in *The State of Texas v, Deputy James Johnson and and Deputy Zachary Camden Judicial District Court Travis County (Texas) Case No.: DPS 09990017*. There are many others.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed August 4, 2025 at Santee, CA.


Roger A. Clark

# EXHIBIT "6B"
# [INTENTIONALLY LEFT BLANK]

# EXHIBIT "6C"

LOS ANGELES COUNTY SHERIFF

CIVILIAN OVERSIGHT COMMISSION

OCTOBER 14, 2022

SPECIAL HEARING ON DEPUTY GANGS IN THE SHERIFF'S DEPARTMENT

MEMBERS

COMMISSION EXECUTIVE DIRECTOR BRIAN K. WILLIAMS

COMMISSION CHAIR SEAN KENNEDY

COMMISSIONER ROBERT BONNER

COMMISSIONER PATTI GIGGANS

COMMISSIONER HANS JOHNSON

COMMISSIONER IRMA HAGANS COOPER

COMMISSIONER JAMES P. HARRIS

COMMISSIONER LUIS S. GARCIA

COMMISSION STAFF INGRID WILLIAMS

Scanned with
CamScanner

previous guy, and that's when I left.

MR. DEIXLER:  I've asked you to consider what you would tell me, if I were the sheriff, was a way to address the problems of deputy subgroups, and we'll get into your background about it.  And -- and other than perhaps telling me that a sheriff should honor subpoenas, would you believe you would be advising me on a culture change in the department in which you serve for 42 years?

MR. TYLER:  That's a general way to say it, and I'd say there's more than one approach potentially available to you, Sheriff Deixler.

I would share with you the fact that over the course of my career, I had observed various actions taken about the deputy subgroups that were effective on a small scale but not on the widespread scale necessary.

I would share with you that I felt that -- one of the main issues about the subgroups hasn't been looked at very hard and that is not why do deputies join the subgroups but what can be considered either missing from or lacking in management that enabled the subgroups to flourish, to be created and thrive for up to 50 years?  Management covers a lot of ground.  There have been hundreds of managers since the 1970s.

MR. DEIXLER:  Let me -- let me ask the next question.  Are there specific elements that are critical to bringing about a change in culture in your 42 years of experience?

MR. TYLER:  I believe there are and the ones --

MR. DEIXLER:  And what are they?

MR. TYLER:  -- that I've identified myself for my own sanity and thinking through what we were going to do with this idea about what's missing about management are leadership, teamwork, mentoring, and accountability.  Four things that don't cost anything.  There's no extra budget required to implement better leadership, teamwork, mentoring, and accountability but are critical to the Sheriff's Department in general and, in particular, this issue we're discussing.

MR. DEIXLER:  We'll come back to the elements, I promise you.  But let me ask you to define terms so that we will understand what we are speaking about.

What do you want the commission to understand when you use the term "deputy clique" or "subgroup" or "subculture"?

MR. TYLER:  Well, the term I've been using since I was more deeply involved in addressing this issue is "subgroups."  Just happens to be the one I picked.  I know cliques, gangs, and secret societies have been named too.  My concern about the various names is that they make discussions about them ambiguous.

And my thought is that the groups that we -- that are discussed with concern, about which I have concerns, have three features, and those three features are what raised the concerns.  They are exclusiveness about who's a member or who

is potentially going to become a member, a degree of secrecy about everything concerning the group, membership lists, how people become members, how people are rejected from membership if they aspire to join, activities, if there are any things, quote/unquote, "bylaws," if there are.  There's just no readily available information about the groups I'm aware of that enables us to understand these things.  And the third feature is symbolism that involves graphics that I consider -- well, in fact, I'm not the only one that considers -- unprofessional, often ambiguous about power or worse, threatening about power, and many cases, about death and violence.  Inappropriate symbolism is the third feature about the subgroups of concern to me.

MR. DEIXLER:  I should ask in light of Commissioner -- Chair Kennedy's remark, you described the terms "deputy clique, subgroup, gangs," and the like.  Have you ever heard those groups described as "unicorns" during the 42 years that you were in the LASD?

MR. TYLER:  No.  Not until I heard some news report or some discussion on the speaker in there this morning.  I hadn't heard that one.

MR. DEIXLER:  Have you -- have you been involved in devising a plan to address the problem with subgroups?

MR. TYLER:  I have.

MR. DEIXLER:  And -- and would you describe what your

initial involvement was, sir?

MR. TYLER: Three months after I retired in March of '17, I received a call from Undersheriff La Berge, my replacement, that he and Sheriff McDonnell and Max Huntsman had had a meeting, and an outgrowth of that meeting was that the Department would do the first-ever systematic, widespread study of the deputy subgroup issue and that the three of them had agreed that I, because of some experience I'd had previously, would be a logical person to begin undertaking that study.

So I got that assignment as a reserve deputy, and I worked on it for a year-and-a-half, 2017 and '18, with a fairly large group of representatives from the County Counsel's Office and developed a study methodology and came to some realizations about the proper way to do this study that I thought made it potentially very valuable.

MR. DEIXLER: And tell us a little bit about how you would have proposed to have the study initiated; in other words, (inaudible) first direct your inquiries.

MR. TYLER: Well, if we ask the question what has been lacking in or missing from management, the logical place to start is at the undersheriff level and work our way down toward the deputy level instead of doing surveys and questionnaires and interviews with deputies.

If we had decided on the deputy route first, which I had in my mind for about a week before I thought more clearly,

Scanned with
CamScanner

we would have created just one more giant batch of resistance and potentially some bloodletting because there'd be very little -- the deputies would be justified in thinking or saying, "What's up with that?  You always blame the deputies.  You always blame the line level.  Just like in any organization, rolls downhill 'til it comes to the bottom guy, and it's his fault somehow."

And while that doesn't cow me into thinking we shouldn't do it, that inspired me to think about, "Well, isn't there somebody else we should be talking with?"  And it's the managers.

So the point to starting with them is to start to build a leadership team -- I said teamwork was one of the major aspects or elements of what I believe something that could work or be more effective than what we've done in past history -- build a leadership team that's cohesive and raise awareness about management's role with respect to the deputy subgroups, which I will admit, as a former manager, all of us have a sense of -- or I mean, a share of the responsibility for being insufficiently attentive to this issue.  We've got umpteen reasons for it, and some of them are valid, but none of them really explain a justification for having it get to this point when there have been a whole series of sheriffs, undersheriffs, assistant sheriffs, captains, and lieutenants, and sergeants.  So if we accept the responsibility for missing some bets about

Scanned with
CamScanner

addressing the problem, now is the time we can correct it.

And the questions that I had devised for the interviewer intended to be the basis for deep introspection about that issue on the parts of the interviewees, which would be, at the time, Undersheriff La Berge and the four assistant sheriffs, to begin with.

MR. DEIXLER: Could you just give the commission a feel for the methodology, the question type that you would have asked in the circumstance and how you would have gone about this?

MR. TYLER: I have a lot of experience in facilitating discussion groups. So I wrote questions that would facilitate discussion. Not yes/no answers, but --

MR. DEIXLER: Let --

MR. TYLER: Oh, I'm sorry.

MR. DEIXLER: -- let's hold up a second and -- and -- and let the distraction go --

COMMISSIONER GIGGANS: Sorry.

MR. DEIXLER: Not a problem.

MR. TYLER: Right. I like the song. Okay?

So anyway, I wrote questions that would elicit discussion rather than pat, simple "yes," "no," or "I don't know" answers. And it would result in the interviewer -- who initially I had thought would be me because I was deputized to do the project -- between the interviewer and the interviewee,

We have legitimate reasons for concern.  This is not a joke.  It's a serious matter.  If we don't learn about this and figure out how to respond more effectively to public concern and the lack of public trust about this, then we're going to get" -- and then, you know, whatever -- "outside monitor, special master, consent decree, et cetera, et cetera, et cetera, and, you know, our pants sued off of us has been already happening."

So a leader in this case, once the sheriff tells us "Here's what I want leadership about," we have not only resolve about getting the right message out -- and initially, the message was to be "The study is legitimate.  Please cooperate with whoever is conducting it, and it's an honest attempt to learn.  It is not an investigation.  As the study proceeds, I, the sheriff, tend to be formulating more definitive reactions to what I'm learning."

The second thing a leader needs is energy to talk about it on his own volition, actively, frequently, recurrently, not let it slip onto the back burner.  And I'll point out that the issue of deputy subgroups has been on the front burner multiple times when something criminal or inordinately notorious like a fight among deputies went on, and it tends to slip to the back burner when all becomes quieter about the issue.  That's management's -- I hate to say "fault" -- but responsibility.  Everybody's busy.  We're juggling a lot of balls.  There are lots and lots of

merely a study but an initiative for culture change because the realization too that dawned on me was, "Hey, by merely talking about this, we'll create the Hawthorne Effect." You know, turn the lights up, workers are better. Turn the lights down, workers do better. Why? Because someone is paying attention to them both times.

If we pay attention and talk about the paying attention, we're going to have an impact on the culture that we've never had before because we've never done what I'm talking about and that's continuously talk about it.

So once the sheriff -- my realization is "My gosh, you know, we can put together an initiative to change the culture by means of this study."

And I created a vision in my head anyway for how and at what stage the transition would occur to the point where the sheriff could say, "Here's what we're going to do. I know enough from hearing from my people, and this is the way I want to proceed," with some large degree of definition in -- about which groups are considered inappropriate enough to say we need to disband them, retire them, or whatever. I can talk more about that later.

But in answer to your question, after the meeting, the next group of people would be the 14 division chiefs, and I had thought that maybe by the end of 2018 -- very, very ambitious, and I was wrong -- we could get through at least

some of the division chief interviews. And, again, a view toward letting them know this is a concern that we're not going to let lie dormant anymore because it never is really dormant. The sheriff's justified in learning more about these. It's compelling because he has to make a decision about what to do about them to respond effectively. So your cooperation is sought. Talk to us about your knowledge.

And then after the division chiefs are all 14 interviewed, there'd be another meeting where the sheriff can sit with his executive staff group and make himself clear and determine if everybody's really on board or, with help from the assistant sheriffs, spot the people who are dubious about whether this matters. Then the sheriff could make decisions about whether the division chief, for instance, would be effective in this effort or shouldn't be involved as a division chief. Sheriff's prerogative is to use or not use division chiefs and above because they serve at his pleasure. They're not Civil Service protected. This is important enough that any sheriff might decide, well, 13 of you are for me, and one of you is neutral. And if you're neutral, you're against me, so I can't use you as a chief.

Now that sounds cold, or maybe it doesn't sound tough enough, I don't know, but that is an option for the sheriff to consider.

MR. DEIXLER: After the buy-in, after you have this

Scanned with
CS CamScanner

multiple times, that the sergeants are so important to deputies' welfare and, therefore, to the public welfare that it cannot be overstated.

MR. DEIXLER: We've talked about leadership. You've talked about teamwork. We've talked about mentoring. I'd like to ask you about accountability, and who, in an organization focused on eliminating deputy gangs, would be the first line of accountability?

MR. TYLER: The Sheriff.

As I said, he needs to meet with his assistant and undersheriffs and make sure he's far enough into their heads to reliably trust them. When he's at a meeting he's got to be, to say the right things about the subgroup issue. Whatever he determines are the right things and to do the right things about them once he gets to steps beyond mentoring, which you haven't asked me about yet, but I will let you know is one of the considerations that I listed in the document. So it's not all just about mentoring because I know it won't work for some people.

After mentoring comes accountability, which in the case of these subgroups in the past has taken the form of actions taken by management -- administrative actions to disrupt or halt the either existence of or the nefarious impact of Subgroup X, Y, or Z, such as the Jump Out Boys, the one I was referring to earlier. It was clear that there had better

not be a Jump Out Boys organization or subgroup within the Gang Enforcement Team anymore because it was a real loser from the day one. Someone should be held accountable for making that message loud and clear so that there are no more Jump Out Boys groups, and that is the entire chain of command that I'm calling the leadership team. If they're a team, they're all on the same sheet of music about the message, which would be no more Jump Out Boys, no more ideas like that, no more creeds that say you can bend the law to -- or break the law to enforce a law, or whatever -- bend it, or whatever they said.

And so, you know, accountability starts at the top, but the sheriff cannot possibly even ensure that every one of 80 captains is responsibly conveying the same message, which is why he has a tier of managers in an 18,000-person organization. Twenty to 30 commanders and 14 division chiefs, everybody's got to be pulling the same amount of weight about the team idea and about accountability or constantly getting the message out there and for dealing with people who don't respond to the message in a hopeful way.

MR. DEIXLER: So -- so yes. Take that as the example, since I think we have about a 50-year history of people not getting the message. How, under accountability -- under your accountability doctrine, would somebody ensure that the message is delivered or there are consequences for not getting the message?

necessarily solve the problem. So we're right back to going into a -- a place where the loyalty to a subgroup and its symbolism is as strong as it is to the badge and the patch and trying to undo it.

Well, to my knowledge, nobody's done this yet, but if I -- I picture, at some juncture, at the Sheriff's, probably, direction, "This is the time. Do it."

Going into every briefing and ending up having talked to every person in that station without trying to identify who's got a tattoo and who doesn't, I'm just saying a variation of the sheriff's message, which appears -- you know, a suggestion appears in the document, in which a sheriff's the one who's entitled to conceive, write, or initially articulate, but have it parroted by everybody in the chain of command down. And whether the captain is accompanied by division chiefs or commanders or whether he just goes in there with a couple of lieutenants or whether he goes in alone and says, "Subgroups -- our subgroup here does not compute anymore in the 21st century. We managers have cast a blind eye to an extent, maybe even approved them in some cases, maybe we've winked at them, maybe we've taken them on and failed, maybe we've expressed ourselves poorly, but tonight, I'm going to express myself well and clearly.

"I'm imploring you to have it be the case that there is no longer a group at this station called" -- pick your

deputies who have come out of the jail without a jaundiced view of humanity just because you were guarding inmates for three or four years.

MR. DEIXLER: You were never a Jump Out Boy?

MR. TYLER: No, I was not --

COMMISSIONER BONNER: He -- he was never a 3000 Boy.

MR. DEIXLER: Yeah. 2000 or --

COMMISSIONER BONNER: 3000 Boy; right?

MR. TYLER: No, I wasn't.

MR. DEIXLER: And you never had a tattoo?

MR. TYLER: You know, I -- I -- I know this may sound incredible, but I have never knowingly worked in a unit that had a deputy subgroup. Lennox did not have one when I was a deputy there. Lennox did not have one when I was a sergeant there. Now, I took an oath; I'm virtually sure that they didn't.

When I was a lieutenant, I went back there a year and a half after, I think, being a sergeant there, and I -- or two years -- and I detected a change in attitudes and stuff. Never heard the word "Grim Reaper," but I had a bad feeling that that might have been in the mid-1980s when that group got invented.

When I went to Temple, even though there had been a history of that little cartoon character, the Tasmanian Devil being their mascot, I knew that that had been emasculated by a previous captain and that if there were a Tasmanian Devil

department leadership has its feet held to the fire.

How do you evaluate the value of a consent decree supervised by a federal judge and a monitor as the best way to achieve elimination of these gangs?

MR. TYLER: We've had more than one settlement agreement and consent decree in my department experience. Every time we've had one, we've ended up working with, not against, the monitor, to -- to my knowledge. I -- I know some of the ones I was personally involved in, we worked with the monitor. We got a lot of good stuff done. When the monitoring period was over, we were able to sustain our reform efforts for some period of time, but I also know that, on occasion, we haven't. We've backslid or slipped. I think that if it's necessary, then the monitorship, however painful or however potentially embarrassing it is, can be helpful. I've seen it be helpful.

But if there were a federal monitor appointed today to the Department about the deputy subgroup issue, and if he ordered us to do everything legally appropriate and severe, most dramatic kinds of things to break up the gang, the groups, or whatever, I'm saying that leadership, teamwork, accountability, and mentoring would still be vital because I want the deputies to think beyond the end of their nose about the effect these groups are having on public trust and not have them drop their membership in a subgroup because they were told to, rather because they figured out it wasn't good for them,

MR. TYLER: Well, I've been interviewed by RAND, by Mr. Kennedy, by various attorneys in lawsuits, by -- I don't know who -- but because -- primarily because the tattoo committee, which we haven't even talked about, that I oversaw for a couple years and this study and potentially partly because of that booklet you showed.

So my brain's been cogitating on this stuff all that time, and I am highly distressed about the controversy that swirls around my beloved former organization. I don't even feel like its former. Most of us don't when we leave, even if we're officially -- guys are cut. And I love police work. I love the concept of what we do in society. I love the whole idealistic picture of a stalwart person who's enforcing the law that is incorruptible and always civil with the public and polite and can get his job done without one degree of unreasonable force and understands how to talk people to jail in every possible case without clobbering them. And these -- some of these subgroups seem inimical to that love.

And so because I'm a former manager who feels that, just like everybody else, to some extent or another, I was insufficiently attentive, not that I ever worked a place that had one of these groups that I recall -- know of, but just that as a manager, collectively, we all potentially could have done better, certainly can do better, and because present just ended a couple of split seconds ago; so now we only have the future

Scanned with
CamScanner

its investigable -- if there's evidence that someone as a group now -- I mean, it's my understanding that they are exclusive and not everybody gets to play. And if some of those decisions about who's in and out are based on race, creed, color, nationality, religion, et cetera, et cetera, they're ripe for termination.

COMMISSIONER BONNER: I'm sorry. I can't really hear the witness --

COMMISSIONER COOPER: (Inaudible) termination --

COMMISSIONER BONNER: -- I can't -- I can't -- I'm sorry. I just can't hear the witness very well because --

CHAIR KENNEDY: (Inaudible) speak into the mic.

COMMISSIONER BONNER: -- he's speaking right at you and...

MR. TYLER: They're ripe for a termination is what I last said. Okay. So that -- that component is in the documentation that I supplied as considerations.

About the past, I'm -- I have a lot of knowledge about some things and have some knowledge about maybe a lot of things but I sure don't have all the knowledge about everything.

At the station that used to be called Lynwood, which polices that city and the adjacent county areas and is now called Century Station, policing the same area and some more county areas, there have been at least one or two instances, about which I know very little, where there was very special

isn't working, it needs to be refurbished, rethought.

CHAIR KENNEDY: So what about the public? What about these --

COMMISSIONER GIGGANS: So what about the public?

CHAIR KENNEDY: -- these law enforcement gangs' impact on community policing, constitutional policing, the rights of accused people to get impeaching information about deputies testifying at their trial -- what about that aspect of the problem?

MR. TYLER: Well, if I didn't mention much about the public in my explanations, either I got the wrong questions or I didn't think to include them. I know I said public trust about --

COMMISSIONER GIGGANS: Yeah, you did.

MR. TYLER: -- three to ten times. I'm acutely aware of it. Now, I will respond to everything I wanted to to Mr. Bonner -- Judge Bonner mentioned. I didn't really want to do this, but here it goes.

There are some subgroups that I'm embarrassed to even mention the names of for the reason you cited. The one you picked and the one from my old station are the two most egregious examples of horrifying symbology and naming for any deputy, any cop, any police officer, period. I was not a member of the Department. I mean, I was a reserve deputy when the Executioners first came to my attention, and I was

Scanned with
CamScanner

absolutely aghast at that name.  Grim Reapers was bad enough.

Every bit of this, what I care about is whether the public is getting served.  I didn't become a policeman -- I -- I became a policeman for the corny reason I wanted to help people and I thought they were heroes and I wanted to be a hero.  I used to get beat up when I was a kid.  I wanted to not have that happen; right?  Sorry about this.  I didn't expect it.

So the public is in every single one of my thoughts.  I spent ten years in Region One as a chief hawking courtesy more than anybody I know ever did in the Department.

How effective was it?

Don't ask me.  I -- I have no way of knowing for sure.

So I can brag about it, but I don't -- I can't tell you that I made a big, giant sea change and how courteous people were.  I had some pretty clever techniques for acknowledging it, but I don't know that it was successful.

I understand if that -- if -- I -- I mean, I am a member of the public, and I think it's embarrassing that there are guardians of the law naming themselves with subgroups that are either racially based, about death, about violence, or about power in ambiguous or threatening ways.  Period.

So you said nothing that I don't agree with and understand on a deeper level than you can tell from my

testimony, and I hope that I made that clear in what --

CHAIR KENNEDY: So when -- when you --

COMMISSIONER GIGGANS: Just one second.

I just want to say, I wasn't saying -- don't misinterpret. I wasn't saying there -- we -- we got a good sense of how much you care about the public, so I wasn't saying that.

MR. TYLER: Oh, yeah.

COMMISSIONER GIGGANS: But I think just as an important for our testimonies, people coming here, that we always have to hold that very high because sometimes it gets -- things get lost in some of the obscurity in the fine details, quote, "of the law," of which good, faithful people disagree about. But it's still -- and those disagreements about how to interpret a law or a policy impact the community and impact -- and impedes change. So I just wanted to bring that up about --

MR. TYLER: I understand.

COMMISSIONER GIGGANS: -- somehow we got to move off that needle.

MR. TYLER: I understand, and I took nothing you said wrong at all.

Thank you.

CHAIR KENNEDY: Well, what -- what I want to know is, aside from courtesy, you talked about the Jump Out Boys. They have a black book memorializing the shootings; right?

Scanned with CamScanner

MR. TYLER:  That's my information from the administrative investigation report, yes.

CHAIR KENNEDY:  And the tattoo gets to be enhanced with smoke when you shoot someone; right?

MR. TYLER:  That was in the creed that they authored.

CHAIR KENNEDY:  And the creed says, "Jump Out Boys are the alpha dogs who think and act like the wolf but never become the wolf"; right?

MR. TYLER:  Correct.

CHAIR KENNEDY:  And they understand when the line needs to be crossed and crossed back; right?

MR. TYLER:  That's what I was referring to when I said it's okay to bend the law to enforce the law.

CHAIR KENNEDY:  Yeah.

MR. TYLER:  In their creed.

CHAIR KENNEDY:  Okay.

And the Jump Out Boys are not afraid to get their hands dirty without disgrace, dishonor, or hesitation.

MR. TYLER:  I am extremely distressed by that creed as I was back then when I first learned about it.

CHAIR KENNEDY:  So as someone who was number two in the Department, what is the Sheriff's Department doing to disclose that information to accused people who are on trial with Jump Out Boys testifying in their criminal trials?  Are you all -- are you telling the prosecutors that these people are tattooed

Scanned with
CamScanner

LACS CIVILIAN OVERSIGHT COMMISSION, October 14, 2022

members of a group with that creed?

MR. TYLER: Well, first of all, I haven't been in the Department for five years --

CHAIR KENNEDY: Well, the -- the Jump Out Boys are -- I mean, that's -- you know --

MR. TYLER: Well...

CHAIR KENNEDY: -- that's more than five years ago.

MR. TYLER: I understand that.

The answer -- I guess your question is we comply with Brady versus Maryland, or we try to when the DA doesn't have concerns about our method of compliance. We answer -- bring forth information to prosecutors when it's appropriate. I'm not aware of anybody in the Jump Out Boys subgroup or gang, or whatever you call it, who had the chance to --

CHAIR KENNEDY: I think "gang" is probably appropriate; right?

MR. TYLER: In that case, I might be tempted to use the word myself because they did mimic the street -- the culture of street gangs to an extent even greater than some of the other groups I'm aware of. But they didn't really have an opportunity -- the thing didn't last very long and there were only seven members that we know of that we found out about. We know that other deputies told us "I didn't join it. I didn't like the looks of it."

So I can't say much about to what extent we notified

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
1-626-792-6777

be eradicated.  Whatever else the Sheriff may have done, he has not done that.  Full stop.

Thank you.

CHAIR KENNEDY:  Bert?

MR. DEIXLER:  Thank you.  Good morning.

Our first witness is Neal Tyler, and if I can be excused to get him.

CHAIR KENNEDY:  Yes.

Can you state your name for the record.

MR. TYLER:  Yes.  It's Neal, N-e-a-l, Tyler, T-y-l-e-r.

CHAIR KENNEDY:  Can you raise your hand.

Do you swear or solemnly affirm, under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

MR. TYLER:  I do.

CHAIR KENNEDY:  Thank you.

MR. TYLER:  Thanks.

CHAIR KENNEDY:  Bert, could you make sure you speak into the microphone because some commissioners are having a hard time hearing you.

MR. DEIXLER:  Yes.  I will -- I will endeavor to do so.

And I should note for the record that Commissioner Johnson has now joined us.

CHAIR KENNEDY:  Welcome.

Commissioner Johnson is our newly appointed

Scanned with CamScanner

# EXHIBIT "7"

Vincent Miller (SBN 291973)
vincent@vincentmillerlaw.com
James Jirn (SBN 241189)
james@vincentmillerlaw.com
THE LAW OFFICES OF VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Tel.: (213) 948-5702 | Fax: (818) 450-0698

Attorneys for Plaintiff
JANE DOE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>            Plaintiff,<br><br>       v.<br><br>COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual; and DOES 1-100, inclusive,<br><br>            Defendants. | Case No.: 2:24-cv-08649-SPG(SKx)<br><br>**PLAINTIFF JANE DOE'S DECLARATION IN OPPOSITION TO DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:<br>Time: 1:30 p.m.<br>Courtroom: 5C<br>Action Filed:<br>Judge:  Hon. Sherilyn Peace Garnett |

**DECLARATION OF JANE DOE (MYKALIA COOK)**

I, Jane Doe, declare:

1.     I am the Plaintiff in this action in this action. I am an individual over the age of 18 years, I have personal knowledge of the facts stated herein and if called upon to testify, I could and would competently testify thereto.

2.     I had friends in law enforcement and was interested in a possible career in law enforcement when I met Defendant Aaron Tanner through other Los Angeles County Sheriff's Department ("LASD") deputies in 2020.

3.     After I was introduced to Deputy Tanner, I told him of my interest in

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

possibly working in law enforcement, and he invited me to participate in LASD's Ride-Along Program. I was excited to go on my first Ride-Along with him.

4. The LASD Ride-Along Program permits members of the public such as myself to accompany deputies during their shifts. Ride-Alongs are not just riding in the patrol car; Ride-Alongs allow a resident to spend a day with a deputy while he or she performs duties, driving around on patrol, handling calls by foot, working in the station, taking breaks, etc. During Ride-Along, participants are not allowed to leave the deputy's side during the entire shift.

5. After I did a few Ride-Alongs with Deputy Tanner at LASD, we began dating. Defendant Deputy Aaron Tanner and I eventually began a romantic relationship and made the relationship "official" in early 2021.

6. When I met Deputy Tanner, he told me that he was separated from his wife and living apart from her. I got an apartment at which he was supposed to move into and live with me, but I later found out that he had lied and was still living with his wife. While Deputy Tanner and I were in a romantic relationship, he would stay overnight at my apartment sometimes.

7. Tanner at times kept sheriff department equipment and his Los Angeles County Sheriff's Department firearm, and other guns, at my apartment. He sometimes stayed overnight with me at for about a year.

8. In the early stages of the relationship, Deputy Tanner was not abusive toward me. He later became regularly abusive toward me when was he was on duty on patrol, and I was with him at his work for LASD, as well as when he was off duty.

9. As I told LASD employees, and testified in my deposition, Deputy Tanner choked me unconscious and violently attacked and abused me on multiple occasions at my apartment, in vehicles, and in bars, sometimes when he was on duty, in his LASD uniform, and at other times when he was off duty. Some of the

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

2

times that Defendant Tanner violently assaulted me was while I was participating in the LASD Ride-Along Program.

10.    Tanner eventually took me on about 30 Ride-Alongs in 2021 and 2022 up until September 2022. I have since been informed that I was supposed to sign a Waiver form which makes it so LASD is not liable if I had gotten injured. I did not know at the time that I was supposed to sign such a Waiver, but Deputy Tanner did make sure I was at his side for the whole shift as is required for Ride-Along Participants to help protect LASD from liability. But I still participated in the Ride-Alongs with the knowledge of LASD that I was on Ride-Alongs.

11.    Deputy Tanner took me on Ride-Alongs sometimes weekly, and on over 30 shifts total, where other deputies and supervisors would observe me on the calls, as Deputy Tanner, in uniform, would assist other deputies with their calls or deputies would assist Tanner on calls. When handling patrol calls, we would often step out the patrol car and walk up to locations and suspects. I would interact with sergeants and deputies. At times, they would ask me if I was on a Ride-Along and I would tell them yes. Usually, they did not ask questions, just interacted with me as if I belonged there. No one ever objected to me being on any of those 30 Ride-Alongs.

12.    As I stated above, as is required by LASD, I stayed by Tanner's side throughout his entire shift, regardless of whether we were "riding along" in his patrol car, walking at a call, working in the station, or taking breaks, including lunch breaks at my apartment, or working side by side with Tanner on calls and at the station. (Deputy Tanner would also sometimes pick me and my daughter up to drive us somewhere during his shift, but those rides were not during LASD Ride-Alongs.)

13.    Lancaster Station personnel, including supervisors such as the watch commander and lieutenants, repeatedly saw me accompanying Deputy Tanner to work at the station while I was on a full-day Ride Along, for over a year and a half. Not once did a supervisor, or any deputy, object to my participating in the Ride Along Program. Initially, at the beginning of our relationship, Tanner was not

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

3

regularly abusive. However, at some point in 2021, he began regularly choking me unconscious, and twisting my wrists to cause me unbearable pain. By 2022, Tanner regularly did this to me. In 2022, Tanner choked me unconscious on a regular basis.

14.     I did witness deputies and supervisors defer to Deputy Tanner, and my observation was consistent with him telling me that he controlled the station as the shot caller, the leader, of what he called his gang, the Rattlesnakes. I can only speculate that Tanner's influence at the station is why I was never asked to sign a Waiver. All I can attest to is that I was never asked to sign a Waiver on any injuries I might have gotten. I can also attest that at no time was I an employee of LASD. I was solely there as a resident Ride-Along participant.

15.     To be clear, while Deputy Tanner was physically abusive to me during my participation in Ride-Alongs, Deputy Tanner never choked me unconscious at the Lancaster Station and or in the patrol car. Tanner at times twisted my wrists to put in my unbearable pain while we were in his patrol car during a Ride Along. But he only choked me unconscious when we were behind closed doors, where there were no witnesses. Some of the times he choked me unconscious was when he was off duty. Some of the times, he choked me unconscious while on duty, but I was not on a Ride-Along. However, at least three of the instances in which he threw me to the ground, got on top of me, put his full weight on me, and choked me until I lost consciousness happened during one of the approximately 30 Ride-Alongs.

16.     Also, I want to be clear, because one of Deputy Tanner's co-workers lied about it: Deputy Tanner never choked me unconscious during sexual intercourse. I was not turned on by being strangled during sex. Deputy Tanner would tell me that he choked me unconscious—not during sex—because he had "to show dominance." When Deputy Tanner choked me unconscious, I would get very scared that he was going to kill me. He would sometimes apologize after choking me unconscious and make me feel it was my fault.

17.     In 2021 and 2022, in addition to choking me unconscious many times,

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                4

Deputy Tanner would often inflict pain on me by twisting my wrist until I could not handle the pain anymore. Tanner did this to me at least three times that I can remember while I was riding in his patrol car during a Ride Along. He also at times would twist my wrist to make me fall to the ground in pain, while we were walking outside the patrol car during Ride Alongs. He also did it many times at my apartment. Some of the times he did this at my apartment was when we had stopped there while we were on a Ride-Along, others times this happened was when he picked me up for a ride but I was not on a Ride Along, other times when he was on patrol and stopped by in his unform to see me, and other times when he was not on duty.

18.     Also in 2021 and 2022, Deputy Tanner assaulted me on several occasions. The first time was at my apartment, when he threw me onto my bed, placed me face down, put his knee on my back, and choked me. That first time, I did not go unconscious. He assaulted me on several other occasions, usually just at the apartment in various circumstances.

19.     As a victim of such repeated violence, I cannot explain why I did not run away from Tanner and the abuse sooner than I did in a way that my therapist can explain. I was trapped in an abusive relationship with someone with power of authority as a peace office over me. In the summer of 2022, Tanner was twisting my wrists and choking me unconscious on a regular, sometime weekly basis, including on Ride Alongs, and things intensified until I finally broke free and out of the relationship in the fall of 2022. I feared for my life every time he choked me unconscious and I feared for my life if I left him. But I finally escaped. I do know that I have PTSD. I have been diagnosed with PTSD by my therapist and I feel extremely traumatized. And I can attest to being intimidated and scared of him due to his role as cop and leader of the deputy gang the Rattlesnakes. Deputy Tanner constantly made me aware of his authority as a cop and as a deputy gang leader.

20.     I knew nothing of the Rattlesnakes and Tanner's role in it until I met

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                    5

him, and he told me about it and I observed it. Tanner told me he had an exclusive Rattlesnakes tattoo on his right leg signifying membership in the group. He told me only certain deputies could join the Rattlesnakes after they proved themselves with some illegal action. I saw the Rattlesnakes tattoo on his leg. Deputy Tanner explained to me that he was the shot caller (leader) of the deputy gang the Rattlesnakes at Lancaster Station.

21.     In addition to what Tanner told me, I witnessed Tanner operate in a manner that made him appear to be the leader of the station, with even supervisors deferring to him. As I indicated, I went on about 30 LASD Ride-Alongs with Deputy Tanner. During those Ride-Alongs, I observed other deputies and supervisors in LASD defer to him and treat him like he was running the station.

22.     Deputy Tanner explained to me that he and his gang members committed crimes against citizens, and I witnessed him plant drugs on a resident after he pulled her over on one of my Ride-Alongs with him. He pulled narcotics out of his pocket, lied that he found it on the driver,  and then cited the driver for the drugs.

23.     Deputy Tanner told me that while on patrol he had murdered a resident and buried the body in the desert. Tanner also told me that he was involved in an incident where he let a suspect die, trapped in pillar. Deputy Tanner told me that he made a false police report where he claimed he and fellow deputies lost the suspect during a chase. But Tanner told me that he actually knew the suspect was trapped in a pillar at a WinCo in Lancaster. Tanner told me that the poor guy died from being trapped in the pillar and that his decomposing body was found many days later after Tanner had left him there to die.

24.     Tanner threatened me with his deputy gang, letting me know that the deputies would kill me if I reported his violence against me. I was totally terrified and intimidated by Deputy Tanner. This is why I was so afraid to break off the relationship and contact with him.

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                    6

25.    In April 2022, I went to an LASD event called "Baker to Vegas" with Deputy Tanner and other deputies. The Baker to Vegas event is not just an LASD event, it is an event for several law enforcement agencies. The event was attended by the sheriff and other County officials. While I rode to the event with the deputies, Tanner grabbed and twisted my wrists to inflict intense pain, called me her a "bitch," and threw his backpack at me. The other deputies could see Tanner was being abusive, and one of them asked me if I was okay. I was too afraid to say anything to them in front of Tanner. None of the passengers, even though I could see they felt bad for me being abused, did anything to help. Even though the deputies made observations and gestures communicating they knew Tanner was beating me, they appeared to me to be too scared to report the abuse.

26.    When we got to the hotel room for the event, Tanner chased me into the bathroom, broke a glass shower door, tackled me to the floor, put his knee on my back, and struck me.

27.    This LASD Baker to Vegas event was just one of many that led me to believe that I could not go to LASD for help to protect me from Tanner.

28.    At one point in 2022, my co-worker, Anna Hargitay, saw bruises on neck and face from Tanner's beating of me, and I told her Tanner was abusing me. Anna then told two deputies about it and they did not report the abuse to LASD.

29.    In another incident, Tanner used his authority as a cop and deputy gang member to call off a 911 call that was made to protect me from him. In this incident, Tanner told me to follow his car. Tanner drove really fast and I tried to keep up with him. Tanner suddenly slammed his brakes at the intersection of 30th Street and Avenue L, causing my vehicle to rear-end Tanner's. Tanner did this act on purpose to make me violently crash my car. He got out of his car laughing devilishly at me. I was hysterical and scared to death and asked why he made me crash into him, and he just kept smirking.

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                7

30.     I asked a bystander for help, telling her I was unsafe, that Tanner was "psycho," and the bystander called the sheriff's department 911 line. After the bystander called 911 against him, Tanner used his position as a peace officer as well as leader of the Rattlesnakes and called the dispatcher, Deputy Shane Dobra, identified himself as Deputy Tanner, and directed Dobra to end the 911 call. Deputy Dobra told Tanner that he would call off LASD's 911 response and proceeded to call it off, and once again I received no help or protection from LASD.

31.     After calling off the 911 call, Tanner grabbed me roughly and did not let me go. He then ordered and forced me into his car with him.

32.     Deputies at LASD did not respond to the 911 call because Tanner called it off. The County attorney asked me in my deposition if I knew if any first responders came to the scene. I would not know if anyone from the fire department or anywhere else came after the fact, but it would not have been for the 911 call against Tanner. If any first responders came by later to do a routine check on a car accident, after Tanner forcibly removed me from the scene, it is unknown to me. But for sure, no deputies came out in response to the 911 call. I was helpless. Again, this is why I was so afraid to leave him and did not do so until September 2022.

33.     In 2022, at one point Tanner came into my apartment without my permission. Tanner furiously displayed a county-owned firearm and his personal knife because he believed I had changed the locks—I had not. Tanner ran the knife across my throat. I thought he was going to cut my throat and kill me.

34.     After Tanner's last violent acts against me, including choking me unconsciousness for the last time in September 2022, I finally ended my relationship with Tanner in September 2022. Things had intensified to the point, I had to break free of him and out of the abusive relationship I was trapped in.

35.     After the relationship ended, however, Tanner stalked me in the rest of 2022, and all through 2023, and into 2024. He repeatedly appeared, at my apartment, at my work, my gym (Planet Fitness in Lancaster), and at a grocery store while I was

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                    8

shopping. He would park his car outside where I was and stare at me or walk up to windows of buildings and stare at me, terrify me.

36. Deputy Tanner stalked me with assistance of others who worked for LASD. I was put under surveillance at my apartment, and my car was vandalized there. The apartment manager was very concerned for my safety. At one point, he told me he approached a man who was doing surveillance on me and the man said he was authorized to do so for the sheriff's department.

37. Tanner was employed by LASD as a deputy sheriff at all times during my relationship with him, and he continued to work for LASD for at least 15 months after our relationship ended. Tanner was repeatedly in close proximity to me, through his stalking, up until my lawsuit here was filed.

38. In the summer of 2023, I received a call from an investigator from LASD regarding an incident that led to an internal affairs investigation involving Tanner. This incident in question happened while I was on one of the Ride-Alongs with Tanner—in fact, I was riding in the car when it happened. Tanner and I saw someone driving fast and weaving past us. The driver appeared to be very drunk and Tanner went in pursuit.

39. Tanner pulled the driver over. He told me to stay in his patrol car because the driver was drunk and driving very aggressively. He had the driver step out of her car and realized she was a deputy. I could see she was totally drunk and acting belligerently to Tanner.

40. The drunk deputy then came over to Tanner's patrol car and started yelling at me and tried to get to me. It seemed like she wanted to assault me. She started asking, "who's the bitch you got on a Ride-Along?" I just sat there, saying nothing. Tanner grabbed her and stopped her. I was stunned to then see the driver start hitting Tanner. Tanner restrained her and told her to go back to her vehicle. Tanner then called the deputy's husband, who was also a deputy, and told him that he would not arrest her, but to come get her. I watched as the husband came and

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

9

drove his drunk deputy wife away from the scene.

41. This is the incident LASD called me about, after someone had identified me as a witness to all of it.

42. The person who called me about the incident with the drunk deputy was Sergeant Kaylee Volk, who was a co-worker of Tanner's at Lancaster Station. Sgt. Volk was not friendly to me. I reminded her that my conversation with her and reporting Tanner to her was not the first time I reported Tanner to LASD, and that I was scared to do so now given Tanner had the power to call off the 911 against him. I told her about the previous incident in which Tanner called off a bystander's call to 911 after I had violently crashed my car into Tanner's.

43. In addition to Sgt. Volk, LASD also assigned a person, Lieutenant Clayton Marion, who I knew to be friends with Tanner, to "investigate" Tanner. I believed and still believe that Marion is an inked (tattooed) member of the Rattlesnakes. I was shocked that LASD had two of Tanner's co-workers and associates at the Lancaster Station interview me about Tanner. Marion was Tanner's associate and friend inside and outside the station and he knew me and knew that I had been in a relationship with Tanner. Marion went to my house with Volk to intimidate the me and report back to Tanner what I said.

44. I was shocked by an obviously biased Lieutenant Clayton Marion coming to the house to interview me. When he and Kaylee Volk knocked on my door, Volk argued with me and claimed that Marion would be objective and it would be okay for him to take part in the interview, trying to force me to accept his presence.

45. I refused to speak in front of Marion. Volk made it clear to me that she was "not happy" with my insistence that Tanner not have his friend there to intimidate me.

46. Finally, Volk proceeded to speak with me without Marion there. However, Volk later lied to the ICIB investigator, Sergeant Lilly Jara. For instance,

Volk lied to Jara claiming that she asked me to bring my daughter out to be interviewed and that I refused to bring my daughter out to be interviewed. I told Sergeant Jara that this was a lie, that I actually offered to get my daughter to speak with Volk. Volk also lied that I answered affirmatively when Volk tried to coach me, intimidate me into saying that Tanner only choked me out during sex, that I liked being "strangled" during sex. That is sick! I did not and do not like being strangled during sex—or at any time. I made clear to investigator Jara that Volk lied to her, and that none of the numerous times that Tanner strangled me unconscious was during sex.

47.     I have been informed that the ICIB investigation into Tanner for what he did to me has been concluded and that Tanner was terminated, but not for what he did to me and instead for some other misconduct.

48.     Tanner and LASD caused me severe emotional distress, severe mental damage, and PTSD. I will never be the same. I am terrified of law enforcement, afraid to go outside, and regularly have nightmares of Tanner strangling me to death.

49.     As a result of Tanner and LASD's conduct, I also suffered financial losses as I am afraid to leave my house and have reduced my work hours and work only from home.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this declaration was executed on October 3, 2025, Los Angeles, California.

By: _____/s/ *Mykalia Cook*_____
JANE DOE (MYKALIA COOK)

PLAINTIFF DECLARATION IN SUPPORT OF OPPOSITION TO MSJ                    11

# EXHIBIT "8"

Vincent Miller (SBN 291973)
vincent@vincentmillerlaw.com
James Jirn (SBN 241189)
james@vincentmillerlaw.com
THE LAW OFFICES OF VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Tel.: (213) 948-5702 | Fax: (818) 450-0698

Attorneys for Plaintiff
JANE DOE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| JANE DOE, | Case No.: 2:24-cv-08649-SPG(SKx) |
|---|---|
| Plaintiff, | **NON-EXPERT DECLARATION OF ROGER CLARK IN OPPOSITION TO DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual; and DOES 1-100, inclusive, | |
| Defendants. | Hearing Date: Time: 1:30 p.m. Courtroom: 5C Action Filed: Judge: Hon. Sherilyn Peace Garnett |

**Declaration of Roger Clark**

I, ROGER CLARK, declare:

1. I am not a party in this action. I am an individual over the age of 18 years, I have personal knowledge of the facts stated herein and if called upon to testify, I could and would competently testify thereto.

2. I served as a Deputy for the Los Angeles County Sheriff's Department ("LASD") from 1965 to 1993. I retired at the rank of Lieutenant.

3. I served in the LASD at a Deputy rank for 6 years, at a Sergeant rank for 6 years and at a Lieutenant Rank for 15 ½ years.

DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

4.     As with all other employees in LASD, I was trained on the "Ride Along Program" for LASD.

5.     The "Ride Along Program" for civilians most often included riding in a patrol car with a deputy, but the "Ride Along Program" is not limited to just riding in a patrol car.

6.     Participants in a "Ride Along Program" stay by the deputy's side throughout the workday, whether the deputy is riding in his patrol car, on patrol by foot, working in the station, on a break, or on lunch. At all times for that deputy's entire shift, the "Ride Along" participant is to not leave the deputy's side.

7.     Patrol deputies work straight shifts with no "lunch breaks"; they eat while they continue to serve on duty. (Court service bailiffs are an exception for deputies – they do get lunch breaks.) This means that when a patrol deputy eats lunch during a "Ride Along," the "Ride Along" is still ongoing. A deputy eating lunch, regardless of where he is eating lunch, is still on duty.

8.     In order to minimize LASD liability, participants in the "Ride-Along" program are required to sign a Waiver of liability. If the participant does not sign the Waiver, the department could be liable for injuries suffered by the participant. The Watch Commander (not the deputy) is responsible for making sure the Waiver is signed.

9.     If a participant does not sign the Waiver, but still participates in the "Ride-Along", it is still a "Ride-Along," and the civilian is still a participant in that "Ride-Along." A lack of a signed Waiver does not turn a "Ride Along" into something else. A signed Waiver is not needed to make a "Ride Along" official.



Declaration in Opposition to MSJ

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this Declaration was executed on October 10, 2025, Santee, California.

(s) _____

Roger A. Clark

Executive, DECLARANT

Declaration in Opposition to MSJ

# EXHIBIT "9"

Vincent Miller (SBN 291973)
vincent@vincentmillerlaw.com
James Jirn (SBN 241189)
james@vincentmillerlaw.com
THE LAW OFFICES OF VINCENT MILLER
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Tel.: (213) 948-5702 | Fax: (818) 450-0698

Attorneys for Plaintiff
JANE DOE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>             Plaintiff,<br><br>     v.<br><br>COUNTY OF LOS ANGELES, a municipal entity; AARON TANNER, an individual; and DOES 1-100, inclusive,<br><br>             Defendants. | Case No.: 2:24-cv-08649-SPG(SKx)<br><br>**DECLARATION OF POLICE PRACTICES EXPERT ROGER CLARK IN OPPOSITION TO DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:<br>Time: 1:30 p.m.<br>Courtroom: 5C<br>Action Filed:<br>Judge:  Hon. Sherilyn Peace Garnett |

**DECLARATION OF ROGER CLARK**

I, Roger Clark, declare:

1.     Since my retirement from the Los Angeles County Sheriff's Department in 1993, I have consulted with Law Enforcement Agencies, U.S. Attorneys, State Attorney Generals, District Attorneys, and numerous entities that oversee law enforcement agencies and review and interpret policies and procedures, as well as Law Firms on 2,675 occasions.  I have testified in either trial or deposition throughout the nation 1,527 times.

DECLARATION IN SUPPORT OF OPPOSITION TO MSJ

2.     I have reviewed the reports, LASD policies, training documents, photographs, deposition transcript, media reports, and other material in order to render opinions in this matter.

3.     Through my experience working for LASD, I witnessed the practices at LASD that allowed deputy gangs to flourish in the department. The County of Los Angeles' Sheriff's Department ("LASD") has a 50-year practice and custom of deputy gangs operating out of certain patrol stations and violating residents' constitutional rights. County I have first-hand knowledge as a witness to these deputy gangs. I also can confirm that County leaders, including the Inspector General and the Board of Supervisors have made admissions that the County of Los Angeles' sheriff's department have allowed deputy gangs to operate within LASD for over 50 years, and that the failure to hold deputies accountable have caused many harms to residents as well as to employees of LASD.

4.     In her deposition, Plaintiff testified that Defendant Aaron Tanner told Plaintiff that he is a "shot caller" (leader), of what he calls a "gang," the Rattlesnakes. Through my work as as an expert, and review of documents including the U.S Government's finding in 2013 of patterns and practices in LASD that the Rattlesnakes was and is a deputy subgroup affiliated with LASD's Lancaster Station. Tanner bragged to the Plaintiff about his gang writing false police reports, withholding back up on patrol calls, and knowingly allowing a suspect to die, trapped in a pillar at a WinCo in Lancaster. The testimony of Plaintiff is consistent with the findings of the DOJ and with what I personally witnessed.

5.     Plaintiff further testified that Tanner choked out the Plaintiff several times, including while Tanner was on duty, and during Ride-Alongs, and called off a 911 call into himself, after he caused the Plaintiff to crash into his car.

6.     As a former employee of LASD and as an expert, I confirm that "Ride Alongs" are not what the County claims to be for purposes of defending the

Declaration in Opposition to MSJ

litigation here. "Ride-Alongs" mean not just a resident "riding along" in a car. A "Ride-Along" involves a resident shadowing a deputy for his entire shift, which may be spent all at the station and on breaks, and is at all times while the deputy is on duty.

7. LASD policy requires participants to sign Waivers to protect LASD from liability. However, a participant signing a Waiver does not make a "Ride-Along" "official." A Ride-Along is a Ride Along, whether a Waiver is signed or not.

8. According to Plaintiff's testimony and her declaration which I reviewed, Tanner and his Rattlesnakes gang members intimidated, assaulted, and stalked her on "Ride Alongs," and at the Baker to Vegas event which means the conduct towards Plaintiff was during department events. What happened between Tanner and Plaintiff was not simply a private matter. In my opinion, Tanner used his authority and badge as a peace office to assault and intimidate the Plaintiff.

9. This case follows a prior State Court case of Taylor v. County of Los Angeles, et al. The documentation of the secret Compton Sheriff clique/gang during discovery in the Taylor case put into motion what was then hoped to finally be an unprecedented investigation and elimination of the Los Angeles County Sheriff gangs.

10. In reaction to the continuing call for investigation and reform spawned by the Taylor case (and others), then Los Angeles County Sheriff Jim McDonnell announced to the Sheriff Civilian Oversight Commission a new study of secret deputy societies, stating, "No one has undertaken a serious, comprehensive study of the issue; and I intend, on my watch, to get to the bottom of this." Unfortunately, nothing happened during Sheriff McDonnell's tenure. His successor, Los Angeles County Sheriff Alex Villanueva, who replaced Sheriff McDonnell in the election

Declaration in Opposition to MSJ

that took place in the midst of the public outcry over secret Sheriff department clique/gangs, also failed to tackle the issue.

11.     Recently, the Los Angeles County Sheriff Civilian Oversight Commission has publicly announced: "Like past sheriffs Sherman Block and Lee Baca, Sheriff Villanueva has downplayed the problems caused by deputy cliques and staunchly refused to investigate them. Whatever the reason, it is not likely that Sheriff Villanueva will investigate the cliques of his own accord."

12.     Additionally, the Los Angeles County Board of Supervisors has repeatedly determined that the Sheriff Department: "has a long and troubled history involving unauthorized, exclusive and secretive Department groups consisting of sworn deputies, whose membership is based on a variety of factors, including station or unit assignment, ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment and even shootings of civilians."

13.     The Board found that Sheriff Villanueva "has acknowledged the problems" but has characterized them as "benign." The Board disagreed (rightfully so) and found that "it is unacceptable that unauthorized, exclusive self-affiliated groups involving a code of silence and violence be part of the Sheriff's Department."

14.     A brief history of these clique/gangs puts the metastasized cancer these gangs present into perspective. When I joined the LASD in 1965 I became aware of a secret society at the East Los Angeles Sheriff's Station called, "The Little Devils." (East LA) I understood that they were a group of white deputies who were responsible for wreaking havoc with the aggressive policing of largely African American and Hispanic communities. In subsequent decades, clique/gangs such as the "Regulators" (Century Station), "Pirates" (Firestone Station), "Cavemen" (East LA Station), "Banditos" (East LA Station), "Rattlesnakes" (Antelope Valley/Lancaster Stations), "Vikings" (Linwood Station), "Jump Out Boys,"

Declaration in Opposition to MSJ

(Men's Central Jail) "Grim Rapers," (Lennox Station) "Tanzanian Devils," (Temple Station) etc. were formed within the Department in stations. While I was in command of Crescenta Valley Station in 1983, I became aware of the existence of a secret sheriff's gang at Lynwood Station that called themselves "Vikings." Subsequently, in a federal lawsuit against the Sheriff's Department, U.S. District Court Judge Terry Hatter labeled the Vikings gang a "Neo-Nazi, white supremacist gang." [(See Thomas v. County of Los Angeles, 978 F.2d 504, 511 (9th Cir. 1992), as amended (Feb. 12, 1993)]. In 1993 I gave testimony regarding the Vikings during the trial in the Thomas case.

15. Common to each of these secret clique/gangs is an identifying tattoo. These tattoos are placed on the bodies of deputies who have "earned their ink" by committing violent acts against citizens. For example, the "Jump Out Boys" tattoo is a sinister-looking skeleton skull with piercing red eyes, who is pointing a gun. When a deputy who has earned his ink with such a tattoo, as a further badge of honor, smoke is inked onto the tattoo coming out of the gun barrel, signifying that he has shot a citizen. This kind of glorification of shooting has resulted in many instances of illegal needless death and significant injury to civilians under color of authority.

16. In this instant case, Tanner has the mark of the "Rattlesnakes" gang tattooed on his leg.

17. It is my opinion that Deputy Tanner, using his authority as a peace officer, choking out the Plaintiff, Jane Doe, was an excessive, unnecessary, and improper use of force of a "Ride-Along" participant. I see nothing that indicates any behaviors whatsoever by Mr. Tanner that would justify the use of physical force, including strangulation and punches to Jane Doe's body.

18. It is my opinion that the Rattlesnakes are a subgroup in LASD operating out of the Lancaster Station.

Declaration in Opposition to MSJ

19.    It is my opinion that the Rattlesnakes meet the definition of a deputy gang.

20.    It is my opinion that Deputy Tanner's references to the Rattlesnakes in conversation with Jane Doe would intimidate a witness.

21.    It is my opinion that this case presents another in a long line of case demonstrating the Sheriff's Department and County of Los Angeles' customs, policies, practices, and/or procedures which were directed, encouraged, allowed, and/or ratified by policy making officers/deputies. Many of these are listed in the complaint in this case and the evidence in this case shows the policies exist:

a.    To use or tolerate the use of excessive and/or unjustified force;

b.    By failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, and/or unlawful seizures;

c.    By ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity, including the proliferation of "cliques" or "gangs" within the Sheriff Department, thus condoning and allowing said cliques/gangs to exist and operate with impunity within the ranks of the Sheriff Department and a policy, practice and/or custom of failing to investigate said cliques/gangs.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and that this Declaration was executed on October 9, 2025, Los Angeles, California.

By: /s/ *Roger Clark*
Roger Clark

Declaration in Opposition to MSJ