# EXHIBIT "10C"

**EXHIBIT**

Ext 2 - Neal Tyler - AB 7549684

exhibitsticker.com

# REPORT AND RECOMMENDATIONS OF THE SPECIAL COUNSEL TO SHERIFF CIVILIAN OVERSIGHT COMMISSION REGARDING DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

**February 2023**

# Sheriff Civilian Oversight Commission

## COMMISSIONERS

Sean Kennedy, Chair

Jamon R. Hicks, Vice Chair

Irma Hagans Cooper

James P. Harris

Hans Johnson

Luis S. Garcia

Patricia Giggans

Robert C. Bonner

Lael Rubin

Brian K. Williams, Executive Director

## SPECIAL COUNSEL TO THE COMMISSION

Lead Special Counsel: Bert Deixler of Kendall Brill & Kelly Other Special Counsel included

Bart Williams and Susan L. Gutierrez of Proskauer
Ashley Bowman and Ariel Neuman of Bird Marella
Carolyn Kubota and Ellen Choi of Covington

William Forman of Winston & Strawn (on behalf of Loyola Law School Center for Juvenile Law and Policy)

L. Ashley Aull and Robyn Bacon of Munger Tolles & Olson (on behalf of Loyola Law School Center for Juvenile Law and Policy)

Naeun Rim and Sarah Moses of Manatt

Clark Brown, former General Counsel L.A. County Bar

Richard Drooyan, Consultant

Adam Dawson, lead investigator

## TABLE OF CONTENTS

Page

PREFACE ......................................................................................................1

THE EXISTENCE OF DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT.................................................................3

I.      INTRODUCTION....................................................................................3

II.     INVESTIGATION....................................................................................5

III.    FACTUAL FINDINGS..............................................................................7

        A.      History of Deputy Gangs and Cliques ..........................................7

        B.      Deputy Gangs and Deputy Cliques Currently in the Department ..............10

        C.      Obstacles to Eliminating Deputy Cliques in the Department....................35

        D.      The Elimination of Deputy Cliques is Constitutionally Permissible ...........41

IV.     FACTUAL FINDINGS SUMMARY...........................................................43

V.      RECOMMENDATIONS TO ELIMINATE DEPUTY GANGS AND CLIQUES.................44

        A.      LEADERSHIP AND SUPERVISION .............................................45

        B.      POLICY AND TRAINING............................................................49

        C.      RE-DEPLOYMENTS AND ROTATIONS .........................................53

        D.      ACCOUNTABILITY .................................................................55

VI.     CONCLUSION ...................................................................................61

i

## **PREFACE**

In November 2021, the Sheriff Civilian Oversight Commission ("COC") directed the Chair of the COC to engage pro bono Special Counsel to assist the COC to investigate the existence and activities of problematic deputy groups, often referred to as "deputy gangs" or "cliques," within the Los Angeles County Sheriff's Department ("Department"). Although prior commissions have documented the existence of deputy gangs and cliques over several decades, the COC wished to determine whether such groups continued to exist and to understand their impacts on the Department, its employees, and members of the public it serves.

By March 2022, a pro bono team of Special Counsel were engaged by the County and the Loyola Law School Center for Juvenile Law and Policy, and the COC launched the investigation of deputy gangs and cliques. The investigation included interviews of numerous members and former members of the Department, and review of numerous documents, court filings, deposition transcripts, public statements by Department representatives, published reports relating to prior investigations, and numerous relevant media reports. To date, the COC has conducted seven public hearings devoted to the investigation, most of which involved the taking of witness testimony under oath pursuant to the COC's subpoena authority.

This Report and Recommendations is a result of the Special Counsel's investigation on behalf of the COC. It is in two parts: **Factual Findings**, entitled *The Existence of Deputy Gangs and Cliques in the Los Angeles County Sheriff's Department,* and **Recommendations to Rid the Department of Deputy Gangs and Cliques** that fall under four headings: Leadership/Supervision, Policy/Training, Assignments/Rotations, and Accountability.

1

A word about nomenclature used in this Report. Special Counsel has chosen to use the term "Deputy Gangs" when referring to deputy groups engaged in egregious conduct such as violations of law, the excessive use of force, threats to the public or Department members and to use the term "Deputy Cliques" in discussing the broader concerns that the exclusionary subgroups pose to the mission of the Department, the careers and morale of other Department members, and the public, even when their activities do not violate specific laws. The term "Deputy Cliques" has historically been understood to include Deputy Gangs and exclusionary subgroups and their problematic behavior however configured. By using this term in this report, we do not intend to minimize the harm done by these groups to the Department, to other Department personnel, and to the public. The Findings confirm such harms.

The origins of Deputy Gangs and Cliques within the Department dates back decades. They may have started with benign intentions, but history has proved that Deputy Cliques have often evolved into Deputy Gangs whose members not only use gang-like symbols but engage in gang-type and criminal behavior directed against the public and other Department members. These groups, both historically and currently, also exalt the use of excessive force against civilians, harass other deputies, and undermine the chain of command within the Department. However denominated, the existence of these groups and their impact adversely affects the mission of the Department and undermines public trust in the Department.

The Deputy Cliques addressed in this Report and several prior reports have been variously referred to as deputy "gangs," "cliques," "subcultures" and "secretive subgroups." "Deputy Cliques" are Sheriff's deputies assigned to a particular Department patrol station, bureau, unit, or location in a jail who self- associate, and identify and act as a subgroup that excludes other deputies assigned to the same station, bureau, unit,

2

or jail location.  They identify themselves by names such as the Banditos, Executioners, Regulators, Spartans, Reapers, Rattlesnakes, Cowboys, Vikings, Wayside Whities, 3000 Boys, and 4000 Boys. Members often have matching and sometimes sequentially numbered tattoos and use language and gestures associated with street gangs. By their actions Deputy Cliques invariably evolve into Deputy Gangs.

The Factual Findings section of this Report documents the overwhelming evidence demonstrating that Deputy Gangs and Deputy Cliques, still exist and engage in harmful activities in several of the Department's patrol stations and bureaus. They victimize the Department, its members, and the public.

The Recommendations section identifies the reforms needed to eliminate Deputy Gangs and Deputy Cliques and to extinguish the culture of the Department that has permitted their existence and harmful influence within the Department for the past 50 years. The Recommendations provide an immediate call to action to the Sheriff, the Department leadership and every member of the Department. There can be no more delays!

## THE EXISTENCE OF DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

### I.      INTRODUCTION

The Department currently contains several active groups that have been, and still are, engaged in harmful, dangerous, and often illegal, behavior. Some of these groups have engaged in acts of violence, threatened acts of violence, placed fellow Deputies at risk of physical harm, engaged in acts celebrating officer involved shootings, and created a climate of physical fear and professional retribution to those who would speak publicly about the misconduct of such groups. Publicly released deputy body camera video illustrates such misconduct directed to a member of the public. For that reason, going back 30 years to the Commission led by Judge James J.

3

Kolts, these groups have been fairly referred to as "Deputy Gangs."

Deputy Cliques that evolve into Deputy Gangs meet the definition of "law enforcement gang" in California Penal Code Section 13670.[1]  The problems they cause in the Department, however, go beyond their "gang-like" behavior. Deputy Cliques are rooted in secrecy and exclusivity. They undermine the Department's leadership and supervision, foster insubordination, and are detrimental to the morale of other deputies and staff by exercising power and decision making that is fundamentally inconsistent with the para-military, chain of command structure of law enforcement agencies such as the Department. By exercising influence ordinarily reserved for supervisors and management, such as controlling assignments, schedules, and promotions, their existence within stations, bureaus and units of the Department violates fundamental principles of professional policing. But Deputy Cliques, whether they meet the definition of "law enforcement gangs" must be eradicated as they are the seeds from which Deputy Gangs develop.

While the prior Sheriff publicly asserted that he had acted to eliminate Deputy Gangs, in fact he facilitated their continued presence by, among other things,

---

[1] Penal Code 13670 provides, in pertinent part: (2) "Law enforcement gang" means a group of peace officers within a law enforcement agency who may identify themselves by name and may be associated with an identifying symbol, including but not limited to, matching tattoos, and who engage in a pattern of on-duty behavior that intentionally violates the law or fundamental principles of professional policing, including but not limited to, excluding, harassing or discriminating against any individual based on a protected category under federal or state antidiscrimination laws, engaging in or promoting conduct that violates the rights of other employees or members of the public, violating agency policy, the persistent practice of unlawful detention or use of excessive force in circumstances where it is known to be unjustified, falsifying police reports, fabricating or destroying evidence, targeting persons for enforcement based solely on protected characteristics of those persons… and retaliation against officers who threaten or interfere with the activities of the group.  Further, these groups often discriminate on the basis of gender, race and ethnicity in deciding who can become a member of the Deputy Cliques. Such workplace discrimination violates the California Fair Employment and Housing Act (FEHA) and federal anti- discrimination law.

4

appointing known tattooed members of Deputy Gangs and Deputy Cliques to leadership positions in the Department, permitting the revival of emblems signifying membership in such groups and repeatedly relying upon an erroneous statement of law to avoid promulgating and enforcing a policy prohibiting Deputy Gangs and Deputy Cliques in the Department. The claim that Deputy Gangs no longer exist in the Department is flatly and inarguably false. Moreover, Deputy Cliques continue to exist.

The COC Policy recommendation prohibiting **Joining and Participation in Deputy Cliques** is constitutionally permissible, and it is factually supported by the investigation and multiple interviews conducted by the COC's Special Counsel as well as the testimony given in the COC's public hearings. The COC urges Sheriff Luna to adopt a policy that prohibits deputies from being members of Deputy Cliques and thereby ending Deputy Gangs.

## II.    <u>INVESTIGATION</u>

As part of the COC's investigation, Special Counsel interviewed approximately eighty witnesses. The witnesses were current and former Deputies, Sergeants, Lieutenants, Captains, Commanders, Assistant Sheriffs, and Undersheriffs; a former Sheriff; and former law enforcement officials from other law enforcement agencies. The witnesses also included attorneys representing current and former litigants against the Department and the County and certain of the litigants themselves. Many witnesses were interviewed multiple times.

Special Counsel coordinated with, interviewed and received information from the Los Angeles County Office of Inspector General, the Los Angeles County District Attorney's Office, Loyola Law School and the Los Angeles County Public Defender's Office.

Special Counsel received and reviewed dozens of depositions and sworn

5

statements, and associated exhibits generated in connection with past and pending litigation involving the Department; multiple media reports; body camera footage; and extensive reports prepared by the Kolts Commission, the United States Commission on Civil Rights, the Loyola Law School Center for Juvenile Law & Policy ('Loyola Law School Report"), the Rand Corporation, the National Association of Blacks in Criminal Justice, and the Citizen's Commission on Jail Violence.

Special Counsel attended virtual briefings by the former Sheriff Alex Villanueva, and repeatedly sought to meet with the former Sheriff and his Undersheriff, Timothy Murakami. They declined to meet or to be interviewed. Each was also invited to voluntarily appear and testify publicly before the COC. The former Sheriff declined to do so unless provided in advance with the questions and any documents that would be presented. The Undersheriff declined, asserting that his physical condition precluded his testimony, but not his other duties as Undersheriff.  As a result, the COC subpoenaed both the Sheriff and Undersheriff to testify. Each refused, and both are now subject to legal proceedings to enforce the subpoenas and/or to hold each in contempt.

The COC held seven public hearings in which approximately fifteen witnesses publicly testified and numerous members of the public spoke. The overwhelming majority of witnesses who testified did so pursuant to subpoena. Several witnesses would only testify anonymously, and some did so remotely, using a voice distortion device out of fear of physical or professional retaliation. Several witnesses who had agreed to testify withdrew, often the night before the proposed testimony, out of similar fears.

In addition to witnesses who testified publicly, approximately sixty other witnesses were interviewed by the Special Counsel's team. Many witnesses spoke only

after receiving assurances that they would not be identified publicly or even confidentially identified to the COC. The witnesses expressed concerns for their physical safety and the physical safety of family members, many of whom are Department employees. In addition, many witnesses insisted upon anonymity in interviews for fear of professional retribution often described as "career suicide." Some of the factual findings recited in this Report are the product of these witness interviews.

III.    **FACTUAL FINDINGS**

    A.    **History of Deputy Gangs and Cliques**

Deputy Gangs and Deputy Cliques have existed in the Los Angeles County Sheriff's Department since at least 1973. That year, an internal Department memo dated December 5, 1973, documented the existence of a group known as the "Little Devils," and identified 38 members who bore sequentially numbered tattoos of a devil.

In 1992, the Kolts Commission's report confirmed the existence of Deputy Gangs and Deputy Cliques, including a Deputy Gang called the Vikings, in the Department. After holding evidentiary hearings in Los Angeles in 1993 and 1996, the United States Commission on Civil Rights in 1999 issued a report focusing on the violence and trauma that Deputy Gangs had inflicted on communities of color and people struggling with mental illness, and urged the LASD to take decisive action to eradicate Deputy Gangs from its ranks.

In 2012, the Citizens' Commission on Jail Violence ("CCJV") found that Deputy Cliques existed in patrol and on certain floors of Men's Central Jail ("MCJ") and that they contributed to the use of excessive force in the jail. The CCJV's report contains five pages of recommendations to address the problem.

The Loyola Law School Report documented the Department's long history of

7

Deputy Gangs and Deputy Cliques in 2021; and the Rand Corporation also confirmed their existence in its report titled *Understanding Subgroups Within the Los Angeles County Sheriff's Department* in 2021.

The Los Angeles County Inspector General, Max Huntsman, testified before the COC about his office's report entitled *Analysis of the Criminal Investigation of Alleged Assault by Banditos* that confirmed the involvement of the Banditos in the severe beating of non-Banditos deputies in an incident at Kennedy Hall in 2018.

As part of its investigation, the COC received and reviewed a September 13, 2004, memorandum from the then Undersheriff William T. Stonich to Sheriff Leroy Baca about efforts to address "inappropriate and potentially damaging behavior" at the Department's Century Station. Among other conclusions the memorandum reported on rumored unethical activity engaged in by Century station personnel as follows:

> "Mexican Mafia", rumored to be a small select group of deputies of Hispanic decent (*sic*). They have been accused of holding positions of influence within the station (i.e.: detective, scheduling, watch deputy and field training officer positions) and are alleged to control much of the negative behind the scenes activity such as fund raising through means of unit level extortion for non -sanctioned events, unfair or biased granting of time off requests, controlling patrol and interior work assignments, etc."

The COC also reviewed an October 1, 2007, memorandum from then Commander Willie Miller to Sheriff Baca reporting on an investigation of a group of deputies named the "Regulators" at Century Station. Among other things, the memorandum concluded that:

> "The Regulators philosophy is that if a sergeant, lieutenant, or captain was weak at Century Station they would run over them, essentially speaking, they would run the station as a subculture fraction (*sic*).

8

They would not respect rank. They openly displayed the Regulators logo of the 'skull and flames' symbol on their motorcycles as well as body tattoos."

The COC also reviewed hundreds of Department documents regarding the 2012 discovery in a patrol car of a written creed for a Deputy Gang named "The Jump Out Boys." Members of the Jump Out Boys shared a common numbered tattoo that depicts a red-eyed skull wearing a bandana with the letters "O.S.S." and holding a revolver next to an ace of spades and an 8 of spades, the so called "dead man's hand" in poker. Their creed recited that members understand "when the line need (*sic*) to be crossed, and crossed back" and that they "sometimes need to do things they don't want to in order to get where they want to be."  It also directed members to keep a "black book" that records the date of every deputy involved shooting that authorized each shooter to embellish his common tattoo with smoke coming out of the gun.  Seven Jump Out Boys members were fired, but because there was no clear policy against joining a Deputy Gang at the time, the Civil Service Commission reinstated four of them.

It is indisputable that for nearly 50 years, Deputy Gangs and Deputy Cliques have existed within the Department and their existence and negative impacts were known to the leadership of the Department. Yet there was no sustained effort during this period to eradicate Deputy Gangs and Deputy Cliques from the Department. All prior efforts were inadequate, lost continuity and failed to eliminate Deputy Gangs and Deputy Cliques. Owing to this failure, Deputy Gangs and Deputy Cliques are embedded in the culture of the Department, either tolerated or ignored. Indeed, during the tenure of Sheriff Baca, the Undersheriff, Paul Tanaka, was a tattooed member of the Vikings. According to numerous witness interviews, former Sheriff Villanueva's Undersheriff, Tim Murakami, has a Caveman tattoo.

While law enforcement cliques are not unknown in other law enforcement

agencies, no other large law enforcement agency in the nation has allowed such cliques to exist and flourish as they have in the Department.

### B.        Deputy Gangs and Deputy Cliques Currently in the Department

There is at least a half dozen, and possibly more, Deputy Gangs and Deputy Cliques currently in the Department, primarily at patrol stations. They include the Executioners, the Banditos, the Regulators, the Spartans, the Gladiators, the Cowboys and the Reapers. There are reports that new Deputy Cliques are forming as members of existing Deputy Gangs and Deputy Cliques retire or otherwise leave the Department. There is some evidence indicating that Deputy Cliques are re-emerging in the Los Angeles County jails as the 4000 Boys.

Merely transferring members of Deputy Gangs or Deputy Cliques has not proved particularly effective. After the CCJV's 2012 findings confirmed the existence of the 2000 and 3000 Boys on the second and third floor of MCJ, many of these deputies were transferred out of the jail to patrol.  Many of the 3000 Boys sought assignments to Compton Station and became Executioners; many 2000 Boys sought assignment to Century Station and became Spartans. As discussed below, transfers or rotation of deputies must be much more intentional to avoid aggregating in a new location deputies involved in, or susceptible to influence by, Deputy Gangs or Deputy Cliques.

All the Deputy Cliques share harmful characteristics. While not all Deputy Cliques engage in identical unprofessional conduct, most share at least some of the following characteristics, and they have done and continue to do certain acts of unprofessional and dangerous policing. Deputy Cliques run the stations or units where they exist, as opposed to the sergeants, lieutenants and the captain who are charged with the duty to run the station; exercise influence over and often decide assignments and shifts, training, and overtime; exclude deputies from the Deputy Cliques, often based on race,

10

ethnicity or gender; intimidate deputies that are not part of the Deputy Cliques; give orders not to provide backup to disfavored deputies who are not members of the Deputy Cliques; order work slowdowns if management of a station attempts to rein them in; encourage a "we-they" attitude, not just between them and the public, but with other deputies within the station; operate in secrecy; lie in reports to protect each other; and threaten the public with use of excessive force without justification and belittle deputies unwilling to engage in such acts.  Most troubling, they create rituals that valorize violence, such as recording all deputy involved shootings in an official book, celebrating with "shooting parties," and authorizing deputies who have shot a community member to add embellishments to their common gang tattoos.

Typically, to be invited to become a member of a Deputy Gang or Deputy Clique, a deputy must demonstrate "toughness" that is frequently associated with use of excessive force or other forms of unconstitutional policing. Often the euphemistic term "peer leader" is used to describe the members.

Deputy Gangs and Deputy Cliques also have used and continue to use assaultive behavior against fellow deputies who do not belong to their groups as a show of power and influence. Certain of these altercations have led to public exposure in the media. The COC investigation uncovered other incidents including threatened use of weapons by deputies upon other deputies.

The pernicious effects of these groups go well beyond assaulting other deputies. Recent publicly released body camera footage of a deputy threatening to shoot a man in a parked car without any evidence of wrongdoing illustrated in real time gang behavior characteristic of Deputy Gangs and Deputy Cliques interacting with the public served.

Not all members of Deputy Cliques engage in acts of misconduct. Even those

11

members who do not engage in misconduct, however, contribute to the unprofessional influence of Deputy Cliques and their negative impact on the Department and on other deputies. Deputy Cliques have and continue to do great damage to the reputation of the Department, and the public hearings demonstrated that they have unquestionably destroyed trust between the Department and the public it serves.

Membership in a Deputy Gang or Deputy Clique is a liability for the County. One of the essential job qualifications of a deputy sheriff is the ability to testify credibly in a court of law. Deputies who belong to Deputy Gangs and Deputy Cliques that value loyalty to their members over their commitment to the Department and the public are likely to be disbelieved when their conduct is at issue. As Lieutenant Eric Strong, a 22-year member of the Department, put it, "If you are a member of a law enforcement gang, you cannot be trusted, you cannot be relied upon, your credibility is lacking." Under the principles set forth by the United States Supreme Court in *Brady v. Maryland*, such information that bears on the credibility of prosecution witnesses must be disclosed by the prosecution to the defense in criminal cases and is likely discoverable in civil lawsuits.

Deputies sued in civil lawsuits arising from the alleged use of excessive force cost the taxpayers of Los Angeles County tens of millions of dollars in judgments and settlements. It has been estimated that the additional cost to the County in these cases is upwards of $55 million. That number can only rise based upon pending and newly filed lawsuits and administrative claims. In addition to judgments and settlements, the County incurs seven-figure legal bills from outside litigation counsel hired by and paid for by the County to defend the misconduct of Deputy Gangs and Deputy Cliques.

Set forth below is some of the evidence developed by Special Counsel during the

12

COC's investigation of Deputy Gangs and Deputy Cliques.

## 1.    Compton Station

Lieutenant Larry Waldie testified before the COC that he was a tattooed member of a deputy group known as the "Gladiators." He obtained the tattoo during his initial tour of duty at Compton Station and that another group known as the "Executioners" subsequently ran aspects of that station. Waldie said that Compton was a "fast station," and it was considered a desirable post for deputies wanting exposure to incidents of crime requiring active law enforcement.

Waldie testified that many of the Executioners had served on the 3000 floor at MCJ. The CCJV noted the existence of the "3000 Boys" at MCJ and recommended that the it be disbanded. It appears, however, that many of the "3000 boys" transferred to Compton Station and formed or joined the Executioners. A witness who worked at MCJ and who insisted on anonymity for fear of reprisal, reported that a new version of the "3000 Boys" operating on the 4000 floor and calling itself the "4000 Boys" currently operates at MCJ.

Another witness currently assigned to the Compton Station disclosed that deputies who had worked on the 3000 floor at MCJ received preferential treatment at Compton. The witness reported being ridiculed based upon gender and race by the scheduling deputy, Jaime Juarez, an Executioner, and that Executioner members regularly discriminated against and ridiculed women.

Waldie testified that Deputy Juarez was the "shot caller" during Waldie's tenure at Compton Station. The Commission received evidence that Juarez participated in four officer involved shootings. Juarez was subsequently removed from patrol, and interacting with the public during Sheriff McDonnell's tenure, but was returned to patrol after Sheriff Villanueva took office. Waldie identified Deputies Ruiz,

13

Cuevas, Barajas, Ingersoll, Raisa and Ruben as Executioners. Waldie stated that based upon his observations Executioner membership apparently excluded females and African Americans.

The Commission received a photograph of Deputy Juarez' truck which depicted an Executioner emblem on a flag. In a deposition in civil litigation brought by Waldie, Deputy Juarez admitted that he had attended approximately seven "inking parties." He confirmed that Deputies Barajas, Ingersoll, Bray, Jimenez, and Reese attended Executioner inking parties as well. According to Juarez, Ingersoll was the last Executioner to receive an Executioner tattoo.

The Commission also received a photograph of a tattoo of a skeleton holding an automatic rifle on the calf of Deputy Aldama, a self-acknowledged Executioner. Other evidence indicates that, much like the Mafia, there are "made" members of Deputy Gangs and Deputy Cliques who are entitled to wear the tattoo associated with the group. The tattoos typically exalt the use of excessive force and are entirely unprofessional.

Deputy Aldama, and his partner, Mizrain Orrego,  were named as defendants in two separate shootings of community members, Sheldon Lockett and Donta Taylor. In each instance the deputies claimed that the victims had guns. In neither case was a gun located and much evidence suggested that in fact neither had guns. The County settled both cases with the families of the deceased for a total amount just short of ten million dollars. Since outside counsel was engaged in each case substantial legal fees were incurred on top of the settlement amounts.

Waldie testified that the Executioners held positions of authority during his time at Compton Station. Those positions included scheduling deputy, training officer, detective, and gang task force membership. Waldie explained that the position of

14

scheduling deputy was powerful because it afforded the scheduler the ability to assign deputies to shifts, vacations and days off, desirable assignments on patrol or less desirable assignments in preferred or less desirable locations.

During 2019, when Waldie served as Acting Captain of Compton Station, Deputy Juarez was scheduled to be removed as scheduling Deputy and transferred from the station. Juarez told Waldie that his successor as scheduling Deputy should be another Executioner, but Waldie declined the request. In response, Juarez led the Executioners in a work slowdown in March 2019, and pressured non-Executioners to adhere to it. The COC received an internal LASD document demonstrating that during the work slowdown, crime rose significantly compared to the preceding year and compared to the months before and after the slowdown. During the slowdown, arrests dropped precipitously, citizen calls were responded to slowly, and pro-active policing initiatives did not occur.

In addition to the statistical evidence documenting the work slowdown, the COC received the content of a text between Waldie and a deputy confirming the work slowdown directed by Deputy Juarez. The deputy supplying the information insisted upon anonymity:  "But please between you and I. This could ruin my career. I don't want my name mentioned at all please. I can't have that."

Waldie testified that the culture of the Department created a justified fear among honest deputies that if it were believed that they had reported on the misconduct of fellow deputies, especially those belonging to a Deputy Clique, it would lead to harassment, ostracism, threats, or interference with career advancement.

A deputy who requested anonymity was suspected of cooperating with the COC and has been continuously subject to harassment and ostracism at the deputy's current station. Another witness who testified anonymously has reported that another

15

deputy, who was wrongly suspected of having provided the anonymous testimony, has been repeatedly harassed at that deputy's current station.

Waldie testified that after an officer involved shooting the deputies involved participated in a celebratory "debrief" at a bar in Fullerton. Waldie identified the pair of deputies, Ingersol and Barajas, as Executioners. Other evidence suggested that they were not yet tattooed Executioners, but were "chasing ink." That is, they engaged in "aggressive" activities in the hope of becoming members.

Copies of texts reviewed by the COC revealed that Waldie brought the celebration to the attention of the captain heading Compton Station. Waldie testified that despite the seriousness of the circumstances, the captain did not take any action. After Sheriff Villanueva took office, the captain was promoted to commander and retired from that position. He declined to be interviewed by Special Counsel's team.

The evidence demonstrates that community needs in Compton were ignored or responded to slowly to pressure a station leader to act in accordance with the Executioners' demands, and celebrations of officer involved shootings were neither stopped nor criticized. Waldie agreed that the conduct of the Executioners violated "fundamental principles of professional policing." During her testimony before the COC, then-Chief, now Acting Undersheriff, April Tardy reviewed this evidence and acknowledged that the Executioners were a "law enforcement gang" within the meaning of California Penal Code section 13670.

### 2.    East L.A. Station

Much public testimony before the COC focused upon the East L.A. Station and particularly on an incident at Kennedy Hall involving a brutal beating inflicted upon junior deputies by senior deputies who were members of the "Banditos." The behavior can only be fairly described as that of a gang. This episode resulted in widely publicized

16

civil litigation brought by the victim deputies against the Bandito Deputies. Even though the defendants assaulted other members of the Department and did so in an after- hours offsite location, County Counsel approved the County paying outside counsel to defend them.

Former Sheriff Villanueva trained at the East L.A. Station and was widely believed to have shown favoritism toward the station and its deputies. He was roundly criticized for the reservation of front row seats for East L.A. deputies at his inauguration when the Kennedy Hall incident had received much negative publicity and was still an open investigation. He also restored the "Fort Apache, kick in the pants" logo at the entrance of the East L.A. Station. The COC also heard much testimony that refuted his repeated assertion that he had replaced a weak captain with a strong one and had transferred many deputies to address discipline problems. In fact, no deputy was involuntarily transferred out of the East LA Station, and many of the transferred deputies were not Banditos.

Finally, there has been substantial evidence that the administrative and potential criminal investigation into the Kennedy Hall incident was obstructed at the direction of the former Sheriff's then Chief of Staff, Larry Del Mese, an acknowledged tattooed member of the "Grim Reapers." Matthew Burson, who retired from the Department as a Chief, testified that when he was the Captain at the Internal Affairs Criminal Bureau he was instructed by Del Mese not to have the investigator of the Kennedy Hall incident ask about "sub-cultures" at the station.  Burson understood that Del Mese was conveying an order from the former Sheriff, and he passed the instruction on to Sergeant Jeffrey Chow, who was investigating the incident. It is reasonable to infer that Sheriff Villanueva, despite its obvious relevance, ordered that no questions were to be asked about the Banditos or their role in the Kennedy Hall

17

"beat- down".

Sergeant Chow testified that he believed the conduct of the assaulting deputies was criminal, but that he was directed not to ask questions about "sub- culture" activity at the station. He understood this to mean that no questions were to be asked about the Banditos/Deputy Cliques and its/their role in the gang style assault on other deputies, and he followed the orders because he worked in a "para-military organization." After Chow testified, the COC learned of attempts to intimidate him and his wife, Vanessa, a Deputy Sheriff. The intimidation included an unmarked sheriff's car following Chow home after his testimony before the COC and an undercover car parked conspicuously near the residence. (Captain Angela Walton reported a similar intimidation effort involving the parking of an undercover car directly in front of her home after her public testimony.)

Retired Chief Joseph Gooden described the early portion of his career at the East L.A. station and the presence of members of the "Cavemen" at the station. Despite having a degree from U.S.C. when fewer than 10% of the deputies had four-year college degrees, a Caveman told Gooden that there was "no way" he could become a training officer. Gooden observed that under 2% of the deputies at the East L.A. station were African American.

Years later, when Gooden was a Chief, he oversaw the Kennedy Hall investigation. Chief Gooden testified that he directed that the investigation be conducted as a criminal investigation, and that determining the motive of the involved deputies was an important part of the investigation. The instruction to Sergeant Chow not to ask questions about "sub-culture" activity in the East L.A. Station was directly contrary to Chief Gooden's expectation and direction. It was also contrary to investigating the motive for the assault and the standard expected of a professional

18

police force.

The investigative report of the Department's Internal Criminal Investigation Bureau regarding the Kennedy Hall incident was transmitted to the District Attorney's Office to consider potential criminal charges. The report failed to mention that the investigating sergeant had been instructed not to ask questions about the Banditos or their role in the assault, even though the evidence related directly to a criminal motive for the attack.

An anonymous witness currently stationed at the East L.A. Station testified using a voice distorter because of a fear of physical and professional retribution. The witness identified current "shot callers" at East L.A. as Deputies Ortiz and Valle. The witness testified that Rene Munoz, one of the defendants in civil litigation relating to the Kennedy Hall beating, was the shot-caller prior to his departure from the East L.A. Station. The witness testified that all three were tattooed Banditos.

The anonymous witness also identified the broad authority of the scheduling deputy, a Bandito, at the East L.A. Station, who gave assignments, schedules, days off and vacations, assigned areas for patrol and directed selection of training officers and assignment of trainees to them. The witness testified that the power of the Banditos was such that they were able to thwart the promotion of a disfavored deputy to training officer even though the deputy was ranked number one in the County for that promotion.

The witness also testified to various means of intimidation and ostracism inflicted by Banditos upon non-Banditos. This included a locker room argument in which a Bandito pointed his gun at the head of another deputy; the turning of backs when a disfavored deputy entered the hallway or room; and the refusal to answer back up calls when summoned by a disfavored deputy. The witness explained how

19

disfavored deputies received "jackets" i.e., reputational slanders intended to thwart their careers.

Another witness testified that the Banditos assaulted "disfavored" deputies, who would be challenged to a fight. The disfavored deputies would be told that they did not belong in East L.A. and that they were a "zero" as a provocation to a fight. The Banditos would surround the disfavored deputies in groups thus employing physical intimidation. This conduct is characteristic of gang activity. Like other Deputy Gangs and Deputy Cliques, the Banditos exert control by forcing disfavored, non-Bandito deputies to transfer to other stations.

Another witness who insisted upon anonymity described how a training officer humiliated trainees, especially women, at the East L.A. Station. Those efforts included name calling and tossing the trainees' written work product to the ground with the goal of embarrassing and ostracizing the trainee before peers.  According to this witness, the training officer who engaged in such unprofessional, intimidating conduct was a Bandito. The witness was certain that the Bandito's control of the station was widely known. He stated that Deputy Valdez was the shot caller at East L.A. at the time and that he arranged the deputies' schedules. As noted, Deputy Valdez was widely known to be a Bandito.

The witness also described a practice of ostracism at the East L.A. Station. When the witness walked into the station the deputies would turn their backs as the witness walked down the hall. The witness explained that Banditos "stepped on the radio" i.e., interfered with the ability to communicate from the patrol car by speaking over the deputy while the witness spoke. The Banditos persistently criticized the witness  for a "culture violation."

The witness reported a refusal to provide requested back up. A specific incident

20

involved a report of a person with a gun in a dangerous part of Boyle Heights. Because of the danger of a night call in that area the witness requested back up, but it was not forthcoming, and the witness abandoned the call. The proffered excuse that the deputies all were "busy" was proved false by review of time records.

A training officer at the East L.A. Station required that trainees keep the car fully stocked with snacks and demanded "good imagination on reports." That the witness understood meant to lie to justify the acts of the deputies. The witness was informed that the training officer was a tattooed Bandito. The stocking of the car was a form of the "tax" imposed by the Banditos. The trainee had to pay for all meals, drinks and anything else the training officer required.

The witness observed that the Department enabled the Banditos control of the station and that known Banditos received promotions under Sheriff Villanueva. The witness claimed that the Banditos brought gifts to the wife of Sheriff Villanueva to procure promotions or to retain power positions. It was widely believed, and confirmed in testimony by Eli Vera, that the Sheriff consulted his wife on promotions even though she held no official position in the LASD. The witness also claimed that the Homicide Bureau is filled with Banditos.

The witness learned that Banditos had to be Mexican American and that Central Americans could not become Banditos. Another witness confirmed that, with one exception, all Banditos were Hispanic males, and none were women.

Another witness who insisted upon anonymity observed that the Banditos also directed work slowdowns that resulted in increased response times to calls and for arrests to cease. The most recent slowdown occurred because the Banditos believed that the Department's Internal Affairs Bureau had pursued too many disciplinary investigations of deputies.

The witness testified that there were between 12 to 15 Banditos currently in the East L.A. Station, and that they held positions as "acting" detectives and training officers. The witness testified that there were also "associate" deputies who wished to be initiated and were "chasing ink." One incident that the witness regarded as "chasing ink" involved the transportation of a shooting victim to a hospital. The witness stated that the deputies went off route and assaulted the victim. Such conduct can only be viewed as the act of a gang member and its indisputable harm to the community.

In an interview, retired Chief Gooden recounted that during his year and a half at the East L.A. Station the dominant group was the "Cavemen." He believes that the Banditos grew out of the Cavemen.

Chief Gooden was one of several witnesses who disputed former Sheriff Villanueva's claim that he had transferred 36 members from East L.A. for misconduct at the station. The anonymous witness claimed that there were no involuntary transfers of Banditos. No transferees were "overnighted," i.e., subject to immediate involuntary transfer. Rather the transfers reflected voluntary departures related to deputy requests, promotions, or retirements.

Retired Chief Eli Vera also refuted the former Sheriff's claim. He agreed with the testimony of Captain Ernie Chavez in a civil deposition that the deputies were transferred from the East L.A. Station for non- disciplinary reasons. One witness said in an interview, however, that a number of the transferees were "whistle blowers" who had objected to the Banditos' control of the station. The witness described them as "the resistance."

Another witness who required anonymity described the witness' tenure at East L.A. Station as one in which deputies who "speak like gangsters" surrounded the witness.  The witness described the unprofessional language used on radios, including

22

the use of nicknames and derogatory statements. Further, the witness reported that because the Banditos mistrusted the witness, they would not allow the witness to enter a house when they conducted a search. The witness said that contrary to Department policy, the fact and results of such searches were often undocumented. The witness also experienced that calls for back up by disfavored deputies were not heeded. Such failures to provide requested back up imperiled the safety of these deputies.  The civil case brought by the victims of the Banditos beating at Kennedy Hall included the deposition testimony of Deputy Concepcion Garcia, who witnessed calls for back up ignored by Banditos.

The anonymous witness had justifiable safety concerns. On one occasion, when the witness drove a personal vehicle from the East L.A. station, the witness observed that the lug nuts from the car wheels had been loosened. The witness said that to be part of the East L.A. anti-gang unit it was necessary to be an "inked" member of the Banditos.

The witness also confirmed the practice of a "tax" being levied by senior Banditos upon trainees to pay for food, "fund raising" and other financial demands of the Bandito training officers. The trainees who participated did so because of a fear that they would not get off training.

The witness also was supervised by, or worked with, "Cavemen" and "Regulators" They were Caucasian males in positions of authority. The witness stated that supervisors were well aware of the existence of these groups but did not act to interfere.

Another witness who spent nearly a decade in East L.A. and who also required anonymity for fear of physical retaliation, also described the Cavemen and the Banditos. The witness, said that the Banditos insisted that others "do what they want

23

you to do." The witness also described the Banditos as "gangs behind the badge." The witness says that everybody in the Department knows of the Banditos; their actions are not a "secret."

This witness also confirmed that the Banditos imposed "taxes" on new deputies. The witness was told by a Bandito training officer to "bring your credit card." The witness was aware of the tattooed members of the Banditos and believed that there were as many as 80 Banditos during the witnesses' tenure at East L.A. The witness said the Banditos would use force to discipline non-Banditos they did not like. This too is the behavior of a gang.

The Banditos exploited the junior deputies by, for example, requiring that they write reports for the Banditos and stay on uncompensated overtime if necessary to get the report done. The witness said that the Banditos recruited deputies to "chase ink", i.e., to do what was necessary to be noticed and "stand apart." That included writing reports to make problematic arrests appear legal. (Another anonymous witness described this practice as "working backwards.")

An aspect of "chasing ink" was a desire to get into shootings. These deputies would follow a suspect believed to have a gun so that a shooting would be justified. The witness said that there was pressure to "get numbers up" from time to time, meaning arrests. The witness was instructed by Banditos that they could always get somebody arrested as "under the influence" and "refused to take a test." The goal was to raise arrest numbers.

Another witness, now retired after 24 years in the Department, was a training officer in East L.A. The witness ran afoul of the scheduling sergeant, Patty Estrada. The witness described Estrada as a female associate of the Banditos who did their bidding and conveyed favors and punishments on their behalf. The witness had a trainee

24

"pulled" by Estrada and observed that the trainee was assigned to a Bandito training officer.

Another witness testified anonymously about working at the East L.A. station. Although warned that East L.A. was a difficult place to work due to harassment and hazing, the witness chose to work there anyway and was subjected to this conduct. Like others, the witness affirmed that the Banditos were an open and notorious gang within the East LA Station. The witness believed that it was appropriate to refer to the Banditos as a "gang" that manifested its power by recruiting desired deputies and isolating others. Having become disfavored, the witness experienced, as did others, dispatch sending the witness a high volume of calls throughout the patrol area. Additionally, when the witness called for backup, it would not arrive. The witness believed that the inability to receive back up when performing services increased considerably the risks of the work.

The witness was aware of "cigar night." Those were evenings when female deputies would act to raise funds at Bandito "events" by circulating among deputies who were drinking and playing cards and selling cigars to those in attendance for support of other Bandito "sponsored" events. The witness described these cigar selling efforts as done upon the demand of the Banditos. The witness acknowledged that deputies were pressured to give money upon a Bandito solicitation. That trainees were "taxed" was well known in the station and in the Department more generally.

Gooden stated that when Sheriff McDonnell assumed office, he barred the East L.A. Station "Fort Apache kick in the pants logo." Gooden regarded the logo as unprofessional and insulting to the East L.A. community. Gooden observed that the logo was reintroduced when Sheriff Villanueva assumed office.

25

### 3.    Lennox Station (Now South L.A. Station)

Recently released shocking body camera footage shows South L.A. Station deputy Justin Sabatine repeatedly threatening to shoot an African American civilian sitting in his car in a parking lot. Several witnesses, including two current Department captains, have asserted that Sabatine was a member of a Deputy Clique. One captain believed that Sabatine was a Reaper. A public report based upon an anonymous source also claimed Sabatine is a Reaper. A second captain believed that Sabatine may not be a Reaper, but rather a member of a newly formed Deputy Clique in the South L.A. Station. A captain reported learning that Sabatine threatened that there would be a work slow-down in South L.A. if the body camera footage was released.

As proof of the consequences to the Department and the County of gang like activities, the County has already been sued based upon Sabatine's conduct. The Complaint demands $10,000,000. The County likely will engage outside counsel to represent the County and Sabatine.

The type of conduct revealed in the Sabatine body camera footage is consistent with a lengthy history of gang behavior at South L.A. Station.  A current deputy who has served in the Department for more than 25 years insisted on anonymity for fear of physical retaliation. The witness described the activities of the group of deputies known as the Reapers at Lennox Station (now the South L.A. Station.) The witness saw the tattoos of the members, all of whom were Caucasian males. The witness observed that the Reapers now consist primarily of Hispanic deputies.

The witness stated that Reapers were involved in multiple shootings. The witness recounted a conversation in which the witness was criticized after the witness confronted two African Americans, a male and female, one of whom had a gun. The witness apprehended the suspects without firing a weapon. Later a Reaper criticized

26

the witness, and asked "why did you not shoot her?" The Reaper described it as a "freebie."

According to the witness, another Reaper encouraged the witness to seek a warrant when there was no basis to do so. The witness declined and believes that this was a source of the mistrust of the witness among certain deputies.

A former deputy who served in the South L.A. Station described Carl Mandoyan as the shot caller at the station at the time. The witness claimed that it was widely known in the Department that Mandoyan was a Reaper. As in other stations, the witness noted that unpopular directives were "pushed back" against by work slowdowns. Some of the friction was with a captain who was acting in accordance with a directive from Sheriff McDonnell to "crackdown" on deputy misconduct.

The witness reported that to get into the Reapers one needed to have a "force incident" and look for an opportunity to shoot people. The other condition was that you "not be a rat."

The witness's experiences as a non-Reaper included being "slammed on calls." The dispatcher repeatedly instructed the witness to answer calls for which other deputies refused to provide back up the witness requested. The witness described one incident in which the witness made a traffic stop and asked for a unit to back up. None came and the suspect ran away.

Another deputy who required anonymity described an incident at the beginning of the witness's career in patrol. The witness pulled over a suspect who was apparently intoxicated and "out of it". The witness said that the suspect appeared unaware that there was a gun on the passenger side front seat, did not reach for the gun, and did not resist arrest. When reporting the incident and booking the gun a Reaper ridiculed the witness for not shooting the suspect and claiming that he had "reached" for the

27

weapon.

Captain Angela Walton testified that in her 27 years of service there have always been Deputy Cliques in the Department and that they continue to exist to this day. Walton described her experience at Lennox Station at the beginning of her career when the Reapers were a well-recognized presence in the station. She identified Larry Del Mese, who later became Sheriff Villanueva's first Chief of Staff, as the "shot caller" at Lennox.

Walton observed that the Reapers were running the Lennox Station, particularly the early morning shift. After Walton obtained a position as a training officer on an interim basis, she was driven to a golf course and told by a deputy Reaper "we don't like you."

Walton testified that the Reapers set out to make her fail as a training officer. She recalled, for example, a trainee who was a father. Walton allowed the trainee to call his children to say good night. The Reapers roundly criticized her for that accommodation and for allowing her trainee to eat lunch.

Walton described an attempt to intimidate her by posting her business card on a bulletin board at the station with a large "X" drawn through it. Further attempts at intimidation were frequent service calls from a Reaper in charge of dispatch. Walton said that the volume of calls alone adversely affected her ability to perform her job.

Walton experienced the scope of the Reapers influence when she delivered a prisoner to the Compton Station. While in Compton, Walton encountered a former colleague, and engaged in social "catch up" conversation. Walton's brief delay from work for this social purpose was relayed by a Reaper who worked at Compton to a Reaper who worked at Lennox. According to Walton, her conversation with a former colleague demonstrated that the Reaper influence was not confined to a single station,

28

and it was used as a basis for criticism of her by the Reapers as part of their attempt to drive her from the station. When Walton sought a position at the Lancaster Station, she realized that she had a "jacket;" i.e., a negative reputation spread by the Reapers which included this supposed transgression.

### 4.    Century Station

Retired Chief Gooden, who had more than 25 years of service in the Department, described how Century Station essentially operated on its own, apart from the Department's command structure. He heard from deputies that if there were "problems" that the deputies would "handle that" and there was to be no involvement of the operations leadership of the station.

Chief Gooden recounted that during his tenure at MCJ the "2000 boys and 3000 boys" staged gladiator fights between jail inmates. Another witness stated that the 2000 boys were "heavy-handed white guys" who encouraged the use of force in large numbers at MCJ and eventually transferred to Century Station.

Chief Gooden also testified about the Department employees' fear of retaliation should they speak out. He recounted female custody assistants explaining their concern to him in connection with deputy misconduct in MCJ.

When Gooden became a captain at Century Station he was concerned about the history of problems associated with the station. He learned that deputies were involved in personnel decisions, including determining who would receive the coveted position of training officer.

There were two problematic groups of deputies at Century Station at the time. One was the Regulators. The other was the Spartans. Gooden described the competition for control of the station between them and recounted how there was even a dispute over one group taking and refusing to allow the other group to use a

station canopy for an event.

A witness requiring anonymity who worked at Century Station for approximately a decade said that the Regulators and Spartans were actively engaged in misconduct. The witness said that the Regulators' shot caller was the scheduling deputy. The witness claimed that Commander Kerry Carter and then Chief April Tardy knew of the presence and activities of the Regulators at the station. According to retired Assistant Sheriff Robert Olmstead, the entire Department leadership knew about the Regulators because the Regulators installed a large monument honoring themselves on the premises of the Century Station that remained in place for several years.

The anonymous witness described a Regulator sponsored fundraising poker game to support the Baker to Vegas run. The Regulators used female deputies as "cocktail waitresses" at the event. The female deputies received personal and administrative days off so they could work at the poker game. The witness reported that the Spartans were angered by the event and sought an equal amount of time off. A Spartan left a threatening note under the door of the captain who denied the request.

The COC reviewed the content of a March 16, 2015, anonymous letter to Sheriff McDonnell that claimed the Spartans' tattoo "represents 'putting in work,' such as unjustified beatings, falsifying reports of beatings, gladiator fighting, and intimidating other employees or inmates who interfered."

Another witness who insisted on anonymity for fear that the witness' career would "be over" if the cooperation were revealed, stated that there was a "book" that the witness had reviewed that identified the name and the date each Regulator received a tattoo. The witness said that there were twenty-five identified members. The book also recited the creed that reflected a commitment to "proactive policing."

The witness described the creed as "propaganda."

The witness also described the "tax" the witness was required to pay. For example, in connection with the Baker to Vegas run the witness was required by a training officer to pay more than $100 for a photograph of the 1960s "Rat Pack" celebrities.

The training officer mirrored the language of former Undersheriff Paul Tanaka by instructing the witness to "work the gray" and "work backwards," which the witness was taught meant "fudging" probable cause. The witness used as an example the "teaching" that all searches in high crime areas are to be defined as with "consent." The witness said that nobody in high crime areas ever consents. The witness said that the goal was to get arrest statistics. When the witness protested "working backwards," the witness was described by the training officer as "a rat." That reputation was spread through the station.

The witness said that with the passage of time the Department is filled with "gang" members, including members of the command staff. The witness said that at least 15 of the 25 Regulators have been promoted. The witness asserted that many of the promotions resulted from Undersheriff Tanaka's efforts to promote favored deputies.

The witness said that the influence of the Regulators affected the goals of young deputies. Because of the perception that the Regulators were in control, young deputies wished to "make their bones" to gain acceptance. The witness said that goal encouraged deputies to get into shootings to establish their "bona fides."

Special Counsel also received confidential information corroborating the assertion of multiple interviewed witnesses that tattooed Deputy Clique members currently hold important positions within the Department. Special Counsel was

31

informed that one specific area of influence is in the Civil Rights and Public Corruption section of the Department. Sheriff Luna has eliminated that section.  It was that section which led a search of former Board of Supervisor's member Sheila Kuehl and current COC member Patricia Giggans.

Chief Gooden recounted that Interim Sheriff John Scott ordered that the Deputy Clique logos be abandoned. Shortly thereafter, however, Gooden learned that there was offsite sale of clothing with the prohibited logos.

### 5.    <u>Lancaster and Palmdale Stations</u>

Angela Walton described her experience with Lancaster Station over several years. She testified that when her Vice Squad participated in an undercover operation, they would not reveal to the Lancaster deputies or supervisors the operation for fear that the suspects would be tipped off. While not specifically tied to Deputy Clique activity, the testimony illustrated inter- Departmental mistrust related to the absence of chain-of-command organizational supervision and the perception that sub-groups had conflicted loyalties.

Walton applied to be the Captain at Lancaster. She was the only "full Captain" applying. Since Lancaster is a contract city, city officials interviewed her for the position. She met with the Vice-Mayor who told her that he had received negative information about her. Walton understood that there was a Reaper at Lancaster Station and that the "jacket" she had obtained almost two decades before prevented her from becoming Captain of Lancaster Station.

Two non-Caucasian witnesses claimed to have been subjected to serial harassment by training officers at Lancaster Station. All training officers are Caucasian. One of the witnesses asserted that there were "bad stops" that led to searches, most often of people of color. The witness said that young deputies were pressured to write

32

reports of searches in "a certain way" to make the stops legally justifiable even though the reports contained false information. The witness said that the training officers insisted that certain reports be constructed either to conceal actions taken or to reflect things which did not occur. The witness has reported that these assertions are now the subject of an investigation by the Internal Affairs Bureau.

The witness' statement was consistent with a report issued by the U.S. Department of Justice in a June 28, 2013, finding that deputies in Lancaster and Palmdale "engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment and Title VI." The Department of Justice went on to note that "Some Antelope Valley Deputies wear tattoos or share paraphernalia with an intimidating skull and snake symbol as a mark of affiliation with the Antelope Valley stations."

In a deposition in a wrongful death case, Oleg Polissky, a Palmdale Station deputy, testified that he received a Cowboys tattoo and attended a celebration with at least twenty similarly tattooed deputies. A similar tattoo appeared on the leg of a former deputy who was shot by another deputy while on a camping trip. A photo of the victim's leg was displayed at a Special Hearing of the COC. A witness who required anonymity was told that the shooting was in retaliation for an act objected to by the Cowboys. The retaliatory shooting of out of favor compatriots is classic criminal gang activity prosecuted regularly.  Another witness with direct knowledge of the circumstances, and who was the source of the first witness' knowledge of the shooting, declined to be interviewed.

### 6.    <u>Aero Bureau</u>

Aero Bureau is responsible for the Department's helicopters. It has a small

number of assigned deputies who have the necessary pilot skills and wear a helmet that has as its logo a chicken being choked. The group is widely referred to as the "Ghetto Birds."

A witness interviewed by COC's staff described systematic harassment by the three senior Caucasian deputies in the Aero Bureau. The witness described them as a "clique" and the three as "shot callers." The witness said that there were no African Americans assigned to the Aero Bureau and that as far as the witness knew there had been only one African American ever assigned to the Bureau.

Another witness, a current deputy with 20 years of service who insisted upon anonymity for fear of retribution, confirmed that the Aero Bureau takes pride in the "Ghetto Bird" logo. The witness said that a leader of the Aero Bureau openly stated that he was a Viking and was a founder of the Regulators. Another leader is a tattooed member of the Spartans. The witness described the process of coordinated "humiliation" efforts directed by the shot callers to disfavored deputies. The shot callers encouraged the others at Aero Bureau to ignore disfavored deputies.

The witness described systematic and routine harassment that caused many new deputies to leave the Bureau. The witness observed the shot callers mocking the accent of a Hispanic deputy and said that disfavored deputies had their pictures placed and defaced on bathroom walls.

The action of a small, self-selected racially harmonious sub-group is consistent with evidence regarding how Deputy Gangs and Deputy Cliques acted in numerous stations throughout the Department.  The use of racially charged and disparaging logos is also consistent with their problematic conduct. Such conduct is inconsistent with fundamental principles of professional policing.

34

### C.      Obstacles to Eliminating Deputy Cliques in the Department

Among those who must participate in the solution to longstanding and widespread problem of Deputy Gangs and Deputy Cliques in the Department are the Association for Los Angeles Deputy Sheriffs ("ALADS") and County Counsel. Neither ALADS nor County Counsel have been helpful in the past.

### 1.      ALADS

Most deputies who are members of ALADS are not tattooed members of a Deputy Gang or Deputy Clique. According to the Rand Report as many as 15 to 20% of deputies belong to Deputy Cliques. ALADS should, accordingly, recognize that the elimination of Deputy Gangs and Deputy Cliques is in the best interests of the vast majority of its members.

The Special Counsel's investigation has revealed, however, numerous instances in which ALADS has protected Deputy Gang and Deputy Clique members.  This has included protecting deputies who engaged in gang activities involving serious misconduct against other deputies who presumably are ALADS members. There is no dispute that pursuant to the Myers-Milias-Brown Act and the National Labor Relations Act, ALADS owes a duty of fair representation to all its members. Special Counsel believes, however, that ALADS can meet its obligations without condoning the existence of Deputy Gangs and Deputy Cliques, the harm they cause to the Department, or the attendant unprofessional conduct in which members of those groups engage.

ALADS has opposed efforts by the Department to require the disclosure of tattoos affiliated with Deputy Cliques. In one example, ALADS procured a legal opinion that the First Amendment prohibits the Department from barring deputies from having tattoos associated with these groups. That opinion, which is it at odds with the

35

applicable law discussed below, was provided to Sheriff Villanueva, who relied upon it to assert that he was constitutionally unable to restrain the use of tattoos by Deputy Cliques even if they constituted "police gangs" as defined by California Penal Code section 13670.

In a very recent example ALADS contacted a current captain who sent an email advising deputies at his station not to get Deputy Gang/Deputy Clique tattoos because it could hurt their careers. ALADS protested that advice and told the captain to cease and desist from advising deputies about tattoos. Such communication serves both to undermine the command structure of the Department and to normalize open display of Deputy Gang and Deputy Clique membership.

Steve Biagini, a retired 37-year veteran of the Department who served as Captain in the East L.A. station, observed that because of actions by ALADS and PPOA (Professional Peace Officers Association), the supervisor's union, he could not question an incoming transferee's "fitness" to serve at the East L.A. station. Rather, if the deputy was on an incoming transfer list, he had no discretion to refuse the transfer. Similarly, he lacked the ability to transfer problematic deputies from the station. Biagini blamed ALADS for this limitation on supervisorial discretion and the consequential harm to the Department of requiring unfit deputies to remain in stations where their problems arose.

Michael Gennaco, who was the head of the Office of Independent Review, described the institutional problems attributable to ALADS. He expects that ALADS will oppose more detailed and explicit training of deputies about the dangers of Deputy Clique affiliation, will oppose changes in the transfer and rotation system to reduce the influence of Deputy Cliques at stations and jails, and will not acknowledge the existence of problems associated with Deputy Cliques, notwithstanding the evidence

36

set forth above.

Gennaco used as an example ALADS' involvement in the Quiet Canon episode, another fight among deputies, some of whom were ultimately terminated. Gennaco said that ALADS ostracized the whistle blowers but backed "to the hilt" the accused. ALADS's reaction to the Internal Affairs investigation of the Kennedy Hall incident involved a similar defense of the accused even though the victims were also deputies (and presumably ALADS members).

ALADS also created obstacles to Special Counsel's investigation. Those include making a baseless contention that the COC has no subpoena power because the grant of that power by Measure R violates the deputies' collective bargaining agreement with the County. Further ALADS has contacted witnesses subpoenaed by the COC and urged them to seek specific lawyers to assist the witnesses in avoiding testimony. A subpoenaed witness reported a specific direction to call a designated lawyer who would arrange for the witness not to testify.

It is imperative that ALADS supports the elimination of the Deputy Gangs and Deputy Cliques for the benefit of its members. The repeated gang style behavior of certain Deputy Cliques has led to enormous litigation costs borne, in part by ALADS, to the detriment of ALADS' members, and significant harm to the Department's reputation with the public. Each special hearing of the COC included multiple public witnesses calling out gang behavior by deputies and expressing a community fear and hatred of deputies simply because they were members of the Department.  The level of anger and mistrust publicly expressed is the tip of a sizable iceberg in the community.  Elimination of Deputy Gangs and Cliques is in the best interest of all Department members. The public enmity alone increases the risk of harm to deputies. If only for reasons of their members safety, ALADS' should be a leader in eliminating

37

Deputy Cliques and the Deputy Gangs that grow out of them.

### 2.    County Counsel

County Counsel bears some responsibility for enabling Deputy Cliques. After the Kolts Commission issued the first report to publicly acknowledge the existence of Deputy Cliques in the Department in 1992, Judge Kolts recommended that the County establish a civilian oversight board to ensure the Sheriff implemented reforms aimed at reducing uses of force and eradicating Deputy Gangs. The County Counsel, however, issued an opinion advising that a civilian oversight board without the Sheriff's agreement would violate state law. The Department leadership used this opinion to successfully oppose civilian oversight for many years. During this period without civilian oversight deputy gangs flourished.

The County Counsel has approved the use of County resources to pay by the hour litigation counsel to defend Deputy Gang and Deputy Clique members who have engaged in misconduct far outside the scope of their duties as deputies. Deputies who engaged in an after-hours beat downs of co-workers as an exercise of their power over other co- workers were not acting within the course and scope of their duty and yet they are supported in litigation by the County.

In connection with *Lockett v. County of Los Angeles*, 18-CV-5838-PJW in a December 2022 "Summary of Corrective Action" an Assistant County Counsel addressing the beating and tasering by Deputies Aldama and Orrego  of Sheldon Lockett alleged to have been motivated by the deputies involvement in the Executioners Deputy Gang wrote "to date, there is no information or evidence obtained through any Sheriff's Department investigation to substantiate this claim[that the use of force by the deputies was motivated by their membership in the Executioners.]"  In fact, as was revealed at the hearing, Aldama displayed his

38

Executioner tattoo at a deposition. The Court denied the County's lawyer's attempt to keep from the jury evidence of the tattoos of the deputies. The question of the relationship between the use of force, a claim ultimately settled by the County for more than two million dollars, and action in furtherance of gang membership surely was a reasonable inference to be drawn from the history of the Executioners and the disturbing facts that led to the multi-million dollar settlement.

It appears that County Counsel refused to accept the inference in light of the facts publicly known. For example, in the case of the shooting of Donta Taylor by the same deputies, Aldama admitted not only that he had an Executioner tattoo but that up to twenty other deputies had the same tattoo. The Taylor case settled for seven million dollars. It appears that notwithstanding almost ten million dollars in County paid settlements that the County Counsel refused to accept the inference widely drawn by the media and the community.

As Michael Gennaco has made clear, County Counsel has not supported meaningful risk management and other efforts to address the problem of Deputy Cliques on the front end; that is, working to root out the problems before they result in litigation as opposed to paying after-the-fact litigation costs, settlements, and adverse judgments. He recalled a handwritten document describing a Regulator tattoo, which stated that "if you kill add smoke" to the tattoo. Gennaco stated that County Counsel urged no action because of concern that the Department would be sued if it took action in response to the tattoo.

The COC believes that County Counsel is aware that former Sheriff Villanueva relied upon a withdrawn and legally erroneous 2014 opinion to claim that he could not end the tattooed Deputy Cliques. Despite the COC's request, the COC has been informed that County Counsel has advised the Board of Supervisors not to release an

39

opinion that fully sustains the COC's recommended policy change. By this simple act County Counsel gave cover to a regime that at minimum tolerated, if not rewarded Deputy Gangs and Deputy Cliques.

The conduct of County Counsel creates a reasonable inference that, whatever its intentions, by its actions and inactions it has not provided meaningful assistance to eliminating Deputy Gangs and Deputy Cliques.

### 3.       Los Angeles District Attorney's Office

The District Attorney's Office has in many instances ignored deputies who participate in Deputy Gangs and Deputy Cliques and who engage in gang-related misconduct. The Justice System Integrity Division (JSID) of the Los Angeles District Attorney's Office investigates alleged criminal misconduct by deputies, as well as all deputy involved shootings to determine whether criminal charges should be filed. In conducting its analyses, the JSID repeatedly refrains from pursuing evidence that a sheriff's deputy accused of potential criminal activity or unconstitutional is affiliated with a Deputy Gang or Deputy Clique. For example, JSID declined to file criminal charges against four alleged Banditos who severely beat other deputies at an off-training party at Kennedy Hall. Despite substantial evidence that incident was, in effect, a "gang beat down," the JSID discounted a gang-related motive, writing: "Although there was some mention of a subculture of "Bandtios" existing at the ELA station, the Banditos was not a focus of this investigation nor were suspects identified as being part of this subculture.… At no point in this investigation did any witnesses indicate that the Banditos were equivalent to a gang or any type of criminal enterprise."

The JSID memo is factually wrong—several witnesses interviewed in Special Counsel's investigation have characterized the Banditos as a "gang"—and betrays a

40

reluctance to pursue any evidence of gang affiliation or a gang-related motive for alleged misconduct. As the Inspector General concluded in his October 2020 report, "Having received what appears to be a purposefully perfunctory investigation by ICIB (which did not gather evidence of the motive behind the alleged assault at Kennedy Hall) the LADA office did not request statements be taken from the uncooperative witnesses or compel a grand jury to compel statements."

The District Attorney's Office also has failed to require the Department to disclose the identity of known Deputy Gang and Deputy Clique members who are to testify as prosecution witnesses in criminal trials. The District Attorney's Office does not require Deputy District Attorneys to ask prosecution witnesses whether they belong to a Deputy Gang. The failure to obtain and to disclose potentially exonerating or impeaching testimony favorable to the defense raises significant constitutional issues under *Brady v. Maryland* (1963) 373 U.S.83.

### D. The Elimination of Deputy Cliques is Constitutionally Permissible

Applicable law permits disciplinary actions, including termination, based upon a deputy's joining or participating in an internal Deputy Clique. The overwhelming evidence presented at the public hearing, and developed in extensive interviews, demonstrates that Deputy Cliques encourage excessive force, undermine supervision, destroy public trust, are discriminatory, disruptive, and act contrary to fundamental principles of professional policing. With these elements Deputy Cliques are properly defined as gangs within the definition of Penal Code Section 13670. These characteristics make the elimination of the Deputy Cliques constitutionally permissible. Indeed, they make the elimination of these Deputy Cliques and Deputy Gangs a constitutional imperative.

The activities of and dangers created by Deputy Cliques meet the balancing test

41

required to ban or limit membership in these groups. *Pickering v. Board of Education*, 391 U.S. 563 (1968) established the required "balancing" test. The Ninth Circuit applied the test in *Hudson v. Craven,* 403 F.3d 691, 696 (9th Cir. 2005). The balance to be weighed is: "(1) [W]hether the speech that led to the adverse employment action [i.e., prohibiting Deputy Cliques] relates to a matter of 'public concern'; and (2) whether, under a balancing test, the public employer can demonstrate that its legitimate interests outweigh the employee's First Amendment rights."

Based upon the "public comment" at COC's special hearings and COC regular meetings and the multiple public reports going back to the Kolts Commission in 1992, the existence and conduct of Deputy Cliques are plainly matters of "public concern." The COC has heard moving statements by friends and family members of deceased or injured individuals impacted by the activities of Deputy Cliques. The treatment and gang activities of Deputy Clique members toward their brothers and sisters in uniform is a chilling statement of the paramount interest of the Department and the County in protecting its own employees and not tolerating persistent violations of law and fundamental principles of professional policing. The public is well advised to be "concerned" and to view the evidence of such misconduct directed toward fellow deputies and assume that they, as outsiders of the organization, can only expect worse treatment.

In *Piscottano v. Murphy*, 511 F. 3d. 247, 274-277 (2nd Cir. 2007), the court concluded that correctional officers' membership in the Outlaws Motorcycle Club, an organization that had engaged in criminal activity, presented an issue of "public concern." Here, both extensive law enforcement testimony and evidence and the public comments demonstrate that Deputy Clique membership is a matter of public concern. *Accord, Godwin v. Rogue Valley Youth Corr. Facility* 656 App'x 874, 875 (9th

42

Cir. 2016).

In the balancing of competing interests prong of the test, the employer needs to show that "the employee's activity is disruptive to the internal operations of the governmental unit in question" and the disruption is significant enough so that it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships...or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Melzer v. Bd. of Educ of City Sch. Dist. of City of New York*, 336 F.3d 185, 197 (2nd Cir. 2003).

Courts have consistently found that a "law enforcement agency has a heightened need for order, loyalty, morale and harmony which affords a police department more latitude in responding to the speech of its officers than other government employers." *See e.g., Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1258 (N.D. Ala. 2017); *Turner v. United States Capital Police,* 34 F. Supp. 3d 124, 143 (D.D.C. 2014); *McMullen v. Carson,* 754 F.2d 936 (11th Cir. 1985) (Ku Klux Klan membership sufficient to terminate a Sheriff's deputy.). Further, the efficiency, security, and integrity of the Department law enforcement function easily outweighs the "associational rights" of a Deputy Clique member.

In short, the applicable law establishes that, based upon the facts found by Special Counsel, and the evidence offered in public hearings conducted by the COC that the elimination of Deputy Cliques is well within the constitutional bounds of the Department. Not only is it permissible, but it is also a necessity.

## IV.    **FACTUAL FINDINGS SUMMARY**

Special Counsel's investigation of Deputy Gangs and Deputy Cliques in the Los Angeles Sheriff's Department demonstrates that it is time to eradicate this 50-year plague upon the County of Los Angeles, its residents and the Department's employees

43

who do not belong to, or wish to be associated with, the Deputy Gangs or Deputy Cliques. The fine distinction, if any, between "Deputy Gangs" and "Deputy Cliques" is not important. The evidence has shown that Deputy Cliques regularly devolve into discriminatory, exclusionary, and dangerous associations that challenge the core goals of law enforcement.

Accordingly, Special Counsel sets forth below recommendations to the COC to urge Sheriff Robert Luna to accomplish this goal. The COC should work with the Sheriff and the Department in facilitating enactment of the recommendations and monitoring the results.

## V.    RECOMMENDATIONS TO ELIMINATE DEPUTY GANGS AND CLIQUES

On February 14, 2020, the COC passed a resolution recommending that the Department enact a policy "prohibiting joining and participation in deputy cliques." A copy of the resolution and preamble is attached as Exhibit A.

The COC defined Deputy Cliques "as groups of Sheriff's deputies within a particular patrol station, bureau or unit who self- associate as a subgroup to the exclusion of others in their station or unit."  The term "Deputy Cliques" when used within the Department was intended to minimize the problem created by such groups.

The harmful effects of groups of deputies who self-associated and acted to exclude other deputies by identifying with symbols and names designed to separate themselves from the Department  had a principal focus upon the harm caused to the Department and to excluded members. Special Counsel urges the COC to reiterate its request that the Sheriff enact a policy prohibiting deputies from joining, participating in or soliciting others to join a Deputy Clique.

However, Special Counsel urges the COC to go further.  As  expressed above, as defined in the COC proposal, the term "Deputy Cliques" encompasses subgroups that

44

engage in misconduct directed against the community such as excessive force and violations of constitutional rights. The factual investigation has revealed widespread, deliberate misconduct that at minimum violates fundamental principles of professional policing and in many cases appears to violate the law. The time has now come for a policy that expressly prohibits not just the internally harmful effects of Deputy Cliques, but the external, community harmful acts of Deputy Gangs. Such harmful acts include falsified police reports, unlawful searches and seizures, misuse and excessive use of force and discriminatory enforcement of law. Proof that the community, particularly the communities of color, are suffering because of gang behavior is epitomized in the recently released body-camera footage of Deputy Sabatine as he exercised his authority by pointing a gun at an African American man sitting in his parked car without any evidence of a crime.

Now is the time to eliminate all these problematic groups, Deputy Cliques and Deputy Gangs. The factual findings compel the COC to urge the Sheriff to adopt the following recommendations:

A. **<u>LEADERSHIP AND SUPERVISION</u>**

1. **<u>The Sheriff must clearly, promptly and unequivocally articulate his vision, policies, and objectives in addressing the problem of Deputy Gangs and Deputy Cliques.</u>**

Deputy Gangs and Deputy Cliques, and their adverse effects on the community and the Department need to be eliminated. This is easier said than done, but it will never be done unless the Sheriff promptly announces that Deputy Gangs and Deputy Cliques will no longer be tolerated. He should make clear that this is a top priority, and he should state his intention to make this happen immediately. He must also promptly adopt policies calculated to achieve this goal and see that these policies are enforced.

45

**2.      Adopt a policy that clearly prohibits deputies from participating in Deputy Gangs, as defined in Penal Code Section 13670.**

Special Counsel's investigation has revealed that, despite 50 years of known Deputy Gangs and Deputy Cliques within the Department, these problematic groups continue to operate at several of the Department's patrol stations, engage in gang like activities and no Sheriff has adopted a policy banning participation in such groups. Moreover, the State legislature has mandated that every law enforcement agency in the State of California "shall maintain a policy that prohibits participation in law enforcement gangs and make violation of that policy grounds for termination." PC Section 13670(b). Moreover, the legislature has defined the term "law enforcement gang."  The current Sheriff's predecessor failed to implement a policy banning law enforcement gangs within the Department. Such a policy should be adopted without further delay.

**3.      Adopt a policy that prohibits deputies from joining, participating in and soliciting others to join Deputy Cliques.**

Given the Department's long history of exclusionary deputy subgroups, it will not be enough merely to prohibit participation in deputy or law enforcement "gangs." Ending this problem requires a prohibition against joining and participating in Deputy Cliques. In April 2021, the COC proposed that the Department adopt a policy that prohibits deputies from joining, participating in, or soliciting others to join a Deputy Clique.  The COC's proposed policy was accompanied by a preamble that explained the need for such a policy and provided definition to the term Deputy Clique.

As noted above, Special Counsel urges that the Sheriff adopt the COC's proposed policy. Violators of the policy would be subject to discipline, up to and including termination. The indispensable element to ending this 50-year harm to the

46

Department and the public is adopting the recommended policy to send a strong message that belonging to a Deputy Clique is no longer going to be tolerated, that gang behaviors are a thing of the past and this Sheriff is fully committed to rid the Department of these groups.

All Deputy Gangs have sprung from Deputy Cliques, and the clique-culture is deeply embedded in the Department. This cancer in the Department must be excised.

### 4. The Sheriff should develop a departmentwide initiative to end Deputy Gangs and Deputy Cliques.

As noted above in the Factual Findings, Deputy Gangs and Deputy Cliques are secretive, exclusive, and often employ intimidating, unprofessional, or controversial graphics, including body tattoos. They diminish the public's trust in the Department, undermine supervision and the chain of command, are detrimental to the morale of other Department members, and negatively impact the Department's effectiveness and professionalism in executing its mission. The elimination of these groups requires buy-in at all levels of the Department. The Sheriff should announce a department-wide initiative banning Deputy Gangs and Deputy Cliques. All executives, managers, and supervisors must be openly and unequivocally committed to conveying the Sheriff's policy, and objectives to Department personnel. As the Rand study stated, "Culture eats policy." The Sheriff's leadership team must change the culture of stations, jails, and other bureaus or units where these groups exist.

### 5. The Sheriff should seek the support of ALADS and PPOA, for his vision, policies and objectives regarding Deputy Gangs and Deputy Cliques.

ALADS and PPOA need to be part of the solution and recognize that the elimination of Deputy Gangs and Deputy Cliques is in the overall best interests

of their members.

**6.      Any captain who is unable or unwilling to support the Sheriff's policy without reservations should be subject to   appropriate discipline ranging from transfer to a less critical position with little or no presence of Deputy Gangs and Deputy Cliques to termination for insubordination in the Sheriff's considered judgment and pursuant to required due process.**

**7.      The Department should consider assigning a senior captain and a newly promoted captain to larger, high activity stations to ensure maximum supervision and mentoring of lieutenants and sergeants while retaining full accountability within the paramilitary structure of the Department.**

Although a single captain heads Sheriff's patrol stations, there is a precedent for having two captains oversee a facility in the Custody Division.  MCJ, Twin Towers Correctional Facility, and North County Correctional Facility all have two captain organizations—one for operations and one for administrative functions. Assigning two captains to larger, busier patrol stations, particularly those with a history of entrenched Deputy Gangs and Deputy Cliques, will enhance the ability of captains to address the continuing problem of these groups and help ensure that such groups will not be formed in the future. If the Sheriff does not believe a two-captain approach is well advised, he should report his reasons to the COC.

B. **POLICY AND TRAINING**

1. **As set forth in recommendations A (2) and A (3)  above, the Sheriff should adopt and promptly implement a clear policy to address the need to eliminate Deputy Gangs and Deputy Cliques and prohibit tattoos that depict violence which must  be  supported, and explained by the Sheriff's leadership team.**

As defined earlier in this Report, a Deputy Clique is an association of deputies within a station or unit that is secretive and invidiously exclusionary and often adopts images, including matching tattoos depicting violence or the use of deadly force. These sub-groups have been fairly and frequently defined as Deputy Gangs. As stated in Recommendations No. A (2) and A (3) above, the Sheriff should immediately bar all deputies from joining, participating in, or soliciting others to join Deputy Gangs and Deputy Cliques. In addition to adopting this policy, the Sheriff should promulgate additional polices to help eradicate Deputy Gangs and Deputy Cliques, including a policy that prohibits new deputies hired after the date of the issuance of Recommendations  A (2) and A (3) from having tattoos that depict violence, the use of deadly force or any iconography that might reasonably be found offensive to the public. Current Department members should also be prohibited from acquiring such tattoos after the date of the issuance of the policy. Any current Department member who acquired a Deputy Gang or Deputy Clique tattoo prior to the adopting of the policy should be required to ensure that it is not visible while the member is on-duty, on Department or County property, or is representing the Department away from the workplace.

A review of stations and jails should be conducted to determine which facilities have unprofessional station/jail/bureau logos. Unit commanders should be

49

accountable for the removal of decals, flags, bumper stickers, decorations, or other depictions of unprofessional symbols inappropriate for representing Department units. All managers and supervisors must be responsive to the existence of graphics or other symbols representing prohibited Deputy Gangs or Deputy Cliques or offensive station/jail/bureau logos such as "Ghetto Birds" or "Ft. Apache."  They should be removed, and misconduct investigations should be initiated to determine which personnel are responsible for such graphics or symbols if they reappear in the future.

2. **The Department should investigate violations of the policy banning joining or participating in Deputy Gang and Deputy Cliques and refer violations for discipline.**

A primary consequence of any violation of the Sheriff's policies regarding Deputy Gangs or Deputy Cliques should be a misconduct investigation followed by appropriate discipline which should range from suspension through demotion to discharge consistent with due process. Department personnel should also be advised that the Department will enforce Penal Code Section 13670.

3. **The Department's leadership team should consistently and recurrently emphasize the adverse career consequences of creating or joining a Deputy Gang or Deputy Clique.**

Although this task belongs to personnel of every rank, the time commitment must increase with each successively lower rank. Notwithstanding the importance of a captain-level manager to set the tone for deputies, lieutenants and sergeants, lieutenants and sergeants spend the most time with deputies. They therefore must be most accountable for communicating to deputies under their supervision the adverse consequences of becoming involved with Deputy Gangs and Deputy Cliques. Captains ultimately are responsible for and must be held accountable for the performance of

50

lieutenants and sergeants.

4. **The Department must implement a procedure for notifying the District Attorney's Office if a deputy testifying as a witness participates in a prohibited Deputy Gang or Deputy Clique.**

Compliance with Federal and State law, including compliance with *Brady v. Maryland* (1963) 373 U.S. 83, requires the District Attorney's Office to disclose if a deputy testifying as a prosecution witness participates in a prohibited Deputy Gang or Deputy Clique that might bear upon the witnesses' credibility. The confidentiality of law enforcement personnel files does not relieve the prosecution of its constitutional obligation to disclose impeaching information for any deputy testifying as a prosecution witness. Sheriff Luna and his designees should consult with the District Attorney's Office to devise an appropriate procedure for the Department to notify the District Attorney's Office that a deputy is participating in a prohibited Deputy Gang or Deputy Clique so that prosecutors can make the required disclosures, if any, to the defense.

5. **The Department should actively investigate violation of the policy prohibiting joining, participating in or soliciting deputies to join Deputy Gangs and Deputy Cliques**

Sheriff Luna should remedy the Department's longstanding failure to investigate Deputy Gangs and Deputy Cliques. After Recommendation No. 2, above is adopted, the Department should make reasonable efforts to learn whether deputies continue to participate in such groups, as the Department did in 1973 with the Little Red Devils and in 2013 with the Jump Out Boys.

51

6.    **The Department should train supervisors how to mentor deputies about the adverse consequences of involvement in Deputy Gangs and Deputy Cliques.**

In 2016 the Department initiated a departmentwide mentoring program for deputy personnel named the "Sergeants' Mentoring Initiative." The objective of the program was to equip and inspire the sergeants to provide to their deputies meaningful, practical, recurrent mentoring about decision-making and conduct in law enforcement and custodial services. The program was designed to (1) emphasize the high aspirations associated with  public safety services, (2) stress the importance and difficulty of the decisions required of peace officers, (3) acknowledge the temptations and pressures prevalent in law enforcement, and (4) enhance deputies' capacity to apply foresight, perspective and wisdom to their decision- making and conduct.

7.    **The Department should implement a series of community meetings involving patrol station captains, commanders, and chiefs to ascertain the impact of Deputy Gangs and Deputy Cliques on community relations.**

The Department should implement at every station a Community Advisory Committee ("CAC"). The committees should consist of community members who have been vocal in their criticisms of law enforcement in addition to station "boosters" who volunteer for membership.

The periodic meetings should be attended by committee members, other members of the community, and station personnel, including the captain, dedicated lieutenant, sergeants, and special assignment and other deputies as necessary. These meetings constitute excellent forums for Department personnel to learn about community concerns. The topic of Deputy Gangs and Deputy Cliques must be an

52

agenda item of these meetings.

C.        **<u>RE-DEPLOYMENTS AND ROTATIONS</u>**

Special Counsel recognizes the complexity of the Department, as well as the difficulty of managing the second largest local law enforcement agency in the country, with its large geographical area, responsibilities for operating the largest county jail system and the largest local court system in America and its duty to police over four million residents.

Special Counsel also recognizes that re-deploying or transferring deputies who belong to a Deputy Gang or Deputy Clique from one unit or patrol station to another has in certain circumstances resulted in moving but not necessarily solving the problem. The clearest illustration of this was the transfer of substantial numbers of deputies who were members of the 2000 and 3000 Boys to the same patrol stations they selected as their preferences, i.e., Compton and South L.A. Stations, respectively. Nonetheless, the use of the Sheriff's authority to re-deploy, transfer and rotate assignments is a valuable tool that can help eliminate Deputy Gangs and Deputy Cliques within the Department and, importantly, preventing their formation and re-emergence.

In interviewing non-Department law enforcement managers, as well as former Department leaders, Special Counsel recognizes that other law enforcement agencies use re-deployment and assignment rotation to minimize the risk of problematic officer or deputy groups forming in those agencies. It is an available and appealing strategy here. While not a panacea, it would provide an additional remedy and the mere announcement of the policy could serve a prophylactic effect.

Moreover, the evidence adduced demonstrates that the Department's decentralized station-based structure has played a significant role in fostering Deputy

Gangs and Deputy Cliques. Deputies' loyalties extend to the station rather than to the Department as a whole. Indeed, tattoos often are associated with the first or "home" station of the deputy.

At a minimum, the Sheriff should provide a report to the COC on his perception of the viability and likelihood of success of the rotational plan set forth below.

Special Counsel urges that the Sheriff implement the following recommendation for re-deployment and periodic rotations of deputies within patrol and custody:

1.   **The Sheriff should use his authority to re-deploy and rotate deputies based upon the needs of the Department for the Department to eliminate the formation and re-emergence of Deputy Gangs and Deputy Cliques.**

The Sheriff should consider making such re-deployments or transfers within a geographic patrol or custody division, where possible, to avoid undue hardships. The Sheriff should also consider rotating all patrol deputies (after completion of field training) no later than the end of their first year in patrol to another patrol station within the Division. The Sheriff should also consider rotating all patrol deputies in periodic rotations, no longer than every five years, or sooner, to another station. The CCJV recommended and the Department implemented frequent rotations of deputies within the facilities of the County Jails. The rotational policy played a role in breaking up of the 2000 and 3000 Boys and reducing excessive force in MCJ. The rotation of deputies serving in Custody divisions should continue.

To effectively use the Sheriff's authority to re-deploy, Unit Commanders should take necessary actions to address the problem of Deputy Gangs and Deputy Cliques under their commands, including recommending to their Chiefs transfers of problematic deputies. Captains must be focused upon the rotation options and actively

54

participate in informing Commanders and Chiefs of the utility and results of such transfers.

2. **The Department should re-assess the dual career track for Custody/Court Services and provide a written report to the COC explaining what factors impede implementation.**

Having more deputies in Custody or Court Services who want careers in those Divisions may allow other deputies to go directly to patrol from the academy or shorten the time that other deputies spend in Custody after the academy.

3. **The Department should assess the feasibility of first assignments to patrol rather than jail facilities and provide a written report to the COC explaining what factors exist, if any, impede implementation.**

D. **ACCOUNTABILITY**

1. **The Sheriff should ensure that senior executives and unit leaders, notably captains and commanders are implementing the Sheriff's policy, vision and objectives regarding Deputy Gangs and Deputy Cliques.**

A segment of the weekly Executive Planning Council meeting (Sheriff, Undersheriff, Assistant Sheriff, Division Chiefs and various staff members) should be devoted to discussion of the progress of the initiative to end Deputy Gangs and Deputy Cliques. Identified obstacles should be remedied quickly.

2. **The Office of Inspector General should monitor implementation of the policy banning, joining or participating in Deputy Gangs and Deputy Cliques.**

Because of the imperative of implementing policies to eliminate Deputy Gangs

55

and Deputy Cliques, Special Counsel recommends that the COC request the Office of Inspector General to deploy its resources as additional "eyes and ears" to ensure the policy recommendations A (2) and A (3) are implemented fully and with alacrity.

3.     **<u>Promotional considerations should include an evaluation of evidence that a member under consideration for a promotion is currently involved in a Deputy Gang or Deputy Clique, including the nature and extent of the member's involvement and whether it was before or after the date of the policy issued by the Sheriff.</u>**

Past administrations have promoted tattooed Deputy Gang members to the highest levels of leadership in the Department. Most notably, Sheriff Baca promoted Paul Tanaka, a tattooed Viking, to Undersheriff. More recently, Sheriff Villanueva promoted Timothy Murakami, a tattooed Caveman, to Undersheriff and Lawrence Del Mese, a tattooed Grim Reaper, to Chief of Staff.

Promoting Deputy Gang members into leadership positions reinforces the power of Deputy Gangs and Deputy Cliques and undermines the ability of officials to implement reforms aimed at eliminating them within the Department. For example, former Undersheriff Tanaka's recommendation encouraging investigative tactics "close to the line"and "in the gray area" became part of the Jump Out Boys creed.

Current or former Deputy Gang and Deputy Clique members in leadership positions will have difficulty enforcing new prohibitions against other deputies joining a Deputy Gang or Deputy Clique because their own tattoos and past participation renders them vulnerable to accusations of, at minimum, hypocrisy. Former Chief of Staff Del Mese testified that he had his Reapers tattoos removed at about the same time as the former Sheriff appointed him Chief of Staff because he understood that the tattoo had come to be a "liability" and "a bad look."

Consequently, the Department should inquire if a deputy under consideration for a promotion is or was Deputy Gang or Deputy Clique affiliated and must carefully evaluate the Department wide implications of promoting those who actively participated in such groups.

**4.**     **The Department should include a standard set of questions regarding a deputy's current affiliations with Deputy Gangs or Deputy Cliques in the use of force review process and in administrative and internal criminal  investigations.**

This recommendation does not assume a *per se* causal connection between membership in a Deputy Gang or Deputy Clique, or the fact that a deputy has a tattoo reflecting involvement in such a group, and unlawful use of force or misconduct. It is, however, important to recognize that the community widely assumes such a causal connection.

Members of communities policed by Deputy Gangs and Deputy Cliques widely infer a connection between such groups and excessive uses of force. The U.S. Commission on Civil Rights report, the Loyola Report and the report of the National Association of Blacks in Criminal Justice noted that stations with active Deputy Gangs have significantly more deputy involved shootings than stations without Deputy Gangs, even when the overall crime rates in the station-districts are comparable.

The questions must enable an assessment of the possibility or likelihood of a connection, without any presumption. If there is evidence indicating even a possible connection between a deputy's membership in a Deputy Gang or Deputy Clique and a use of force incident or misconduct, investigative steps should be taken to determine the nature and extent of the connection. In any such cases, the Office of the Inspector General should be notified and asked to monitor the progress of the investigation.

57

5.      **The Department should ensure that captains are notified of deputies involved in force incidents or personnel misconduct investigations who have affiliations with Deputy Gangs or Deputy Cliques, including tattoos associated with such groups.**

The Department should codify this recommendation as a rule in the Department Manual of Policy and Procedures. The responsibility for making this notification will normally fall to an investigator at the captain's own unit of assignment, or to an Internal Affairs Bureau or to Internal Criminal Investigations Bureau investigator. However, anyone who obtains such knowledge must promptly notify the concerned captain, either directly or through the chain of command.

6.      **The Department should ensure that the CompStat process for risk management indicators regarding the existence of Deputy Gangs or Deputy Cliques within a patrol station or other Department unit is implemented and is effective in assessing the risk mitigation efforts of unit commanders.**

The Department previously instituted a CompStat process, also referred to as the Sheriff's Critical Issues Forum (SCIF). The Department initially used it primarily in patrol divisions, but later extended to every division involved with large scale risk management issues. LAPD has successfully employed a CompStat process that allows measurable results. Such statistics driven analyses can assess unit commanders' efforts to successfully manage their responsibilities. SCIF or other statistics driven analyses will assist in the responsible operating of the Department and provide another forum for evaluating progress on efforts to end Deputy Gangs and Deputy Cliques.  The Department should track force incidents by shifts or deputy partners, checking for, and assessing, patterns that may indicate the need for re-assignments, transfers or,

discipline.

The Department should implement a "performance mentoring" process, overseen by Risk Management Bureau ("RMB"). The object of the program should be to identify "at-risk" employees by means of the automated "early identification and intervention system".

Active management will determine the cause and the means of rectifying patterns of problematic conduct. Where leadership perceives the behavior as curable and non-recurrent, a mentoring program specifically designed to help the employee avoid future misconduct should be enacted.

**7.     The Department must ensure that captains hold sergeants and lieutenants accountable for deputies under their supervision involved in Deputy Gangs and Deputy Cliques.**

It is essential that captains and lieutenants back up sergeants who face insubordination from members of Deputy Gangs and Deputy Cliques. Fulfilling this recommendation is a fundamental duty of captain- and lieutenant-level managers. They must assess lower ranking managers and supervisors as to their commitment to convey, support and enforce the Sheriff's vision and intentions about Deputy Gangs and Deputy Cliques. Failure on the part of a captain to meet this obligation should be grounds for transfer or other appropriate employment action.

**8.     The Department must ensure that sergeants actively and recurrently mentor deputy personnel and enforcement of the policy prohibiting Deputy Gangs and Deputy Cliques.**

For sergeants to succeed in conducting the policy prohibiting Deputy Gangs and Deputy Cliques they must be supported by the chain of command. The persistence of these groups is due in part to sergeants perceiving that higher ranking officers will not

59

support them. With that perception, much of the incentive for a sergeant to actively seek to eliminate such groups is removed. Creation and systematic use of a data base tracking the date, time, setting, duration, topics covered, personnel in attendance, and identity of mentor will allow assurance that the policy of the Sheriff is reenforced by those closest to the deputies who might consider participation in a Deputy Gang or Deputy Clique.

9.    **The Sheriff should flatten the chain of command by eliminating at least one layer of supervision between him and the captains running patrol stations.**

As noted earlier in this Report, the Department's decentralized station- based structure has played a significant role in fostering Deputy Gangs and Deputy Clique. Deputies' loyalties are extended to the station rather than to the institution of the Department as a whole.

Despite some Sheriffs' prior efforts to eradicate Deputy Gangs and Deputy Cliques some patrol station captains where these groups have flourished have found it easier to do nothing than take them on. The COC interviewed several captains of stations with widely known, active Deputy Gangs or Deputy Cliques who professed to know nothing about them despite extensive media coverage of scandals and widespread awareness of deputies of their presence.  Because of the relative ease of the "do nothing" choice, information has not consistently flowed up to Commanders, Chiefs, and Assistant Sheriffs. That must change. Shortening the chain of command will assist the Sheriff in seeing that his policies will be enforced.

Currently, there are six layers of reporting from a Captain of a Patrol Station to the Sheriff (Captain to a Commander to a Chief to an Assistant Sheriff to the Undersheriff to the Sheriff). This top-heavy structure has led to a level of autonomy at

60

certain patrol stations that has contributed to the continuation of these groups. Some have equated patrol stations to functioning more like fiefdoms than integral parts of a command structure where policy is implemented throughout the Department.

This level of autonomy would be ameliorated by a shorter chain of command which the Sheriff could accomplish in a number of ways. At a minimum, the Assistant Sheriff for Patrol Operations should be a direct report to the Sheriff.

**10.** **The prohibition against joining or participating in Deputy Gangs or Cliques should be a condition of employment.**

Once the Sheriff adopts Recommendation No. 2, above, non-participation in Deputy Gangs or Deputy Cliques should be an express condition of employment. Such a condition will make clear from inception what will not be tolerated by the Department.

## VI.   CONCLUSION

Special Counsel respectfully urges the COC to consider the factual findings and recommendations in this report and to deliver the report to Sheriff Luna for his consideration.

There can be no doubt that Deputy Gangs and Deputy Cliques have been, and still are, responsible for undermining discipline, morale, and safety of the public and Department personnel. Deputy Gangs and Deputy Cliques, as the seed from which Deputy Gangs grow, must be eliminated. Sheriff Luna has an opportunity to set the Department on the right path in the best interests of the Department and the community. Special Counsel recommends that the COC adopt the Report and Recommendations and deliver it to the Sheriff.

# EXHIBIT A

## CIVILIAN OVERSIGHT COMMISSION'S PROPOSED POLICY PROHIBITING DEPUTY CLIQUES

## PREAMBLE TO PROPOSED POLICY

*The policy set forth below is based on the following factual findings:*

*The existence of deputy cliques within the Los Angeles Sheriff's Department (LASD) dates back at least to 1971 and continues to the present. Deputy cliques are groups of Sheriff's deputies, assigned to a particular LASD patrol station or unit, who self-associate, self-identify and exclude other deputies assigned to the same station or unit, and thus are a subgroup within a particular station or unit. The deputy cliques identify themselves by name, e.g., the Banditos, the Executioners, the Regulators, the Grim Reapers, the Rattlesnakes, the Cowboys, etc., and often their members have common or matching tattoos or use hand signals, and engage in other rituals similar to street gangs.*

*The existence of deputy cliques within the LASD for the past fifty years has created myriad internal and external problems. Internally, the deputy cliques hurt morale within the LASD and create a shadow-system of supervision and leadership in conflict with each station's actual supervision and chain of command. Externally, the deputy cliques foster an "us-against-them culture" that leads to frequent and excessive uses of force, dishonesty, racial profiling, and the enforcement of a code of silence. The totality of deputy clique misconduct has eroded trust and mutual respect between the LASD and the communities they are supposed to serve.*

*The more notorious deputy cliques—such as the Vikings, the Wayside Whites, the Regulators, the 2000 Boys, 3000 Boys, the Jump Out Boys, the Posse, the Grim Reapers, the Banditos, and the Executioners—have generated scandals that cast the Department in a negative light and lawsuits that ultimately cost the County millions of dollars in settlements and judgments. The Los Angeles County Counsel has estimated that the clique-related misconduct and uses of force have cost the taxpayers at least $55 million in settlements. The actual settlement costs are likely much higher than this because LASD leadership has refused to investigate whether any deputy involved in a shooting is affiliated with a deputy clique.*

1

For decades, independent oversight bodies and commissions have identified deputy cliques as a serious problem within the LASD and recommended that the leadership take affirmative action to eradicate deputy cliques.

In 1992, the Kolts Commission investigated use-of-force problems associated with patrol deputy cliques, such as the Vikings, and concluded that some members "appeared at least in times past to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs." (Kolts Report at 323.) The Kolts Commission recommended that LASD officials "conduct an immediate, thorough Internal Affairs investigation to root out, and punish severely any lingering gang-like behavior by its deputies." (Id. at 332.) The LASD leadership declined to implement this recommendation.

In 1999, the United States Commission on Civil Rights released a report on use of force and police misconduct in Los Angeles, which addressed deputy cliques within the LASD. (Racial and Ethnic Tensions in American Communities: Poverty, Inequality, and Discrimination: Vol. V the Los Angeles Report.) The Commission stated, "Serious allegations persist that groups of deputies have formed associations that harass and brutalize minority residents." (Id. at 220). While the Sheriff had testified at one of the hearings that the LASD had no cliques, the Commission noted that he had recently acknowledged the existence of "an organized vigilante group of LASD employees" called the Posse that assaulted mentally ill inmates in their custody. (Id.) The Commission recommended, "The LASD should initiate a careful investigation into allegations of other deputy gangs," and urged the United States Department of Justice to open an investigation, as well. (Id.)

In 2012, the Citizens Commission on Jail Violence (CCJV) investigated use-of-force problems associated with custody deputy cliques, such as the 2000 Boys and the 3000 Boys. Like the Kolts Commission, the CCJV concluded that "the Department has a long history of deputy cliques" and that "these subcultures within the Department contributed to acts of insubordination, aggressive behavior, and excessive force in the jails for many years." (CCJV Report at 101.) The CCJV warned, "Cliques of deputies that resist or undermine supervision, violate Department policies, exert negative influences over deputies, use frequent and excessive force against inmates, and engage in violent behavior against members of the public and other deputies represent threats to the very integrity, ethics, and mission of the Department." (Id. at 104.) The CCJV recommended that

2

*"Department leaders should actively discourage membership in deputy cliques and avoid promoting or condoning a culture of allegiance to a subpart of the Department." (Id. at 115.)*

*Despite these prior findings and recommended reforms, deputy cliques within the LASD have persisted. For example, a relatively new deputy clique, the Banditos, has emerged at the East Los Angeles station. Several female deputies have alleged they were pressured to provide sexual favors to Banditos in order to remain working at the station. At a September 18, 2018 off-training party, several Banditos severely beat new deputies whom they didn't want to work with at the East Los Angeles station. The Office of Inspector General (OIG) found that that the LASD internal investigation of the incident deliberately ignored the assailants' clique-affiliation as a motive for the assaults. The OIG concluded, "Substantial evidence exists to support the conclusion that the Banditos are gang-like and their influence has resulted in favoritism, sexism, racism, and violence." (OIG, Analysis of the Criminal Investigation of Alleged Assault by Banditos (Oct. 2020) at 29.)*

*Another new clique, the Executioners, has emerged at the Compton station. According to a recent whistleblower lawsuit filed by a Compton deputy, the Executioners exclude African Americans and women, and assault and retaliate against other deputies who challenge their authority at the station. "Prospects" who want to join the Executioners allegedly "chase ink" (i.e., seek to obtain permission to get an Executioners tattoo) by shooting somebody to prove that they are worthy of wearing their tattoo. The whistleblower has testified that the two deputies involved in the fatal shooting of Andres Guardado were prospects seeking to join the Executioners at the time of the shooting.*

*While some of the historic deputy cliques are gone, there is evidence that a number of deputy cliques are still in existence. They include: the Banditos (East LA station),[1] the Cowboys (Lancaster Station),[2] the Executioners,[3] the Grim Reapers,[4] the Rattlesnakes (Palmdale and Lancaster stations),[5] and the Regulators (Century Station).[6]*

---

[1] See 50 Years of Deputy Gangs in the Los Angeles County Sheriff's Department, Loyola Law School, Jan. 2021, at pp. 4-7.
[2] Ibid., p. 10.
[3] Ibid., pp. 10-11.
[4] Ibid., p. 12.
[5] Ibid., p.18.
[6] Ibid., p. 18.

3

*Efforts short of an outright ban on participation in deputy cliques have been ineffective. For example, despite a new policy adopted by the Sheriff in February 2020, there has not been one instance in which a deputy has been disciplined for his participation in a deputy clique.*

*In view of the foregoing, the only effective way of eradicating deputy cliques is to adopt the policy below which clearly prohibits, henceforward,[7] participation in, joining, or soliciting others to join a deputy clique.*

## MANUAL OF POLICY AND PROCEDURES

### 3-01/        -   Joining and Participation in Deputy Cliques is Prohibited

Department personnel shall not participate in, join or solicit other Department personnel to join a deputy clique. A deputy clique is a group of Sheriff's deputies, assigned to a particular LASD station, unit or bureau, who self-associate, self-identify and exclude other deputies assigned to the same station or unit, and thus are a subgroup within a particular station or unit. Deputy cliques identify themselves by name, *e.g.*, the Banditos, the Executioners, the Regulators, the Grim Reapers, the Rattlesnakes, the Cowboys, etc., and often their members have common or matching tattoos or use hand signals, and/or engage in other rituals and behaviors similar to street gangs.

Any Department employee who participates in or joins a deputy clique, or solicits another employee to join a deputy clique, will be subject to discipline.[8]

Deputy cliques include but are not limited to the Banditos, the Executioners, the Regulators, the Grim Reapers, the Rattlesnakes, and the Cowboys and participation in or joining these deputy cliques is specifically prohibited.

This policy supersedes and replaces 3-01/050.83 of 2/14/2020

---

[7] The Policy set forth below is not intended to be retroactive. However, an employee of the LASD who joins, participates in a deputy clique, or solicit another employee to join a deputy clique on or after the effective date on which this Policy is adopted is subject to discipline for violation of the Policy.

[8] The Table of Discipline must provide for this as a distinct MPP violation. The range discipline for violation of this policy should range from reprimand, involuntary re-assignment, to and including termination.

4

*Posted 4.15.2021*