EXHIBIT D

**EXHIBIT**

Ext 7 - Neal Tyler - AB 7549684

exhibitsticker.com

LOS ANGELES COUNTY SHERIFF

CIVILIAN OVERSIGHT COMMISSION

OCTOBER 14, 2022

SPECIAL HEARING ON DEPUTY GANGS IN THE SHERIFF'S DEPARTMENT

MEMBERS

COMMISSION EXECUTIVE DIRECTOR BRIAN K. WILLIAMS

COMMISSION CHAIR SEAN KENNEDY

COMMISSIONER ROBERT BONNER

COMMISSIONER PATTI GIGGANS

COMMISSIONER HANS JOHNSON

COMMISSIONER IRMA HAGANS COOPER

COMMISSIONER JAMES P. HARRIS

COMMISSIONER LUIS S. GARCIA

COMMISSION STAFF INGRID WILLIAMS

ATTENDEES

Commission Executive Director, Brian K. Williams

Commission Chair, Sean Kennedy

Commission Staff, Ingrid Williams

COMMISSIONERS:

    Robert Bonner

    Patti Giggans

    Irma Hagans Cooper

    James P. Harris

    Luis S. Garcia

    Hans Johnson

    Special Counsel:  Bert Deixler, Kendall, Brill & Kelly, LLP

    Special Counsel:  Anthony Pacheco, Vedder Price

    County Counsel:  Danielle Vappie

| Witnesses | Page |
|---|---|
| 1   Neal Tyler, LASD Executive, retired | 11 |
| 2   Eric Strong, LASD Lieutenant | 94 |

| Exhibits | Page |
|---|---|
| 1   "Sergeants' Mentoring Initiative Resource Guide" | 38 |
| 2   "Background Information About LASD and Deputy Subgroups" | 58 |
| 3   "Considerations for LASD Action Concerning Deputy Subgroups" | 59 |

/ / /

Public Comments                                                  Page

1     Steve Krueger                                          133

2     Vanessa Perez                                          136

3     Jacqueline Venters                                     138

4     Ron Dowell                                             139

5     Ernest Moore                                           140

6     MJ King                                                142

7     Stephanie Luna                                         143

P-R-O-C-E-E-D-I-N-G-S

CHAIR KENNEDY:  Okay.  It's 9:02, so I think we are going to -- I think we're going to start our seventh special hearing on deputy gangs.  I think the first thing we need to do is do the roll call.

MS. WILLIAMS:  Commissioner Bonner?

COMMISSIONER BONNER:  (No audible response.)

MS. WILLIAMS:  Commissioner Cooper?

COMMISSIONER COOPER:  Here.

MS. WILLIAMS:  Commissioner Garcia?

COMMISSIONER GARCIA:  Here.

MS. WILLIAMS:  Commissioner Harris?

COMMISSIONER HARRIS:  Here.

MS. WILLIAMS:  Oh, I'm sorry.  I skipped -- Commissioner Giggans?

COMMISSIONER GIGGANS:  Here.

MS. WILLIAMS:  Vice Chair Hicks?

VICE CHAIR HICKS:  (No audible response.)

MS. WILLIAMS:  Commissioner Johnson?

COMMISSIONER JOHNSON:  (No audible response.)

MS. WILLIAMS:  Chair Kennedy?

CHAIR KENNEDY:  Here.

MS. WILLIAMS:  And Commissioner Rubin?

COMMISSIONER RUBIN:  (No audible response.)

CHAIR KENNEDY:  She may be attending via Zoom, but I don't

see her.

Well, I think we -- I think we have enough commissioners to proceed so we're going to start this.

First -- first thing on the agenda are reports from myself and our able special counsel, Bert Deixler.  So why don't we begin.

I just want to start...

DIRECTOR WILLIAMS:  We have one other item.

CHAIR KENNEDY:  Okay.  You want to begin that?

DIRECTOR WILLIAMS:  Sure.  Just very, very quickly.

As you know, we've been having these special hearings, and we, as a result, have cancelled our regular commission meetings during the same months to give staff the time and the commission time to prepare for the special hearings.  I was thinking that it might be appropriate at this point to just go ahead today and cancel our October 20th, November 17th, and perhaps December 15th meetings until we finish the special hearing period.  That'll also take us past activities that are happening early November in terms of the election as well.  Some of our staff will be involved in volunteering for the election process.

CHAIR KENNEDY:  I think that we're going to have an eighth special hearing two weeks -- is it two weeks from today?

Is that right?

MR. DEIXLER:  Yes.  And I was going to report procedurally

that on Monday morning at 8:30, the motion to enforce the subpoena for the testimony of the Sheriff and to have him held in contempt is going to be heard in the Los Angeles Superior Court and --

CHAIR KENNEDY:  This is one of the --

MR. DEIXLER:  One of --

CHAIR KENNEDY:  -- the contempt hearings; right?

MR. DEIXLER:  Yes.  The one that's being heard on Monday.

There's another one that has now been pushed to December 7th, the day that'll live in infamy, and in connection with that, the County Counsel's outside lawyer who had -- who is handling that matter has asked for a specific date to request the Court to order the Sheriff to appear for his testimony.  I suggested October the 28th -- it's a Friday, and it's two weeks hence.  If that doesn't work, then it'd be helpful for me to know so I can communicate that before Monday morning so the counsel will be in a position to inform the Court should -- should the Court order testimony to proceed.

CHAIR KENNEDY:  Okay.  How does that sound, Mr. Executive Director?

DIRECTOR WILLIAMS:  That's fine.

CHAIR KENNEDY:  Okay.

DIRECTOR WILLIAMS:  That's fine.

CHAIR KENNEDY:  I will try to book this room and let you know if I'm successful.

COMMISSIONER HARRIS:  Hang on.  Hang on before we start the victory lap here.  I've got a real hard conflict that day because I -- I anticipate that day may take more than four hours.

CHAIR KENNEDY:  The problem is that everyone has a conflict no matter what date we have, JP.

COMMISSIONER HARRIS:  Okay.

COMMISSIONER GIGGANS:  What is the actual date?  What's he talking about?

CHAIR KENNEDY:  He said October 28th.

MR. DEIXLER:  Two weeks from today.

CHAIR KENNEDY:  Well, let's hold that thought because, JP, I don't even know that -- that I can get this room, you know, so -- but that's our plan.

MR. DEIXLER:  And I might -- I might also say it's outcome-determinative on the hearing on Monday, should the judge decide to not do it or to set a different date.

COMMISSIONER COOPER:  Okay.

MR. DEIXLER:  I have one more administrative matter, if I could attend to it, which is --

COMMISSIONER HARRIS:  Oh, okay.  There you go.  We are confused a lot, I know this.

DIRECTOR WILLIAMS:  So just to be sure Mr. -- Mr. Chair, we will cancel October 20th and November 17th meeting, and then we will wait to see what happens in December --

COMMISSIONER GIGGANS:  Sound is not working.  These mics -- I'm not -- I'm not hearing anyone.

DIRECTOR WILLIAMS:  Testing.  Testing.  Yeah.  I think -- I think they're just low.

So we'll act accordingly.

Thank you.

CHAIR KENNEDY:  Okay.  Commissioner Bonner has joined us, so we -- we have an almost full house.

JP, we're going to try to work it out.

COMMISSIONER HARRIS:  I -- I -- I understand.  I appreciate that.  As long as you know, and if it can't be worked out, oh, well, we'll -- we'll work around it.

CHAIR KENNEDY:  So we're going to begin this hearing, and I just -- it's time to make some initial remarks.

So I want to highlight the fact that last February, Sheriff Villanueva openly challenged officials to give him the facts about deputy gangs and to name individuals in the Department who are gang involved.  The COC accepted that challenge, which is why we are holding these special hearings.  This is our seventh special hearing with live witnesses.

Myriad deputies have already testified under oath that deputy gangs exist in the Department, and some witnesses have identified specific individuals who have deputy gang tattoos, including Undersheriff Murakami and the Sheriff's former chief of staff, Larry Del Mese.

The Sheriff's response has been to attack this commission and his own deputies and pronounce at a recent televised debate that deputy gangs are like, quote, "unicorns," unquote, meaning they are the stuff of fairy tales rather than things that actually exist. Sheriff Villanueva simultaneously argues during the campaign that he is the only sheriff in LA history to take decisive action to eradicate deputy gangs from the LASD.

These inconsistent positions cannot be reconciled with each other, and for that reason and others, this commission has subpoenaed Sheriff Villanueva to explain his inconsistent positions, but he has refused to appear, citing these reasons:

He is simply too busy to testify. He fears for his safety at Loyola Law School. It is unconstitutional to compel him to testify under oath at an oversight hearing. He cannot be expected to testify about deputy gangs without first being given all the questions in advance of the hearing. And finally, the COC has no right to investigate deputy gangs in the department that it exercises oversight over.

Most recently, Sheriff Villanueva has barred the inspector general, Max Huntsman, from entering all LASD facilities or accessing any LASD documents. The effect of this order is to further inhibit oversight officials from investigating deputy gangs.

We will not be dissuaded from our mission to investigate deputy gangs within the LASD.  The Sheriff's intimidation tactics will not prevent this commission from moving forward, and to that end, I turn it over to our special counsel to make any remarks and call any witnesses he would like to call today.

COMMISSIONER BONNER:  I wonder, before counsel does that, I just wanted to perhaps add a footnote to the comments of the Chair here, and that is that the claim by the Sheriff that he's taken decisive action against deputy gangs, cliques, and exclusionary subgroups, I mean, the proof is always in the pudding.  The reality is the actions that he claims he took in February of 2020, over two years ago, have not been effective.  They have not been effective.  They have not eradicated deputy cliques, gangs, or exclusionary subgroups from the Sheriff's Department, and the evidence that's been produced so far by special counsel in this hearing demonstrates that beyond doubt.

His policy's been -- it's not been effective, and we'd like very much to have an opportunity to discuss that with the Sheriff as to what -- why he believes his policy has been effective when deputy -- deputy gangs and cliques still exist, still have pernicious effects, both -- not just on the -- the community, which they do, no doubt about that -- but they have a terrible and disastrous effect on the Sheriff's Department itself, its deputies and its personnel, and it's time that they

be eradicated.  Whatever else the Sheriff may have done, he has not done that.  Full stop.

Thank you.

CHAIR KENNEDY:  Bert?

MR. DEIXLER:  Thank you.  Good morning.

Our first witness is Neal Tyler, and if I can be excused to get him.

CHAIR KENNEDY:  Yes.

Can you state your name for the record.

MR. TYLER:  Yes.  It's Neal, N-e-a-l, Tyler, T-y-l-e-r.

CHAIR KENNEDY:  Can you raise your hand.

Do you swear or solemnly affirm, under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

MR. TYLER:  I do.

CHAIR KENNEDY:  Thank you.

MR. TYLER:  Thanks.

CHAIR KENNEDY:  Bert, could you make sure you speak into the microphone because some commissioners are having a hard time hearing you.

MR. DEIXLER:  Yes.  I will -- I will endeavor to do so.

And I should note for the record that Commissioner Johnson has now joined us.

CHAIR KENNEDY:  Welcome.

Commissioner Johnson is our newly appointed

commissioner for Supervisor Solis's district.

So welcome.

MR. DEIXLER:  Let me begin if I can, and if my voice drops, if somebody would make sure to remind me since this is for your benefit, not for mine.

Mr. Tyler, have you any experience in law enforcement?

MR. TYLER:  Yes, I do.

MR. DEIXLER:  And for whom did you work in law enforcement?

MR. TYLER:  The Los Angeles County Sheriff's Department.

MR. DEIXLER:  And how long did you serve with the LASD?

MR. TYLER:  Over a period of 42 years.  About 40 full-time years as a regular member of the Department.

MR. DEIXLER:  And what was the highest position you held in the LASD, sir?

MR. TYLER:  It was undersheriff.

MR. DEIXLER:  And during what period of time did you serve as the undersheriff?

MR. TYLER:  Between February of 2014 and March of 2017.

MR. DEIXLER:  And would you provide the commission a very brief summary of your career in the LASD, noting that it's 42 years so --

MR. TYLER:  Okay.

MR. DEIXLER:  -- give us the greatest hits, if you would.

MR. TYLER:  I began in 1975 as a regular deputy.  My two assignments as a deputy were at Lennox -- well, Inmate Reception Center first and then Lennox Sheriff's Station.

As a sergeant, I worked at Central Jail, again at Lennox Station, and also in the Media Relations Section.

As a lieutenant, I worked at Lennox again, and then at Temple and then also the Training Bureau.  In there sometime, I was on the Crisis Negotiations Team.

I was promoted to captain, and I served at a special unit that was created to do audits and ensure accountability, the Training Bureau; and then at Temple Sheriff's Station, I was the station commander for two-and-a-half years.  I remained in the Patrol division that Temple was part of, which was called Region One, as a commander, and for ten years as the division chief of that division, overseeing the eight northernmost sheriff stations in LA County.

I retired in 2012 as a division chief.  I was gone for a year and a half retired but serving as a reserve deputy.

Then in 2014, interim Sheriff John Scott asked me to be his undersheriff for the 10 months that he'd be in office; and when he left office, I was prepared to go out with him. But Sheriff McDonnell didn't have a different idea about who to appoint to that position and so he asked me to stick around for a few months and it turned out to be two years.  So then he was ready to pick an undersheriff that wasn't inherited from the

previous guy, and that's when I left.

MR. DEIXLER:  I've asked you to consider what you would tell me, if I were the sheriff, was a way to address the problems of deputy subgroups, and we'll get into your background about it.  And -- and other than perhaps telling me that a sheriff should honor subpoenas, would you believe you would be advising me on a culture change in the department in which you serve for 42 years?

MR. TYLER:  That's a general way to say it, and I'd say there's more than one approach potentially available to you, Sheriff Deixler.

I would share with you the fact that over the course of my career, I had observed various actions taken about the deputy subgroups that were effective on a small scale but not on the widespread scale necessary.

I would share with you that I felt that -- one of the main issues about the subgroups hasn't been looked at very hard and that is not why do deputies join the subgroups but what can be considered either missing from or lacking in management that enabled the subgroups to flourish, to be created and thrive for up to 50 years?  Management covers a lot of ground.  There have been hundreds of managers since the 1970s.

MR. DEIXLER:  Let me -- let me ask the next question.  Are there specific elements that are critical to bringing about a change in culture in your 42 years of experience?

MR. TYLER:  I believe there are and the ones --

MR. DEIXLER:  And what are they?

MR. TYLER:  -- that I've identified myself for my own sanity and thinking through what we were going to do with this idea about what's missing about management are leadership, teamwork, mentoring, and accountability.  Four things that don't cost anything.  There's no extra budget required to implement better leadership, teamwork, mentoring, and accountability but are critical to the Sheriff's Department in general and, in particular, this issue we're discussing.

MR. DEIXLER:  We'll come back to the elements, I promise you.  But let me ask you to define terms so that we will understand what we are speaking about.

What do you want the commission to understand when you use the term "deputy clique" or "subgroup" or "subculture"?

MR. TYLER:  Well, the term I've been using since I was more deeply involved in addressing this issue is "subgroups."  Just happens to be the one I picked.  I know cliques, gangs, and secret societies have been named too.  My concern about the various names is that they make discussions about them ambiguous.

And my thought is that the groups that we -- that are discussed with concern, about which I have concerns, have three features, and those three features are what raised the concerns.  They are exclusiveness about who's a member or who

is potentially going to become a member, a degree of secrecy about everything concerning the group, membership lists, how people become members, how people are rejected from membership if they aspire to join, activities, if there are any things, quote/unquote, "bylaws," if there are.  There's just no readily available information about the groups I'm aware of that enables us to understand these things.  And the third feature is symbolism that involves graphics that I consider -- well, in fact, I'm not the only one that considers -- unprofessional, often ambiguous about power or worse, threatening about power, and many cases, about death and violence.  Inappropriate symbolism is the third feature about the subgroups of concern to me.

MR. DEIXLER:  I should ask in light of Commissioner -- Chair Kennedy's remark, you described the terms "deputy clique, subgroup, gangs," and the like.  Have you ever heard those groups described as "unicorns" during the 42 years that you were in the LASD?

MR. TYLER:  No.  Not until I heard some news report or some discussion on the speaker in there this morning.  I hadn't heard that one.

MR. DEIXLER:  Have you -- have you been involved in devising a plan to address the problem with subgroups?

MR. TYLER:  I have.

MR. DEIXLER:  And -- and would you describe what your

initial involvement was, sir?

MR. TYLER:  Three months after I retired in March of '17, I received a call from Undersheriff La Berge, my replacement, that he and Sheriff McDonnell and Max Huntsman had had a meeting, and an outgrowth of that meeting was that the Department would do the first-ever systematic, widespread study of the deputy subgroup issue and that the three of them had agreed that I, because of some experience I'd had previously, would be a logical person to begin undertaking that study.

So I got that assignment as a reserve deputy, and I worked on it for a year-and-a-half, 2017 and '18, with a fairly large group of representatives from the County Counsel's Office and developed a study methodology and came to some realizations about the proper way to do this study that I thought made it potentially very valuable.

MR. DEIXLER:  And tell us a little bit about how you would have proposed to have the study initiated; in other words, (inaudible) first direct your inquiries.

MR. TYLER:  Well, if we ask the question what has been lacking in or missing from management, the logical place to start is at the undersheriff level and work our way down toward the deputy level instead of doing surveys and questionnaires and interviews with deputies.

If we had decided on the deputy route first, which I had in my mind for about a week before I thought more clearly,

we would have created just one more giant batch of resistance and potentially some bloodletting because there'd be very little -- the deputies would be justified in thinking or saying, "What's up with that?  You always blame the deputies. You always blame the line level.  Just like in any organization, rolls downhill 'til it comes to the bottom guy, and it's his fault somehow."

And while that doesn't cow me into thinking we shouldn't do it, that inspired me to think about, "Well, isn't there somebody else we should be talking with?"  And it's the managers.

So the point to starting with them is to start to build a leadership team -- I said teamwork was one of the major aspects or elements of what I believe something that could work or be more effective than what we've done in past history -- build a leadership team that's cohesive and raise awareness about management's role with respect to the deputy subgroups, which I will admit, as a former manager, all of us have a sense of -- or I mean, a share of the responsibility for being insufficiently attentive to this issue.  We've got umpteen reasons for it, and some of them are valid, but none of them really explain a justification for having it get to this point when there been a whole series of sheriffs, undersheriffs, assistant sheriffs, captains, and lieutenants, and sergeants. So if we accept the responsibility for missing some bets about

addressing the problem, now is the time we can correct it.

And the questions that I had devised for the interviewer intended to be the basis for deep introspection about that issue on the parts of the interviewees, which would be, at the time, Undersheriff La Berge and the four assistant sheriffs, to begin with.

MR. DEIXLER:  Could you just give the commission a feel for the methodology, the question type that you would have asked in the circumstance and how you would have gone about this?

MR. TYLER:  I have a lot of experience in facilitating discussion groups.  So I wrote questions that would facilitate discussion.  Not yes/no answers, but --

MR. DEIXLER:  Let --

MR. TYLER:  Oh, I'm sorry.

MR. DEIXLER:  -- let's hold up a second and -- and -- and let the distraction go --

COMMISSIONER GIGGANS:  Sorry.

MR. DEIXLER:  Not a problem.

MR. TYLER:  Right.  I like the song.  Okay?

So anyway, I wrote questions that would elicit discussion rather than pat, simple "yes," "no," or "I don't know" answers.  And it would result in the interviewer -- who initially I had thought would be me because I was deputized to do the project -- between the interviewer and the interviewee,

a fellow former executive, who I knew in this case all four

of -- or five of, and trusted them to be honest with me and to

allow themselves to be introspective about what they could be

doing and what we ought to be doing in the future.

The questions were -- I don't know if you want detail

about the questions.

MR. DEIXLER:  Well, give us a more sense -- some general

sense of what the type questions were so that we could have a

feel for it.

MR. TYLER:  Well, it's a series of questions that take

eight pages, double-spaced, and it has to do with initially

asking -- and remember, these questions were designed for

executives.  If we were to interview deputies, we'd change the

nature of the questions as appropriate as we get to that point.

But for now, they had to do with:  Have you ever

overseen a unit?  What do you know about these groups?  What's

your -- what's the basis of your knowledge?  How did you become

familiar with them?  At what point in your career did you learn

about them?  Do you currently have any in your -- under your

section of responsibility?  What do you -- again -- what do you

know about them?  How much?

The second series of questions was a little more

personal, and I had hoped to get a green light on being --

before I tell you about that, I want to say, at the beginning

of the interview, there was going to be a five-minute spiel by

me reassuring a person that this is not an investigation, it's not an inquisition, it's only an attempt to learn.  One of the problems managers had is the secrecy aspect.  Nobody comes and asks us if it's okay to form a subgroup.  Nobody comes and notifies us how successful they've been in building up the membership.  So since we're ignorant, this is a genuine attempt to learn.

There are deputies who can at least somewhat convincingly express their support for this idea of a subgroup by saying it's good for morale; it's merely a rite of passage; we're not involved in criminal activity of any kind.

That's a myth.  I'm not saying nobody who's ever gotten a tattoo has never committed misconduct, but I'm telling you, I haven't and I'm proud of my tattoo and it's no different than the military symbols you see that are either grizzly or about death and violence.  It's reflective of the danger of ensuring public safety.

That rationale, which I've heard from people who have tattoos and are members, is something we have to deal with, and I want to know more about it.  I want to know how they can have that mindset in the face of the drawbacks, which, as I said are -- exclusiveness is not good for morale, secrecy is not good for their reputation as members of the group, and the symbol is just -- are not professional.  I don't care about the military.

So I made sure that the first five minutes would be reassuring. "I want to know about this stuff. I'm not here to judge. I'm here to listen."

"Okay."

Then part two of the question series was, "Are you now, or have you ever been?"

And I was going to make sure, with the Sheriff's concurrence, that the person understood he didn't have to answer that. If he didn't want to say yes or no, he could say "I'd rather not discuss it," and we'd skip over the whole interview series of questions about a person's personal involvement.

If they were willing to tell me anything, as I've had people who were subgroup members do, I try to vacuum their brain and make sure we knew all their thoughts about the motivation, why other people join, how they feel about the exclusivity, how the members of the group (inaudible) at the sheriff's stations or the jails or the bureaus where these things have arisen, et cetera.

If they didn't want to talk about their own involvement (inaudible) ask the same questions of people and say, "Well, what do you believe to be the case? What is your sense about how the members relate to other deputies?"

When I was done with that series of questions, there were two more. One had to do with, again, the peer

relationships and the morale aspect of the groups and get in the executive's head or the manager's head about "Does -- do these things concern you that," you know, "there are" -- whatever -- "hardly any women?  Certain people have said they were excluded because they work a traffic car instead of a crime car.  How do you feel about those things?"

And the last series of questions was about what can management do to support this study, as controversial as it may be or it may not be if we play our cards right.  We're a manager.  What can we all be doing to make sure that the study is explained to people at each successive rank correctly so that they understand it's good to talk to us, not bad to talk to us because we're learning?

That was the idea of the interview questions.

MR. DEIXLER:  So -- so -- so that's a -- that's a lead-in to my next series of questions about the elements you've described.  Your first element you mentioned was leadership and, with it, teamwork.  What does leadership entail when it comes to changing the culture of -- of an organization as large as the LASD?

MR. TYLER:  Well, first of all, the Sheriff is the top leader of the Department, and he has to establish a message about Issue A, B, or C.  In this case, Issue A is a deputy subgroup issue.  And the first message I'd expect the leaders to get straight in their head is "Here's what the study is for.

We have legitimate reasons for concern. This is not a joke. It's a serious matter. If we don't learn about this and figure out how to respond more effectively to public concern and the lack of public trust about this, then we're going to get" -- and then, you know, whatever -- "outside monitor, special master, consent decree, et cetera, et cetera, et cetera, and, you know, our pants sued off of us has been already happening."

So a leader in this case, once the sheriff tells us "Here's what I want leadership about," we have not only resolve about getting the right message out -- and initially, the message was to be "The study is legitimate. Please cooperate with whoever is conducting it, and it's an honest attempt to learn. It is not an investigation. As the study proceeds, I, the sheriff, tend to be formulating more definitive reactions to what I'm learning."

The second thing a leader needs is energy to talk about it on his own volition, actively, frequently, recurrently, not let it slip onto the back burner. And I'll point out that the issue of deputy subgroups has been on the front burner multiple times when something criminal or inordinately notorious like a fight among deputies went on, and it tends to slip to the back burner when all becomes quieter about the issue. That's management's -- I hate to say "fault" -- but responsibility. Everybody's busy. We're juggling a lot of balls. There are lots and lots of

considerations about public safety in the modern world besides deputy subgroups, but that mentality is something we ought to get rid of and start keeping it on the front burner, and that's what a leader would do.

MR. DEIXLER:  You indicated that the place you would start your questioning would be with the undersheriff.  Why would it be important for the undersheriff to first be surveyed?

MR. TYLER:  Well, for one thing, at the time we were planning this, the undersheriff was Anthony La Berge, and I knew that he had arrived at Lennox Station after I left as a lieutenant and he told me that he'd been invited to join the Lennox Station subgroup and that he turned it down.

He told me that years ago.  I don't know how it came up.  I -- I just -- just I asked him about the Grim Reapers once, innocently, back when he was a commander and I was a chief and I was interested to hear more about the story about how he had the -- take your pick -- courage, temerity, gall to turn down the opportunity.

The second reason is because he's at the top of the organization under the undersheriff, and everybody has to be part of a -- I'm going to mention the second word, teamwork, a cohesive team for this to really work in a department with 18,000 people and an unknown member -- number of participants in the -- in the problematic groups.  So it made sense to talk to him -- him first, and immediately thereafter, the four

assistant sheriffs because they're the highest-ranking people in the Department.

MR. DEIXLER:  Let me ask you:  Would you -- would you agree that having a tattooed member of a known subgroup as the undersheriff is contrary to the goal you're trying to achieve?

MR. TYLER:  It depends.  It depends on, in my estimation, the nature of the tattoo.  Some subgroup tattoos are, on the surface of it, unprofessional; some are more neutral or toward the neutral.  It depends on what that particular leader says and does about the tattoo.

If a hypothetical department member who had been promoted multiple times had a tattoo and it became known and he addressed it in a manner that I would consider very positive, I think he could be viewed as not in conflict with department -- whatever you said -- policy or department -- what's good for the Department because he could make a lot of positive hay about the fact that he, at his current station and even years ago, renounced his -- whatever it is -- membership or association, doesn't flash the tattoo around, doesn't brag about it, in fact, he's a little sheepish about it.  But hey, it's on his ankle and he's not man enough to get it removed, I would respect the guy greatly.  And potentially, I believe the two sheriffs that I worked for most recently as undersheriff would've also potentially respected that kind of response.

Otherwise, I'd say it's one of the things that's of

concern to me because if the person's going to be part of a cohesive leadership team and he's walking around with a tattoo that is unprofessional, that's a conflict of interest, and I don't see how he can be cohesive with the team.

MR. DEIXLER:  After the undersheriff would be interviewed under the scenario where I'm the sheriff -- I, by the way, add I don't have any tattoos -- what would happen next under the kind of waterfall of interviews and investigation that you've identified?

MR. TYLER:  Well, you know, we in the working group that did this work between 2017 and '18 had planned to regroup at some point and decide where are we heading from here, but it was clear to me that if we do the interviews, if I do or anyone -- anyone does the interviews of the four assistant sheriffs and the undersheriff, the next step is not more interviews.  The next step is a meeting between the sheriff and the interviewed people where they talk about the issue, the interviews, the questions, any conflicts they had about, you know, preliminarily determined destination or message that might go out.  They'd talk about the value of the study. They'd talk about whether the interview questions were spot on or should be revised.

And after that, it -- meeting occurred, I presume that if the sheriff thought this study was worth continuing that -- in order for the study to begin to transition into not

merely a study but an initiative for culture change because the realization too that dawned on me was, "Hey, by merely talking about this, we'll create the Hawthorne Effect." You know, turn the lights up, workers are better. Turn the lights down, workers do better. Why? Because someone is paying attention to them both times.

If we pay attention and talk about the paying attention, we're going to have an impact on the culture that we've never had before because we've never done what I'm talking about and that's continuously talk about it.

So once the sheriff -- my realization is "My gosh, you know, we can put together an initiative to change the culture by means of this study."

And I created a vision in my head anyway for how and at what stage the transition would occur to the point where the sheriff could say, "Here's what we're going to do. I know enough from hearing from my people, and this is the way I want to proceed," with some large degree of definition in -- about which groups are considered inappropriate enough to say we need to disband them, retire them, or whatever. I can talk more about that later.

But in answer to your question, after the meeting, the next group of people would be the 14 division chiefs, and I had thought that maybe by the end of 2018 -- very, very ambitious, and I was wrong -- we could get through at least

some of the division chief interviews.  And, again, a view toward letting them know this is a concern that we're not going to let lie dormant anymore because it never is really dormant. The sheriff's justified in learning more about these.  It's compelling because he has to make a decision about what to do about them to respond effectively.  So your cooperation is sought.  Talk to us about your knowledge.

And then after the division chiefs are all 14 interviewed, there'd be another meeting where the sheriff can sit with his executive staff group and make himself clear and determine if everybody's really on board or, with help from the assistant sheriffs, spot the people who are dubious about whether this matters.  Then the sheriff could make decisions about whether the division chief, for instance, would be effective in this effort or shouldn't be involved as a division chief.  Sheriff's prerogative is to use or not use division chiefs and above because they serve at his pleasure.  They're not Civil Service protected.  This is important enough that any sheriff might decide, well, 13 of you are for me, and one of you is neutral.  And if you're neutral, you're against me, so I can't use you as a chief.

Now that sounds cold, or maybe it doesn't sound tough enough, I don't know, but that is an option for the sheriff to consider.

MR. DEIXLER:  After the buy-in, after you have this

meeting and -- and the sheriff is satisfied that the assistant division chiefs have -- have bought in, how would it proceed next?

MR. TYLER: Well, my thought would be that consideration should be given at that point to getting deputy sheriff-level input.

I believe that once it's known that there is a study about the deputy subgroups that genuinely interested in learning about them, there will be members of the deputy rank who are in these groups who will be willing to be interviewed under safe, trustworthy circumstances. And I was hoping to -- to have some of those interviews conducted; whether I did it or not doesn't matter.

But at the same time, the division chiefs would be asked by the sheriff, in my hopes and dreams, "I want you to go interview your two commanders. You interview your five commanders. You interview your one commander with these same questions. Forget this outside reserve deputy, former-retired guy. Let's have the division chiefs find out where their direct assistant managers, who are running entire divisions of the Department with hundreds to even thousands of people in them, can verify with the commanders where their head is on this. 'Do you think this is a problem?' 'How do you rationalize that it's not a problem?' 'Okay. If it is a problem, tell me what you know about it.'"

And, of course, they may find that they have tattooed commanders with tattoos that are not flowers or anchors like sailors used to wear, and they can deal with that in a manner that's non-judgmental but also got to do with the ultimate upcoming leadership message because by the time we're talking with commanders and deputies, the sheriff, I believe, would be impatient to say, "Okay. Fine. Look, we've looked into this. On the surface, from what I know now about the depth of it, such as Tyler's gotten it for me, there's enough concern that I want the message to be..."

And then, as you know from the document that I sent you, there's a little writeup about what a sheriff might think makes sense as a message. I'm not the sheriff. I don't presume to -- and I've written stuff for the sheriffs, but this is a very personal and potentially emotional issue, and I think the sheriff should be entitled to phrase the message in his own manner. But the short version was something like these things don't correspond to 21st-century law enforcement. They're not good for morale, despite what I've heard, and the symbolism is unprofessional in at least some cases I verified and so the time has come to retire these groups into the past and leave them there, or something to that effect.

I don't think the sheriff is well-advised to say that until there have been at least some interviews of deputies if we can get them. Now, if 8,000 deputies tell us pound sand,

well, we tried.  But if anybody talks to us, and I've already had people talk to me and allow -- this was before this effort even started, back when I was the undersheriff, I had a sergeant come in and talked to me very candidly about his tattoo, what it means to him, and it was some of the stuff I -- I cited earlier about "I'm proud of it.  It's a morale builder.  It recognizes good, energetic police work.  Our symbol's not that unprofessional or grizzly" -- in his mind -- "and, you know, it's -- if you outlaw them, you'll just drive them deeper underground."

Well, we need to hear that from at least some people.  We also need to hear the extent to which it might be true.  I don't know that every single deputy subgroup is secretly planning activities that are considered misconduct.  I don't know that I -- in fact, I know that some people got the tattoo practically on a lark and it's not a significant factor in their life, but they feel like you belong to something that I don't necessarily understand.

So we don't want to be throwing too many babies out with the bathwater, but at the same time, we don't want -- I mean, I would think that a sheriff wouldn't want to be paralyzed by a two-year study.  My thoughts are that the consideration for action that I put together as part of that working group, and since then, I've thought about it -- stewing about the publicity that I've heard more and more about the

lack of -- or the impairments to public trust -- that if we interview down to the division chief level and then start getting deputies to talk with us who are willing to, including deputies who don't belong to the gangs, the deputies who tried to get into one and weren't allowed to, I'd like to hear from them too.  But that's about the time when the sheriff would be tapping his foot, expecting this study guy to tell him "Can I now say what I want to do?"

And by that time, he would be justified in telling deputies and the union "I have enough information to know that what I'm about to tell you is valid and important, and it's actually for everybody's good.  So here it goes," and then put something out that's definite.

MR. DEIXLER:  Talk a little bit about your sense of the involvement or possibilities of having the union cooperate with this kind of investigation.

MR. TYLER:  The working group I was on recognized right away that if the -- the union -- it's basically -- there are two primary involved units, and it's ALADS and POPA.  One represents deputies, the other, sergeants, lieutenants.  If they got wind that there was a secret, confidential thing being planned about the deputy subgroups, they would have a negative reaction right away.  So we kept our efforts confidential initially and, by some miracle, it remained confidential for a year that some former undersheriff was meeting with a bunch of

attorneys to figure what to do about this issue.

The point of the confidentiality is we were building to the day when the sheriff himself would go to the union and explain "We're conducting a study.  No, no.  Not an investigation, not an inquisition, a study.  We seek your cooperation.  Failing your cooperation, we seek your acquiescence.  We're telling you, eye-to-eye, face-to-face, it is not a negative thing.  We don't know enough about these things.  The public's calling them gangs.  We need to know more to be effective about managing the loss of public trust and fairness to the deputies.  So please, union, understand when we ask deputies to visit us voluntarily, and they will, it's not an issue about for -- of concern to you.  It should be an issue of you're glad we're willing to listen."

And hopefully, the unions would at least not fight us on it, not that they'd have a legal basis for it, but they can always use the -- the dispatcher and the star and shield to do what's most popular and that's point out management's failings. So we didn't need that to be done in an unfair manner about this issue.  The less controversy about the study, the better it'll work.  The more deputies understand "No.  Really, it's a study," the more sergeants, lieutenants understand it so they can tell them that.  So when this face or some other face that is helping me shows up as a mere reserve deputy, they'll be willing to answer the questions, or at least we'll maximize the

chance.

MR. DEIXLER:  So --

MR. TYLER:  We wanted to tell the unions in an official manner.  Didn't work.

MR. DEIXLER:  Before --

MR. TYLER:  Sorry about carrying on.

MR. DEIXLER:  Well, we appreciate your passion.

The -- before we get to the additional elements, I guess I have to ask, how far did this study get before you left the Department?  And then I'll ask you about the other elements of mentoring and accountability.

MR. TYLER:  From July of 2017 to about July of 2018, we worked on -- "we" being the County Counsel attorneys and me and one other department member for a year -- we -- the interview questions that, you know, I wrote out a list of objectives and everybody thought that they were just fine.  I wrote out interview questions.  Then it became the subject of a great deal of discussion.

The County Counsel attorneys are a lot smarter than I am about potential liability, about employee relations issues; by stepping on toes, it could cost us employee lawsuits, which have cost us way too much money, as well as the ones from the public, and so, therefore, there were lots of discussions about interviews, who should be there.  Should a County Counsel attorney be there?  Can they have a rep if we try and get

voluntary interviews?

And, therefore, by July of '18, we had not interviewed anyone. It was a plan at that time, now it's just a bunch of considerations, but at that time, it was a plan, and it was derailed because it came to pass that County Counsel members and the sheriff talked about the potential outcome being viewed by the public as a mere whitewash, as "What's this about? They're investigating themselves? Well, I mean, yeah, sure. Who's that -- that guy used to be the undersheriff? How -- how can we trust what he tells us about whether 'Hey, they're not so bad,' or 'hey, only these are the ones that are a problem'?"

So it was recommended strongly to the sheriff, and he concurred, that an outside entity undertake the study. Therefore, my efforts were converted to helping the working group interview for consultants. We selected the RAND Corporation. I asked them when meeting whether we could join forces, and they said, "We don't -- we can't be viewed as objective if somebody from the organization we're assessing is polluting our objectivity." So --

MR. DEIXLER: And so we -- we have the RAND study, which we're all familiar with.

Let me take you back to if you had been able to proceed, and assuming that the sheriff -- I as the sheriff -- had taken the advice to heart, I had communicated within the

LSA -- LASD my strong commitment to ending deputy cliques, and the message has gotten communicated throughout the organization, how would you ensure that the message, once received, was adhered to?

MR. TYLER:  Well, first of all, we haven't talked about the third component.

And so while we're doing this study, and increasingly as we move down the ranks and especially by the time we're interviewing any deputies, which is early on, in truth, there should be mentoring going on because it's very, very, very possible to mentor deputies about the negative aspects of these groups, the ones that I cited as secretive, exclusive, and symbolized unprofessionally.  There's tons of room for mentoring, and at the same time, we're, as a leadership team, being cohesive.  There should be an expectation that there's already beginning to be mentoring about it whether it's from the chief level or the commander level or whatever level.

MR. DEIXLER:  And what do you mean by "mentoring"?  Let me try to understand --

MR. TYLER:  Mentor --

MR. DEIXLER:  -- better.

MR. TYLER:  -- a wise and trusted counselor-advisor. Mentoring, accelerating the development of wisdom, broadening an employee's keen foresight and broader perspective, talking about past mistakes the mentors made and others have made so

that people can learn from them and, in general, accelerating -- as I said, accelerating the development of wisdom so that the mentee -- I guess that's a term -- is experiencing personal and professional growth and development in the right direction.

MR. DEIXLER:  Did you prepare a resource guide for sergeants on mentoring?

MR. TYLER:  I did.

MR. DEIXLER:  And let me ask that we display at least the cover sheet of that.

I'm going to just ask you a little question about "Sergeants' Mentoring Initiative Resource Guide."  And who is the sheriff who commissioned you to do that?

MR. TYLER:  Well, first it was John Scott.  He knew that I had been assembling a career's worth of notes about ethics awareness training during my first year of retirement because I felt like I had piles and piles of disorganized stuff that might be of value if I organized it.  As I organized it, it began to look like a resource guide or a book.  And because John Scott and I had talked about it before, he said, "Get that thing going."

So I started using that material to train sergeants and -- and lieutenants in how to affect more productive mentoring on a recurrent basis with -- by talking with their deputies about decisions and conduct instead of at them from a

pulpit like they're a minister.

And by 2016, when Sheriff McDonnell -- I'm sorry -- 2015, when Sheriff McDonnell had become the sheriff, I made him aware of it, and he said, "Yeah.  Go with it."

So I did more training.  I finalized that document at some point.  He wrote the foreword, and he authorized its publication.  By "publication," I mean printing at the Jail Vocational Print Shop.  We made several thousand of them up, and I started giving them out to sergeants as I did an eight-hour course with them as I'd piloted at two stations back when John Scott was the sheriff and handed them that book and saying, "Here it is."

MR. DEIXLER:  This book here --

MR. TYLER:  "Use it..."

MR. DEIXLER:  -- it is 182 pages.  Some portion of this mentoring guide includes advice on mentoring regarding subgroups and deputy gangs.

MR. TYLER:  Correct.

MR. DEIXLER:  Could you just give us a brief overview of what you would do or what you did -- let me withdraw the question.

About how many sergeants do you believe were mentored with the use of this document?

MR. TYLER:  After I developed a team of -- of Mini Mes, a trusted bunch of lieutenants and sergeants who could mimic what

I was doing in training groups of sergeants, we got up to about 8- or 900 sergeants and lieutenants who went through the eight-hour course in how to use the material in that booklet with deputies.

MR. DEIXLER:  So talk, if you would, a little bit about what the mentoring would be on the topic of deputy subgroups or cliques.

MR. TYLER:  Well, much of the material in that guidebook consists of situation narratives, which are interrupted by questions to be asked by the presenter or the facilitator of a discussion about "Deputies Joe and Harry went to this call and here's what happened, and then they had this decision to make." They're all based on real incidents where deputies' judgment was lacking or where it was excellent and where there were consequences that were negative for the public and the Department and the deputies.

So the person who's doing their mentoring would take somebody through that -- well, take a group of deputies through that situation at a briefing or in a training session -- there are ample opportunities for doing this -- and get the deputies to talk with each other, try and find peer leaders who will talk about what makes sense to do instead of what the deputies actually did or why what the deputy that looks like the hero did was so smart or so natural or so, "Well, of course, what else would you do?"

The more they hear from each other's peers, the better the message sinks in, in my opinion.  But failing that, the sergeant is there to point out, well, now here is -- here's the results of Option C and here's the results of Option D. They didn't work so well so why wouldn't a deputy consider Option A, which is maybe the harder, takes longer, or it was more the right thing to do and discuss why.  What are the incentives to tell them the truth when you've made a mistake, as opposed to lying because you're terrified of being -- looking stupid or caught red-handed?

MR. DEIXLER:  And how does this all apply to deputy subgroups?

MR. TYLER:  Well, there's one section in that book -- there are 11 sections about issues in law enforcement that have ethical considerations that are sometimes not obvious:  Use of force, anger management, power, honesty.

One of the sections is titled "Pride, Arrogance, and Counterculture."  It is about prides not tempered with humility.  Basically, it transitions into arrogance too often. Arrogance among two or more people leads to a syndrome about lionizing the bad guys and starting to mimic them in some cases.  And so there's that material, about three pages worth of my thoughts about how things can go wrong about pride and how valuable pride is if it is tempered with humility.

And then there's a situation narrative that I based

on an actual Sheriff's Department misconduct investigation which is fairly well known, in which it was a textbook example of everything that deputies could possibly think of to do that would create an unprofessional, ill-advised, potentially borderline illegal subgroup, and it is designed to be told as a discussion, not just reading a narrative about a story like you read a fairy tale to a kid.

There are points at which the mentor, whom I or somebody has trained, stops and says, "Well, what do you think the deputies did?  Here are four symbols they might have picked for their group, and three of them are professional and one's not and that happens to be the one they picked."

So the challenge for the mentor is to get the deputies to talk with each other about yeah, you know, it was kind of dumb to have a gun pointing at the viewer and say that it's appropriate to put smoke coming out of the barrel only if you've shot a guy in the line of duty because if a deputy says that, and they start talking with each other after the discussion's over, we're making culture change, I hope.

MR. DEIXLER:  How -- how important do you assess the role of sergeants in mentoring to help eliminate the deputy gang/clique culture?

MR. TYLER:  It cannot be overestimated.  I don't have words to describe how important.  I tried in that book you had up there on the slide a minute ago by writing it redundantly,

multiple times, that the sergeants are so important to deputies' welfare and, therefore, to the public welfare that it cannot be overstated.

MR. DEIXLER:  We've talked about leadership.  You've talked about teamwork.  We've talked about mentoring.  I'd like to ask you about accountability, and who, in an organization focused on eliminating deputy gangs, would be the first line of accountability?

MR. TYLER:  The Sheriff.

As I said, he needs to meet with his assistant and undersheriffs and make sure he's far enough into their heads to reliably trust them.  When he's at a meeting he's got to be, to say the right things about the subgroup issue.  Whatever he determines are the right things and to do the right things about them once he gets to steps beyond mentoring, which you haven't asked me about yet, but I will let you know is one of the considerations that I listed in the document.  So it's not all just about mentoring because I know it won't work for some people.

After mentoring comes accountability, which in the case of these subgroups in the past has taken the form of actions taken by management -- administrative actions to disrupt or halt the either existence of or the nefarious impact of Subgroup X, Y, or Z, such as the Jump Out Boys, the one I was referring to earlier.  It was clear that there had better

not be a Jump Out Boys organization or subgroup within the Gang Enforcement Team anymore because it was a real loser from the day one.  Someone should be held accountable for making that message loud and clear so that there are no more Jump Out Boys groups, and that is the entire chain of command that I'm calling the leadership team.  If they're a team, they're all on the same sheet of music about the message, which would be no more Jump Out Boys, no more ideas like that, no more creeds that say you can bend the law to -- or break the law to enforce a law, or whatever -- bend it, or whatever they said.

And so, you know, accountability starts at the top, but the sheriff cannot possibly even ensure that every one of 80 captains is responsibly conveying the same message, which is why he has a tier of managers in an 18,000-person organization. Twenty to 30 commanders and 14 division chiefs, everybody's got to be pulling the same amount of weight about the team idea and about accountability or constantly getting the message out there and for dealing with people who don't respond to the message in a hopeful way.

MR. DEIXLER:  So -- so yes.  Take that as the example, since I think we have about a 50-year history of people not getting the message.  How, under accountability -- under your accountability doctrine, would somebody ensure that the message is delivered or there are consequences for not getting the message?

MR. TYLER:  Permit me to correct one thing.  We have a 50-year history of some people not getting the message.  The majority of deputies, by my rude, unprofessional calculations, are not members of subgroups.  At stations where they exist, a sizable number of deputies are not members of subgroups.  Some of those deputies, like Deputy Anthony La Berge, turned down the opportunity.  So about getting to the ones who don't get the message.

MR. DEIXLER:  Yes.

MR. TYLER:  Good grief.  I've forgotten the structure of the question.  I'm sorry.

MR. DEIXLER:  So my question is if -- if you have --

MR. TYLER:  How do we hold...

MR. DEIXLER:  -- a deputy or somebody through -- in the chain who doesn't get the message --

MR. TYLER:  Okay.

MR. DEIXLER:  -- how do you hold that person accountable?

MR. TYLER:  Okay.

Well, depending on the extent to which they're not energetically singing the leadership team theme song, that's not necessarily misconduct, it's lass of -- lack of conduct.

But the options for ensuring accountability range from marginalization, not social, but structural.  There are places we can assign people that are not quite so mainstream, not quite so likely to become involved with or have a negative

impact on the study and the initiative, and they can be moved to those positions. At multiple -- at the deputy rank, there are any number of potential management responses, all of which we've used in the past, as I said earlier, on a small scale when problems erupt and get sufficiently big. There are attentions directed at it for a long period of time.

Transfers from units to other units, which can involve disruption to their personal life and is a -- a disincentive to commit misconduct sufficient to get transferred. Most people want to stay at the unit they're in until they choose to go, and they're normally entitled to, but management has prerogatives about transferring, and that has been used in the past and is a potential -- lower evaluation ratings for either managers who are confidentially or secretly saying things to deputies that support the idea of certain subgroups even though the sheriff has said those are the groups I'd no longer wish to have existent.

That's really a bad undercutting, but there are other ways to undercut the message without being so obvious, and if the sheriff or the supervisor of that executive detects it, he should be held accountable by a lower performance evaluation rating or not promoted to chief or -- or the next rank, whatever it is, or making his life miserable by telling him how he's failing the leadership team and being honest in your discussions with him when you detect that that ambassador for

the leadership team is not doing the right kind of ambassadorship.

At the ground level, again, we have multiple, more overhanded, more severe administrative actions that can be taken beyond mentoring if it's necessary for people who just aren't openminded to the message and to the mentoring, and I've named some of them, evaluation ratings -- the same things we talk about for --

MR. DEIXLER:  Does -- does -- does all accountability, though, sort of start with the sheriff who has to send the message and ensure that this message is going to be followed?

MR. TYLER:  I can't think of any way to say it but, yes. I mean, if the sheriff's not part of the team, it's like the team doesn't have a head.

The undersheriffs -- now, that's an important rank, but he's only the sheriff if the sheriff's out of town or ill.

People are going to look to the sheriff, who is just phenomenally highly respected in that avenue.  No matter how many jokes people might tell about him, that position is worthy of great respect; and if he's not the main cheerleader, I mean, he'd better have cheerleaders that can yell as loud as he can, but he needs to be yelling as loud as they are, in my opinion.

MR. DEIXLER:  Let me raise with you some specifics that others have discussed with the commission or in interviews for the commission.  We've had two witnesses who felt the problem

at certain stations such as East LA, Compton, and Century, that the solution was burning the stations down and starting all over. I -- I assume you're not an advocate of -- of burning, but how would you approach the stations that are at the core of the problem and have been for years or decades?

MR. TYLER: Okay. First of all, the person who advocated burning them down, I'm just wondering if that person believes that by starting over there automatically would not be a deputy subgroup in 10 years. My fear is or concern is that there would be. I don't know why. I'm not a sociologist; I'm not a psychologist.

That's why the study intrigues me because there's something about stations that are what we call "faster." Stations that are in higher-crime areas, stations that have a policing jurisdiction with more crime problems, more violent crime than property crime or disproportionate amounts compared to other stations, and they're tough to work in many ways. They're also desirable to work at because you learn so fast, and they're exciting. Lennox is one of them. I was there because I wanted to be there because I wanted to learn fast and have a lot of stuff happen that I could test myself with.

I don't know why those are the places where these things arise other than insecurity about something, which is why I wonder about management, in general, or some other factor I don't know about, but burning a station down wouldn't

necessarily solve the problem.  So we're right back to going into a -- a place where the loyalty to a subgroup and its symbolism is as strong as it is to the badge and the patch and trying to undo it.

Well, to my knowledge, nobody's done this yet, but if I -- I picture, at some juncture, at the Sheriff's, probably, direction, "This is the time.  Do it."

Going into every briefing and ending up having talked to every person in that station without trying to identify who's got a tattoo and who doesn't, I'm just saying a variation of the sheriff's message, which appears -- you know, a suggestion appears in the document, in which a sheriff's the one who's entitled to conceive, write, or initially articulate, but have it parroted by everybody in the chain of command down. And whether the captain is accompanied by division chiefs or commanders or whether he just goes in there with a couple of lieutenants or whether he goes in alone and says, "Subgroups -- our subgroup here does not compute anymore in the 21st century. We managers have cast a blind eye to an extent, maybe even approved them in some cases, maybe we've winked at them, maybe we've taken them on and failed, maybe we've expressed ourselves poorly, but tonight, I'm going to express myself well and clearly.

"I'm imploring you to have it be the case that there is no longer a group at this station called" -- pick your

favorite.  "I cannot have them at the station anymore.  The symbolism is hideous.  I'm -- I'm open to anybody's input about how it looks like the military one for the Big Red One or whatever -- 101st Airborne -- but my sense is that it's unprofessional to have a depiction of death for our Sheriff's Station; therefore, I'm begging you to retire the thing volitionally.

"Those of you who have the tattoo, I'm not asking you get rid of it, just keep it covered, and don't flash it around anymore.

"Those of you who are members or have considered yourself even leaders, I'm asking you to no longer consider yourself a member of the group.

"Those of you who aren't, I'm asking you to help be leaders, and not overtly, necessarily, but slyly, confidentially or gently talk to your partner deputies about why it makes sense that these things not exist here anymore."

That kind of a conversation with a group of deputies at Lennox or Temple, the two stations I worked at, potentially would fall on some percentage of deaf ears.  Maybe I'd have an impact on, what, 10 percent of the group members, 20, 30?  Am I dumb enough to hope for 50?  I don't know.  I have no way of knowing initially.

Once everybody gets the word though, if I take my thumb off, then I might as well be a criminal as far as I'm

concerned because once we've decided on the leadership team and the constant, redundant mentoring, we've decided on making sure we're accountable for keeping that message out in front. No deputy's going to rest 'til I'm pretty convinced there are no more recruitment efforts to become a member of the group.

I imagine I'd have a string of people coming to my office singing the blues, or I'd probably have civil claims from deputies who are violating their -- I -- who knows what. We don't know because we've never tried it.

But at the stations you asked about, the ones where they're entrenched and have been for years, there's a large group of deputies there who don't belong to the groups and do not have the tattoos.

Once I've communicated my heartfelt request or begging or imploring, I watch what happens, and I ratchet up as necessary. I need my commanders' support about some decision I want to make. I can count on it because the Sheriff created a leadership team that has tested integrity. I won't have some commander who says, "Look, I got a tattoo, and it doesn't bother anybody. So what are you so jacked up about?"

MR. DEIXLER: So it -- it -- for you, it is still leadership, mentoring, accountability, teamwork, and not burning down the station. Is that a fair summary of your point of view?

MR. TYLER: Correct. Yes, that's correct.

MR. DEIXLER:  Let me ask you about another -- another suggestion we've had from some witness that new academy of graduates not go first to jails, but rather serve as Patrol deputies, a team with highly-regarded mentors for the purpose of seeing every encounter as not a battle with an enemy but rather a way to serve the public.  How do you react to that as a means of trying to tamp down or eliminate the gang culture?

MR. TYLER:  The sheriff's department looked at a variety of options to minimize the amount of time deputies are forced to stay in Custody at the beginning of their career.  I -- I did three years and ten months and now -- or -- at some junctions after that, people were doing two years or one year and then later it was seven years, and I don't know what the deal is there, but the jail has to be staffed.

I -- I know we've tried a variety of different ways to do a variation of just flipping everything and saying, "Okay.  All you new guys, go out there and then stand by because after two years you're coming back to the jail and you're going to work there for seven years."

And I don't really have the authoritative information about custody and staffing to give an authoritative answer.  My reaction is if it would work, and I had some evidence that it would have an effect, I'd be for considering it much stronger.

But I work -- came out of the jail in 1979 with no such attitudes.  I'm just one of hundreds to thousands of

deputies who have come out of the jail without a jaundiced view of humanity just because you were guarding inmates for three or four years.

MR. DEIXLER:  You were never a Jump Out Boy?

MR. TYLER:  No, I was not --

COMMISSIONER BONNER:  He -- he was never a 3000 Boy.

MR. DEIXLER:  Yeah.  2000 or --

COMMISSIONER BONNER:  3000 Boy; right?

MR. TYLER:  No, I wasn't.

MR. DEIXLER:  And you never had a tattoo?

MR. TYLER:  You know, I -- I -- I know this may sound incredible, but I have never knowingly worked in a unit that had a deputy subgroup.  Lennox did not have one when I was a deputy there.  Lennox did not have one when I was a sergeant there.  Now, I took an oath; I'm virtually sure that they didn't.

When I was a lieutenant, I went back there a year and a half after, I think, being a sergeant there, and I -- or two years -- and I detected a change in attitudes and stuff.  Never heard the word "Grim Reaper," but I had a bad feeling that that might have been in the mid-1980s when that group got invented.

When I went to Temple, even though there had been a history of that little cartoon character, the Tasmanian Devil being their mascot, I knew that that had been emasculated by a previous captain and that if there were a Tasmanian Devil

symbol in the building, it wasn't meant to be a statement of we're the best deputies here, but kind of a mascot for the gym.

MR. DEIXLER:  Well, let's put a pin in that.  Perhaps one of the commissioners would want to follow up with some questions --

MR. TYLER:  Oh, okay.  All right.

MR. DEIXLER:  -- at their -- at their time.  I -- I'm going to guess maybe they will.

One of the many recommendations of the Citizens Commission on Jail Violence, of which Judge Bonner was a member, was that deputies be more frequently rotated so as to break up affinity groups and minimize the prospect for subgroups in any station.  How do you assess that as a strategy based on your 42 years?

MR. TYLER:  First of all, you mean rotated within the jail facility or rotated between jail facilities?

MR. DEIXLER:  (Inaudible) --

COMMISSIONER BONNER:  Between stations.  Between stations, sir.

MR. TYLER:  Okay --

COMMISSIONER BONNER:  Moved out of stations, rotated.

MR. TYLER:  Okay.

COMMISSIONER BONNER:  Yeah.  There's -- we've already done that in the jails, and that was -- had a real effect, I believe, against the 3000 Boys and 2000 Boys.  I'd like to hear

whether you agree with that statement.

We're really talking about rotation as -- which is transfer also. So I think you're -- you're using a term that he's thinking jails, and we're -- we're thinking --

MR. DEIXLER: (Inaudible.)

COMMISSIONER BONNER: -- rotation in the sense of -- of transfer.

MR. TYLER: Oh, yeah. Well, I -- I'll use the term "transfer."

You mean as a matter of regular course, rotating deputies in and out of sheriff stations and/or jails; right?

MR. DEIXLER: We'll focus on rotation or transfer between stations --

MR. TYLER: Okay. All right.

MR. DEIXLER: -- every two or three years.

MR. TYLER: You know, there are drawbacks and there are advantages, and I've -- I know that somebody had testified about that being a practice in another agency. I'm openminded about that.

You know, the traditional thing to think about is that deputies go to stations they want to be at. They configure their brains about how far from home and where, the community and what they like, and then they become part of the community to the extent we can encourage that to happen and that's all on the good for keeping them there. But facing the

issue that we're facing, I can understand how having it be a regular matter of course instead of an occasional, like, transfer for cause because of misbehavior -- you're talking about just transfer on GP, general principles.  I can see how that might have a good effect on stations where the subgroups are the most problematic because it would depopulate their -- I don't know -- their most fundamental people.

My next concern would be to what extent would that affect the incoming -- the -- the station to which you're going?  Right now, I don't think there's anything called the "Crescenta Valley Whatevers."  I don't know if there'd become one because 17 guys from an inner-city station end up going there.  I -- I just don't know.

I'm not averse to -- I mean, I wouldn't be averse to experimenting with that idea after we cut through all the employee relations stuff about transfers that are not requested.  But it's this horrific consideration if -- among the many things we could do either along with mentoring or instead of, if mentoring doesn't have a decent effect in a quick order of time.

MR. DEIXLER:  Let me move on.

We've -- we've interviewed witnesses who feel strongly that, like the LAPD, strong leadership, good mentoring, accountability are all fine, but what is really necessary is the oversight by a federal judge to ensure the

department leadership has its feet held to the fire.

How do you evaluate the value of a consent decree supervised by a federal judge and a monitor as the best way to achieve elimination of these gangs?

MR. TYLER: We've had more than one settlement agreement and consent decree in my department experience. Every time we've had one, we've ended up working with, not against, the monitor, to -- to my knowledge. I -- I know some of the ones I was personally involved in, we worked with the monitor. We got a lot of good stuff done. When the monitoring period was over, we were able to sustain our reform efforts for some period of time, but I also know that, on occasion, we haven't. We've backslid or slipped. I think that if it's necessary, then the monitorship, however painful or however potentially embarrassing it is, can be helpful. I've seen it be helpful.

But if there were a federal monitor appointed today to the Department about the deputy subgroup issue, and if he ordered us to do everything legally appropriate and severe, most dramatic kinds of things to break up the gang, the groups, or whatever, I'm saying that leadership, teamwork, accountability, and mentoring would still be vital because I want the deputies to think beyond the end of their nose about the effect these groups are having on public trust and not have them drop their membership in a subgroup because they were told to, rather because they figured out it wasn't good for them,

their families, the public, or the Department.

MR. DEIXLER:  You spent an inordinate amount of time writing documents that express in more detail than you provided today your belief on these issues.  I've distributed to the commissioners one document entitled "Background Information About LASD and Deputy Subgroups."  Is that a document of which you were an author?

MR. TYLER:  Yes, it is.

MR. DEIXLER:  And does that set forth your views of the background issue that informs your strategy to attempt to fix this problem?

MR. TYLER:  Well, it primarily details my awareness of efforts to deal with the deputy subgroup issue in the past.  I originally wrote it when I first started hearing from Board of Supervisors members and other people in the public that we'd never done anything, when I knew we had.

As I pointed out in that document, I didn't list everything that we might have done.  I don't know everything we might have done.  I'm not that old, and I'm not that widely experienced, but I had some pretty special examples of efforts on the parts of specific individuals.  I was aware of which things I had had a hand in, and so I -- before I left -- so I represented those in there as among the efforts that the Department had undertaken to address the issue.

MR. DEIXLER:  And -- and another --

MR. TYLER:  But it's not comprehensive as it --

MR. DEIXLER:  Right.

MR. TYLER:  -- is accurate.

MR. DEIXLER:  And a second exhibit, which I have placed before each of the commissioners entitled "Considerations for LASD Action Concerning Deputy Subgroups," is that a document that you were the author of?

MR. TYLER:  Yes, it is.

MR. DEIXLER:  And does that set forth accurately and in some detail your strategy for addressing the deputy subgroup problem?

MR. TYLER:  I -- I titled it "Considerations for Action."

I -- I'm not a reserve deputy even now.  I haven't been in the Department for four years, and I do not feel that I have the standing to develop a plan or proposal.  It's a whole bunch of thoughts that came out of that study we started and out of here about where it could go profitably that are still viable today if anyone is interested.

MR. DEIXLER:  Pardon my asking, but you spent an inordinate amount of time on this, as I've mentioned before, thinking about these problems, and particularly since you've left the Department.  Are you being paid for the time that you have spent on this project?

MR. TYLER:  No.

MR. DEIXLER:  Why are you spending time doing this, sir?

MR. TYLER:  Well, I've been interviewed by RAND, by Mr. Kennedy, by various attorneys in lawsuits, by -- I don't know who -- but because -- primarily because the tattoo committee, which we haven't even talked about, that I oversaw for a couple years and this study and potentially partly because of that booklet you showed.

So my brain's been cogitating on this stuff all that time, and I am highly distressed about the controversy that swirls around my beloved former organization.  I don't even feel like its former.  Most of us don't when we leave, even if we're officially -- guys are cut.  And I love police work.  I love the concept of what we do in society.  I love the whole idealistic picture of a stalwart person who's enforcing the law that is incorruptible and always civil with the public and polite and can get his job done without one degree of unreasonable force and understands how to talk people to jail in every possible case without clobbering them.  And these -- some of these subgroups seem inimical to that love.

And so because I'm a former manager who feels that, just like everybody else, to some extent or another, I was insufficiently attentive, not that I ever worked a place that had one of these groups that I recall -- know of, but just that as a manager, collectively, we all potentially could have done better, certainly can do better, and because present just ended a couple of split seconds ago; so now we only have the future

to consider, and those considerations for action matter to me that they be evaluated.

It doesn't matter at all to me if somebody thinks I'm full of hooey, and I don't have an ego thing with this.  I'm not interested in pay; I only care about the Department.  There are people in that agency that are suffering about this reputation damage caused by some of these groups, and it's not that they're mad at any individual specific deputy, it's just the whole darn thing's big and it's a problem, and we -- I'm hoping some of those ideas might help someday in the future.

MR. DEIXLER:  And help the public.

MR. TYLER:  And it's worth it to me to try -- yeah.  And the public's the whole purpose.  I don't say "public trust" like it's some buzzword.  It has to do -- I'm looking at people that I know are dying to get this mic out of my hands -- thank you for acknowledging that.

I put together -- I was on that working group that formed this body.  Okay?  People came in public hearings and described situations, some percentage of which were 100 percent valid wherein deputy sheriffs had done unprofessional things, were very hurtful to them, and it's excruciating to hear especially when I have reason to believe they're telling every bit of the truth and they're not shading it or exaggerating it.

I -- I care enough to help if I can.  If it's something I know something about, I normally say yeah instead

of no, if I can, and I'm retired and happily -- very incredibly lucky to have a retirement salary so money is not an issue to me.  What is is making things better if I can.  If I can help, I will.

MR. DEIXLER:  Thank you for your testimony and for your service.

I pass the witness.

MR. TYLER:  Thank you.

CHAIR KENNEDY:  Commissioner questions?

Irma.

COMMISSIONER COOPER:  Thank you for coming today.

I noticed you mentioned several times about accountability and the sheriff being at the top and the message.  I'm really concerned about how you felt about the message because with my military background, commanders give an order, and they expect them to be followed.  And if they don't get followed, then the commander is expected to take action, because if they don't then the general will take actions on the commander.

So my concern is the fact that accountability -- the message not getting out, holding people accountable, even though you mentioned several times there was a lack in management, but yet there was -- the accountability was just too soft.

You mentioned begging or asking them to stop.  Where

does telling them to stop and then holding them accountable --
I'm very concerned about the language because if you just say
"Please, I'm begging you to stop," nothing's going to happen.
You need to tell people to stop.  "This is my expectation, and
this -- and if it's not done, I'm going to hold you
accountable."  So I'm getting sort of mixed messages from
leadership, accountability.

And then you mentioned the -- the -- the stations
that had more problems.  Why wasn't more psychologists, social
workers, and people put in there to help with that mentoring
that you called to -- to keep the message out front?  I'm sort
of concerned about how that sort of worked within this
Department as you were working on this study.

MR. TYLER:  Okay.  Well, gosh.  There were three questions
in there.  I'm going to try and do them all but tell me when
I've talked too long.

First of all, when I role-played a captain imploring
his deputies to bust up the group volitionally, Mr. Deixler was
concerned about how long I talk, and I -- with good reason
because I probably violated his expectations already, but I
will re-emphasize "When does the accountability part kick in?"

"The next week."

After he starts getting the stream of deputies coming
in saying, "Captain, you're full of garbage.  We're not going
to be -- you've been here two years, and you're going to be

gone in another two years, and we're going to have a gang to --" whatever.

There's going to be some accountability. There's going to be marginalization, and he's not going to have a trainee assigned to him anymore. He's going to be transferred if necessary. He's going to be put in a different job where he can't affect people in the manner that has -- has taken place in the past.

So the reason that the word "accountability" is in there is to make it clear that the considerations for action include the kind of thing you're talking about, giving orders and expecting them to be obeyed and, you know -- what do you call it? -- sanctions if -- or not, which include discipline and include lower evaluation ratings and include denial of promotions and include termination from employment in the most dramatic cases, potentially. There's mention in there about the new Penal Code section about mandatory terminations for officers who join groups that are exclusive and, therefore, violate the rights of people of whatever, you know, protected classes.

CHAIR KENNEDY: Law enforcement gangs, as the statute says.

MR. TYLER: Correct. Yeah. To -- of 13670 Penal Code, new statute.

That's enforceable if there is evidence that -- and

its investigable -- if there's evidence that someone as a group now -- I mean, it's my understanding that they are exclusive and not everybody gets to play.  And if some of those decisions about who's in and out are based on race, creed, color, nationality, religion, et cetera, et cetera, they're ripe for termination.

COMMISSIONER BONNER:  I'm sorry.  I can't really hear the witness --

COMMISSIONER COOPER:  (Inaudible) termination --

COMMISSIONER BONNER:  -- I can't -- I can't -- I'm sorry. I just can't hear the witness very well because --

CHAIR KENNEDY:  (Inaudible) speak into the mic.

COMMISSIONER BONNER:  -- he's speaking right at you and...

MR. TYLER:  They're ripe for a termination is what I last said.  Okay.  So that -- that component is in the documentation that I supplied as considerations.

About the past, I'm -- I have a lot of knowledge about some things and have some knowledge about maybe a lot of things but I sure don't have all the knowledge about everything.

At the station that used to be called Lynwood, which polices that city and the adjacent county areas and is now called Century Station, policing the same area and some more county areas, there have been at least one or two instances, about which I know very little, where there was very special

managerial focus on those stations because of either the Vikings, the Spartans, or the Regulators.

Am I okay on this?

COMMISSIONER BONNER:  Yeah.  I can hear you now.

MR. TYLER:  Those three groups were associated with that policing area over the past -- excuse me -- past 40 or 50 years.  I don't know the details about what was done about whether psychological services was brought in.  I'm not saying they were.  I just don't know so I can't answer your question very well.  And you're right.  I did cite, you know, management hasn't been sufficiently, successfully attentive to the big-scale picture.  So all I can say about why didn't you X, Y, Z is mea culpa.  Speak for hundreds...

COMMISSIONER COOPER:  But the -- the higher groups, the -- the undersheriff, those are nonunion people; right?  So management --

MR. TYLER:  Mostly, yeah.  Yes.

COMMISSIONER COOPER:  -- should be able to take action without a union telling them what they can and cannot do?

MR. TYLER:  Correct.  But we also get told what's legal and what's ill-advised by attorneys who advise us about very, very complicated and protective arena of employee relations.

So there -- as Mike Gennaco testified -- I watched his stuff, I know him -- it's not always as simple as directly addressing what's perceived to be unfairness or some nexus to

misconduct between the symbol on the ankle and the misconduct.

COMMISSIONER COOPER:  Uh-huh.

MR. TYLER:  It's often -- it's usually very difficult with the -- in the case that I talked about, the Jump Out Boys, which is in that booklet, it was easy.  They put stuff in writing and left it in the trunk of a radio car and somebody found it.  But for the most part, to the best of my knowledge, there's not a lot of stuff in writing that management's ever going to be privy to.

Ordering them to give it up, who would we order?  I mean, if it's in somebody's house, we're not going to end up getting a search warrant for it, most likely, so...

I mean, there are challenges for managers who try to do something.  Century had a massive -- Century Station had a massive infusion of some of the highest quality supervisors and managers.  I believe that this occurred when Sheriff Baca was in office.  At some juncture -- I'm not sure that's right.  I don't remember whether it was Baca or Sheriff Block -- but because of the concern about, at the time, the Regulators, the Sheriff hand-picked a set of lieutenants and sergeants to send there en masse put on every shift.  I knew at least two or three of the people very personally.  I knew they are the cream-of-the-crop supervisors.  They will be promoted soon. And so they're just the kind of bullet we need to go in there and, you know, do the military-style stuff about misconduct

and, if necessary, about the deputy subgroup issue, which was implicated, I believe, in the things you typically hear: Controlling the station, the captain doesn't run the place, the deputies do, the Regulators, or whoever, the scheduling deputy's a member, blah, blah, blah.

And there were, at least on two occasions I'm generally aware of without remembering dates and people, large-scale transfers from that station, or from those two -- Lynwood and Century. Same policing area, two different stations.

So those -- for want of the better way to put it -- hammer-type techniques are certainly available. But they happened. The excellent sergeants, lieutenants did a year to a year and a half there, they went and got their richly deserved promotions, they didn't likely promote and remain. They probably got transferred elsewhere where they were needed, and I'm not saying these subsequent sergeants, lieutenants were deficient, but over time, we got to today.

So the mass transfer-hammer approach is a sound approach for an immediate problem, but the long-term issue about how this happens, why is it phenomenon, the sociological aspects about which I'm no expert, I think we should be trying to take a bite out of, at the same time, the federal monitor, if he's in the -- in the cards, tells us what else to do. I'm committed to this approach because I know that talking with

deputies about conduct and decisions is more effective than telling them do right and be good and no more talking about it. Just get out there and do your job.

This is a very, very, very complicated job. I mean, street police work and jailing are very complicated. There are rules that are available to break that are fairly detailed and sometimes inconsequential seeming are many and varied, and I've made mistakes out there that are in good faith that weren't so hot. It's kind of a scary job in terms of not getting shot but looking stupid or dumb and not knowing exactly the right thing to do. Talking with deputies in advance of making those decisions does help, and I can tell you that without a sociology degree.

CHAIR KENNEDY: I want to get to everyone's questions.

MR. TYLER: Okay.

CHAIR KENNEDY: Irma, did you have more?

COMMISSIONER COOPER: No.

MR. TYLER: Okay.

COMMISSIONER COOPER: No.

CHAIR KENNEDY: Rob, you had a question?

COMMISSIONER BONNER: You know, I'd like to say one question. I -- I actually really appreciate the thoughtful and -- and insightful testimony that you've given to this commission, Mr. Tyler. I think you -- you nailed it when you said that, you know, a big part of the problem here is the lack

of sustained attention on the part of management to the deputy clique/gang/exclusionary subgroup issue.  And I think you also -- you know, you've made it very -- very plain that what's -- what -- what is desperately needed is leadership at the highest levels of the Sheriff's Department that, you know, makes the goal clearer.  And the goal, you know, I -- I -- seems to me, you're -- even you're temporizing a little bit here, but the goal has to be to eradicate deputy cliques, gangs, exclusionary subgroups, and we know what they are.

We know what -- by the way, you said the symbols are unprofessional.  Their names are unprofessional, sir.  The Banditos is not a professional name for law enforcement group -- the Executioners.  I mean, it's -- I mean, it's ridiculously unprofessional, and you're right; it's inimical to the best interests of the Sheriff's Department.

You know, I -- I'm here because I want the Sheriff's Department of LA County not just to be the biggest sheriff's department in the country; I want it to be the best sheriff's department in the country.  I want it to be among the best and finest and most professional law enforcement organizations in the country, and I know you do too, by the way, and that's why you're here.

MR. TYLER:  Yes.

COMMISSIONER BONNER:  So I just want you to know we -- we're -- we're identifying here but...

MR. TYLER:  I understand.

COMMISSIONER BONNER:  I guess that the root of my questions would be, you know, you -- you talked about, you know, imploring people to do things.  You alluded to that.  You talk about, you know, you could be a member of the Executioners right now and, you know, and unless you commit some misconduct, well, it's okay to be a member of the Executioners; it's okay to recruit other people to be members of the Executioners. That's not acceptable.

So if you read -- I all -- I'm going to ask you -- first of all, I should ask you, and when you answer my question, I want to know whether you've read the proposed policy of the Civilian Oversight Commission that would make it as a matter of policy in the Sheriff's Department that it would be -- and subject to discipline -- for any person to become a member, join a deputy clique or gang or sub -- exclusionary subgroup or solicit others to do that, and if they did that, you don't have to show further misconduct.  Just that -- I'm not talking about past; I'm talking about in the future.  That sends a strong message, does it not, that it's just not acceptable.  It's no longer acceptable in the Department.  I don't know why that policy wasn't adopted by Sheriff Villanueva, but it wasn't.

But what -- why wouldn't you -- or would you? -- how -- what would be your comments on just being very clear

about this to everybody in the Sheriff's Department that these -- these organizations, these -- these subgroups, which are exclusionary, and by the way, not just exclusionary, by the way, you know there are insubordination that goes on all the time with these subgroups; right?  They -- they control the assignments in some of these stations.  They control who gets training.

In any -- in any event, I'm asking you, basically, in terms of accountability, why don't we have a policy in the Sheriff's Department that just flat out prohibits joining, participating in, or recruiting others to join these deputy exclusionary subgroups?

MR. TYLER:  How much time have I got?  Really.  I mean, I need --

COMMISSIONER BONNER:  Well, we can have a side meeting after this, but --

MR. TYLER:  All right.

COMMISSIONER BONNER:  -- but try -- try to be...

MR. TYLER:  I've not seen the proposed policy.

We tried to write a policy that addressed cliques and tattoos when Sheriff Scott assigned me to attempt to do that in 2014.  It's mentioned in your document there.  The group worked on it -- your next witness was a member of it -- for a year-and-a-half or two.  We had multiple versions.  They were submitted to the County Counsel's Office.  There were cited

problems with First Amendment issues that caused us to pause and rethink it.  We ended up with a very different kind of policy draft from what had initially occurred, and it still wasn't viewed as the ideal thing to put out in that manner.  In other words, I failed, so...

COMMISSIONER BONNER:  But it failed because County Counsel said it was --

MR. TYLER:  I'm not blaming --

COMMISSIONER BONNER:  -- you couldn't constitutionally...

MR. TYLER:  -- I'm not blaming the County Counsel.  I refuse to --

COMMISSIONER BONNER:  Well, who -- who else -- who else are we to blame?

MR. TYLER:  They've helped us tremendously over decades and me personally, and they represent the County well, and because we don't always agree does not mean that they're the reason why.  I mean, to blame the County Counsel for some issue with the deputy subgroups is not --

COMMISSIONER BONNER:  Well, I'm not talking about over the past 50-year period.

By the way, that's an interesting question you raised because County Counsel has often taken positions in civil litigation that have been, I think, counterproductive to getting rid of deputy gangs and cliques within the Sheriff's Department, but let's not debate that.

They certainly killed your 2014 policy proposal by essentially saying -- opining it was unconstitutional and not proposing any other alternative policy that you might have considered that would have been equally or more effective than the -- the one that was being discussed in terms of tattoos.

Is that -- isn't that a fair statement?

MR. TYLER:  I suppose that they -- I don't like the word "destroyed," but they did impair the progress, and I submitted to Sheriff McDonnell in my, like, last week in office an alternate proposal, which this group would not find adequate at all, but it was a -- a workaround that I came up with, for what little it's worth, and it's the method of using existing sections and enhancing one other one.  But the whole idea about finding people in violation of policy because they are a member of a tattoo -- which we tried -- or because they --

COMMISSIONER BONNER:  They're a member --

MR. TYLER:  (Inaudible) --

COMMISSIONER BONNER:  -- they're -- they're a member that's associated with a deputy exclusionary subgroup that's been identified as -- as -- as -- you know.  I -- I'd like you to read our policy, but in a word, can you -- the -- my question to you is why would you be opposed to such a policy being implemented?  That is to say --

MR. TYLER:  Oh, I would not be.

You know, if --

COMMISSIONER BONNER:  Oh, okay.

MR. TYLER:  -- I don't -- I got to get this out.

I'm normally supposed to answer his questions, primarily, but --

CHAIR KENNEDY:  Yes.

MR. TYLER:  -- if I gave the impression that all we're going to do is implore these people to not be in the things and then walk away and hope it works, then I misstated the situation and failed my guidance counselor over here.

Obviously, I'm trying to get the guys who aren't committed to it to turn into cheerleaders with the leadership teams.  I mean, ones with tattoos, like that hypothetical undersheriff who could renounce it wearing it, I want to give him a chance.

So a week later, if they don't respond, if the sheriff told the captains here are the -- the six groups or the seven groups, or I don't care what the heck group they are or how innocuous the name, there better not be any secretive exclusionary subgroups, and I -- if I find out they're still in existence in a month, you, Captain, are in trouble, then I'd say the captain should do a lot more than implore them within a week, as I said.  I'm not averse to that personally.

I started this study before this issue had boiled over due to two different depositions which occurred in 2017 and 2018, and that's when the thing came to greater, greater,

and greater attention by wider -- wider-spread amount of the public.  I certainly understand it.  All it means is we were living on borrowed time, we managers, and now it's not just our problem to attend when it boils over and then forget about when we're so busy with other stuff.

Because I started then, I was bending over backwards with my interview question series to sell people on the idea of cooperating, I can feel a sea change about the situation.  And whether it's a federal monitor or this commission or who the heck it is from outside, if there's some direction that we're not advised against taking by some learned attorney or other factor that I can't guess about in advance of it to eradicate Groups X, Y, and Z, my personal thought would be sir, yes, sir -- got that military reference there -- three bags full and see to it.

But the way I would feel that it's right to see to it is to explain the whys and talk with the people involved about the whys.  The people who consider these things innocuous and good sport and who never got in a bar fight, didn't get the tattoo when they were drunk and genuinely believe that it accords recognition to deputies who are energetically doing good police work, whether misguided or not, they're entitled to an explanation about why the drawbacks outweigh the advantages.

COMMISSIONER BONNER:  And I take your point there, and I totally agree with you that you have to understand the

rationale for people that actually join deputy cliques and gangs and subgroups, whatever we want to call them.  We know what they are, by the way.  It's not -- and -- and a learned attorney has opined that it would be constitutional to essentially ban joining or participating in the deputy cliques, gangs, or exclusionary subgroups, that learned attorney being me.

But -- but nonetheless, here's -- here's -- here's a question, and then I'll -- I'll -- I'll turn it over to my fellow commissioners.  But as I've looked at this thing, you know, one of the things -- one of the reasons I think that maybe management hasn't had sustained accountability here within the Sheriff's Department is the structure of the Sheriff's Department itself, and I -- I would like your comment on it.  And what I'm talking about is that the -- it seems that it has a much more decentralized structure than I would have expected between headquarters and the station captains.  And -- and if you have the station captains having, let's say, a significant degree of autonomy or they're not around that long, you're not going to be able to actually manage the organization effectively in terms of whatever your policy is.

And I -- I don't know whether you -- I -- I just -- it just -- it just struck me as I've been looking at this issue now over -- going back to the CCJV of a decade ago that this is a problem, and it's a problem also in the sense that there

doesn't appear to be sort of the vigorous CompStat kind of approach for this kind of a problem that would be important, and that is that the captain -- you -- you have a clear policy. No cliques or gangs in your -- in your station happen, and -- and then you have a policy of holding them to account for that by the -- essentially, by the commanders and --and the -- and the chiefs and so forth.

But I -- I don't know.  I mean, I -- this is probably -- it could be a very long answer, I realize, but -- and we could talk about this more later, but would you see a structural issue here in terms of the ability to actually effectuate and carry out effective policy against deputy cliques, gangs, subgroups?

MR. TYLER:  I understand you, sir.  And I've often thought that the Department is close to unmanageable because it's so big.  But then we're in the big county, we're in the most populous county, et cetera, et cetera, excuses, excuses --

COMMISSIONER BONNER:  Yeah.

MR. TYLER:  -- explanations, whatever.  Okay.

About decentralization, I'm going to cite my predecessors.  They're named in there.  Bob Mirabella and John Ingebretsen (phonetic), still with us, and they just ran Temple Station before I got there so effectively they didn't need a commander parked out there looking over their shoulder like in Barney Miller all the time.  They knew what they were doing.

The contact between a division chief and the commanders was frequent, and commanders are supposed to be going to the stations.  That's what I did when I was in that job and visiting with the captains on site and then monkeying around, visiting with the deputies and the whoevers, and ride-along if you can still fit in the uniform.  That's an offset to the lack of central, you know, authority controlling the stations, but fine.  Those two guys were great, and I just cited them publicly.

What about in circumstances where --

COMMISSIONER BONNER:  Other people.  Other captains.

MR. TYLER:  -- the accountability is not on a tether that's that strong.

Answer:  Well, gosh, if we had more commanders, there could be one for each station but we're not budgeted for it, and they could park at the stations and actually work there but that's not in the budget.

The City of Los Angeles, if I understand correctly, and I'm not very familiar with them, but I understand they have two captains running what they call divisions, the things we call stations.  Two people of captain rank splitting the duties between either Investigative and Patrol, or between Administrative and Operational, I don't know.

But holy mackerel, when I was a captain, if I was only responsible for half of what was going on at Temple, I

could have managed in much greater depth with or without a commander overseeing me and theoretically been more effective. I didn't have that.

So if we -- not saying money is the issue, I'm -- everything I said about earlier had nothing to do with money. Getting more management in the field does, unfortunately.

COMMISSIONER BONNER:  Okay.  Thank you.

MR. TYLER:  Can I make one more -- oh, I'm sorry.  Go ahead.

COMMISSIONER GIGGANS:  Okay.

MR. TYLER:  I'm -- no, my comment's the last one I want to make, so go ahead.  Maybe you'll give me a chance to bring it up.

COMMISSIONER GIGGANS:  Okay.

Well, we've had quite a scholarly discussion today, and I really appreciate looking at management, leadership, all of these things which are really important to any organization.

But I -- I want to bring up the public.  I want to bring up the community.  And we can have lawyers tripping all over themselves about the finer points of, well, maybe this would work, or maybe this would work, or you can't do this because of this.  What's happening is that the community and the public becomes more and more disinfect -- you know, disaffected.

MR. TYLER:  Yeah.

COMMISSIONER GIGGANS:  They feel that they're left out of the impact on them.  Then we have us-and-them -- more and more, deeper us-and-them -- clearly, there's going to be us-and-them within the Department also going on.  So I'm not so sure this is a question, but I think it's a big question.

Exact -- you know, if you want to -- we're talking about changing culture a lot, and I really do appreciate the fine points of changing culture.  Very challenging.  Not just for organizations.  I mean, our entire society right now is in huge upheaval around our culture and our habits and our behaviors and our policies and how we treat one another, and so my impression is that the public would like clarity.  The public would like to know what is a clear policy, and then yes, if it takes some time to change the culture, do all the things that you can do to support having a healthier, better, less-contentious culture within so that it impacts the community in a healthier way.

So I'm -- so I -- I -- I guess it's more of a comment, but this is -- I -- I want to speak to the frustration that is out there and within our -- within our own commission about how do we move this needle?  How do we even -- how can we work with the Department to move this needle?  You know, it's not going to go away in the next two months.  It's been around for a long time and there have been some attempts, but the attempts have not worked.  So if it -- if it -- if something

isn't working, it needs to be refurbished, rethought.

CHAIR KENNEDY:  So what about the public?  What about these --

COMMISSIONER GIGGANS:  So what about the public?

CHAIR KENNEDY:  -- these law enforcement gangs' impact on community policing, constitutional policing, the rights of accused people to get impeaching information about deputies testifying at their trial -- what about that aspect of the problem?

MR. TYLER:  Well, if I didn't mention much about the public in my explanations, either I got the wrong questions or I didn't think to include them.  I know I said public trust about --

COMMISSIONER GIGGANS:  Yeah, you did.

MR. TYLER:  -- three to ten times.  I'm acutely aware of it.  Now, I will respond to everything I wanted to to Mr. Bonner -- Judge Bonner mentioned.  I didn't really want to do this, but here it goes.

There are some subgroups that I'm embarrassed to even mention the names of for the reason you cited.  The one you picked and the one from my old station are the two most egregious examples of horrifying symbology and naming for any deputy, any cop, any police officer, period.  I was not a member of the Department.  I mean, I was a reserve deputy when the Executioners first came to my attention, and I was

LACS CIVILIAN OVERSIGHT COMMISSION, October 14, 2022

absolutely aghast at that name.  Grim Reapers was bad enough.

Every bit of this, what I care about is whether the public is getting served.  I didn't become a policeman -- I -- I became a policeman for the corny reason I wanted to help people and I thought they were heroes and I wanted to be a hero.  I used to get beat up when I was a kid.  I wanted to not have that happen; right?  Sorry about this.  I didn't expect it.

So the public is in every single one of my thoughts.  I spent ten years in Region One as a chief hawking courtesy more than anybody I know ever did in the Department.

How effective was it?

Don't ask me.  I -- I have no way of knowing for sure.

So I can brag about it, but I don't -- I can't tell you that I made a big, giant sea change and how courteous people were.  I had some pretty clever techniques for acknowledging it, but I don't know that it was successful.

I understand if that -- if -- I -- I mean, I am a member of the public, and I think it's embarrassing that there are guardians of the law naming themselves with subgroups that are either racially based, about death, about violence, or about power in ambiguous or threatening ways.  Period.

So you said nothing that I don't agree with and understand on a deeper level than you can tell from my

testimony, and I hope that I made that clear in what --

CHAIR KENNEDY:  So when -- when you --

COMMISSIONER GIGGANS:  Just one second.

I just want to say, I wasn't saying -- don't misinterpret.  I wasn't saying there -- we -- we got a good sense of how much you care about the public, so I wasn't saying that.

MR. TYLER:  Oh, yeah.

COMMISSIONER GIGGANS:  But I think just as an important for our testimonies, people coming here, that we always have to hold that very high because sometimes it gets -- things get lost in some of the obscurity in the fine details, quote, "of the law," of which good, faithful people disagree about.  But it's still -- and those disagreements about how to interpret a law or a policy impact the community and impact -- and impedes change.  So I just wanted to bring that up about --

MR. TYLER:  I understand.

COMMISSIONER GIGGANS:  -- somehow we got to move off that needle.

MR. TYLER:  I understand, and I took nothing you said wrong at all.

Thank you.

CHAIR KENNEDY:  Well, what -- what I want to know is, aside from courtesy, you talked about the Jump Out Boys.  They have a black book memorializing the shootings; right?

MR. TYLER:  That's my information from the administrative investigation report, yes.

CHAIR KENNEDY:  And the tattoo gets to be enhanced with smoke when you shoot someone; right?

MR. TYLER:  That was in the creed that they authored.

CHAIR KENNEDY:  And the creed says, "Jump Out Boys are the alpha dogs who think and act like the wolf but never become the wolf"; right?

MR. TYLER:  Correct.

CHAIR KENNEDY:  And they understand when the line needs to be crossed and crossed back; right?

MR. TYLER:  That's what I was referring to when I said it's okay to bend the law to enforce the law.

CHAIR KENNEDY:  Yeah.

MR. TYLER:  In their creed.

CHAIR KENNEDY:  Okay.

And the Jump Out Boys are not afraid to get their hands dirty without disgrace, dishonor, or hesitation.

MR. TYLER:  I am extremely distressed by that creed as I was back then when I first learned about it.

CHAIR KENNEDY:  So as someone who was number two in the Department, what is the Sheriff's Department doing to disclose that information to accused people who are on trial with Jump Out Boys testifying in their criminal trials?  Are you all -- are you telling the prosecutors that these people are tattooed

members of a group with that creed?

MR. TYLER:  Well, first of all, I haven't been in the Department for five years --

CHAIR KENNEDY:  Well, the -- the Jump Out Boys are -- I mean, that's -- you know --

MR. TYLER:  Well...

CHAIR KENNEDY:  -- that's more than five years ago.

MR. TYLER:  I understand that.

The answer -- I guess your question is we comply with Brady versus Maryland, or we try to when the DA doesn't have concerns about our method of compliance.  We answer -- bring forth information to prosecutors when it's appropriate.  I'm not aware of anybody in the Jump Out Boys subgroup or gang, or whatever you call it, who had the chance to --

CHAIR KENNEDY:  I think "gang" is probably appropriate; right?

MR. TYLER:  In that case, I might be tempted to use the word myself because they did mimic the street -- the culture of street gangs to an extent even greater than some of the other groups I'm aware of.  But they didn't really have an opportunity -- the thing didn't last very long and there were only seven members that we know of that we found out about.  We know that other deputies told us "I didn't join it.  I didn't like the looks of it."

So I can't say much about to what extent we notified

prosecutors or defense attorneys about people that have these tattoos, and it's a perfectly valid question.  I just don't have a lot of information about legalities and --

CHAIR KENNEDY:  Is that because the answer is "nothing"?  Nothing was done to notify prosecutors who was in the Jump Out Boys?

MR. TYLER:  Well, I don't know that that's true either.

I -- I -- I know this sounds like a copout, but I had a break in service.  The Jump Out Boys thing happened while I was retired writing up that material, and it was investigated and they were discharged before I returned as the undersheriff.  So they were a historical fact.

I do not know the details about to what extent the investigators who were assisting DAs in prosecuting cases of people arrested by those seven people with that tattoo, to what extent they were notified about anything because I wasn't the undersheriff, and I wasn't even employed at the time.

CHAIR KENNEDY:  You are aware that the Sheriff has stated repeatedly in public that all the Jump Out Boys have been rehired or reinstated?

MR. TYLER:  I'm not aware of that.  I do not know much about the Sheriff's Department today.  I have no personal knowledge about it.  I know what I read in the papers.  I know what I hear from people inside who are occasionally willing to talk to me.  I don't happen to know about that quotation and so

I don't know that he has said that --

CHAIR KENNEDY:  What about the Vikings?

MR. TYLER:  -- or it's incorrect.  Just so everybody knows, I do know that that statement is incorrect.

I'm sorry.

CHAIR KENNEDY:  Okay.

The Vikings, you were -- you were in leadership when the Vikings scandal broke; right?

MR. TYLER:  By -- by the "Viking scandal," you mean the class-action lawsuit at Lynwood?

CHAIR KENNEDY:  And the statement by U.S. District Judge --

MR. TYLER:  Hatter.

CHAIR KENNEDY:  -- Terry Hatter that they were a White Supremacist, neo-Nazi gang.

MR. TYLER:  I was a lieutenant at the time that occurred, and I'm sorry, I -- I lost track of the question.  I do know about that.

CHAIR KENNEDY:  Okay.  Do you know if the Department did anything to notify accused people in criminal trials that the testifying deputy was a tattooed member of the Vikings?

MR. TYLER:  I do not know.

CHAIR KENNEDY:  If you don't ask -- if leadership doesn't ask deputies if they are in these tattooed law enforcement gangs, how will leadership ever be able to advise prosecutors

in -- who are calling them in criminal trials that they have this affiliation so that the prosecutors can meet their Brady obligation to people who are accused of, sometimes, extremely serious crimes?

MR. TYLER:  Well, I don't know every provision of the Brady versus Maryland decision.  I believe that the Sheriff's Department complied with it as required by the LA County District Attorney's Office during a time period I was working, but I was not at a level where I was involved in individual cases one at a time.  I know that we attempted to give Brady information to the District Attorney's Office at one juncture, and they were hesitant to take it because there was some concern about the legality of police personnel records.  And I don't know whether the Brady versus Maryland decision directly addresses subgroup tattoos so I'm -- I'm afraid I can't answer the question capably.

CHAIR KENNEDY:  Well, it does address impeaching information about testifying deputy witnesses; right?

MR. TYLER:  I'm sure it does and --

CHAIR KENNEDY:  And do you think if someone is a member of the Wayside Whities and the defendant is African-American, wouldn't that be impeaching information about a deputy?

MR. TYLER:  Potentially.  But I'd have to know a little bit more about the Wayside Whities and what they stood for.  I understand that wasn't about being white, but I'm not sure I'm

right.

CHAIR KENNEDY:  The name "Wayside Whities" isn't about being white?

MR. TYLER:  I'm telling you what I've heard about an explanation concerning that group that is no longer in existence, to my knowledge.

And I happen to agree with you that potentially impeaching information should be offered to the DA and discussed with him.  If he decides, well, that's not really a Brady requirement so we don't want to risk forking it over to the defense attorney, that's his decision.  Discussing it with them makes sense to me so I agree with that part.

CHAIR KENNEDY:  But the prosecutor won't know unless the Sheriff's Department tells the prosecutor.

MR. TYLER:  Unless they have information on our personnel who are still working, who have Brady material in their past history, you're correct.

CHAIR KENNEDY:  It's 11:08.  We have gone over two hours. You've been a good sport.  We're going to take a 15-minute break.

Thank you so much.

(A break was taken from 11:08 a.m. to 11:24 a.m.)

CHAIR KENNEDY:  All right.  We're -- we need to resume this hearing because we have another witness after Mr. Tyler.

Neal, can I trouble you to take the stand again?

I don't have any questions.  I just want to make sure that anyone else who has a question, then we're going to --

MR. TYLER:  Oh, okay.  I thought you were kidding.  It was a break.  I'm sorry.

CHAIR KENNEDY:  We -- we really appreciate all of your testimony.

MR. TYLER:  Oh, thank you.

CHAIR KENNEDY:  So I don't have any questions.

Does any other commissioner?

Hans.  All right.

COMMISSIONER JOHNSON:  Hi, there.  Thank you, Mr. Tyler.  Thank you for your presence here today and for your testimony and your observations about troubleshooting, to say the least, within the Department.

The question I wanted to ask was about whether the law and changes in the law and policy -- which didn't figure, I don't believe, into your expressions of the leverage that commanders have over accountability -- whether changes in policy and the law might be factored into those forms of accountability and the messages that commanders can share with deputies in eradicating or at least stigmatizing and bringing to their attention the presence of deputy gangs.  How does the law figure into those series of pieces of leverage and/or how might it?  How might the articulation of law and policy be factored into those leverages?

MR. TYLER:  It very much does.  It is a valuable piece of leverage, as you put it, if you want to put it that way, for any mentoring process because what -- part of what mentoring is about is how to not get in trouble in a business where it's as easy as falling off a log to get in trouble because there's so much liability out there about the decisions that policemen have to make.

It's mentioned in the document there, the considerations document, that there's a Penal Code section that makes at least one of the highly suspected aspects of the groups illegal, and that's exclusion of people on the wrong basis.  I mentioned in there that -- I updated the interview discussion questions with that awareness after Max Huntsman told me the law had been passed with that provision because I realized that, as you say, a mentor who is either interviewing with those questions in that format or doing his own thing should have among his information valuable to increase the wisdom of the mentee the fact that it's illegal to do that thing, exclude people on the basis of -- et cetera.

So it factors in directly, and -- to answer the question how does it factor in and if there were additional -- if there were -- my concern about policy, and I'll stick with the one I was working on, is that it be enforceable and respected.  I don't mean liked.  I mean respected as okay.  That's the rules  Okay?  And failing that, especially failing

enforceability, I almost don't see a need for it.

Now, we can split hairs all the time about, you know, policy statement should be general and the rules are what you enforce. I don't want to go there. I'm considering policy, regulations, rules, procedures all in one glump. Okay? So if that stuff isn't enforceable what they're doing in the Department Manual of Policy and Procedures? Maybe it's symbolic of intent, but it's not as useful as it could be unless it is enforceable and respected and also known about.

So part of the mentoring would be making people aware "Hey, not only did we want to rap with you about our concerns about the deputy subgroups" -- there I go going soft again -- but also we want to inform you that there is new legislation that's been approved, and it's in state law now. It's in that thing we enforce called a Penal Code that certain activities that these subgroups are known or suspected to be involved in could be considered illegal and result in your termination.

That's a long yes.

CHAIR KENNEDY: Anyone else?

Okay. I think we can excuse you, Mr. Tyler. If we wanted you to come back, is that an option?

MR. TYLER: Yes. If you're brave enough to have me.

CHAIR KENNEDY: Thank you so much.

COMMISSIONER GIGGANS: Thank you so much.

MR. DEIXLER: Before Mr. Tyler leaves, I just thought I'd

also tell the commission he has volunteered to assist us in the report-writing aspect of this so we'll have all of his experience and judgment to assist us further.  So...

COMMISSIONER BONNER:  Excellent.

CHAIR KENNEDY:  Oh, thank you.

COMMISSIONER COOPER:  Thank you.

CHAIR KENNEDY:  Thank you.

COMMISSIONER GIGGANS:  You're a scholar and a gentleman.

MR. TYLER:  That's the first time I heard that. (Inaudible) tell my family (inaudible).

CHAIR KENNEDY:  Mr. Deixler?

MR. DEIXLER:  Mr. Pacheco has the next witness.

CHAIR KENNEDY:  Mr. Pacheco, I am so sorry.

MR. PACHECO:  We call Eric Strong.  If you'll give me a minute, I'll --

CHAIR KENNEDY:  Sure.

Would you state and spell your name.

MR. STRONG:  Eric Strong.

CHAIR KENNEDY:  Okay.

MR. STRONG:  E-r-i-c S-t-r-o-n-g.

CHAIR KENNEDY:  Mr. Strong, could you raise your hand.

Do you swear or solemnly affirm, under penalty of perjury, to tell the truth, the whole truth, and nothing but the truth?

MR. STRONG:  Yes, I do.

CHAIR KENNEDY: You may be seated.

Mr. Pacheco?

MR. PACHECO: Thank you.

Good morning. Thank you for --

MR. STRONG: Good morning.

MR. PACHECO: -- being here today.

You are here pursuant to a subpoena; correct?

MR. STRONG: Yes.

MR. PACHECO: Have you worked in law enforcement previously?

MR. STRONG: Yes, I have.

MR. PACHECO: Can you tell us where you first started in law enforcement?

MR. STRONG: I first started my career with the Compton Police Department.

MR. PACHECO: And what was your job when you were at the Compton Police Department?

MR. STRONG: I had a number of assignments. I obviously started off as a Patrol trainee. I was a field training officer, I worked the Gang Unit, I worked on the SWAT team, and I was also on what we called a task force -- Metro Task Force, and more or less a field supervisor.

MR. PACHECO: How long did you work in Compton?

MR. STRONG: Little over seven years.

MR. PACHECO: And after that position did you take another

law enforcement position?

MR. STRONG: Actually, yes. I had two. I -- I did a short stint at Pasadena, less than a year, and I -- when I left Compton, I actually went back to Compton PD, and then I was absorbed into the Sheriff's Department in 2000.

MR. PACHECO: So in 2000 is when you started with the Los Angeles Sheriff's Department?

MR. STRONG: Yes, sir.

MR. PACHECO: And what was your first position with the Sheriff's Department?

MR. STRONG: My first position was -- actually, I worked in Court Services as a bailiff.

MR. PACHECO: Okay.

And how long were you with the Sheriff's Department?

MR. STRONG: I've been there since 2000, so a little over 22 years now.

MR. PACHECO: And can you share with us some of the positions that you've held in the Sheriff's Department?

MR. STRONG: Yes.

I worked with our STAR Unit where I worked in the schools teaching our DARE and SANE programs.

I worked at Lennox Station for a while, and I was assigned to the Youth Center as the PAL coordinator, Clergy Council coordinator, and we put together curriculums and programs for youth. I worked in the Lennox Station side as an

operations deputy.

I promoted to sergeant, and I worked at Century Station. I left Century Station and went to Internal Affairs Bureau.

I then promoted to lieutenant, and I went to Custody where I worked at Men's Central Jail and Twin Towers for a couple of years. I left there, and I was the unit commander of our Advocacy Bureau.

After leaving Advocacy, I went to South LA Station where I was the watch commander, operations lieutenant, and unit commander. Kind of held a lot of different hats there depending on what was going on.

I then went to Audit and Accountability Bureau where I was the operations lieutenant as well as the unit commander, and I'm now assigned to Court Services Bureau.

MR. PACHECO: And did you also attend training at the federal level?

MR. STRONG: I did, yes.

MR. PACHECO: And what was that training?

MR. STRONG: The FBI National Academy.

MR. PACHECO: And when did you do that?

MR. STRONG: 2016.

MR. PACHECO: And what did that training consist of?

MR. STRONG: It's a residential executive leadership training that's pretty highly coveted in law enforcement. It

speaks to leadership.  It speaks to national-level issues.

It's 200 and -- my class had 231 students representing 48 states, and I think 15 or 16 of those were international.  So it really gives you a very broad-view perspective of -- of law enforcement, not only domestic but in other -- in other areas of the world as well.

MR. PACHECO:  And at the Department, you've worked in Custody and on Patrol and as a supervisor; is that correct?

MR. STRONG:  Yes, sir.

MR. PACHECO:  And when you were in the Sheriff's Department, other than the stations to which you had been assigned or the areas to which you'd work, did you visit other areas in the Department?

MR. STRONG:  Yes.

MR. PACHECO:  Do you feel that you have a very good understanding of the Department as a whole and its deputies?

MR. STRONG:  I think I have a good understanding, yes.

MR. PACHECO:  Much of our discussions in the commission here have been about sheriff deputy gangs so I'd like to focus your attention on that.

Do sheriff deputy gangs, also referred to as law enforcement gangs, cliques, or subgroups, exist in the Los Angeles Sheriff's Department?

MR. STRONG:  I believe they do.  Absolutely.

MR. PACHECO:  How widespread is that problem?

MR. STRONG:  I don't think it's as -- when you -- are you talking about numbers or, you know, as far as the different stations?  I mean, there's reports out there that there are, you know, 17, 18, 19 different subgroups, cliques, gangs.  As far as numbers, I don't have an accurate number.  I know OIG has identified at least, positively, I think a little over 40. But it's been something that's been talked about for a very long time.

MR. PACHECO:  Have sheriff deputy gangs existed in the Department for a long time?

MR. STRONG:  To my knowledge, well before I joined the Department, yes.

MR. PACHECO:  And were you a member of a sheriff deputy gang?

MR. STRONG:  Never.

MR. PACHECO:  In terms of sheriff deputy gangs, there's a qualitative aspect I want you to focus on.  What types of behaviors did you see gang members involved in in different aspects of the station?

MR. STRONG:  You know, it could be criminal behavior, and I speak specifically to I investigated a case where deputy gang members assaulted other deputies at a -- at a party.  It could be biased policing, excessive force, you know, any number of things that -- that violate the public trust and do things that are -- are -- are opposed or against policy and the law.

MR. PACHECO: And in your experience, did sheriff deputy gang members control shifts and assignments in the various stations?

MR. STRONG: They can.

MR. PACHECO: And did they have a voice in certain areas in the Department with regard to promotions?

MR. STRONG: Yes.

MR. PACHECO: Did certain gang members impose financial obligations on other gang members, particularly the younger deputies?

MR. STRONG: Yeah. I -- I've heard that often. Not that I personally saw, but there is a -- a -- a common term in the Department that you're being "taxed."

MR. PACHECO: Getting "taxed." So that's sort of a -- a street-gang-type of term; is that correct?

MR. STRONG: That's exactly what it is.

MR. PACHECO: And this commission has heard testimony about "chasing ink." Are you familiar with that concept, and can you explain it?

MR. STRONG: Yes.

I've heard that many times and, you know, what it boils down, in my opinion, to is a person that wants to be accepted, wants to be included in a group, and therefore, they may do things that they think are going to get them noticed or favorably looked upon by those people who are controlling the

ink or who have the tattoo and pretty much give you the blessing to say, yes. You're allowed to get it now.

MR. PACHECO: Do sheriff deputy gangs, law enforcement gangs, operate openly in the Department?

MR. STRONG: Well, when you say "openly," can you clarify just a little bit?

MR. PACHECO: Sure.

Do they have a list of their members?

MR. STRONG: No.

MR. PACHECO: Do they have an open process for people to apply?

MR. STRONG: No. Not that I'm aware of.

MR. PACHECO: Do they hide their identity from -- from certain members of the public or certain members of the Department?

MR. STRONG: Yes.

MR. PACHECO: Do they -- do they operate openly with regard to their voice about shift work or promotions?

MR. STRONG: You know, when you -- when you speak "openly," I just want to clarify something, that within their station or their facilities they may operate openly. However, when you're speaking to somebody like myself that's a -- a sergeant or lieutenant that's not -- that's not part of that, then it's not something that they're going to come to me and say, "Hey, we're the deputy gang, and we want to make sure that

all of these people are on this shift."

So within their groups and, you know, within their -- their training and scheduling, they may speak openly about who they want, where they want them, how they want them, but it's not something that is -- is openly -- like you said, there's -- there's no list of the qualifications that are needed to join a deputy gang. It's -- you know, I think if it was ethical behavior, you'd post it on the wall like you do our Baker to Vegas times, you know, but that's not the case. So it's -- it's -- I'd say it's pretty secretive.

MR. PACHECO: And what effect does the existence of law enforcement gangs have on the community?

MR. STRONG: It -- it violates the community, it violates the trust, it creates an atmosphere of -- of oppressive behavior, illegal detentions, excessive uses of force. It has a number of -- of impacts on our communities, and it -- and it just really damages the entire reputation of -- of the Department and law enforcement.

MR. PACHECO: And so when deputies testify in criminal cases in court, does the existence of sheriff deputy gangs impact their credibility?

MR. STRONG: I would think so, yes. Especially if it's known, if it's brought out that they're a member of -- of a deputy gang and overall, it has, you know, hampered the public trust of the Sheriff's Department. You know, whether you're a

deputy gang member or not, if you wear that uniform and you wear that badge, it is tarnished because of the deputy gangs.

MR. PACHECO:  So you've been in law enforcement, sir, a long time.  You dedicated your career as a guardian of the public and so do you think that in criminal court proceedings it's important for the parties to know if a deputy who's testifying is a member of a law enforcement gang or a clique or a subgroup?

MR. STRONG:  I think that's vitally important.

MR. PACHECO:  And why is that?

MR. STRONG:  We've seen, you know, throughout history that if -- if you have less of an -- if you don't have ethical behavior, if you don't have an ethical standard that you stand to -- that you stand for, you are going to exert that, and you're going to have that influence over evidence, over witness testimony, over, you know, the reports that you write.  And as we've seen, if we find out that you have conducted this unethical behavior in one area, it oftentimes carries over and transfers into other areas.

And I -- I think that's something that needs to be vetted; it's something that needs to be brought out in the public especially when you're dealing with criminal cases.  If we're putting away somebody that we lied or we fabricated evidence on, number one, we could possibly be putting away an innocent person.  Number two, the greater harm is that we've

left the true perpetrator out in the public to continue to harm people.  So it -- it's a vast variety of violations.  It just -- it goes on and on in -- in what it does to the public.

MR. PACHECO:  Are law enforcement gangs the source of civil liability for the Sheriff's Department and, thus, the County of Los Angeles, in your experience?

MR. STRONG:  Yes.

MR. PACHECO:  Can you explain that a bit?

MR. STRONG:  You know, there's reports out there that -- directly connected to law enforcement gangs.  The County's paid out over $50 million.  I think it's even higher than that.  You know, bottom line is the County oftentimes will settle many of these cases because they don't even want it to go to court.  There's huge amounts of money that is paid out in lawsuits and settlements based on, you know, some -- some nefarious behavior, or even some just poor decision-making.

And if that particular behavior is part of that "chasing ink" concept that we talked about -- if that particular behavior is -- is -- is a failure on the leadership and a failure on the station and on the training, it -- again, you know, the -- the -- the barometer for that is -- is -- is never-ending.  It's just going to keep going.

So absolutely.  It -- it -- it has a negative effect, and it -- and it impacts our taxpayer dollars.

MR. PACHECO:  Do you think that the existence of law

enforcement gangs serves the end of -- ends of justice in the investigation and in the prosecution of criminal cases by law enforcement?

MR. STRONG:  Can you repeat that one more time?

MR. PACHECO:  Sure.

Does the existence of law enforcement gangs serve the ends of justice in the investigation and in the prosecution of criminal cases by law enforcement?

MR. STRONG:  Does it serve it?  Is it kind of like noble-cause corruption?  No.  If I'm -- if I'm understanding your answer -- I'm sorry -- your question.  Does law enforcement gangs have -- are they a means to an end or are we looking at the end result, if I'm hearing you correctly?

MR. PACHECO:  Let me break it down this way.  So law -- sheriff deputy gangs exist.  You'd agree with that.  And do -- does their mere existence have an impact in connection with the investigation of criminal cases?

MR. STRONG:  Oh, yes.  Yes.  I would say yes.

MR. PACHECO:  And explain that a bit for me.

MR. STRONG:  Again, what it really boils down to is the behavior and anything that is unethical.  If it's abuse of their power in any way, if you are a member of a law enforcement gang, you cannot be trusted, you cannot be relied upon, your credibility is lacking.  So, therefore, how can you write reports?  How can you present evidence?  How can you get

on a stand and testify and have people believe you?

And the -- the reality of it is -- is that, if we don't know that you're on the gang and we give you that credibility, we believe those reports and we look at the evidence and it's not verified, it's not looked upon, or it's not -- it's not questioned, yes, it can absolutely have a negative impact.

I mean, just by the mere fact that we have illegal detentions, that right there is the start of a criminal investigation, and if that detention is illegal from the very get-go, then everything behind that is as well.

MR. PACHECO:  So, in your view, we can't think about sheriff deputy gangs simply as an isolated policy event in the Sheriff's Department.  It has a greater place in the community; is that accurate?

MR. STRONG:  Very accurate, yes.

MR. PACHECO:  And that's accurate because it infect -- affects the investigation of criminal cases; is that right?

MR. STRONG:  I think it affects -- in the investigation of criminal cases, it -- it affects the Department; it affects the other deputies that are working in those stations as well. Where -- whereas, it -- it -- it just has a -- an effect on the public and public trust.  I mean, yes, it goes on and on.  But definitely, yes, in criminal cases.

MR. PACHECO:  So you -- you mentioned something important,

that the existence of sheriff deputy gangs affects other deputies.  I'm assuming you're saying the other non-gang member deputies.  What's the effect on a non-gang member deputy of the existence of sheriff deputy gangs?

MR. STRONG:  Well, if you're not a member of the gang, then you're pretty much excluded.  You know, a lot of times, if you are not part of their group, you may not get the choice assignments in terms of what car you're working or what area you're working.  You might not get the backup, especially if you're vocal or adverse to -- to them, you know.  And what that does is it -- it -- it -- it influences other personnel, because when you're out there in the middle of the night and you're by yourself, what do you want when you go to a dangerous call?  You want backup.  So therefore, what do you feel like you have to do in order to be out there and be safe?  You have to either remain silent.  You have to kind of go along to get along.  There's a number of things that it -- that it causes deputy personnel.  I can tell you, me personally, it -- it causes a great amount of anguish.  Just I meet people, and "Hey, what do you do for a living?"

"I'm in law enforcement."

"Where do you work?"

"The Sheriff's Department."

And whether it be a joke or whether they're serious, "Oh, are you one of the gang members?"

You know, and I know lots of deputies who have had these types of interactions with just people.  So it -- it just tarnishes.  And if you don't feel good, if you don't feel proud about what you're doing, you're more liable to go park under a tree and -- and -- and not be proactive and not get out there to do, you know, the positive work for the public that you're there to do.  You're just going to wait 'til the radio call comes, and you're going to go handle those calls.

MR. PACHECO:  So is the existence of sheriff deputy gangs consistent with the principles of professional policing?

MR. STRONG:  No.

MR. PACHECO:  Is it consistent with the values of professional policing for the Sheriff's Department to have former or current members of the sheriff's -- of sheriff's deputy gangs who are in the leadership positions?

MR. STRONG:  Definitely no, for current.  Former, I think it depends on what their current state of mind or position is with that.

MR. PACHECO:  So why don't you explain a bit more why it's not a good idea for the Department to have members of its leadership who are current members of sheriff deputy gangs?

MR. STRONG:  Well, I -- I guess I could equate it to would you want to put, you know, a -- a person of any type of -- of lacking -- lacking in any type of ethical behavior over any kind of organization?  And so if deputy gangs -- and when I say

"if" -- deputy gangs right now are -- are our nemesis.  They're our hill.  And so you have a leader -- the very top leader that's refusing to even acknowledge that they exist.  So what does that mean to everybody beneath him?  It means we do the same thing.  Many of them will say, "Well, they don't exist."  And if you have one of those people beneath him that is a current member, I think it emboldens them.  It gives them the ability to continue to foster that type of -- of environment and leadership.

It is something that it -- when somebody comes to, let's say a current member, and they say, "Hey, we have a complaint that," you know, "this deputy is a gang member and he did something," you know, "unethical, illegal, immoral, and we're submitting this complaint to you," can you really truly believe that he's going to evaluate or she's going to evaluate it in such a way that it -- it gives an objective standing that's in the best benefit of the public and the public trust?  I mean, it's just -- it's -- it's kind of like putting somebody with an addiction over -- over a pharmacy full of -- full of drugs, you know.  It's -- it's just not going to be a good end result.

MR. PACHECO:  Is it a truthful statement if someone was to deny that sheriff deputy gangs exist presently in the Department?

MR. STRONG:  I don't believe it's true at all.

MR. PACHECO:  Is it misinformation if someone was to deny the existence of law enforcement gangs in the Department currently?

MR. STRONG:  Yes.

MR. PACHECO:  Let's shift our attention briefly to the investigation of sheriff deputy gangs.  And you've investigated a variety of matters in the Department; correct?

MR. STRONG:  Yes.

MR. PACHECO:  And so you're -- got skills as an investigator in the Department?

MR. STRONG:  Yes.

MR. PACHECO:  How important are station tattoos in investigating law enforcement gangs?

MR. STRONG:  I -- I think the station tattoo -- if you're saying "station tattoo," they've been along -- around for a long time.  They are -- there are station tattoos that are not necessarily affiliated with, you know, the deputy gang culture. However, when we're looking at investigations which have occurred wherein a shooting happens, and after that shooting, a deputy gets a tattoo and it's a tattoo affiliated or associated or directly connected to one of the -- the known deputy gangs, that is a problem.  This has been brought about in depositions. It's one of the things that has cost the County a lot of money. Yeah.  I think that goes to kind of like the "chasing the ink" concept.

In these investigations, I -- I think it's important, but I also think is -- what's really important is to investigate the behavior, the intent of the behavior, and -- and whether or not that behavior was part of, at least for me as an Internal Affairs investigation, did it violate policy? Did it violate the law and, you know, was it consistent with, you know, what our -- our ethics and morals tell us to do?

MR. PACHECO:  And as an investigator, how important are gang names like the Grim Reapers, the Executioners, the Regulators, the Banditos when investigating law enforcement gangs?

MR. STRONG:  If you're investigating deputy gangs, then that's very important.

MR. PACHECO:  And how important is it when investigating sheriff deputy gangs to look at gang membership rituals?

MR. STRONG:  I -- again, when you're investigating those gangs -- excuse me -- all of those things are -- are vitally important when that's what the -- the basis of your investigation is.

MR. PACHECO:  And there are investigators and detectives in the Sheriff's Department that investigate street gangs; correct?

MR. STRONG:  Yes.

MR. PACHECO:  And those investigators look at indicia of gang membership like gang tattoos, gang names, and gang

rituals; is that right?

MR. STRONG:  Yes.

MR. PACHECO:  And so that's a -- a -- a -- a bona fide investigative tool that one uses when investigating gangs, whether it's a street gang or a law enforcement gang; is that --

MR. STRONG:  Yes.

MR. PACHECO:  Want to take you back to 2010.  Can we focus on Quiet Canyon -- Cannon -- that's a banquet hall -- and that's an investigation, I believe, that you were the lead investigator for; is that correct?

MR. STRONG:  Yes, it is.

MR. PACHECO:  Can you tell us what Quiet Cannon was about?

MR. STRONG:  Quiet Cannon was a Christmas party for Men's Central Jail, which is something that most stations or facilities have, and basically what happened was a group of deputies, six of them, jumped on and assaulted -- and honestly, what I call it is did a gangster beatdown on two other deputies, and that was caught on video.  There were dozens and dozens of -- of witnesses.  And the basic premise behind that is that the two deputies that were working Visiting -- or that worked Visiting -- disrespected members of the 3000 floor deputies.

MR. PACHECO:  And just for some folks that don't know, the 3000 Boys, it's a sheriff deputy gang in the jails?

MR. STRONG:  Yes, it was.

MR. PACHECO:  And did -- did you work with other investigators on the matter?

MR. STRONG:  Yes.

MR. PACHECO:  And did they report to you?

MR. STRONG:  Yes.

MR. PACHECO:  And did you prepare a report?

MR. STRONG:  Yes.

MR. PACHECO:  And did you share that report with anybody in the Sheriff's Department above your rank?

MR. STRONG:  Yes.

MR. PACHECO:  And who did you share a report of your findings with?

MR. STRONG:  Well, it would've went through my immediate chain of command.  My team lieutenant, my captain at Internal Affairs Bureau, and then that case was presented to Paul Tanaka.

MR. PACHECO:  And at the time what was Paul Tanaka's rank?

MR. STRONG:  He was an assistant sheriff.

MR. PACHECO:  And, you know, there's been some press on Quiet Cannon that referred to it as a drunken brawl.  Was it more than that based on your investigation?

MR. STRONG:  Yes.

MR. PACHECO:  And was it more than that because it involved sheriff deputy gang members beating up other deputies?

LACS CIVILIAN OVERSIGHT COMMISSION, October 14, 2022

MR. STRONG:  That was part of it, yes.

MR. PACHECO:  What's the other part of it?

MR. STRONG:  You know, a drunken brawl is, to me, people get drunk, they get intoxicated, they get aggravated, irritated, and a fight ensues.

This, like I said, was a jump -- jumping.  I mean, you have six deputies that literally -- I don't want to say in a coordinated fashion -- but at the same time, jump on, and not only punch on, but while they're on the ground, kick and stomp on other deputy sheriffs.  That was an absolute criminal assault and that is behavior that, you know, street gang members partake in.

MR. PACHECO:  So you shared your findings of this with immediate supervisors and, ultimately, with Paul Tanaka.  What did Tanaka share with you about the findings that you raised with him about Quiet Cannon?

MR. STRONG:  Well, what I think is important to note is, as I stated, there was video, and there were numerous people that were there.  And, of course, there were probably -- if I don't -- if I remember, I know there was over 100 interviews, and in those interviews, there were a lot of people who basically said they weren't there, they didn't see anything.  And we had video evidence that very clearly showed that not only were they there present, but they either protected those that were doing the assaulting by keeping other people away,

and they lied in their interview.

So when it was presented to -- to Paul Tanaka at the time, we presented him with those six that were obviously identified as -- as -- as the culprits of the assault.  And then we began to identify other members that we felt should've been made subjects, or could be made subjects in the investigation for giving false statements in an investigation, and we were told no, that that was not of his concern.  He was simply going to make an example out of the six, and they were going to get fired.

And, you know, I remember my lieutenant even pressing and saying, "Yeah.  But we have -- we probably have another half-a-dozen, maybe even to a dozen, that we can make subjects."

And he got a little -- probably a little indignant and basically -- basically, very firmly said, "No.  We're not doing that.  We're not looking at any of that.  We're going to fire these six and that's it."

And that was his -- his stance on it.

MR. PACHECO:  And was this an opportunity for investigators in the Sheriff's Department and the assistant sheriff, Paul Tanaka, to investigate sheriff deputy gangs, in particular, the 3000 Boys?

MR. STRONG:  Yes.  It -- it was an opportunity.

It was also an opportunity to set a standard and a

tone, you know.  You don't lie in an Internal Affairs investigation where you're ordered to tell the truth, and you set that standard so people will know.

MR. PACHECO:  Did Mr. Tanaka dissuade you and others from investigating sheriff deputy gang members further in that investigation?

MR. STRONG:  I -- I won't say that he dissuaded us from investigating further.  I mean, at that point, the investigation was pretty much done, and, like I said, you know, we -- we dug into why the assault occurred, which, like I said, boiled down to a level of disrespect.  But he definitely did dissuade the decision makers, because as the investigator, I'm simply the fact finder, but he definitely dissuaded the decision makers, which should have been the -- the chief of that division against naming any other personnel as subjects and disciplining them.

MR. PACHECO:  Were -- if the discipline only went to six members and more people were involved and some of whom lied, what happened to them?  Did they go back into the Department?

MR. STRONG:  They stayed on the Department, and actually, I -- I know of at least one or two who've promoted since.

MR. PACHECO:  And Mr. Tanaka was promoted after this; right?  He became undersheriff?

MR. STRONG:  Yes.

MR. PACHECO:  The question has arisen, asked by some of

117

the commissioners on the commission, about how is it that law enforcement gangs have endured in the Department?

Can you address that?

MR. STRONG:  The leadership has allowed it.  You know, not -- not -- there's a saying, you know, "What do deputies do?"  And basically, they do what they're allowed to do.

We have been hearing about this -- this issue before my time, before I was even old enough to probably read -- since the 1970s -- early 1970s, and I -- I think it's -- it's mostly been ignored.  I think, you know, whenever it comes up, they say, "Well, let's do a report.  Let's put together a commission.  Let's do a panel on it," but I don't think it's been truly addressed.

I can tell you, you know, in -- in my 22 years on the Department, I have lots of conversations with my wife, who's been on the Department her entire career -- closer to 28, 29 -- I have never heard the sheriff or any other executive-level member of this Department come and say, "Deputy gangs shall stop, they will stop, and they're not allowed."

So if -- if you're not willing to make that statement, if you're not willing to -- to -- to establish that as your -- as your expectation and stance, it's just going to continue to -- to fester.

MR. PACHECO:  One of the commissioners, this morning, asked a question about rank and compared it to the military.

Do you think that the Sheriff's Department, if it got a direction from the Sheriff to stop the existence of sheriff deputy gangs, that there would be a response to that clear, definite direction?

MR. STRONG:  It would not be overnight, but yes.

You know, I have seen, in my career, three different sheriffs, and with those three different sheriffs, you see a shift almost immediately in the mindset of the leadership based on what they've established as their expectations.

And just to give you a quick example, you know, under Sheriff McDonnell, when I worked at Audit and Accountability Bureau and part of the Shooting Analysis Committee, Sheriff McDonnell was very serious about accountability, and you know, he wanted to send a message, you know, "The unethical behavior will not be tolerated."

So when you go to these hearings, when you go to these -- when you present disciplinary cases, you hear executives in the decision-making process say, "This is what the sheriff has said.  This is the standard the sheriff has established."

Now, soon after, you know, again, at Audit and Accountability Bureau as the -- as the unit commander, now Sheriff Villanueva comes in, and we go to a shooting analysis, and he has set the tone.

You know, one of the things he tried to do was bring

back a number of deputies that'd been fired. So now you see people in this decision-making process saying "Oh, well, you know, this discipline might be a little bit too harsh. I don't think this is what the sheriff wants."

So will it stop it overnight? No. But will it set the tone of what's expected? Absolutely.

MR. PACHECO: Want to bring this back somewhat to Quiet Cannon, and it sounded to me that it was a lost opportunity to address sort of this law enforcement gang issue and other things.

Is Quiet Cannon, in -- in your view, an explanation in whole or in part about why sheriff deputy gangs have persisted over the years in the Department?

MR. STRONG: I think it's a good example of why they have.

MR. PACHECO: And why is that?

MR. STRONG: Again, if you -- if you don't have leadership that takes it seriously, and if you don't have the leadership that -- that sets the tone for what's expected and what's accepted in the Department, people follow that.

You know, there's a lot of writing and effort that goes into justifying deputy behavior a lot of times, even in our complaints of our uses of force. I reviewed complaints and uses of force and things that are clearly out of policy or wrong. You will have sergeants and lieutenants that go through a great deal to make it right. I call it "writing it right."

W-r-i-t-e it until it's r-i-g-h-t.

And they -- and they go through this justification process, and when they get called on it, I've heard repeatedly "Why -- "You know, Eric, I thought that's what we're supposed to do. We're supposed to support the deputies."

It's a mindset, and that mindset comes from the higher-ups.

MR. PACHECO: If Sheriff Villanueva wanted to rid the Department of sheriff deputy gangs, do you think he could do so?

MR. STRONG: Again, I don't know if -- if ridding the Department -- it's definitely not an overnight fix. I don't know if it can happen even in one term, but he could have made serious inroads and progress in doing so and shutting down the -- the continuation of them.

MR. PACHECO: Let's talk about some ideas that you have that would be important for this commission to consider on how to eliminate sheriff deputy gangs, law enforcement gangs. Can you share some of those ideas with us?

MR. STRONG: How much time do we have?

MR. PACHECO: The floor is yours. Keeping in mind, we're looking at the lunch hour.

MR. STRONG: Right.

You know, I think first and foremost is you -- you have to acknowledge it. You have to say that they exist, and

you have to acknowledge that they have been a problem.  You have to acknowledge what they do to our public.  You have to acknowledge all of the -- all of the negatives that go along with it, and you basically have to set the standard.  And like I said, it starts with the messaging.  It starts with the messaging from the very top about what's accepted, what's not, what's tolerated, what's not, what's -- and what the expectations are.

Then there comes the accountability piece.  You know, when you have people, for example, this investigation, where people that worked 3000 floor clearly supported their comrades or their partners, whatever you want to call them, and they lied in internal investigation.  They have to be fired.  There's no room for them on this Department.

You know, we have depositions, and we have deputies who unfortunately feel like they have to testify under a disguise.  Why?  Because when the deputies come out and actually speak up against it, they're the ones that are ostracized.  And who are they ostracized by?  The leadership.  They're ostracized by the guy that's, right now, at the very top.  So, you know, there's accountability, there's the acknowledgement.

You know, we have depositions, we have criminal investigations, we have Internal Affairs investigations, and what I will say to this is that there has been years and years

of discussions and talk about deputy gangs. These deputies that are participating in this, we don't need to continue to give them more warnings. It's time to take action. They have heard it time and time again. And guess what? Nothing's been done, so they continue going, you know. So I think it's time to take action.

And I understand -- and as the former unit commander of Advocacy, I understand there is a huge component of employment law that is going to be at issue, but at some point, you have to start, you know, pressing the issue. I think we have to stop pressing what I call "the Staples commercial." We have to stop pressing the easy button, and you have to get out there and you have to fight those causes.

And I know, you know, sometimes our employment law attorneys want to say, "Well, this is a good case to settle," and sometimes those are not good cases to settle, you need to press the issue. And when Civil Service gives them their job back, you know, you -- you don't put them back in a place where they can continue to harm the public, you know, which takes me to the next, you know.

Deputy gangs, their strength is in their numbers at one particular facility. So if we were to use Compton Station Executioners as an example, where is their strength? How many are really there? You know, most of our stations have 100 -- anywhere to 100 to 200 personnel. Are all of those station

personnel deputy gang members?  No.  But if there's 30 of them, and they're in very influential positions and I don't want them going to any other community and harming it, but if you take 30, they're a powerful group.  But if you take one, and you move them to another station, wherever you can -- you know what I mean? -- they're -- they're -- they're not going to have that influence.

There are a lot of places within our department that we can put deputies where they don't -- they -- they don't impact the public.  Let's just say we don't have the legal grounds to fire them.  Put them in Fleet.  Let them count tires and batteries.  Put them at Logistics.  Let them count flashlights and batteries, you know.  So, in other words, we -- we -- we -- we start putting them in these positions where they are not together collectively harming society and -- and that's a start.

You know, and there's -- there's the -- there's several different levels that we can go to, but I think it really just starts with -- with taking a -- an assertive stance.

MR. PACHECO:  The Department's extremely large and diffuse and there's a lot of territory and a lot of people.  How do you get them all on the same page?

MR. STRONG:  You know, it -- it -- it starts -- you -- you know, you have a -- a rank structure and, you know, within that

structure, everybody has their own, you know, area of responsibility. And, again, it starts with the leadership, getting everybody on the same page in those leadership positions, you know, and that's very difficult, especially with the amount of time that has gone on where this issue has continued, you know, to -- to -- to fester. It's going to take a very -- like I said, a very strong stance, and then there's going to have to be accountability to the leadership or for the leadership.

One thing I've noticed in the Sheriff's Department is that if you are a deputy, a sergeant kind of slows down as a lieutenant. The higher you go, the less accountability there is, and my theory behind that has always been, and I've worked Internal Affairs, I've worked Advocacy, and I've seen executive's cases where they get in trouble, let a deputy get in trouble, and it's the talk of the town. Let a commander get in trouble, and it's a big secret. I've always felt that because there's a handpicked process here, there's no legitimate, grievable testing process for executives that if people know that the executives are messing up, then that has a bad look on the sheriff because, "Well, I'm the one that selected this person." So they go through a great deal to keep it quiet. I think there needs to be, you know, proper accountability throughout the entire organization.

MR. PACHECO: How do you keep a sustained attention on

this issue of law enforcement gangs?

MR. STRONG:  You just -- you keep at it until, you know, you -- you are able to -- again, I think it's going to take, honestly, a generation.  It's going to take more than a term, and you have to continually acknowledge it.  You have to continually hold accountability to it.  You have to let, you know, and I'll -- I'm going to use Compton and East LA -- you have to let East LA deputies know that a Compton deputy got fired for participating in this.  You have to let Compton deputies know that a East LA deputy got fired or got 30 days off because of this, and if you're part of that problem, if we catch you doing it, you're going to get the same thing.

You -- you have to stay on top of, and you have to be transparent.

MR. PACHECO:  How important is civilian oversight to bringing an end to sheriff deputy gangs?  And I'd like to focus on groups like this commission, the Office of the Inspector General, the LA Board of Supervisors.  How important and what role do you think they play in shaping an outcome here?

MR. STRONG:  I think they play an important role.  Other than these hearings, what else are we hearing about it?  You know, and that's -- we're not hearing about this in the Department until, you know, Alex is called on the carpet, and he has to answer something in the media.  So I think that these type of oversights are important.  I think they are needed to

build public trust.

Not to -- not to digress too much, but I remember going to a NACOLE Conference and -- and actually seeing the passion and the energy that is put into oversight and why people are so interested in oversight. And -- and my -- my idea is that if you're doing what you're supposed to do when you're supposed to do it, you really don't care who's looking. It doesn't matter, you know. But I think oversight like this is -- is vitally important. I think we need to open our doors to oversight more and be more transparent. That's the only way we're going to build any trust.

MR. PACHECO: In your view, do you think the Sheriff's Department could disband law enforcement gangs without something like a federal consent decree or an appointed monitored by the court?

MR. STRONG: I -- I think that is a -- I think that's a positive direction, but I do think, in my optimistic view, that they could with the right people. I mean, we have consent decrees now. We've had many. And let's look -- and let's look at those and see how long they take to become -- to -- to get into compliance if they ever do.

I don't think that's the -- the absolute answer. I think what it is is that we've just not had the right people giving the right message for a very long time.

MR. PACHECO: Mr. Chairman, I pass the witness.

CHAIR KENNEDY:  Thank you so much.

Are there any commissioner questions?

Patti.

COMMISSIONER GIGGANS:  Yeah.

Hi.  Thank you so much for being here.

My -- my question has to do with -- within the Department because there are public statements that "We fixed the problem.  It's a -- it's a perception problem.  There's not really a problem, but we fixed the problem."

What about -- what about the rank-and-file?  How do they feel about that?  I'm sure that I'm -- well, no, I'm not going to make -- I'd like to hear from you what -- what -- what about the rank-and-file with that?  Are they -- do they catch on to some of that?  Do they care?  Does it matter to them that there's this controversy?

MR. STRONG:  In those members of the Department that I have talked to, and obviously, with over 9000, I haven't -- not talked to all of our sworn, but yes, they care.

Number one, it's like I said, sometimes you just meet somebody, and they think it's funny to ask if -- you know, once they know that you're from the Sheriff's Department, "Are you a member of one of the gangs?"

I think it's important to know that the vast majority of the deputy sheriffs and even -- and even sergeants and lieutenants and even executives -- and -- and I -- and I say

this not as a pat on my back, but during my campaign, I got phone calls from people that I didn't even realize knew me that were either retired executives or still executives or text messages that said, "Thank you," you know, for -- for -- "for," you know, "speaking to it and -- and being open and honest."

I think when you have examples, and I -- you know, I want to go back to some of the testimony that happened here, you know. When you have a chief or a former chief sit up here and -- and say that they were duped into obstructing justice, deputy sheriffs look at that, and -- and it diminishes the credibility of executives, it diminishes the credibility of law enforcement, and I get phone calls and -- and, you know, deputies are angry. They're angry that we're still talking about this.

So it -- it has a huge, huge impact on the vast majority. Unfortunately, I think what we don't see is the vast majority coming forward because, as we have seen, when you do, you're the one that's ostracized. And they want to get through their shift safely, they want to get home safely, and they want to make it through their career, you know, as -- as smoothly as possible.

COMMISSIONER GIGGANS: Just a followup.

Do you feel -- I mean -- well, in terms of our experience as commissioners, and we've heard a lot about this "us-and-them," you know, the Sheriff's Department on the one

side and the community on the other, and then divisions, a lot of divisions.  Do you think there is an us-and-them within the Department, also?

MR. STRONG:  Yes.  Absolutely.

You know, I've worked three different agencies and, again, you know, when I went to the FBI Academy, most agencies are not as big as the Sheriff's Department.  And one of the things that's -- that's clear to me is that, yes, there has -- law enforcement has created this us-and-them with the community, which we need to break that barrier down because we all come from some community.  But within the Sheriff's Department, when you have deputies that can't even treat other deputies with respect and dignity and -- and -- and just common courtesy because they don't work a certain station or they don't work a certain facility or they don't work a certain floor, how could you ever expect that they're going to treat the community right?

So there is a absolute division, you know, with -- with -- within this Department, and it's something that I have never seen.  I mean, I don't -- I don't care where you go.  You know, if you're in high school, you got the kids that are the skaters, you got the kids that are in the band, you got the jocks, and you got the nerds, and you got the rockabillies, you know.  There -- there's always going to be groups of people that -- that -- that -- that commune for a common interest, but

this common interest is -- is nefarious.  This common interest is -- is -- is divisive, and -- and that's the problem.

There is, absolutely.  And -- and it's known within the Department; there are jokes about it.  We call it "the Century nod."  You don't work Century, you say hi to your former colleague that you worked Custody with at a training, and -- that's all you get is a nod.  You know, there -- there -- it's -- it's known within the Department.  It's not a secret, I mean, and it's -- it's known all throughout, you know, everywhere you go.  So there's -- I -- I'm sorry to keep going on, but it's -- it's absolutely divided within.

COMMISSIONER GIGGANS:  Thank you.

CHAIR KENNEDY:  If what you're telling us is true, why do the law enforcement unions like ALADS -- why are they so supportive of hiding deputy gangs and opposing this body using subpoena power to unearth the evidence of deputy gangs?  It -- it doesn't seem to make sense.

MR. STRONG:  You know, I -- I've asked the same question, you know, many times, and I -- I have no idea.  I -- I think, you know, the -- the purpose of any union is to protect its members, to make sure that their members are treated fairly, to give equal representation to their members, but it appears to me that this union is -- and, again, from -- from what I've heard, seen, and even from the questions that were asked of me during this campaign, they want the person that's going to

allow them to get away with the most, and that is the reality of it.

I was -- again, when I go back to Internal Affairs, I would think that a union would want to say, "Hey, we're tired of paying money for your legal defense. You keep getting in trouble. Cut it out." You know what I mean? Because there's 8000 other deputies that aren't using any money for their legal defense, and you got a small few that are kind of using, you know, are -- are kind of burning through it.

I -- I've never been in the union leadership, not on this Department. I was in union -- union leadership at my other agency, but it -- it baffles me. It -- it baffles me to this day that they wouldn't want to -- why -- it's -- it should be an embarrassment to them. Not only deputy gangs but, you know, there's a slew of other, you know, illegal conduct and -- and -- and activity that goes on within this Department, and they defend it.

If it were me and I was a union leader, I would have a set -- set of criteria. "Look, you're going to pay your union dues, and we're going to -- we're going to support you, but I'm sorry, when we have DNA evidence on you sexually assaulting a female inmate, we're not going to back you, and we're not going to pay for your criminal defense or your administrative employment law defense."

And -- and you set those standards, and people know

what they're going to get, but they pretty much, you know, will spend a lot of money to defend, you know, just about anything.

COMMISSIONER GIGGANS:  Just a quick question.  It's a little bit snarky.

But is there any oversight of unions?

MR. STRONG:  Not -- not that I'm aware of.

CHAIR KENNEDY:  So -- so we're -- we're coming near the end, and -- and I just want to get your perspective on this.

Sheriff Villanueva has repeatedly stated during the campaign that oversight officials who question the existence of deputy gangs or law enforcement gangs -- and that's actually the term in the statute -- that -- that questioning whether there are law enforcement gangs in the Department is racist.  Do you agree with that?  He -- he says that it's racist to ask if there are deputy gangs in the Department.

MR. STRONG:  I don't see how it could be racist.  And if I can be a little snarky back?

CHAIR KENNEDY:  Yes.

MR. STRONG:  I mean, if you ask me, you know, when you -- when you -- when you speak specifically to Alex Villanueva, I -- I ask the question, "What's worse than an actual gang member?"  And what's -- to me -- and I worked gangs, I've been in -- in environments and, you know, just in my life -- I mean, to me, what's worse than an actual gang member is one that wants to be a gang member and he was never accepted, from what

I've heard, when he was, you know, working these stations anyway.  Because somebody that wants to be one is willing to do whatever it takes to -- to -- to get accepted and -- and be part of that group.

So I think it's a far, far reach to claim that it's racist, and I think it's a ridiculous claim.  But I think, you know, I've seen him over the years, and I've known him for many years.  He makes a lot of ridiculous claims.

CHAIR KENNEDY:  Thank you.

Anyone else?  Otherwise, we'll move to -- we'll excuse the witness and move to public comment.

Mr. Strong, thank you so much --

COMMISSIONER GIGGANS:  Thank you so much.

CHAIR KENNEDY:  -- for testifying here.

We're going to -- unless any commissioners want to make a comment, I think we're going to hear from the public because the public probably has a lot to say.

MS. WILLIAMS:  Our first speaker, Steve Krueger, followed by Vanessa Perez; Vanessa Perez, followed by Jacqueline Venters.

MR. KRUEGER:  How you doing?

I'm here today -- this has been quite a show.  You're going to hear the low end of it.

CHAIR KENNEDY:  We're listening.

MR. KRUEGER:  I -- back in 2015, I was a transient in San

Dimas, homeless, and I came upon the Sheriff's Department over there, and they do have a sheriff gang there called the Ruthless Cowboys. And I was homeless for about five-and-a-half years, and I kept trying to figure out, you know, why I'm having problems. Why am I being stopped? Why am I getting arrested? Why are these guys falsifying reports? And I was just amazed, you know.

August 1st, 2020, I was almost shot to death behind 7-Eleven just eating my breakfast. This is LA County.

So I want to pass you guys a little picture of something. You guys can keep it and make a paper airplane out of it.

Here you go, sir.

CHAIR KENNEDY: Thank you.

MR. KRUEGER: Here you go.

And we're going to take this to a whole new level.

At one time I was in custody, and when I was in custody of the sheriffs, I went out for in-custody surgery, and what you're looking at on that paper right there is a real-time satellite tracking device. The rectangle is a lithium battery, in the lower left corner would be a chip, there are metal prongs. When you actually look at the real MRI, you see it embedded in the back of my leg behind the calf. I had to go out and get a ligament fixed. They never repaired the injury. They figured I was -- they were banking on being a career

criminal. So they decided to drop this in me and then stalk me, harass me, and do a lot of fabulous stuff, and over the course of that duration, you know, I was kind of going cuckoo. So I finally -- on -- I believe it was August 30th of 2018, I went and had surgery done.

I'm going to try to sum this up.

CHAIR KENNEDY: Yeah. Because your time is up.

MR. KRUEGER: I'm --

CHAIR KENNEDY: So I think your --

MS. WILLIAMS: Sorry, sir. Your time is up.

MR. KRUEGER: Anyway. The surgery revealed what you guys are looking at right there.

CHAIR KENNEDY: Okay.

MR. KRUEGER: So I don't want any of this to sound like a rant. I'm asking for help. I need somebody from Department of Justice to sit down and go through my file. I'm willing to leave the satellite file here with you people.

MS. WILLIAMS: Thank you, sir.

CHAIR KENNEDY: This is your number on here?

MR. KRUEGER: Yes, sir.

CHAIR KENNEDY: Okay. I will talk to you personally.

MR. KRUEGER: I strongly suggest if there's any defendants, do not get medical attention in the Sheriff's Department because they will slide this in without your consent and violate your Fourth Amendment right to privacy, and

California --

CHAIR KENNEDY:  We'll talk more later.

MR. KRUEGER:  -- point seven.  52.7 --

MS. WILLIAMS:  Our next speaker, Vanessa Perez, followed by Jacqueline Venters, followed by Ron Dowell.

MR. KRUEGER:  I'll be back if you don't call.

CHAIR KENNEDY:  I -- I will call you.

Go ahead.

MS. PEREZ:  Hi, my name is Vanessa.  I'm Joseph Perez's mom.  This is my son.

I want to say my son's out of jail now after being -- after two years of being beat by the sheriffs.  Nothing's been done at all for his case.

But since my son's release, one of the deputies that beat my son, Paul Saldana, 619121, is now at my daughter's high school campus with my daughter every day for seven to eight hours a day walking around school with my daughter on campus, and she has to see him daily.  The amount of fear and intimidation she endures at school -- that's supposed to be a safe zone -- with this man that tried to kill her brother is every -- is with her every day, is unnecessary.

I tried getting a restraining order and, of course, they denied it, but gave us a hearing in which they pushed -- postponed it for a-month-and-a-half, in the middle of November, with the restraining order not granted.

I'm not a lawyer, but I'm sure this deputy and his lawyer bought more time. I say this to say -- I say that to say this: How much longer does my daughter have to go to school in her safe spot with a deputy that attempted to kill her brother?

The man that just testified up here said "accountability." I want to know who was accountable on putting this deputy, not only back on the field, but put this attempted murderer on the high school campus with my daughter.

The lack of disregard for, not only one of my children, but for two of my children is beyond imaginable.

CHAIR KENNEDY: What -- what high school?

MS. PEREZ: Nogales High School in West Covina. West Covina -- La Puente.

CHAIR KENNEDY: Thank you.

MS. PEREZ: All right. Thank you.

COMMISSIONER HARRIS: Could we make sure the staff gets this information so we can do some follow up?

MS. PEREZ: Okay.

CHAIR KENNEDY: Yep.

MS. PEREZ: Thank you.

CHAIR KENNEDY: Could someone get --

MS. WILLIAMS: Ms. Perez, if you could please come over here. Thank you.

CHAIR KENNEDY: Go ahead.

MS. VENTERS:  Good morning.  Jacqueline Venters.

First of all, I just want to say -- thank the commission -- Oversight Commission.  I've been coming here since 2018 addressing the issue with my son, Tennell Billups, that was shot five times in the back by Deputy Gonzalo Inzunza from the Century Station.  And I'm glad to hear that they're talking about the Jump Out Boys, because Deputy Gonzalo Inzunza was a Jump Out Boy, you know.  Their MO is jump out and shoot, and that's just what he did, jumped out and shot my son five times in the back.

Accountability.  If we start exposing them, it would bring closure.  You know, a lot of this stuff has been swept up under the rug with no accountability, and this is why they continue to do these things.  If you notice now, it haven't been that many shootings prior to the last few years of innocent people getting shot.

I took some notes -- the Executioners, they're from Compton, and they still exist there.  You know, I was just told a few days ago that our new captain is, you know, part of it. So we got to be careful who we put in positions in power and control -- and not only him, it's a few more over there.  I'm trying to get some names, but they still exist.

And a lot of the community is afraid, you know, afraid because of the things that happened in Compton for years.  And not only Compton, but Century Station is -- some of

their deputies come over to our area and do the same things to our male and females, and it's black and brown, you know.  And we are all one community, and if we don't come together as one and help each other, we're going to destroy each other.  The law enforcement have destroyed some of our communities with their behaviors and have not been held accountable for their actions.  Let's now start holding them accountable.

I had a meeting with the Deputy District Attorney in regards to Tennell's case, and I hand over all that documents, and that's a blessing from you guys because y'all helped me push their line.

CHAIR KENNEDY:  Thank you.

MS. WILLIAMS:  Our next speaker, Ron Dowell, followed by Ernest Moore, followed by MJ King.

CHAIR KENNEDY:  Go ahead.

MR. DOWELL:  We traced the Jump Out Boys activity in Compton all way back as early as 2009 with the murder of Avery Cody, Jr., and they were there before then.

And to Commissioner Giggans's and Kennedy's comments to change the culture, LASD needs to reconstruct, not tweak -- tweak the existing structure.  For example, in the city of Compton, we face an existential threat, and we need the sheriff, a leader, with a community-oriented mission that's clear and ask questions like how can we best service the community considering what the community says it needs,

We're asking for mechanisms to collect and assess those needs to have ways to measure and report the performance towards addressing those needs that are unique to the city of Compton. All areas within the county don't have the same so-called law enforcement needs, and this requires that the sheriff move away from arrest numbers, response times, and changes in part one and part two crimes over time. We suggest adopting Nibras as a way to collect information to get us useful information.

Compton weak leadership has not dismantled -- or has not demanded such accountability and, therefore, are complicit and responsible for the existence of deputy gangs and for poor service from the Sheriff's Department. They don't even know who in -- in the Sheriff's Department works in the city. So reconstruction might include (indiscernible) membership to help mitigate their tendency to backslide, which is what law enforcement generally does over time. So the accountability can start, really, at the local level in Compton.

Thank you.

CHAIR KENNEDY: Thank you.

MS. WILLIAMS: Our next speaker, Ernest Moore, followed by MJ King.

CHAIR KENNEDY: Go ahead.

MR. MOORE: My name is Ernest Moore. I've been coming to these commission meetings ever since the very first meeting

141

many years ago.  I have set up a support group for the victims of the LA Probate Courts called Domata (phonetic).  The judges in the probate courts are totally corrupt and another type of LA County gang that I call the "Black Robe Mafia Syndicate."

I have contacted the LA County Sheriff deputies at the -- at the Stanley Mosk Courthouse several times over the years demanding to make citizens' arrests of the specific judges that are operating -- that were operating in the Stanley Mosk Courthouse.  Some are still operating now, but they refuse my arrests, which is a felony, and will not even take a crime report against these corrupt judges and lawyers and court-appointed fiduciaries that are operating the Stanley Mosk Courthouse.

I have filed several complaints with the Sheriff's Department and to the Inspector General.  There is an investigation going on now with the Internal Affairs Department of the LA County Sheriff's Department, but nothing has been done yet.

Sheriff's -- Sheriff's Department is totally corrupt. It always has been.  It's always been racist against black Americans, and I want to set up a specialized law enforcement agency made up of black American citizens to police and do internal affairs of LA County Sheriff's Department.

This is -- this commission is a waste of time.  This is just a dog-and-pony show.  We need enforcement now.  We

don't need to be shucking and jiving and doing hearings and -- and nothing is done.

Thank you very much.

CHAIR KENNEDY:  Thank you.

MS. WILLIAMS:  Our next speaker, MJ King, followed by Stephanie Luna.

MS. KING:  What's there to say when the Sheriff and Undersheriff continue to deny -- deny subpoenas to appear, when the Sheriff will raid a supervisor and Civilian Oversight Committee member's home in retaliation for calling for transparency in his department, when the Sheriff sends deputies to surveil and intimidate sheriff's deputies who testify in front of the Oversight Commission?

What are you doing to protect our community members who have been telling you this week after week?  When will you protect our community members from the Sheriff and his deputies who harass and intimidate when they speak out against their loved ones who are -- I'm sorry -- about their loved ones who are -- whose lives are stolen by LA Sheriff deputies, when they're followed, when they're harassed, when they're put in danger by the LASD?  The families shouldn't have to stand in front of you pleading for protection, the trauma of recounting their story each and every time.

Tell the Board of Supervisors to stop increasing LASD funding.  This year, the Board approved $1.3 million for an

armored -- armored vehicle for LASD.  They haven't done enough damage with weapons that they already have?  They can't figure out how to stop killing our community members?  What do they need a tank for?  Are they going to patrol East LA with a tank?  With a $3.6-billion budget, surely they can find room in their current budget to find -- to fund such frivolities.

Eric Strong testified that taxpayers paid $50 million or more in settlements for LASD misconduct.  That's an underestimate.  We pay $86 million a year for LASD misconduct.  We, taxpayers, not LASD.  What message does that send?  We're rewarding them for their gang activity, textbook negative reinforcement that they're above the law and will be rewarded for it.

LA County lawyers just recommended an $8-million settlement for the parents of 18-year-old Andres Guardado, murdered by a sheriff's deputy prospect Executioner gang member in 2020 and then slandered in the press.

Tell the BOS to stop funding LASD budget increases and stop funding LASD misconduct.  It's an insult to taxpayers.  When will enough be enough?

CHAIR KENNEDY:  Thank you.

Is that it?

MS. WILLIAMS:  Stephanie Luna.

MS. LUNA:  There's a lot to -- there's a lot to unpack that came out of this meeting today.  I'm not even, honestly,

sure where to start.

I guess I'll start with the officer that testified, Neal. A lot of the language he was using was extremely problematic because he is the reason why this crisis of deputy gangs has lasted 50 years. The way that he was talking, he is the reason why a lot of these deputies are emboldened to act the way they act. There is a extreme lack of accountability.

I also want to raise a point that burning down the sheriff's departments, that statement is extremely problematic as well because that's also criminalizing the people that are just saying that we don't need sheriffs patrolling our areas and killing our kids. What we need is an increase in funding, and we need an increase in systems that are actively working, not systems that are put into place to actively destroy us.

Another comment that was made was about the tattoos hanging in the gym -- the symbols hanging in the gym, and I'd like to reference that these tattoos are trophies for killing our loved ones. Jonathan Rojas and Nicholas Perez, which one of them -- whichever one of them got the tattoo for killing my nephew, wears that tattoo with pride and wears that tattoo as a trophy of my nephew's murder.

The leadership, the mentoring, and the teamwork that we heard the officer mention, it's been thriving in the Department, and it's actively working together to keep these deputy gangs going and to keep them rolling. You know, the

fact that we have ex-deputies sitting up here saying that they could've joined the gangs but they didn't is exactly the problem because that shows that they're part of the problem. They haven't tried to stop it. They've consistently tried to keep it quiet.

Another quick -- I know my time is running out, but another quick thing is talking about these police associations. That's why a lot of people don't consider them a union because unions protect people. Unions don't allow their employees to actively hurt people, and that's why we don't consider ALADS a police union. It's considered nothing more than an association that protects and emboldens the deputy gangs.

I appreciate the commission consistently holding these hearings. This is really one of the only places aside from community activism where we're seeing people challenging Alex because everyone here knows Alex runs from accountability the way that he runs from the people. And this is a fight that we're going to be in for the rest of our life, and we're here for it.

Thank you.

CHAIR KENNEDY: Thank you.

That concludes public comment.

Mr. Deixler, we're almost done. I just need to ask you: My understanding is that we have an outstanding subpoena duces tecum to the Sheriff that was never responded to; is that

correct?

MR. DEIXLER:  Yes, it is.

CHAIR KENNEDY:  Okay.

And my request to the County Counsel, who I think is on the Zoom, would be that as with all of the other subpoenas that the Sheriff's Department has flouted that we seek to enforce the subpoena duces tecum as soon as possible.  We cannot have the top law enforcement officer of Los Angeles County willfully violating duly-issued subpoenas.

MS. VAPPIE:  Yes, Chair.  We will do so.  Thank you.

CHAIR KENNEDY:  Thank you.

I really want to thank Mr. Deixler and Mr. -- Mr. Pacheco for your efforts today.

I read on social media often deputies think that you're all profiting from these hearings.  The truth is that you're volunteering your time to develop this evidence on behalf of the public good, and we really, really express our gratitude to you.  We -- we know your time is valuable, and we greatly appreciate it.

With that, this meeting is adjourned.  We will resume tentatively the eighth special hearing on deputy gangs at this location on October 28th at 9:00 a.m.

Thank you.

(The hearing was concluded.)

-o0o-

STATE OF CALIFORNIA    )

                       ) ss.

COUNTY OF LOS ANGELES )


     I, ANN BONNETTE, California CSR No. 6108, Louisiana Court Reporter No. 85135, Registered Professional Reporter, Certified Manager of Reporting Services, AAERT CERT D-368, do hereby certify:

     That said digitally recorded audio of the Civilian Oversight Commission Hearing, October 14th, 2022, was transcribed into computer-generated text under my direction and supervision, and I hereby certify the foregoing transcript to the best of my ability.

     I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

     IN WITNESS WHEREOF, I have hereunto subscribed my name this 16th day November, 2022.

                    _____

                    ANN BONNETTE, CSR 6108

                    AAERT CERT D-368