EXHIBIT B



EXHIBIT

Ext 2 - Neal Tyler - AB 7549684

# REPORT AND RECOMMENDATIONS OF THE SPECIAL COUNSEL TO SHERIFF CIVILIAN OVERSIGHT COMMISSION REGARDING DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

**February 2023**

# Sheriff Civilian Oversight Commission

## COMMISSIONERS

Sean Kennedy, Chair

Jamon R. Hicks, Vice Chair

Irma Hagans Cooper

James P. Harris

Hans Johnson

Luis S. Garcia

Patricia Giggans

Robert C. Bonner

Lael Rubin

Brian K. Williams, Executive Director

## SPECIAL COUNSEL TO THE COMMISSION

Lead Special Counsel: Bert Deixler of Kendall Brill & Kelly Other Special Counsel included

Bart Williams and Susan L. Gutierrez of Proskauer
Ashley Bowman and Ariel Neuman of Bird Marella
Carolyn Kubota and Ellen Choi of Covington

William Forman of Winston & Strawn (on behalf of Loyola Law School Center for Juvenile Law and Policy)

L. Ashley Aull and Robyn Bacon of Munger Tolles & Olson (on behalf of
Loyola Law School Center for Juvenile Law and Policy)

Naeun Rim and Sarah Moses of Manatt

Clark Brown, former General Counsel L.A. County Bar

Richard Drooyan, Consultant

Adam Dawson, lead investigator

## TABLE OF CONTENTS

Page

PREFACE ...........................................................................................................1

THE EXISTENCE OF DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT...................................................................3

I.    INTRODUCTION...................................................................................3

II.   INVESTIGATION..................................................................................5

III.  FACTUAL FINDINGS.............................................................................7

      A.    History of Deputy Gangs and Cliques ..........................................7

      B.    Deputy Gangs and Deputy Cliques Currently in the Department .............10

      C.    Obstacles to Eliminating Deputy Cliques in the Department.....................35

      D.    The Elimination of Deputy Cliques is Constitutionally Permissible ...........41

IV.   FACTUAL FINDINGS SUMMARY...........................................................43

V.    RECOMMENDATIONS TO ELIMINATE DEPUTY GANGS AND CLIQUES.................44

      A.    LEADERSHIP AND SUPERVISION ................................................45

      B.    POLICY AND TRAINING...........................................................49

      C.    RE-DEPLOYMENTS AND ROTATIONS .........................................53

      D.    ACCOUNTABILITY ..................................................................55

VI.   CONCLUSION ...................................................................................61

i

## **PREFACE**

In November 2021, the Sheriff Civilian Oversight Commission ("COC") directed the Chair of the COC to engage pro bono Special Counsel to assist the COC to investigate the existence and activities of problematic deputy groups, often referred to as "deputy gangs" or "cliques," within the Los Angeles County Sheriff's Department ("Department"). Although prior commissions have documented the existence of deputy gangs and cliques over several decades, the COC wished to determine whether such groups continued to exist and to understand their impacts on the Department, its employees, and members of the public it serves.

By March 2022, a pro bono team of Special Counsel were engaged by the County and the Loyola Law School Center for Juvenile Law and Policy, and the COC launched the investigation of deputy gangs and cliques. The investigation included interviews of numerous members and former members of the Department, and review of numerous documents, court filings, deposition transcripts, public statements by Department representatives, published reports relating to prior investigations, and numerous relevant media reports. To date, the COC has conducted seven public hearings devoted to the investigation, most of which involved the taking of witness testimony under oath pursuant to the COC's subpoena authority.

This Report and Recommendations is a result of the Special Counsel's investigation on behalf of the COC. It is in two parts: **Factual Findings**, entitled *The Existence of Deputy Gangs and Cliques in the Los Angeles County Sheriff's Department,* and **Recommendations to Rid the Department of Deputy Gangs and Cliques** that fall under four headings: Leadership/Supervision, Policy/Training, Assignments/Rotations, and Accountability.

1

A word about nomenclature used in this Report. Special Counsel has chosen to use the term "Deputy Gangs" when referring to deputy groups engaged in egregious conduct such as violations of law, the excessive use of force, threats to the public or Department members and to use the term "Deputy Cliques" in discussing the broader concerns that the exclusionary subgroups pose to the mission of the Department, the careers and morale of other Department members, and the public, even when their activities do not violate specific laws. The term "Deputy Cliques" has historically been understood to include Deputy Gangs and exclusionary subgroups and their problematic behavior however configured. By using this term in this report, we do not intend to minimize the harm done by these groups to the Department, to other Department personnel, and to the public. The Findings confirm such harms.

The origins of Deputy Gangs and Cliques within the Department dates back decades. They may have started with benign intentions, but history has proved that Deputy Cliques have often evolved into Deputy Gangs whose members not only use gang-like symbols but engage in gang-type and criminal behavior directed against the public and other Department members. These groups, both historically and currently, also exalt the use of excessive force against civilians, harass other deputies, and undermine the chain of command within the Department. However denominated, the existence of these groups and their impact adversely affects the mission of the Department and undermines public trust in the Department.

The Deputy Cliques addressed in this Report and several prior reports have been variously referred to as deputy "gangs," "cliques," "subcultures" and "secretive subgroups." "Deputy Cliques" are Sheriff's deputies assigned to a particular Department patrol station, bureau, unit, or location in a jail who self- associate, and identify and act as a subgroup that excludes other deputies assigned to the same station, bureau, unit,

2

or jail location.  They identify themselves by names such as the Banditos, Executioners, Regulators, Spartans, Reapers, Rattlesnakes, Cowboys, Vikings, Wayside Whities, 3000 Boys, and 4000 Boys. Members often have matching and sometimes sequentially numbered tattoos and use language and gestures associated with street gangs. By their actions Deputy Cliques invariably evolve into Deputy Gangs.

The Factual Findings section of this Report documents the overwhelming evidence demonstrating that Deputy Gangs and Deputy Cliques, still exist and engage in harmful activities in several of the Department's patrol stations and bureaus. They victimize the Department, its members, and the public.

The Recommendations section identifies the reforms needed to eliminate Deputy Gangs and Deputy Cliques and to extinguish the culture of the Department that has permitted their existence and harmful influence within the Department for the past 50 years. The Recommendations provide an immediate call to action to the Sheriff, the Department leadership and every member of the Department. There can be no more delays!

## THE EXISTENCE OF DEPUTY GANGS AND DEPUTY CLIQUES IN THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## I.    INTRODUCTION

The Department currently contains several active groups that have been, and still are, engaged in harmful, dangerous, and often illegal, behavior. Some of these groups have engaged in acts of violence, threatened acts of violence, placed fellow Deputies at risk of physical harm, engaged in acts celebrating officer involved shootings, and created a climate of physical fear and professional retribution to those who would speak publicly about the misconduct of such groups. Publicly released deputy body camera video illustrates such misconduct directed to a member of the public. For that reason, going back 30 years to the Commission led by Judge James J.

3

Kolts, these groups have been fairly referred to as "Deputy Gangs."

Deputy Cliques that evolve into Deputy Gangs meet the definition of "law enforcement gang" in California Penal Code Section 13670.[1] The problems they cause in the Department, however, go beyond their "gang-like" behavior. Deputy Cliques are rooted in secrecy and exclusivity. They undermine the Department's leadership and supervision, foster insubordination, and are detrimental to the morale of other deputies and staff by exercising power and decision making that is fundamentally inconsistent with the para-military, chain of command structure of law enforcement agencies such as the Department. By exercising influence ordinarily reserved for supervisors and management, such as controlling assignments, schedules, and promotions, their existence within stations, bureaus and units of the Department violates fundamental principles of professional policing. But Deputy Cliques, whether they meet the definition of "law enforcement gangs" must be eradicated as they are the seeds from which Deputy Gangs develop.

While the prior Sheriff publicly asserted that he had acted to eliminate Deputy Gangs, in fact he facilitated their continued presence by, among other things,

---

[1] Penal Code 13670 provides, in pertinent part: (2) "Law enforcement gang" means a group of peace officers within a law enforcement agency who may identify themselves by name and may be associated with an identifying symbol, including but not limited to, matching tattoos, and who engage in a pattern of on-duty behavior that intentionally violates the law or fundamental principles of professional policing, including but not limited to, excluding, harassing or discriminating against any individual based on a protected category under federal or state antidiscrimination laws, engaging in or promoting conduct that violates the rights of other employees or members of the public, violating agency policy, the persistent practice of unlawful detention or use of excessive force in circumstances where it is known to be unjustified, falsifying police reports, fabricating or destroying evidence, targeting persons for enforcement based solely on protected characteristics of those persons... and retaliation against officers who threaten or interfere with the activities of the group. Further, these groups often discriminate on the basis of gender, race and ethnicity in deciding who can become a member of the Deputy Cliques. Such workplace discrimination violates the California Fair Employment and Housing Act (FEHA) and federal anti- discrimination law.

4

appointing known tattooed members of Deputy Gangs and Deputy Cliques to leadership positions in the Department, permitting the revival of emblems signifying membership in such groups and repeatedly relying upon an erroneous statement of law to avoid promulgating and enforcing a policy prohibiting Deputy Gangs and Deputy Cliques in the Department. The claim that Deputy Gangs no longer exist in the Department is flatly and inarguably false. Moreover, Deputy Cliques continue to exist.

The COC Policy recommendation prohibiting **Joining and Participation in Deputy Cliques** is constitutionally permissible, and it is factually supported by the investigation and multiple interviews conducted by the COC's Special Counsel as well as the testimony given in the COC's public hearings. The COC urges Sheriff Luna to adopt a policy that prohibits deputies from being members of Deputy Cliques and thereby ending Deputy Gangs.

## II.     <u>INVESTIGATION</u>

As part of the COC's investigation, Special Counsel interviewed approximately eighty witnesses. The witnesses were current and former Deputies, Sergeants, Lieutenants, Captains, Commanders, Assistant Sheriffs, and Undersheriffs; a former Sheriff; and former law enforcement officials from other law enforcement agencies. The witnesses also included attorneys representing current and former litigants against the Department and the County and certain of the litigants themselves. Many witnesses were interviewed multiple times.

Special Counsel coordinated with, interviewed and received information from the Los Angeles County Office of Inspector General, the Los Angeles County District Attorney's Office, Loyola Law School and the Los Angeles County Public Defender's Office.

Special Counsel received and reviewed dozens of depositions and sworn

statements, and associated exhibits generated in connection with past and pending litigation involving the Department; multiple media reports; body camera footage; and extensive reports prepared by the Kolts Commission, the United States Commission on Civil Rights, the Loyola Law School Center for Juvenile Law & Policy ('Loyola Law School Report"), the Rand Corporation, the National Association of Blacks in Criminal Justice, and the Citizen's Commission on Jail Violence.

Special Counsel attended virtual briefings by the former Sheriff Alex Villanueva, and repeatedly sought to meet with the former Sheriff and his Undersheriff, Timothy Murakami. They declined to meet or to be interviewed. Each was also invited to voluntarily appear and testify publicly before the COC. The former Sheriff declined to do so unless provided in advance with the questions and any documents that would be presented. The Undersheriff declined, asserting that his physical condition precluded his testimony, but not his other duties as Undersheriff.  As a result, the COC subpoenaed both the Sheriff and Undersheriff to testify. Each refused, and both are now subject to legal proceedings to enforce the subpoenas and/or to hold each in contempt.

The COC held seven public hearings in which approximately fifteen witnesses publicly testified and numerous members of the public spoke. The overwhelming majority of witnesses who testified did so pursuant to subpoena. Several witnesses would only testify anonymously, and some did so remotely, using a voice distortion device out of fear of physical or professional retaliation. Several witnesses who had agreed to testify withdrew, often the night before the proposed testimony, out of similar fears.

In addition to witnesses who testified publicly, approximately sixty other witnesses were interviewed by the Special Counsel's team. Many witnesses spoke only

after receiving assurances that they would not be identified publicly or even confidentially identified to the COC. The witnesses expressed concerns for their physical safety and the physical safety of family members, many of whom are Department employees. In addition, many witnesses insisted upon anonymity in interviews for fear of professional retribution often described as "career suicide." Some of the factual findings recited in this Report are the product of these witness interviews.

III.    **FACTUAL FINDINGS**

A.    **History of Deputy Gangs and Cliques**

Deputy Gangs and Deputy Cliques have existed in the Los Angeles County Sheriff's Department since at least 1973. That year, an internal Department memo dated December 5, 1973, documented the existence of a group known as the "Little Devils," and identified 38 members who bore sequentially numbered tattoos of a devil.

In 1992, the Kolts Commission's report confirmed the existence of Deputy Gangs and Deputy Cliques, including a Deputy Gang called the Vikings, in the Department. After holding evidentiary hearings in Los Angeles in 1993 and 1996, the United States Commission on Civil Rights in 1999 issued a report focusing on the violence and trauma that Deputy Gangs had inflicted on communities of color and people struggling with mental illness, and urged the LASD to take decisive action to eradicate Deputy Gangs from its ranks.

In 2012, the Citizens' Commission on Jail Violence ("CCJV") found that Deputy Cliques existed in patrol and on certain floors of Men's Central Jail ("MCJ" ) and that they contributed to the use of excessive force in the jail. The CCJV's report contains five pages of recommendations to address the problem.

The Loyola Law School Report documented the Department's long history of

7

Deputy Gangs and Deputy Cliques in 2021; and the Rand Corporation also confirmed their existence in its report titled *Understanding Subgroups Within the Los Angeles County Sheriff's Department* in 2021.

The Los Angeles County Inspector General, Max Huntsman, testified before the COC about his office's report entitled *Analysis of the Criminal Investigation of Alleged Assault by Banditos* that confirmed the involvement of the Banditos in the severe beating of non-Banditos deputies in an incident at Kennedy Hall in 2018.

As part of its investigation, the COC received and reviewed a September 13, 2004, memorandum from the then Undersheriff William T. Stonich to Sheriff Leroy Baca about efforts to address "inappropriate and potentially damaging behavior" at the Department's Century Station. Among other conclusions the memorandum reported on rumored unethical activity engaged in by Century station personnel as follows:

> "Mexican Mafia", rumored to be a small select group of deputies of Hispanic decent (*sic*). They have been accused of holding positions of influence within the station (i.e.: detective, scheduling, watch deputy and field training officer positions) and are alleged to control much of the negative behind the scenes activity such as fund raising through means of unit level extortion for non -sanctioned events, unfair or biased granting of time off requests, controlling patrol and interior work assignments, etc."

The COC also reviewed an October 1, 2007, memorandum from then Commander Willie Miller to Sheriff Baca reporting on an investigation of a group of deputies named the "Regulators" at Century Station. Among other things, the memorandum concluded that:

> "The Regulators philosophy is that if a sergeant, lieutenant, or captain was weak at Century Station they would run over them, essentially speaking, they would run the station as a subculture fraction (*sic*).

8

They would not respect rank. They openly displayed the Regulators logo of the 'skull and flames' symbol on their motorcycles as well as body tattoos."

The COC also reviewed hundreds of Department documents regarding the 2012 discovery in a patrol car of a written creed for a Deputy Gang named "The Jump Out Boys." Members of the Jump Out Boys shared a common numbered tattoo that depicts a red-eyed skull wearing a bandana with the letters "O.S.S." and holding a revolver next to an ace of spades and an 8 of spades, the so called "dead man's hand" in poker. Their creed recited that members understand "when the line need (*sic*) to be crossed, and crossed back" and that they "sometimes need to do things they don't want to in order to get where they want to be."  It also directed members to keep a "black book" that records the date of every deputy involved shooting that authorized each shooter to embellish his common tattoo with smoke coming out of the gun.  Seven Jump Out Boys members were fired, but because there was no clear policy against joining a Deputy Gang at the time, the Civil Service Commission reinstated four of them.

It is indisputable that for nearly 50 years, Deputy Gangs and Deputy Cliques have existed within the Department and their existence and negative impacts were known to the leadership of the Department. Yet there was no sustained effort during this period to eradicate Deputy Gangs and Deputy Cliques from the Department. All prior efforts were inadequate, lost continuity and failed to eliminate Deputy Gangs and Deputy Cliques. Owing to this failure, Deputy Gangs and Deputy Cliques are embedded in the culture of the Department, either tolerated or ignored. Indeed, during the tenure of Sheriff Baca, the Undersheriff, Paul Tanaka, was a tattooed member of the Vikings. According to numerous witness interviews, former Sheriff Villanueva's Undersheriff, Tim Murakami, has a Caveman tattoo.

While law enforcement cliques are not unknown in other law enforcement

9

agencies, no other large law enforcement agency in the nation has allowed such cliques to exist and flourish as they have in the Department.

**B.      Deputy Gangs and Deputy Cliques Currently in the Department**

There is at least a half dozen, and possibly more, Deputy Gangs and Deputy Cliques currently in the Department, primarily at patrol stations. They include the Executioners, the Banditos, the Regulators, the Spartans, the Gladiators, the Cowboys and the Reapers. There are reports that new Deputy Cliques are forming as members of existing Deputy Gangs and Deputy Cliques retire or otherwise leave the Department. There is some evidence indicating that Deputy Cliques are re-emerging in the Los Angeles County jails as the 4000 Boys.

Merely transferring members of Deputy Gangs or Deputy Cliques has not proved particularly effective. After the CCJV's 2012 findings confirmed the existence of the 2000 and 3000 Boys on the second and third floor of MCJ, many of these deputies were transferred out of the jail to patrol.  Many of the 3000 Boys sought assignments to Compton Station and became Executioners; many 2000 Boys sought assignment to Century Station and became Spartans. As discussed below, transfers or rotation of deputies must be much more intentional to avoid aggregating in a new location deputies involved in, or susceptible to influence by, Deputy Gangs or Deputy Cliques.

All the Deputy Cliques share harmful characteristics. While not all Deputy Cliques engage in identical unprofessional conduct, most share at least some of the following characteristics, and they have done and continue to do certain acts of unprofessional and dangerous policing. Deputy Cliques run the stations or units where they exist, as opposed to the sergeants, lieutenants and the captain who are charged with the duty to run the station; exercise influence over and often decide assignments and shifts, training, and overtime; exclude deputies from the Deputy Cliques, often based on race,

10

ethnicity or gender; intimidate deputies that are not part of the Deputy Cliques; give orders not to provide backup to disfavored deputies who are not members of the Deputy Cliques; order work slowdowns if management of a station attempts to rein them in; encourage a "we-they" attitude, not just between them and the public, but with other deputies within the station; operate in secrecy; lie in reports to protect each other; and threaten the public with use of excessive force without justification and belittle deputies unwilling to engage in such acts.  Most troubling, they create rituals that valorize violence, such as recording all deputy involved shootings in an official book, celebrating with "shooting parties," and authorizing deputies who have shot a community member to add embellishments to their common gang tattoos.

Typically, to be invited to become a member of a Deputy Gang or Deputy Clique, a deputy must demonstrate "toughness" that is frequently associated with use of excessive force or other forms of unconstitutional policing. Often the euphemistic term "peer leader" is used to describe the members.

Deputy Gangs and Deputy Cliques also have used and continue to use assaultive behavior against fellow deputies who do not belong to their groups as a show of power and influence. Certain of these altercations have led to public exposure in the media. The COC investigation uncovered other incidents including threatened use of weapons by deputies upon other deputies.

The pernicious effects of these groups go well beyond assaulting other deputies. Recent publicly released body camera footage of a deputy threatening to shoot a man in a parked car without any evidence of wrongdoing illustrated in real time gang behavior characteristic of Deputy Gangs and Deputy Cliques interacting with the public served.

Not all members of Deputy Cliques engage in acts of misconduct. Even those

members who do not engage in misconduct, however, contribute to the unprofessional influence of Deputy Cliques and their negative impact on the Department and on other deputies. Deputy Cliques have and continue to do great damage to the reputation of the Department, and the public hearings demonstrated that they have unquestionably destroyed trust between the Department and the public it serves.

Membership in a Deputy Gang or Deputy Clique is a liability for the County. One of the essential job qualifications of a deputy sheriff is the ability to testify credibly in a court of law. Deputies who belong to Deputy Gangs and Deputy Cliques that value loyalty to their members over their commitment to the Department and the public are likely to be disbelieved when their conduct is at issue. As Lieutenant Eric Strong, a 22-year member of the Department, put it, "If you are a member of a law enforcement gang, you cannot be trusted, you cannot be relied upon, your credibility is lacking." Under the principles set forth by the United States Supreme Court in *Brady v. Maryland*, such information that bears on the credibility of prosecution witnesses must be disclosed by the prosecution to the defense in criminal cases and is likely discoverable in civil lawsuits.

Deputies sued in civil lawsuits arising from the alleged use of excessive force cost the taxpayers of Los Angeles County tens of millions of dollars in judgments and settlements. It has been estimated that the additional cost to the County in these cases is upwards of $55 million. That number can only rise based upon pending and newly filed lawsuits and administrative claims. In addition to judgments and settlements, the County incurs seven-figure legal bills from outside litigation counsel hired by and paid for by the County to defend the misconduct of Deputy Gangs and Deputy Cliques.

Set forth below is some of the evidence developed by Special Counsel during the

12

COC's investigation of Deputy Gangs and Deputy Cliques.

### 1.    Compton Station

Lieutenant Larry Waldie testified before the COC that he was a tattooed member of a deputy group known as the "Gladiators." He obtained the tattoo during his initial tour of duty at Compton Station and that another group known as the "Executioners" subsequently ran aspects of that station. Waldie said that Compton was a "fast station," and it was considered a desirable post for deputies wanting exposure to incidents of crime requiring active law enforcement.

Waldie testified that many of the Executioners had served on the 3000 floor at MCJ. The CCJV noted the existence of the "3000 Boys" at MCJ and recommended that the it be disbanded. It appears, however, that many of the "3000 boys" transferred to Compton Station and formed or joined the Executioners. A witness who worked at MCJ and who insisted on anonymity for fear of reprisal, reported that a new version of the "3000 Boys" operating on the 4000 floor and calling itself the "4000 Boys" currently operates at MCJ.

Another witness currently assigned to the Compton Station disclosed that deputies who had worked on the 3000 floor at MCJ received preferential treatment at Compton. The witness reported being ridiculed based upon gender and race by the scheduling deputy, Jaime Juarez, an Executioner, and that Executioner members regularly discriminated against and ridiculed women.

Waldie testified that Deputy Juarez was the "shot caller" during Waldie's tenure at Compton Station. The Commission received evidence that Juarez participated in four officer involved shootings. Juarez was subsequently removed from patrol, and interacting with the public during Sheriff McDonnell's tenure, but was returned to patrol after Sheriff Villanueva took office. Waldie identified Deputies Ruiz,

13

Cuevas, Barajas, Ingersoll, Raisa and Ruben as Executioners. Waldie stated that based upon his observations Executioner membership apparently excluded females and African Americans.

The Commission received a photograph of Deputy Juarez' truck which depicted an Executioner emblem on a flag. In a deposition in civil litigation brought by Waldie, Deputy Juarez admitted that he had attended approximately seven "inking parties." He confirmed that Deputies Barajas, Ingersoll, Bray, Jimenez, and Reese attended Executioner inking parties as well. According to Juarez, Ingersoll was the last Executioner to receive an Executioner tattoo.

The Commission also received a photograph of a tattoo of a skeleton holding an automatic rifle on the calf of Deputy Aldama, a self-acknowledged Executioner. Other evidence indicates that, much like the Mafia, there are "made" members of Deputy Gangs and Deputy Cliques who are entitled to wear the tattoo associated with the group. The tattoos typically exalt the use of excessive force and are entirely unprofessional.

Deputy Aldama, and his partner, Mizrain Orrego,  were named as defendants in two separate shootings of community members, Sheldon Lockett and Donta Taylor. In each instance the deputies claimed that the victims had guns. In neither case was a gun located and much evidence suggested that in fact neither had guns. The County settled both cases with the families of the deceased for a total amount just short of ten million dollars. Since outside counsel was engaged in each case substantial legal fees were incurred on top of the settlement amounts.

Waldie testified that the Executioners held positions of authority during his time at Compton Station. Those positions included scheduling deputy, training officer, detective, and gang task force membership. Waldie explained that the position of

14

scheduling deputy was powerful because it afforded the scheduler the ability to assign deputies to shifts, vacations and days off, desirable assignments on patrol or less desirable assignments in preferred or less desirable locations.

During 2019, when Waldie served as Acting Captain of Compton Station, Deputy Juarez was scheduled to be removed as scheduling Deputy and transferred from the station. Juarez told Waldie that his successor as scheduling Deputy should be another Executioner, but Waldie declined the request. In response, Juarez led the Executioners in a work slowdown in March 2019, and pressured non-Executioners to adhere to it. The COC received an internal LASD document demonstrating that during the work slowdown, crime rose significantly compared to the preceding year and compared to the months before and after the slowdown. During the slowdown, arrests dropped precipitously, citizen calls were responded to slowly, and pro-active policing initiatives did not occur.

In addition to the statistical evidence documenting the work slowdown, the COC received the content of a text between Waldie and a deputy confirming the work slowdown directed by Deputy Juarez. The deputy supplying the information insisted upon anonymity: "But please between you and I. This could ruin my career. I don't want my name mentioned at all please. I can't have that."

Waldie testified that the culture of the Department created a justified fear among honest deputies that if it were believed that they had reported on the misconduct of fellow deputies, especially those belonging to a Deputy Clique, it would lead to harassment, ostracism, threats, or interference with career advancement.

A deputy who requested anonymity was suspected of cooperating with the COC and has been continuously subject to harassment and ostracism at the deputy's current station. Another witness who testified anonymously has reported that another

15

deputy, who was wrongly suspected of having provided the anonymous testimony, has been repeatedly harassed at that deputy's current station.

Waldie testified that after an officer involved shooting the deputies involved participated in a celebratory "debrief" at a bar in Fullerton. Waldie identified the pair of deputies, Ingersol and Barajas, as Executioners. Other evidence suggested that they were not yet tattooed Executioners, but were "chasing ink." That is, they engaged in "aggressive" activities in the hope of becoming members.

Copies of texts reviewed by the COC revealed that Waldie brought the celebration to the attention of the captain heading Compton Station. Waldie testified that despite the seriousness of the circumstances, the captain did not take any action. After Sheriff Villanueva took office, the captain was promoted to commander and retired from that position. He declined to be interviewed by Special Counsel's team.

The evidence demonstrates that community needs in Compton were ignored or responded to slowly to pressure a station leader to act in accordance with the Executioners' demands, and celebrations of officer involved shootings were neither stopped nor criticized. Waldie agreed that the conduct of the Executioners violated "fundamental principles of professional policing." During her testimony before the COC, then-Chief, now Acting Undersheriff, April Tardy reviewed this evidence and acknowledged that the Executioners were a "law enforcement gang" within the meaning of California Penal Code section 13670.

### 2.    East L.A. Station

Much public testimony before the COC focused upon the East L.A. Station and particularly on an incident at Kennedy Hall involving a brutal beating inflicted upon junior deputies by senior deputies who were members of the "Banditos." The behavior can only be fairly described as that of a gang. This episode resulted in widely publicized

16

civil litigation brought by the victim deputies against the Bandito Deputies. Even though the defendants assaulted other members of the Department and did so in an after- hours offsite location, County Counsel approved the County paying outside counsel to defend them.

Former Sheriff Villanueva trained at the East L.A. Station and was widely believed to have shown favoritism toward the station and its deputies. He was roundly criticized for the reservation of front row seats for East L.A. deputies at his inauguration when the Kennedy Hall incident had received much negative publicity and was still an open investigation. He also restored the "Fort Apache, kick in the pants" logo at the entrance of the East L.A. Station. The COC also heard much testimony that refuted his repeated assertion that he had replaced a weak captain with a strong one and had transferred many deputies to address discipline problems. In fact, no deputy was involuntarily transferred out of the East LA Station, and many of the transferred deputies were not Banditos.

Finally, there has been substantial evidence that the administrative and potential criminal investigation into the Kennedy Hall incident was obstructed at the direction of the former Sheriff's then Chief of Staff, Larry Del Mese, an acknowledged tattooed member of the "Grim Reapers." Matthew Burson, who retired from the Department as a Chief, testified that when he was the Captain at the Internal Affairs Criminal Bureau he was instructed by Del Mese not to have the investigator of the Kennedy Hall incident ask about "sub-cultures" at the station.  Burson understood that Del Mese was conveying an order from the former Sheriff, and he passed the instruction on to Sergeant Jeffrey Chow, who was investigating the incident. It is reasonable to infer that Sheriff Villanueva, despite its obvious relevance, ordered that no questions were to be asked about the Banditos or their role in the Kennedy Hall

17

"beat- down".

Sergeant Chow testified that he believed the conduct of the assaulting deputies was criminal, but that he was directed not to ask questions about "sub- culture" activity at the station. He understood this to mean that no questions were to be asked about the Banditos/Deputy Cliques and its/their role in the gang style assault on other deputies, and he followed the orders because he worked in a "para-military organization." After Chow testified, the COC learned of attempts to intimidate him and his wife, Vanessa, a Deputy Sheriff. The intimidation included an unmarked sheriff's car following Chow home after his testimony before the COC and an undercover car parked conspicuously near the residence. (Captain Angela Walton reported a similar intimidation effort involving the parking of an undercover car directly in front of her home after her public testimony.)

Retired Chief Joseph Gooden described the early portion of his career at the East L.A. station and the presence of members of the "Cavemen" at the station. Despite having a degree from U.S.C. when fewer than 10% of the deputies had four-year college degrees, a Caveman told Gooden that there was "no way" he could become a training officer. Gooden observed that under 2% of the deputies at the East L.A. station were African American.

Years later, when Gooden was a Chief, he oversaw the Kennedy Hall investigation. Chief Gooden testified that he directed that the investigation be conducted as a criminal investigation, and that determining the motive of the involved deputies was an important part of the investigation. The instruction to Sergeant Chow not to ask questions about "sub-culture" activity in the East L.A. Station was directly contrary to Chief Gooden's expectation and direction. It was also contrary to investigating the motive for the assault and the standard expected of a professional

18

police force.

The investigative report of the Department's Internal Criminal Investigation Bureau regarding the Kennedy Hall incident was transmitted to the District Attorney's Office to consider potential criminal charges. The report failed to mention that the investigating sergeant had been instructed not to ask questions about the Banditos or their role in the assault, even though the evidence related directly to a criminal motive for the attack.

An anonymous witness currently stationed at the East L.A. Station testified using a voice distorter because of a fear of physical and professional retribution. The witness identified current "shot callers" at East L.A. as Deputies Ortiz and Valle. The witness testified that Rene Munoz, one of the defendants in civil litigation relating to the Kennedy Hall beating, was the shot-caller prior to his departure from the East L.A. Station. The witness testified that all three were tattooed Banditos.

The anonymous witness also identified the broad authority of the scheduling deputy, a Bandito, at the East L.A. Station, who gave assignments, schedules, days off and vacations, assigned areas for patrol and directed selection of training officers and assignment of trainees to them. The witness testified that the power of the Banditos was such that they were able to thwart the promotion of a disfavored deputy to training officer even though the deputy was ranked number one in the County for that promotion.

The witness also testified to various means of intimidation and ostracism inflicted by Banditos upon non-Banditos. This included a locker room argument in which a Bandito pointed his gun at the head of another deputy; the turning of backs when a disfavored deputy entered the hallway or room; and the refusal to answer back up calls when summoned by a disfavored deputy. The witness explained how

19

disfavored deputies received "jackets" i.e., reputational slanders intended to thwart their careers.

Another witness testified that the Banditos assaulted "disfavored" deputies, who would be challenged to a fight. The disfavored deputies would be told that they did not belong in East L.A. and that they were a "zero" as a provocation to a fight. The Banditos would surround the disfavored deputies in groups thus employing physical intimidation. This conduct is characteristic of gang activity. Like other Deputy Gangs and Deputy Cliques, the Banditos exert control by forcing disfavored, non-Bandito deputies to transfer to other stations.

Another witness who insisted upon anonymity described how a training officer humiliated trainees, especially women, at the East L.A. Station. Those efforts included name calling and tossing the trainees' written work product to the ground with the goal of embarrassing and ostracizing the trainee before peers.  According to this witness, the training officer who engaged in such unprofessional, intimidating conduct was a Bandito. The witness was certain that the Bandito's control of the station was widely known. He stated that Deputy Valdez was the shot caller at East L.A. at the time and that he arranged the deputies' schedules. As noted, Deputy Valdez was widely known to be a Bandito.

The witness also described a practice of ostracism at the East L.A. Station. When the witness walked into the station the deputies would turn their backs as the witness walked down the hall. The witness explained that Banditos "stepped on the radio" i.e., interfered with the ability to communicate from the patrol car by speaking over the deputy while the witness spoke. The Banditos persistently criticized the witness  for a "culture violation."

The witness reported a refusal to provide requested back up. A specific incident

20

involved a report of a person with a gun in a dangerous part of Boyle Heights. Because of the danger of a night call in that area the witness requested back up, but it was not forthcoming, and the witness abandoned the call. The proffered excuse that the deputies all were "busy" was proved false by review of time records.

A training officer at the East L.A. Station required that trainees keep the car fully stocked with snacks and demanded "good imagination on reports." That the witness understood meant to lie to justify the acts of the deputies. The witness was informed that the training officer was a tattooed Bandito. The stocking of the car was a form of the "tax" imposed by the Banditos. The trainee had to pay for all meals, drinks and anything else the training officer required.

The witness observed that the Department enabled the Banditos control of the station and that known Banditos received promotions under Sheriff Villanueva. The witness claimed that the Banditos brought gifts to the wife of Sheriff Villanueva to procure promotions or to retain power positions. It was widely believed, and confirmed in testimony by Eli Vera, that the Sheriff consulted his wife on promotions even though she held no official position in the LASD. The witness also claimed that the Homicide Bureau is filled with Banditos.

The witness learned that Banditos had to be Mexican American and that Central Americans could not become Banditos. Another witness confirmed that, with one exception, all Banditos were Hispanic males, and none were women.

Another witness who insisted upon anonymity observed that the Banditos also directed work slowdowns that resulted in increased response times to calls and for arrests to cease. The most recent slowdown occurred because the Banditos believed that the Department's Internal Affairs Bureau had pursued too many disciplinary investigations of deputies.

The witness testified that there were between 12 to 15 Banditos currently in the East L.A. Station, and that they held positions as "acting" detectives and training officers. The witness testified that there were also "associate" deputies who wished to be initiated and were "chasing ink." One incident that the witness regarded as "chasing ink" involved the transportation of a shooting victim to a hospital. The witness stated that the deputies went off route and assaulted the victim. Such conduct can only be viewed as the act of a gang member and its indisputable harm to the community.

In an interview, retired Chief Gooden recounted that during his year and a half at the East L.A. Station the dominant group was the "Cavemen." He believes that the Banditos grew out of the Cavemen.

Chief Gooden was one of several witnesses who disputed former Sheriff Villanueva's claim that he had transferred 36 members from East L.A. for misconduct at the station. The anonymous witness claimed that there were no involuntary transfers of Banditos. No transferees were "overnighted," i.e., subject to immediate involuntary transfer. Rather the transfers reflected voluntary departures related to deputy requests, promotions, or retirements.

Retired Chief Eli Vera also refuted the former Sheriff's claim. He agreed with the testimony of Captain Ernie Chavez in a civil deposition that the deputies were transferred from the East L.A. Station for non- disciplinary reasons. One witness said in an interview, however, that a number of the transferees were "whistle blowers" who had objected to the Banditos' control of the station. The witness described them as "the resistance."

Another witness who required anonymity described the witness' tenure at East L.A. Station as one in which deputies who "speak like gangsters" surrounded the witness.  The witness described the unprofessional language used on radios, including

22

the use of nicknames and derogatory statements. Further, the witness reported that because the Banditos mistrusted the witness, they would not allow the witness to enter a house when they conducted a search. The witness said that contrary to Department policy, the fact and results of such searches were often undocumented. The witness also experienced that calls for back up by disfavored deputies were not heeded. Such failures to provide requested back up imperiled the safety of these deputies.  The civil case brought by the victims of the Banditos beating at Kennedy Hall included the deposition testimony of Deputy Concepcion Garcia, who witnessed calls for back up ignored by Banditos.

The anonymous witness had justifiable safety concerns. On one occasion, when the witness drove a personal vehicle from the East L.A. station, the witness observed that the lug nuts from the car wheels had been loosened. The witness said that to be part of the East L.A. anti-gang unit it was necessary to be an "inked" member of the Banditos.

The witness also confirmed the practice of a "tax" being levied by senior Banditos upon trainees to pay for food, "fund raising" and other financial demands of the Bandito training officers. The trainees who participated did so because of a fear that they would not get off training.

The witness also was supervised by, or worked with, "Cavemen" and "Regulators" They were Caucasian males in positions of authority. The witness stated that supervisors were well aware of the existence of these groups but did not act to interfere.

Another witness who spent nearly a decade in East L.A. and who also required anonymity for fear of physical retaliation, also described the Cavemen and the Banditos. The witness, said that the Banditos insisted that others "do what they want

23

you to do." The witness also described the Banditos as "gangs behind the badge." The witness says that everybody in the Department knows of the Banditos; their actions are not a "secret."

This witness also confirmed that the Banditos imposed "taxes" on new deputies. The witness was told by a Bandito training officer to "bring your credit card." The witness was aware of the tattooed members of the Banditos and believed that there were as many as 80 Banditos during the witnesses' tenure at East L.A. The witness said the Banditos would use force to discipline non-Banditos they did not like. This too is the behavior of a gang.

The Banditos exploited the junior deputies by, for example, requiring that they write reports for the Banditos and stay on uncompensated overtime if necessary to get the report done. The witness said that the Banditos recruited deputies to "chase ink", i.e., to do what was necessary to be noticed and "stand apart." That included writing reports to make problematic arrests appear legal. (Another anonymous witness described this practice as "working backwards.")

An aspect of "chasing ink" was a desire to get into shootings. These deputies would follow a suspect believed to have a gun so that a shooting would be justified. The witness said that there was pressure to "get numbers up" from time to time, meaning arrests. The witness was instructed by Banditos that they could always get somebody arrested as "under the influence" and "refused to take a test." The goal was to raise arrest numbers.

Another witness, now retired after 24 years in the Department, was a training officer in East L.A. The witness ran afoul of the scheduling sergeant, Patty Estrada. The witness described Estrada as a female associate of the Banditos who did their bidding and conveyed favors and punishments on their behalf. The witness had a trainee

24

"pulled" by Estrada and observed that the trainee was assigned to a Bandito training officer.

Another witness testified anonymously about working at the East L.A. station. Although warned that East L.A. was a difficult place to work due to harassment and hazing, the witness chose to work there anyway and was subjected to this conduct. Like others, the witness affirmed that the Banditos were an open and notorious gang within the East LA Station. The witness believed that it was appropriate to refer to the Banditos as a "gang" that manifested its power by recruiting desired deputies and isolating others. Having become disfavored, the witness experienced, as did others, dispatch sending the witness a high volume of calls throughout the patrol area. Additionally, when the witness called for backup, it would not arrive. The witness believed that the inability to receive back up when performing services increased considerably the risks of the work.

The witness was aware of "cigar night." Those were evenings when female deputies would act to raise funds at Bandito "events" by circulating among deputies who were drinking and playing cards and selling cigars to those in attendance for support of other Bandito "sponsored" events. The witness described these cigar selling efforts as done upon the demand of the Banditos. The witness acknowledged that deputies were pressured to give money upon a Bandito solicitation. That trainees were "taxed" was well known in the station and in the Department more generally.

Gooden stated that when Sheriff McDonnell assumed office, he barred the East L.A. Station "Fort Apache kick in the pants logo." Gooden regarded the logo as unprofessional and insulting to the East L.A. community. Gooden observed that the logo was reintroduced when Sheriff Villanueva assumed office.

25