### 3.    Lennox Station (Now South L.A. Station)

Recently released shocking body camera footage shows South L.A. Station deputy Justin Sabatine repeatedly threatening to shoot an African American civilian sitting in his car in a parking lot. Several witnesses, including two current Department captains, have asserted that Sabatine was a member of a Deputy Clique. One captain believed that Sabatine was a Reaper. A public report based upon an anonymous source also claimed Sabatine is a Reaper. A second captain believed that Sabatine may not be a Reaper, but rather a member of a newly formed Deputy Clique in the South L.A. Station. A captain reported learning that Sabatine threatened that there would be a work slow-down in South L.A. if the body camera footage was released.

As proof of the consequences to the Department and the County of gang like activities, the County has already been sued based upon Sabatine's conduct. The Complaint demands $10,000,000. The County likely will engage outside counsel to represent the County and Sabatine.

The type of conduct revealed in the Sabatine body camera footage is consistent with a lengthy history of gang behavior at South L.A. Station.  A current deputy who has served in the Department for more than 25 years insisted on anonymity for fear of physical retaliation. The witness described the activities of the group of deputies known as the Reapers at Lennox Station (now the South L.A. Station.) The witness saw the tattoos of the members, all of whom were Caucasian males. The witness observed that the Reapers now consist primarily of Hispanic deputies.

The witness stated that Reapers were involved in multiple shootings. The witness recounted a conversation in which the witness was criticized after the witness confronted two African Americans, a male and female, one of whom had a gun. The witness apprehended the suspects without firing a weapon. Later a Reaper criticized

26

the witness, and asked "why did you not shoot her?" The Reaper described it as a "freebie."

According to the witness, another Reaper encouraged the witness to seek a warrant when there was no basis to do so. The witness declined and believes that this was a source of the mistrust of the witness among certain deputies.

A former deputy who served in the South L.A. Station described Carl Mandoyan as the shot caller at the station at the time. The witness claimed that it was widely known in the Department that Mandoyan was a Reaper. As in other stations, the witness noted that unpopular directives were "pushed back" against by work slowdowns. Some of the friction was with a captain who was acting in accordance with a directive from Sheriff McDonnell to "crackdown" on deputy misconduct.

The witness reported that to get into the Reapers one needed to have a "force incident" and look for an opportunity to shoot people. The other condition was that you "not be a rat."

The witness's experiences as a non-Reaper included being "slammed on calls." The dispatcher repeatedly instructed the witness to answer calls for which other deputies refused to provide back up the witness requested. The witness described one incident in which the witness made a traffic stop and asked for a unit to back up. None came and the suspect ran away.

Another deputy who required anonymity described an incident at the beginning of the witness's career in patrol. The witness pulled over a suspect who was apparently intoxicated and "out of it". The witness said that the suspect appeared unaware that there was a gun on the passenger side front seat, did not reach for the gun, and did not resist arrest. When reporting the incident and booking the gun a Reaper ridiculed the witness for not shooting the suspect and claiming that he had "reached" for the

weapon.

Captain Angela Walton testified that in her 27 years of service there have always been Deputy Cliques in the Department and that they continue to exist to this day. Walton described her experience at Lennox Station at the beginning of her career when the Reapers were a well-recognized presence in the station. She identified Larry Del Mese, who later became Sheriff Villanueva's first Chief of Staff, as the "shot caller" at Lennox.

Walton observed that the Reapers were running the Lennox Station, particularly the early morning shift. After Walton obtained a position as a training officer on an interim basis, she was driven to a golf course and told by a deputy Reaper "we don't like you."

Walton testified that the Reapers set out to make her fail as a training officer. She recalled, for example, a trainee who was a father. Walton allowed the trainee to call his children to say good night. The Reapers roundly criticized her for that accommodation and for allowing her trainee to eat lunch.

Walton described an attempt to intimidate her by posting her business card on a bulletin board at the station with a large "X" drawn through it. Further attempts at intimidation were frequent service calls from a Reaper in charge of dispatch. Walton said that the volume of calls alone adversely affected her ability to perform her job.

Walton experienced the scope of the Reapers influence when she delivered a prisoner to the Compton Station. While in Compton, Walton encountered a former colleague, and engaged in social "catch up" conversation. Walton's brief delay from work for this social purpose was relayed by a Reaper who worked at Compton to a Reaper who worked at Lennox. According to Walton, her conversation with a former colleague demonstrated that the Reaper influence was not confined to a single station,

28

and it was used as a basis for criticism of her by the Reapers as part of their attempt to drive her from the station. When Walton sought a position at the Lancaster Station, she realized that she had a "jacket;" i.e., a negative reputation spread by the Reapers which included this supposed transgression.

### 4.    Century Station

Retired Chief Gooden, who had more than 25 years of service in the Department, described how Century Station essentially operated on its own, apart from the Department's command structure. He heard from deputies that if there were "problems" that the deputies would "handle that" and there was to be no involvement of the operations leadership of the station.

Chief Gooden recounted that during his tenure at MCJ the "2000 boys and 3000 boys" staged gladiator fights between jail inmates. Another witness stated that the 2000 boys were "heavy-handed white guys" who encouraged the use of force in large numbers at MCJ and eventually transferred to Century Station.

Chief Gooden also testified about the Department employees' fear of retaliation should they speak out. He recounted female custody assistants explaining their concern to him in connection with deputy misconduct in MCJ.

When Gooden became a captain at Century Station he was concerned about the history of problems associated with the station. He learned that deputies were involved in personnel decisions, including determining who would receive the coveted position of training officer.

There were two problematic groups of deputies at Century Station at the time. One was the Regulators. The other was the Spartans. Gooden described the competition for control of the station between them and recounted how there was even a dispute over one group taking and refusing to allow the other group to use a

29

station canopy for an event.

A witness requiring anonymity who worked at Century Station for approximately a decade said that the Regulators and Spartans were actively engaged in misconduct. The witness said that the Regulators' shot caller was the scheduling deputy. The witness claimed that Commander Kerry Carter and then Chief April Tardy knew of the presence and activities of the Regulators at the station. According to retired Assistant Sheriff Robert Olmstead, the entire Department leadership knew about the Regulators because the Regulators installed a large monument honoring themselves on the premises of the Century Station that remained in place for several years.

The anonymous witness described a Regulator sponsored fundraising poker game to support the Baker to Vegas run. The Regulators used female deputies as "cocktail waitresses" at the event. The female deputies received personal and administrative days off so they could work at the poker game. The witness reported that the Spartans were angered by the event and sought an equal amount of time off. A Spartan left a threatening note under the door of the captain who denied the request.

The COC reviewed the content of a March 16, 2015, anonymous letter to Sheriff McDonnell that claimed the Spartans' tattoo "represents 'putting in work,' such as unjustified beatings, falsifying reports of beatings, gladiator fighting, and intimidating other employees or inmates who interfered."

Another witness who insisted on anonymity for fear that the witness' career would "be over" if the cooperation were revealed, stated that there was a "book" that the witness had reviewed that identified the name and the date each Regulator received a tattoo. The witness said that there were twenty-five identified members. The book also recited the creed that reflected a commitment to "proactive policing."

30

The witness described the creed as "propaganda."

The witness also described the "tax" the witness was required to pay. For example, in connection with the Baker to Vegas run the witness was required by a training officer to pay more than $100 for a photograph of the 1960s "Rat Pack" celebrities.

The training officer mirrored the language of former Undersheriff Paul Tanaka by instructing the witness to "work the gray" and "work backwards," which the witness was taught meant "fudging" probable cause. The witness used as an example the "teaching" that all searches in high crime areas are to be defined as with "consent." The witness said that nobody in high crime areas ever consents. The witness said that the goal was to get arrest statistics. When the witness protested "working backwards," the witness was described by the training officer as "a rat." That reputation was spread through the station.

The witness said that with the passage of time the Department is filled with "gang" members, including members of the command staff. The witness said that at least 15 of the 25 Regulators have been promoted. The witness asserted that many of the promotions resulted from Undersheriff Tanaka's efforts to promote favored deputies.

The witness said that the influence of the Regulators affected the goals of young deputies. Because of the perception that the Regulators were in control, young deputies wished to "make their bones" to gain acceptance. The witness said that goal encouraged deputies to get into shootings to establish their "bona fides."

Special Counsel also received confidential information corroborating the assertion of multiple interviewed witnesses that tattooed Deputy Clique members currently hold important positions within the Department. Special Counsel was

31

informed that one specific area of influence is in the Civil Rights and Public Corruption section of the Department. Sheriff Luna has eliminated that section.  It was that section which led a search of former Board of Supervisor's member Sheila Kuehl and current COC member Patricia Giggans.

Chief Gooden recounted that Interim Sheriff John Scott ordered that the Deputy Clique logos be abandoned. Shortly thereafter, however, Gooden learned that there was offsite sale of clothing with the prohibited logos.

### 5.     Lancaster and Palmdale Stations

Angela Walton described her experience with Lancaster Station over several years. She testified that when her Vice Squad participated in an undercover operation, they would not reveal to the Lancaster deputies or supervisors the operation for fear that the suspects would be tipped off. While not specifically tied to Deputy Clique activity, the testimony illustrated inter- Departmental mistrust related to the absence of chain-of-command organizational supervision and the perception that sub-groups had conflicted loyalties.

Walton applied to be the Captain at Lancaster. She was the only "full Captain" applying. Since Lancaster is a contract city, city officials interviewed her for the position. She met with the Vice-Mayor who told her that he had received negative information about her. Walton understood that there was a Reaper at Lancaster Station and that the "jacket" she had obtained almost two decades before prevented her from becoming Captain of Lancaster Station.

Two non-Caucasian witnesses claimed to have been subjected to serial harassment by training officers at Lancaster Station. All training officers are Caucasian. One of the witnesses asserted that there were "bad stops" that led to searches, most often of people of color. The witness said that young deputies were pressured to write

reports of searches in "a certain way" to make the stops legally justifiable even though the reports contained false information. The witness said that the training officers insisted that certain reports be constructed either to conceal actions taken or to reflect things which did not occur. The witness has reported that these assertions are now the subject of an investigation by the Internal Affairs Bureau.

The witness' statement was consistent with a report issued by the U.S. Department of Justice in a June 28, 2013, finding that deputies in Lancaster and Palmdale "engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment and Title VI." The Department of Justice went on to note that "Some Antelope Valley Deputies wear tattoos or share paraphernalia with an intimidating skull and snake symbol as a mark of affiliation with the Antelope Valley stations."

In a deposition in a wrongful death case, Oleg Polissky, a Palmdale Station deputy, testified that he received a Cowboys tattoo and attended a celebration with at least twenty similarly tattooed deputies. A similar tattoo appeared on the leg of a former deputy who was shot by another deputy while on a camping trip. A photo of the victim's leg was displayed at a Special Hearing of the COC. A witness who required anonymity was told that the shooting was in retaliation for an act objected to by the Cowboys. The retaliatory shooting of out of favor compatriots is classic criminal gang activity prosecuted regularly.  Another witness with direct knowledge of the circumstances, and who was the source of the first witness' knowledge of the shooting, declined to be interviewed.

### 6.    Aero Bureau

Aero Bureau is responsible for the Department's helicopters. It has a small

number of assigned deputies who have the necessary pilot skills and wear a helmet that has as its logo a chicken being choked. The group is widely referred to as the "Ghetto Birds."

A witness interviewed by COC's staff described systematic harassment by the three senior Caucasian deputies in the Aero Bureau. The witness described them as a "clique" and the three as "shot callers." The witness said that there were no African Americans assigned to the Aero Bureau and that as far as the witness knew there had been only one African American ever assigned to the Bureau.

Another witness, a current deputy with 20 years of service who insisted upon anonymity for fear of retribution, confirmed that the Aero Bureau takes pride in the "Ghetto Bird" logo. The witness said that a leader of the Aero Bureau openly stated that he was a Viking and was a founder of the Regulators. Another leader is a tattooed member of the Spartans. The witness described the process of coordinated "humiliation" efforts directed by the shot callers to disfavored deputies. The shot callers encouraged the others at Aero Bureau to ignore disfavored deputies.

The witness described systematic and routine harassment that caused many new deputies to leave the Bureau. The witness observed the shot callers mocking the accent of a Hispanic deputy and said that disfavored deputies had their pictures placed and defaced on bathroom walls.

The action of a small, self-selected racially harmonious sub-group is consistent with evidence regarding how Deputy Gangs and Deputy Cliques acted in numerous stations throughout the Department.  The use of racially charged and disparaging logos is also consistent with their problematic conduct. Such conduct is inconsistent with fundamental principles of professional policing.

34

C.    **Obstacles to Eliminating Deputy Cliques in the Department**

Among those who must participate in the solution to longstanding and widespread problem of Deputy Gangs and Deputy Cliques in the Department are the Association for Los Angeles Deputy Sheriffs ("ALADS") and County Counsel. Neither ALADS nor County Counsel have been helpful in the past.

1.    **ALADS**

Most deputies who are members of ALADS are not tattooed members of a Deputy Gang or Deputy Clique. According to the Rand Report as many as 15 to 20% of deputies belong to Deputy Cliques. ALADS should, accordingly, recognize that the elimination of Deputy Gangs and Deputy Cliques is in the best interests of the vast majority of its members.

The Special Counsel's investigation has revealed, however, numerous instances in which ALADS has protected Deputy Gang and Deputy Clique members.  This has included protecting deputies who engaged in gang activities involving serious misconduct against other deputies who presumably are ALADS members. There is no dispute that pursuant to the Myers-Milias-Brown Act and the National Labor Relations Act, ALADS owes a duty of fair representation to all its members. Special Counsel believes, however, that ALADS can meet its obligations without condoning the existence of Deputy Gangs and Deputy Cliques, the harm they cause to the Department, or the attendant unprofessional conduct in which members of those groups engage.

ALADS has opposed efforts by the Department to require the disclosure of tattoos affiliated with Deputy Cliques. In one example, ALADS procured a legal opinion that the First Amendment prohibits the Department from barring deputies from having tattoos associated with these groups. That opinion, which is it at odds with the

35

applicable law discussed below, was provided to Sheriff Villanueva, who relied upon it to assert that he was constitutionally unable to restrain the use of tattoos by Deputy Cliques even if they constituted "police gangs" as defined by California Penal Code section 13670.

In a very recent example ALADS contacted a current captain who sent an email advising deputies at his station not to get Deputy Gang/Deputy Clique tattoos because it could hurt their careers. ALADS protested that advice and told the captain to cease and desist from advising deputies about tattoos. Such communication serves both to undermine the command structure of the Department and to normalize open display of Deputy Gang and Deputy Clique membership.

Steve Biagini, a retired 37-year veteran of the Department who served as Captain in the East L.A. station, observed that because of actions by ALADS and PPOA (Professional Peace Officers Association), the supervisor's union, he could not question an incoming transferee's "fitness" to serve at the East L.A. station. Rather, if the deputy was on an incoming transfer list, he had no discretion to refuse the transfer. Similarly, he lacked the ability to transfer problematic deputies from the station. Biagini blamed ALADS for this limitation on supervisorial discretion and the consequential harm to the Department of requiring unfit deputies to remain in stations where their problems arose.

Michael Gennaco, who was the head of the Office of Independent Review, described the institutional problems attributable to ALADS. He expects that ALADS will oppose more detailed and explicit training of deputies about the dangers of Deputy Clique affiliation, will oppose changes in the transfer and rotation system to reduce the influence of Deputy Cliques at stations and jails, and will not acknowledge the existence of problems associated with Deputy Cliques, notwithstanding the evidence

36

set forth above.

Gennaco used as an example ALADS' involvement in the Quiet Canon episode, another fight among deputies, some of whom were ultimately terminated. Gennaco said that ALADS ostracized the whistle blowers but backed "to the hilt" the accused. ALADS's reaction to the Internal Affairs investigation of the Kennedy Hall incident involved a similar defense of the accused even though the victims were also deputies (and presumably ALADS members).

ALADS also created obstacles to Special Counsel's investigation. Those include making a baseless contention that the COC has no subpoena power because the grant of that power by Measure R violates the deputies' collective bargaining agreement with the County. Further ALADS has contacted witnesses subpoenaed by the COC and urged them to seek specific lawyers to assist the witnesses in avoiding testimony. A subpoenaed witness reported a specific direction to call a designated lawyer who would arrange for the witness not to testify.

It is imperative that ALADS supports the elimination of the Deputy Gangs and Deputy Cliques for the benefit of its members. The repeated gang style behavior of certain Deputy Cliques has led to enormous litigation costs borne, in part by ALADS, to the detriment of ALADS' members, and significant harm to the Department's reputation with the public. Each special hearing of the COC included multiple public witnesses calling out gang behavior by deputies and expressing a community fear and hatred of deputies simply because they were members of the Department. The level of anger and mistrust publicly expressed is the tip of a sizable iceberg in the community. Elimination of Deputy Gangs and Cliques is in the best interest of all Department members. The public enmity alone increases the risk of harm to deputies. If only for reasons of their members safety, ALADS' should be a leader in eliminating

37

Deputy Cliques and the Deputy Gangs that grow out of them.

### 2. County Counsel

County Counsel bears some responsibility for enabling Deputy Cliques. After the Kolts Commission issued the first report to publicly acknowledge the existence of Deputy Cliques in the Department in 1992, Judge Kolts recommended that the County establish a civilian oversight board to ensure the Sheriff implemented reforms aimed at reducing uses of force and eradicating Deputy Gangs. The County Counsel, however, issued an opinion advising that a civilian oversight board without the Sheriff's agreement would violate state law. The Department leadership used this opinion to successfully oppose civilian oversight for many years. During this period without civilian oversight deputy gangs flourished.

The County Counsel has approved the use of County resources to pay by the hour litigation counsel to defend Deputy Gang and Deputy Clique members who have engaged in misconduct far outside the scope of their duties as deputies. Deputies who engaged in an after-hours beat downs of co-workers as an exercise of their power over other co- workers were not acting within the course and scope of their duty and yet they are supported in litigation by the County.

In connection with *Lockett v. County of Los Angeles*, 18-CV-5838-PJW in a December 2022 "Summary of Corrective Action" an Assistant County Counsel addressing the beating and tasering by Deputies Aldama and Orrego  of Sheldon Lockett alleged to have been motivated by the deputies involvement in the Executioners Deputy Gang wrote "to date, there is no information or evidence obtained through any Sheriff's Department investigation to substantiate this claim[that the use of force by the deputies was motivated by their membership in the Executioners.]"  In fact, as was revealed at the hearing, Aldama displayed his

Executioner tattoo at a deposition. The Court denied the County's lawyer's attempt to keep from the jury evidence of the tattoos of the deputies. The question of the relationship between the use of force, a claim ultimately settled by the County for more than two million dollars, and action in furtherance of gang membership surely was a reasonable inference to be drawn from the history of the Executioners and the disturbing facts that led to the multi-million dollar settlement.

It appears that County Counsel refused to accept the inference in light of the facts publicly known. For example, in the case of the shooting of Donta Taylor by the same deputies, Aldama admitted not only that he had an Executioner tattoo but that up to twenty other deputies had the same tattoo. The Taylor case settled for seven million dollars. It appears that notwithstanding almost ten million dollars in County paid settlements that the County Counsel refused to accept the inference widely drawn by the media and the community.

As Michael Gennaco has made clear, County Counsel has not supported meaningful risk management and other efforts to address the problem of Deputy Cliques on the front end; that is, working to root out the problems before they result in litigation as opposed to paying after-the-fact litigation costs, settlements, and adverse judgments. He recalled a handwritten document describing a Regulator tattoo, which stated that "if you kill add smoke" to the tattoo. Gennaco stated that County Counsel urged no action because of concern that the Department would be sued if it took action in response to the tattoo.

The COC believes that County Counsel is aware that former Sheriff Villanueva relied upon a withdrawn and legally erroneous 2014 opinion to claim that he could not end the tattooed Deputy Cliques. Despite the COC's request, the COC has been informed that County Counsel has advised the Board of Supervisors not to release an

39

opinion that fully sustains the COC's recommended policy change. By this simple act County Counsel gave cover to a regime that at minimum tolerated, if not rewarded Deputy Gangs and Deputy Cliques.

The conduct of County Counsel creates a reasonable inference that, whatever its intentions, by its actions and inactions it has not provided meaningful assistance to eliminating Deputy Gangs and Deputy Cliques.

### 3.    Los Angeles District Attorney's Office

The District Attorney's Office has in many instances ignored deputies who participate in Deputy Gangs and Deputy Cliques and who engage in gang-related misconduct. The Justice System Integrity Division (JSID) of the Los Angeles District Attorney's Office investigates alleged criminal misconduct by deputies, as well as all deputy involved shootings to determine whether criminal charges should be filed. In conducting its analyses, the JSID repeatedly refrains from pursuing evidence that a sheriff's deputy accused of potential criminal activity or unconstitutional is affiliated with a Deputy Gang or Deputy Clique. For example, JSID declined to file criminal charges against four alleged Banditos who severely beat other deputies at an off-training party at Kennedy Hall. Despite substantial evidence that incident was, in effect, a "gang beat down," the JSID discounted a gang-related motive, writing: "Although there was some mention of a subculture of "Bandtios" existing at the ELA station, the Banditos was not a focus of this investigation nor were suspects identified as being part of this subculture.… At no point in this investigation did any witnesses indicate that the Banditos were equivalent to a gang or any type of criminal enterprise."

The JSID memo is factually wrong—several witnesses interviewed in Special Counsel's investigation have characterized the Banditos as a "gang"—and betrays a

reluctance to pursue any evidence of gang affiliation or a gang-related motive for alleged misconduct. As the Inspector General concluded in his October 2020 report, "Having received what appears to be a purposefully perfunctory investigation by ICIB (which did not gather evidence of the motive behind the alleged assault at Kennedy Hall) the LADA office did not request statements be taken from the uncooperative witnesses or compel a grand jury to compel statements."

The District Attorney's Office also has failed to require the Department to disclose the identity of known Deputy Gang and Deputy Clique members who are to testify as prosecution witnesses in criminal trials. The District Attorney's Office does not require Deputy District Attorneys to ask prosecution witnesses whether they belong to a Deputy Gang. The failure to obtain and to disclose potentially exonerating or impeaching testimony favorable to the defense raises significant constitutional issues under *Brady v. Maryland* (1963) 373 U.S.83.

### D.    The Elimination of Deputy Cliques is Constitutionally Permissible

Applicable law permits disciplinary actions, including termination, based upon a deputy's joining or participating in an internal Deputy Clique. The overwhelming evidence presented at the public hearing, and developed in extensive interviews, demonstrates that Deputy Cliques encourage excessive force, undermine supervision, destroy public trust, are discriminatory, disruptive, and act contrary to fundamental principles of professional policing. With these elements Deputy Cliques are properly defined as gangs within the definition of Penal Code Section 13670. These characteristics make the elimination of the Deputy Cliques constitutionally permissible. Indeed, they make the elimination of these Deputy Cliques and Deputy Gangs a constitutional imperative.

The activities of and dangers created by Deputy Cliques meet the balancing test

41

required to ban or limit membership in these groups. *Pickering v. Board of Education*, 391 U.S. 563 (1968) established the required "balancing" test. The Ninth Circuit applied the test in *Hudson v. Craven,* 403 F.3d 691, 696 (9th Cir. 2005). The balance to be weighed is: "(1) [W]hether the speech that led to the adverse employment action [i.e., prohibiting Deputy Cliques] relates to a matter of 'public concern'; and (2) whether, under a balancing test, the public employer can demonstrate that its legitimate interests outweigh the employee's First Amendment rights."

Based upon the "public comment" at COC's special hearings and COC regular meetings and the multiple public reports going back to the Kolts Commission in 1992, the existence and conduct of Deputy Cliques are plainly matters of "public concern." The COC has heard moving statements by friends and family members of deceased or injured individuals impacted by the activities of Deputy Cliques. The treatment and gang activities of Deputy Clique members toward their brothers and sisters in uniform is a chilling statement of the paramount interest of the Department and the County in protecting its own employees and not tolerating persistent violations of law and fundamental principles of professional policing. The public is well advised to be "concerned" and to view the evidence of such misconduct directed toward fellow deputies and assume that they, as outsiders of the organization, can only expect worse treatment.

In *Piscottano v. Murphy*, 511 F. 3d. 247, 274-277 (2nd Cir. 2007), the court concluded that correctional officers' membership in the Outlaws Motorcycle Club, an organization that had engaged in criminal activity, presented an issue of "public concern." Here, both extensive law enforcement testimony and evidence and the public comments demonstrate that Deputy Clique membership is a matter of public concern. *Accord, Godwin v. Rogue Valley Youth Corr. Facility* 656 App'x 874, 875 (9th

42

Cir. 2016).

In the balancing of competing interests prong of the test, the employer needs to show that "the employee's activity is disruptive to the internal operations of the governmental unit in question" and the disruption is significant enough so that it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships…or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Melzer v. Bd. of Educ of City Sch. Dist. of City of New York*, 336 F.3d 185, 197 (2nd Cir. 2003).

Courts have consistently found that a "law enforcement agency has a heightened need for order, loyalty, morale and harmony which affords a police department more latitude in responding to the speech of its officers than other government employers." *See e.g., Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1258 (N.D. Ala. 2017); *Turner v. United States Capital Police,* 34 F. Supp. 3d 124, 143 (D.D.C. 2014); *McMullen v. Carson,* 754 F.2d 936 (11th Cir. 1985) (Ku Klux Klan membership sufficient to terminate a Sheriff's deputy.). Further, the efficiency, security, and integrity of the Department law enforcement function easily outweighs the "associational rights" of a Deputy Clique member.

In short, the applicable law establishes that, based upon the facts found by Special Counsel, and the evidence offered in public hearings conducted by the COC that the elimination of Deputy Cliques is well within the constitutional bounds of the Department. Not only is it permissible, but it is also a necessity.

## IV.    <u>FACTUAL FINDINGS SUMMARY</u>

Special Counsel's investigation of Deputy Gangs and Deputy Cliques in the Los Angeles Sheriff's Department demonstrates that it is time to eradicate this 50-year plague upon the County of Los Angeles, its residents and the Department's employees

43

who do not belong to, or wish to be associated with, the Deputy Gangs or Deputy Cliques. The fine distinction, if any, between "Deputy Gangs" and "Deputy Cliques" is not important. The evidence has shown that Deputy Cliques regularly devolve into discriminatory, exclusionary, and dangerous associations that challenge the core goals of law enforcement.

Accordingly, Special Counsel sets forth below recommendations to the COC to urge Sheriff Robert Luna to accomplish this goal. The COC should work with the Sheriff and the Department in facilitating enactment of the recommendations and monitoring the results.

## V.    <u>RECOMMENDATIONS TO ELIMINATE DEPUTY GANGS AND CLIQUES</u>

On February 14, 2020, the COC passed a resolution recommending that the Department enact a policy "prohibiting joining and participation in deputy cliques." A copy of the resolution and preamble is attached as Exhibit A.

The COC defined Deputy Cliques "as groups of Sheriff's deputies within a particular patrol station, bureau or unit who self- associate as a subgroup to the exclusion of others in their station or unit."  The term "Deputy Cliques" when used within the Department was intended to minimize the problem created by such groups.

The harmful effects of groups of deputies who self-associated and acted to exclude other deputies by identifying with symbols and names designed to separate themselves from the Department  had a principal focus upon the harm caused to the Department and to excluded members. Special Counsel urges the COC to reiterate its request that the Sheriff enact a policy prohibiting deputies from joining, participating in or soliciting others to join a Deputy Clique.

However, Special Counsel urges the COC to go further.  As  expressed above, as defined in the COC proposal, the term "Deputy Cliques" encompasses subgroups that

44

engage in misconduct directed against the community such as excessive force and violations of constitutional rights. The factual investigation has revealed widespread, deliberate misconduct that at minimum violates fundamental principles of professional policing and in many cases appears to violate the law. The time has now come for a policy that expressly prohibits not just the internally harmful effects of Deputy Cliques, but the external, community harmful acts of Deputy Gangs. Such harmful acts include falsified police reports, unlawful searches and seizures, misuse and excessive use of force and discriminatory enforcement of law. Proof that the community, particularly the communities of color, are suffering because of gang behavior is epitomized in the recently released body-camera footage of Deputy Sabatine as he exercised his authority by pointing a gun at an African American man sitting in his parked car without any evidence of a crime.

Now is the time to eliminate all these problematic groups, Deputy Cliques and Deputy Gangs. The factual findings compel the COC to urge the Sheriff to adopt the following recommendations:

A.    **LEADERSHIP AND SUPERVISION**

1.    **The Sheriff must clearly, promptly and unequivocally articulate his vision, policies, and objectives in addressing the problem of Deputy Gangs and Deputy Cliques.**

Deputy Gangs and Deputy Cliques, and their adverse effects on the community and the Department need to be eliminated. This is easier said than done, but it will never be done unless the Sheriff promptly announces that Deputy Gangs and Deputy Cliques will no longer be tolerated. He should make clear that this is a top priority, and he should state his intention to make this happen immediately. He must also promptly adopt policies calculated to achieve this goal and see that these policies are enforced.

45

**2.      Adopt a policy that clearly prohibits deputies from participating in Deputy Gangs, as defined in Penal Code Section 13670.**

Special Counsel's investigation has revealed that, despite 50 years of known Deputy Gangs and Deputy Cliques within the Department, these problematic groups continue to operate at several of the Department's patrol stations, engage in gang like activities and no Sheriff has adopted a policy banning participation in such groups. Moreover, the State legislature has mandated that every law enforcement agency in the State of California "shall maintain a policy that prohibits participation in law enforcement gangs and make violation of that policy grounds for termination." PC Section 13670(b). Moreover, the legislature has defined the term "law enforcement gang."  The current Sheriff's predecessor failed to implement a policy banning law enforcement gangs within the Department. Such a policy should be adopted without further delay.

**3.      Adopt a policy that prohibits deputies from joining, participating in and soliciting others to join Deputy Cliques.**

Given the Department's long history of exclusionary deputy subgroups, it will not be enough merely to prohibit participation in deputy or law enforcement "gangs." Ending this problem requires a prohibition against joining and participating in Deputy Cliques. In April 2021, the COC proposed that the Department adopt a policy that prohibits deputies from joining, participating in, or soliciting others to join a Deputy Clique.  The COC's proposed policy was accompanied by a preamble that explained the need for such a policy and provided definition to the term Deputy Clique.

As noted above, Special Counsel urges that the Sheriff adopt the COC's proposed policy. Violators of the policy would be subject to discipline, up to and including termination. The indispensable element to ending this 50-year harm to the

46

Department and the public is adopting the recommended policy to send a strong message that belonging to a Deputy Clique is no longer going to be tolerated, that gang behaviors are a thing of the past and this Sheriff is fully committed to rid the Department of these groups.

All Deputy Gangs have sprung from Deputy Cliques, and the clique-culture is deeply embedded in the Department. This cancer in the Department must be excised.

4. **The Sheriff should develop a departmentwide initiative to end Deputy Gangs and Deputy Cliques.**

As noted above in the Factual Findings, Deputy Gangs and Deputy Cliques are secretive, exclusive, and often employ intimidating, unprofessional, or controversial graphics, including body tattoos. They diminish the public's trust in the Department, undermine supervision and the chain of command, are detrimental to the morale of other Department members, and negatively impact the Department's effectiveness and professionalism in executing its mission. The elimination of these groups requires buy-in at all levels of the Department. The Sheriff should announce a department-wide initiative banning Deputy Gangs and Deputy Cliques. All executives, managers, and supervisors must be openly and unequivocally committed to conveying the Sheriff's policy, and objectives to Department personnel. As the Rand study stated, "Culture eats policy." The Sheriff's leadership team must change the culture of stations, jails, and other bureaus or units where these groups exist.

5. **The Sheriff should seek the support of ALADS and PPOA, for his vision, policies and objectives regarding Deputy Gangs and Deputy Cliques.**

ALADS and PPOA need to be part of the solution and recognize that the elimination of Deputy Gangs and Deputy Cliques is in the overall best interests

47

of their members.

6.      **Any captain who is unable or unwilling to support the Sheriff's policy without reservations should be subject to   appropriate discipline ranging from transfer to a less critical position with little or no presence of Deputy Gangs and Deputy Cliques to termination for insubordination in the Sheriff's considered judgment and pursuant to required due process.**

7.      **The Department should consider assigning a senior captain and a newly promoted captain to larger, high activity stations to ensure maximum supervision and mentoring of lieutenants and sergeants while retaining full accountability within the paramilitary structure of the Department.**

Although a single captain heads Sheriff's patrol stations, there is a precedent for having two captains oversee a facility in the Custody Division.  MCJ, Twin Towers Correctional Facility, and North County Correctional Facility all have two captain organizations—one for operations and one for administrative functions. Assigning two captains to larger, busier patrol stations, particularly those with a history of entrenched Deputy Gangs and Deputy Cliques, will enhance the ability of captains to address the continuing problem of these groups and help ensure that such groups will not be formed in the future. If the Sheriff does not believe a two-captain approach is well advised, he should report his reasons to the COC.

48

B.      **POLICY AND TRAINING**

1.      **As set forth in recommendations A (2) and A (3)  above, the Sheriff should adopt and promptly implement a clear policy to address the need to eliminate Deputy Gangs and Deputy Cliques and prohibit tattoos that depict violence which must  be  supported, and explained by the Sheriff's leadership team.**

As defined earlier in this Report, a Deputy Clique is an association of deputies within a station or unit that is secretive and invidiously exclusionary and often adopts images, including matching tattoos depicting violence or the use of deadly force. These sub-groups have been fairly and frequently defined as Deputy Gangs. As stated in Recommendations No. A (2) and A (3) above, the Sheriff should immediately bar all deputies from joining, participating in, or soliciting others to join Deputy Gangs and Deputy Cliques. In addition to adopting this policy, the Sheriff should promulgate additional polices to help eradicate Deputy Gangs and Deputy Cliques, including a policy that prohibits new deputies hired after the date of the issuance of Recommendations  A (2) and A (3) from having tattoos that depict violence, the use of deadly force or any iconography that might reasonably be found offensive to the public. Current Department members should also be prohibited from acquiring such tattoos after the date of the issuance of the policy. Any current Department member who acquired a Deputy Gang or Deputy Clique tattoo prior to the adopting of the policy should be required to ensure that it is not visible while the member is on-duty, on Department or County property, or is representing the Department away from the workplace.

A review of stations and jails should be conducted to determine which facilities have unprofessional station/jail/bureau logos. Unit commanders should be

49

accountable for the removal of decals, flags, bumper stickers, decorations, or other depictions of unprofessional symbols inappropriate for representing Department units. All managers and supervisors must be responsive to the existence of graphics or other symbols representing prohibited Deputy Gangs or Deputy Cliques or offensive station/jail/bureau logos such as "Ghetto Birds" or "Ft. Apache."  They should be removed, and misconduct investigations should be initiated to determine which personnel are responsible for such graphics or symbols if they reappear in the future.

**2.** **The Department should investigate violations of the policy banning joining or participating in Deputy Gang and Deputy Cliques and refer violations for discipline.**

A primary consequence of any violation of the Sheriff's policies regarding Deputy Gangs or Deputy Cliques should be a misconduct investigation followed by appropriate discipline which should range from suspension through demotion to discharge consistent with due process. Department personnel should also be advised that the Department will enforce Penal Code Section 13670.

**3.** **The Department's leadership team should consistently and recurrently emphasize the adverse career consequences of creating or joining a Deputy Gang or Deputy Clique.**

Although this task belongs to personnel of every rank, the time commitment must increase with each successively lower rank. Notwithstanding the importance of a captain-level manager to set the tone for deputies, lieutenants and sergeants, lieutenants and sergeants spend the most time with deputies. They therefore must be most accountable for communicating to deputies under their supervision the adverse consequences of becoming involved with Deputy Gangs and Deputy Cliques. Captains ultimately are responsible for and must be held accountable for the performance of

50

lieutenants and sergeants.

4.      **The Department must implement a procedure for notifying the District Attorney's Office if a deputy testifying as a witness participates in a prohibited Deputy Gang or Deputy Clique.**

Compliance with Federal and State law, including compliance with *Brady v. Maryland* (1963) 373 U.S. 83, requires the District Attorney's Office to disclose if a deputy testifying as a prosecution witness participates in a prohibited Deputy Gang or Deputy Clique that might bear upon the witnesses' credibility. The confidentiality of law enforcement personnel files does not relieve the prosecution of its constitutional obligation to disclose impeaching information for any deputy testifying as a prosecution witness. Sheriff Luna and his designees should consult with the District Attorney's Office to devise an appropriate procedure for the Department to notify the District Attorney's Office that a deputy is participating in a prohibited Deputy Gang or Deputy Clique so that prosecutors can make the required disclosures, if any, to the defense.

5.      **The Department should actively investigate violation of the policy prohibiting joining, participating in or soliciting deputies to join Deputy Gangs and Deputy Cliques**

Sheriff Luna should remedy the Department's longstanding failure to investigate Deputy Gangs and Deputy Cliques. After Recommendation No. 2, above is adopted, the Department should make reasonable efforts to learn whether deputies continue to participate in such groups, as the Department did in 1973 with the Little Red Devils and in 2013 with the Jump Out Boys.

51

**6.      The Department should train supervisors how to mentor deputies about the adverse consequences of involvement in Deputy Gangs and Deputy Cliques.**

In 2016 the Department initiated a departmentwide mentoring program for deputy personnel named the "Sergeants' Mentoring Initiative." The objective of the program was to equip and inspire the sergeants to provide to their deputies meaningful, practical, recurrent mentoring about decision-making and conduct in law enforcement and custodial services. The program was designed to (1) emphasize the high aspirations associated with  public safety services, (2) stress the importance and difficulty of the decisions required of peace officers, (3) acknowledge the temptations and pressures prevalent in law enforcement, and (4) enhance deputies' capacity to apply foresight, perspective and wisdom to their decision- making and conduct.

**7.      The Department should implement a series of community meetings involving patrol station captains, commanders, and chiefs to ascertain the impact of Deputy Gangs and Deputy Cliques on community relations.**

The Department should implement at every station a Community Advisory Committee ("CAC"). The committees should consist of community members who have been vocal in their criticisms of law enforcement in addition to station "boosters" who volunteer for membership.

The periodic meetings should be attended by committee members, other members of the community, and station personnel, including the captain, dedicated lieutenant, sergeants, and special assignment and other deputies as necessary. These meetings constitute excellent forums for Department personnel to learn about community concerns. The topic of Deputy Gangs and Deputy Cliques must be an

52

agenda item of these meetings.

C.      **RE-DEPLOYMENTS AND ROTATIONS**

Special Counsel recognizes the complexity of the Department, as well as the difficulty of managing the second largest local law enforcement agency in the country, with its large geographical area, responsibilities for operating the largest county jail system and the largest local court system in America and its duty to police over four million residents.

Special Counsel also recognizes that re-deploying or transferring deputies who belong to a Deputy Gang or Deputy Clique from one unit or patrol station to another has in certain circumstances resulted in moving but not necessarily solving the problem. The clearest illustration of this was the transfer of substantial numbers of deputies who were members of the 2000 and 3000 Boys to the same patrol stations they selected as their preferences, i.e., Compton and South L.A. Stations, respectively. Nonetheless, the use of the Sheriff's authority to re-deploy, transfer and rotate assignments is a valuable tool that can help eliminate Deputy Gangs and Deputy Cliques within the Department and, importantly, preventing their formation and re-emergence.

In interviewing non-Department law enforcement managers, as well as former Department leaders, Special Counsel recognizes that other law enforcement agencies use re-deployment and assignment rotation to minimize the risk of problematic officer or deputy groups forming in those agencies. It is an available and appealing strategy here. While not a panacea, it would provide an additional remedy and the mere announcement of the policy could serve a prophylactic effect.

Moreover, the evidence adduced demonstrates that the Department's decentralized station-based structure has played a significant role in fostering Deputy

Gangs and Deputy Cliques. Deputies' loyalties extend to the station rather than to the Department as a whole. Indeed, tattoos often are associated with the first or "home" station of the deputy.

At a minimum, the Sheriff should provide a report to the COC on his perception of the viability and likelihood of success of the rotational plan set forth below.

Special Counsel urges that the Sheriff implement the following recommendation for re-deployment and periodic rotations of deputies within patrol and custody:

1.     **The Sheriff should use his authority to re-deploy and rotate deputies based upon the needs of the Department for the Department to eliminate the formation and re-emergence of Deputy Gangs and Deputy Cliques.**

The Sheriff should consider making such re-deployments or transfers within a geographic patrol or custody division, where possible, to avoid undue hardships. The Sheriff should also consider rotating all patrol deputies (after completion of field training) no later than the end of their first year in patrol to another patrol station within the Division. The Sheriff should also consider rotating all patrol deputies in periodic rotations, no longer than every five years, or sooner, to another station. The CCJV recommended and the Department implemented frequent rotations of deputies within the facilities of the County Jails. The rotational policy played a role in breaking up of the 2000 and 3000 Boys and reducing excessive force in MCJ. The rotation of deputies serving in Custody divisions should continue.

To effectively use the Sheriff's authority to re-deploy, Unit Commanders should take necessary actions to address the problem of Deputy Gangs and Deputy Cliques under their commands, including recommending to their Chiefs transfers of problematic deputies. Captains must be focused upon the rotation options and actively

54

participate in informing Commanders and Chiefs of the utility and results of such transfers.

**2. The Department should re-assess the dual career track for Custody/Court Services and provide a written report to the COC explaining what factors impede implementation.**

Having more deputies in Custody or Court Services who want careers in those Divisions may allow other deputies to go directly to patrol from the academy or shorten the time that other deputies spend in Custody after the academy.

**3. The Department should assess the feasibility of first assignments to patrol rather than jail facilities and provide a written report to the COC explaining what factors exist, if any, impede implementation.**

**D. ACCOUNTABILITY**

**1. The Sheriff should ensure that senior executives and unit leaders, notably captains and commanders are implementing the Sheriff's policy, vision and objectives regarding Deputy Gangs and Deputy Cliques.**

A segment of the weekly Executive Planning Council meeting (Sheriff, Undersheriff, Assistant Sheriff, Division Chiefs and various staff members) should be devoted to discussion of the progress of the initiative to end Deputy Gangs and Deputy Cliques. Identified obstacles should be remedied quickly.

**2. The Office of Inspector General should monitor implementation of the policy banning, joining or participating in Deputy Gangs and Deputy Cliques.**

Because of the imperative of implementing policies to eliminate Deputy Gangs

and Deputy Cliques, Special Counsel recommends that the COC request the Office of Inspector General to deploy its resources as additional "eyes and ears" to ensure the policy recommendations A (2) and A (3) are implemented fully and with alacrity.

3. **Promotional considerations should include an evaluation of evidence that a member under consideration for a promotion is currently involved in a Deputy Gang or Deputy Clique, including the nature and extent of the member's involvement and whether it was before or after the date of the policy issued by the Sheriff.**

Past administrations have promoted tattooed Deputy Gang members to the highest levels of leadership in the Department. Most notably, Sheriff Baca promoted Paul Tanaka, a tattooed Viking, to Undersheriff. More recently, Sheriff Villanueva promoted Timothy Murakami, a tattooed Caveman, to Undersheriff and Lawrence Del Mese, a tattooed Grim Reaper, to Chief of Staff.

Promoting Deputy Gang members into leadership positions reinforces the power of Deputy Gangs and Deputy Cliques and undermines the ability of officials to implement reforms aimed at eliminating them within the Department. For example, former Undersheriff Tanaka's recommendation encouraging investigative tactics "close to the line"and "in the gray area" became part of the Jump Out Boys creed.

Current or former Deputy Gang and Deputy Clique members in leadership positions will have difficulty enforcing new prohibitions against other deputies joining a Deputy Gang or Deputy Clique because their own tattoos and past participation renders them vulnerable to accusations of, at minimum, hypocrisy. Former Chief of Staff Del Mese testified that he had his Reapers tattoos removed at about the same time as the former Sheriff appointed him Chief of Staff because he understood that the tattoo had come to be a "liability" and "a bad look."

56

Consequently, the Department should inquire if a deputy under consideration for a promotion is or was Deputy Gang or Deputy Clique affiliated and must carefully evaluate the Department wide implications of promoting those who actively participated in such groups.

**4.      The Department should include a standard set of questions regarding a deputy's current affiliations with Deputy Gangs or Deputy Cliques in the use of force review process and in administrative and internal criminal  investigations.**

This recommendation does not assume a *per se* causal connection between membership in a Deputy Gang or Deputy Clique, or the fact that a deputy has a tattoo reflecting involvement in such a group, and unlawful use of force or misconduct. It is, however, important to recognize that the community widely assumes such a causal connection.

Members of communities policed by Deputy Gangs and Deputy Cliques widely infer a connection between such groups and excessive uses of force. The U.S. Commission on Civil Rights report, the Loyola Report and the report of the National Association of Blacks in Criminal Justice noted that stations with active Deputy Gangs have significantly more deputy involved shootings than stations without Deputy Gangs, even when the overall crime rates in the station-districts are comparable.

The questions must enable an assessment of the possibility or likelihood of a connection, without any presumption. If there is evidence indicating even a possible connection between a deputy's membership in a Deputy Gang or Deputy Clique and a use of force incident or misconduct, investigative steps should be taken to determine the nature and extent of the connection. In any such cases, the Office of the Inspector General should be notified and asked to monitor the progress of the investigation.

5.     **The Department should ensure that captains are notified of deputies involved in force incidents or personnel misconduct investigations who have affiliations with Deputy Gangs or Deputy Cliques, including tattoos associated with such groups.**

The Department should codify this recommendation as a rule in the Department Manual of Policy and Procedures. The responsibility for making this notification will normally fall to an investigator at the captain's own unit of assignment, or to an Internal Affairs Bureau or to Internal Criminal Investigations Bureau investigator. However, anyone who obtains such knowledge must promptly notify the concerned captain, either directly or through the chain of command.

6.     **The Department should ensure that the CompStat process for risk management indicators regarding the existence of Deputy Gangs or Deputy Cliques within a patrol station or other Department unit is implemented and is effective in assessing the risk mitigation efforts of unit commanders.**

The Department previously instituted a CompStat process, also referred to as the Sheriff's Critical Issues Forum (SCIF). The Department initially used it primarily in patrol divisions, but later extended to every division involved with large scale risk management issues. LAPD has successfully employed a CompStat process that allows measurable results. Such statistics driven analyses can assess unit commanders' efforts to successfully manage their responsibilities. SCIF or other statistics driven analyses will assist in the responsible operating of the Department and provide another forum for evaluating progress on efforts to end Deputy Gangs and Deputy Cliques.  The Department should track force incidents by shifts or deputy partners, checking for, and assessing, patterns that may indicate the need for re-assignments, transfers or,

58

discipline.

The Department should implement a "performance mentoring" process, overseen by Risk Management Bureau ("RMB"). The object of the program should be to identify "at-risk" employees by means of the automated "early identification and intervention system".

Active management will determine the cause and the means of rectifying patterns of problematic conduct. Where leadership perceives the behavior as curable and non-recurrent, a mentoring program specifically designed to help the employee avoid future misconduct should be enacted.

**7.** **The Department must ensure that captains hold sergeants and lieutenants accountable for deputies under their supervision involved in Deputy Gangs and Deputy Cliques.**

It is essential that captains and lieutenants back up sergeants who face insubordination from members of Deputy Gangs and Deputy Cliques. Fulfilling this recommendation is a fundamental duty of captain- and lieutenant-level managers. They must assess lower ranking managers and supervisors as to their commitment to convey, support and enforce the Sheriff's vision and intentions about Deputy Gangs and Deputy Cliques. Failure on the part of a captain to meet this obligation should be grounds for transfer or other appropriate employment action.

**8.** **The Department must ensure that sergeants actively and recurrently mentor deputy personnel and enforcement of the policy prohibiting Deputy Gangs and Deputy Cliques.**

For sergeants to succeed in conducting the policy prohibiting Deputy Gangs and Deputy Cliques they must be supported by the chain of command. The persistence of these groups is due in part to sergeants perceiving that higher ranking officers will not

59

support them. With that perception, much of the incentive for a sergeant to actively seek to eliminate such groups is removed. Creation and systematic use of a data base tracking the date, time, setting, duration, topics covered, personnel in attendance, and identity of mentor will allow assurance that the policy of the Sheriff is reenforced by those closest to the deputies who might consider participation in a Deputy Gang or Deputy Clique.

9.    **The Sheriff should flatten the chain of command by eliminating at least one layer of supervision between him and the captains running patrol stations.**

As noted earlier in this Report, the Department's decentralized station- based structure has played a significant role in fostering Deputy Gangs and Deputy Clique. Deputies' loyalties are extended to the station rather than to the institution of the Department as a whole.

Despite some Sheriffs' prior efforts to eradicate Deputy Gangs and Deputy Cliques some patrol station captains where these groups have flourished have found it easier to do nothing than take them on. The COC interviewed several captains of stations with widely known, active Deputy Gangs or Deputy Cliques who professed to know nothing about them despite extensive media coverage of scandals and widespread awareness of deputies of their presence.  Because of the relative ease of the "do nothing" choice, information has not consistently flowed up to Commanders, Chiefs, and Assistant Sheriffs. That must change. Shortening the chain of command will assist the Sheriff in seeing that his policies will be enforced.

Currently, there are six layers of reporting from a Captain of a Patrol Station to the Sheriff (Captain to a Commander to a Chief to an Assistant Sheriff to the Undersheriff to the Sheriff). This top-heavy structure has led to a level of autonomy at

60

certain patrol stations that has contributed to the continuation of these groups. Some have equated patrol stations to functioning more like fiefdoms than integral parts of a command structure where policy is implemented throughout the Department.

This level of autonomy would be ameliorated by a shorter chain of command which the Sheriff could accomplish in a number of ways. At a minimum, the Assistant Sheriff for Patrol Operations should be a direct report to the Sheriff.

**10.    The prohibition against joining or participating in Deputy Gangs or Cliques should be a condition of employment.**

Once the Sheriff adopts Recommendation No. 2, above, non-participation in Deputy Gangs or Deputy Cliques should be an express condition of employment. Such a condition will make clear from inception what will not be tolerated by the Department.

## VI.    CONCLUSION

Special Counsel respectfully urges the COC to consider the factual findings and recommendations in this report and to deliver the report to Sheriff Luna for his consideration.

There can be no doubt that Deputy Gangs and Deputy Cliques have been, and still are, responsible for undermining discipline, morale, and safety of the public and Department personnel. Deputy Gangs and Deputy Cliques, as the seed from which Deputy Gangs grow, must be eliminated. Sheriff Luna has an opportunity to set the Department on the right path in the best interests of the Department and the community. Special Counsel recommends that the COC adopt the Report and Recommendations and deliver it to the Sheriff.